# EXHIBIT A

# ADS FOR NEXIUM

## COMMENTARY ON TWO SURVEYS BY TOM DUPONT
## AS PART OF
## A DISCUSSION OF PUBLIC UNDERSTANDING OF
## WHAT THE ADS COMMUNICATE

A REPORT PREPARED FOR
KRAMER LEVIN ET AL

MAY 2005

RL ASSOCIATES

601 EWING STREET SUITE A-11
PRINCETON, NEW JERSEY 08540
(609) 683-9200
(609) 683-0855 FAX

TABLE OF CONTENTS

I  OVERVIEW
    BACKGROUND    1
    ABOUT THIS REPORT    2

II  THE UNDERLYING ISSUES
    THE NATURE OF ACID REFLUX    3
    THE SURVEY PROBLEM    5

III  INTERPRETING DUPONT'S TV SURVEY
    DUPONT'S KEY ASSUMPTIONS IN THE TV SURVEY    7
    AN APPROPRIATE SURVEY DESIGN    8

IV  DUPONT'S TV SURVEY QUA SURVEY
    INTRODUCTION    10
    METHODOLOGY    10
    UNIVERSE AND SAMPLE    11
    IMPLEMENTATION    12

V  DUPONT'S INTRNET SURVEY    17

VI  DUPONT'S INTRNET SURVEY QUA SURVEY
    INTRODUCTION    19
    CORRECTIONS TO TABLE 4    19
    CLOSED END AND OPEN END QUESTIONS    19
    ANALYSIS - THE OPEN ENDED QUESTION    20
    ANALYSIS – THE CLOSED ENDED QUESTION    21
    CONCLUSION    22

VII  PERSONNEL AND REMUNERATION

    APPENDIX A – RESUME OF MICHAEL RAPPEPORT

## I – OVERVIEW

Background

We have prepared this commentary with the understanding that Nexium is a prescription drug, made by AstraZeneca, and indicated for the treatment of acid reflux disease and heartburn and the corollary healing of erosive esophagitis. We have also been told that Prevacid is a competing drug for the same indications. It is our understanding that there is clinical evidence comparing Nexium to Prevacid that demonstrates Nexium is better than Prevacid at "healing damage to the esophagus", at least with respect to patients with moderate to severe damage.[1]  Presumably predicated on this clinical evidence, Nexium has been running television commercials, which make the claim "Nexium heals acid related damage to the esophagus better... in patients with moderate to severe damage."

TAP Pharmaceuticals (TAP), makers of Prevacid, has claimed that consumers will be misled by the commercials. As part of their case, TAP through its attorneys Patterson, Belknap, Webb and Tyler, commissioned two surveys from Dr. Thomas Dupont of D2 research (the Dupont TV survey, and the Dupont Internet survey).[2]  The objective of the Dupont TV survey was:[3]

> "TAP Pharmaceuticals are concerned that the commercial also communicates to consumers a false message that Nexium is superior to other Rx products, including Prevacid, at relieving the symptoms of acid reflux disease, such as heartburn. Accordingly a consumer perception study was conducted to determine what the commercial communicates to consumers and specifically whether or not it communicates a message of superior relief of the symptoms of acid reflux disease."

The objective of the Dupont Internet Survey was:[4]
> "TAP Pharmaceuticals are concerned that consumers do not understand that Nexium's healing superiority is limited to patients with moderate to severe damage... Accordingly, a consumer perception study was conducted to determine what the ad communicates to consumers, and specifically whether or not consumers understood that Nexium's claim of superiority in healing acid related damage to the esophagus applied only to the minority of patients with moderate to severe damage."

---

[1] Everything in this report is predicated on the accuracy of this understanding.
[2] The title of the Dupont TV report is "Consumer Perception Test of Nexium 'Man Talks About Better': 45", and the title of the Dupont Internet Survey is "Consumer Perception Test of Nexium Internet Ad".
[3] Dupont TV Survey – page 2.
[4] Dupont Internet Survey – page 2.

<u>About This Report</u>

Kramer Levin et al, counsel for AstraZeneca, asked R L Associates to comment on the two Dupont surveys. This report contains that commentary. In the course of developing our comments on the surveys, we became convinced that the problems underlying the meaning of the surveys were deeper and more complex than the technical problems we had with the surveys themselves. For that reason, this report is in five parts.

- A discussion of what we believe to be the underlying issues in this case.
- A discussion of the Dupont TV survey in the light of what we understand to be the underlying issues in this case. In this part of the discussion, we are concerned with both how the design of the Dupont TV survey treats what we perceive as the issues, and what the actual data from the Dupont TV survey has to say about those issues.
- A discussion of the Dupont TV survey qua survey. Here we are concerned with the usual subjects in a critique of a survey - e.g. the sample and the various parts of the questionnaire.
- A discussion of the assumption underlying the Dupont Internet and why we believe that assumption is unsupported, and quite likely incorrect.
- A discussion of the Dupont Internet survey qua survey.

## II – THE UNDERLYING ISSUES

<u>The Nature of Acid Reflux</u>

Acid reflux is a condition in which acidic stomach liquids flow back into the esophagus. Heartburn is a burning sensation in the chest caused by this flow of acid into the esophagus. Erosive esophagitis is the wearing away or eroding of the lining of the esophagus resulting over time from the flow of acid from the stomach back into the esophagus. Acid reflux disease, which as we understand it, is synonymous with the medical diagnosis known as gastroesophageal reflux disease, is the disease manifestation related to the occurrence of acid reflux leading to generation of heartburn symptoms on a frequent and persistent basis, usually at least twice a week for at least three months, and/or leading to the development of complications such as erosive esophagitis.

Thus, we get the following four definitions:

Acid reflux is a <u>condition</u> – the backup of acid from the stomach into the esophagus.

Heartburn is a <u>symptom</u> of acid reflux – the burning sensation occurring from acid reflux.

Erosive esophagitis is a <u>complication</u> of acid reflux disease – the separate medical condition, resulting from frequent and persistent acid reflux, which can lead to the wearing away of the lining of the esophagus.

Acid reflux disease is a <u>medical diagnosis</u> that reflects the frequency and persistency of the prototypical symptom resulting from acid reflux – if you get acid reflux (heartburn) often enough for a long enough period (i.e. 2x a week for 3 months) you have gone from having heartburn to having acid reflux disease. Acid reflux disease can also be diagnosed if a medical procedure has been performed that identifies complications such as erosive esophagitis or other reflux-related damage to the esophagus.

Looked at from this perspective, the data from the Dupont survey confirms that many consumers (indeed we would say the overwhelming majority) are unaware of these distinctions, let alone understand their implications. We found similar results in our own qualitative research. Indeed, we believe that many people do not understand even the basic idea that while the condition starts with acid in the stomach, any pain (heartburn) comes because some of that acid refluxes ("backs up") into the esophagus.

We want to emphasize as strongly as we can that this is not a criticism of the "stupid consumer". In a world full of commercials on how to reduce heartburn by eliminating (or reducing) stomach acid (e.g. everything from Tums to Tagamet), surely it is reasonable for viewers to think that heartburn has something to do with something actually happening in the stomach. And of course it does. The stomach does indeed generate the acid. But if the acid doesn't flow back into the esophagus, there is no pain. Given the emphasis on stomach acid, it is no surprise that as far as we can tell the vast majority of Americans are at most vaguely aware that pain and/or damage occurs only from acid reflux into the esophagus.

We come now to what we consider the real issue in this case.

If a typical consumer knew and understood the four definitions given above,

And if they also knew that one medicine did a better job than another medicine at healing the complication of acid reflux called erosive esophagitis,

And if they also knew that because of the complexity of the scientific measurements involved, there was at this point simply no evidence as to which product, if either, actually did a better job of reducing the amount of acid refluxed into the esophagus,

Would they believe that Nexium is better than Prevacid for "acid reflux disease"?

That is, regardless of the lack of specific test evidence, is doing a better job at healing one of the principal complications arising from acid reflux disease TANTAMOUNT IN THE MIND OF THE CONSUMER to doing a better job in some sense at treating acid reflux disease? In other words, are consumers who see this commercial, and interpret it to have something to say about relative efficacy with regard to acid reflux disease, doing so

a) because they are being misled by the commercial, or

b) because the commercial is presenting an abridged account of facts, which if they were known in their entirety would still lead them (the consumer not the experts) to the same conclusion?

## The Survey Problem

A classic survey research problem is to find a way to understand how respondents understand the questions, and what the respondents meant by their answers. On its face the process appears straight-forward. The researcher asks a question. The respondent gives an answer. The researcher has to interpret that answer. The easiest, indeed the natural, interpretation by the researcher is that what the respondent meant by their answer is what the researcher would have meant if she or he had given the same answer. **But is that what the respondent meant?**

To clarify the problem in this case, consider the following hypothetical.

The researcher asks

"What did the commercial tell you about what Nexium was better at doing?"

The respondent answers,

"Treating acid reflux disease"

The researcher interprets,

I know there is no clinical evidence Nexium is better at reducing the frequency or severity of acid reflux, and therefore by <u>my</u> (i.e. the researcher's) <u>definition</u> of "better at treating acid reflux disease", this respondent is being misled.

The respondent meant,

What the commercial told me was that Nexium does a better job of healing a condition caused by acid reflux disease (i.e. erosive esophagitis). Because Nexium is better at healing a complication caused by acid reflux disease, <u>by my definition</u> Nexium does a better job of treating that disease. That is, whether or not I know that there is no clinical evidence Nexium is better at reducing the frequency or severity of acid reflux, I would still say that, <u>by my definition of better</u>, Nexium does a better job of treating acid reflux disease.

Clearly, to the degree this hypothetical represents the reality of a respondent's perception, the researcher is **mis**interpreting that respondent's answer. We believe that for a majority of consumers, the respondent's position in the hypothetical is a more reasonable interpretation of what is meant then is the researcher's position in the hypothetical. That

is, we think most consumers would say that even if they knew there is no clinical evidence Nexium is better at reducing the frequency or severity of acid reflux, because it heals a complication of acid reflux better <u>by their</u> (the respondent's) <u>definition of better</u> (i.e. Nexium does a better job of treating acid reflux disease). Indeed, we believe that it is simply ordinary common sense to feel that if I heal a result (complication) of a disease, I am in some sense treating that disease. If I have a head cold, and it is causing my throat to be sore, if I heal the sore throat, surely most people would say I have "treated" the head cold. A key difference here is between treating and curing. I may not have "cured" the cold, but surely the vast majority of people would agree I have treated it in some useful way.

But even if one disagreed and thought that in the hypothetical the researcher's definition was the most likely description of what respondents' meant, as long as there is some reasonable chance that respondent's definition (as given in the hypothetical) applies, the researcher has not successfully carried out his or her task (which is to be able to say with some <u>assurance</u> how respondents, not researchers, interpret the survey questions). Accordingly, since there is certainly a reasonable chance that the respondent's definition in the hypothetical reflects reality, the survey becomes essentially valueless as evidence that the commercial misleads.

## III – INTERPRETING DUPONT'S TV SURVEY

Dupont's Key Assumptions in the TV Survey

As part of his discussion of controls, Dupont makes reasonably explicit his basic assumption about how consumers' understand the meaning of the word "better" when it is used in discussing the complex of acid reflux disease/heartburn/erosive esophagitis. Talking about why he believes a "control" is unnecessary, Dupont says:[5]

"The issue here is not whether the commercial said Nexium is better – it is what the commercial said Nexium is better at doing. That analysis does not require a control commercial – just an analysis of what consumers said Nexium was better at doing."

From Dupont's perspective all that matters is, "What do consumers perceive the commercial to be saying about what Nexium is better at doing?" Thus, Dupont implicitly assumes that, from the consumers' viewpoint, being better at treating acid reflux disease and/or heartburn is distinct from being better at healing erosive esophagitis. To say this another way, Dupont's key assumption is that (knowing all the facts) consumers would not interpret "better at healing erosive esophagitis" as "better at healing a complication of acid reflux disease, and therefore better at treating acid reflux disease."

In short, from a survey perspective this whole case comes down to deciding which of the following two definitions of better reflects consumer understanding

Dupont's definition – Being better at healing erosive esophagitis says nothing about being better at treating acid reflux disease.

Alternative definition (which we think is what most consumers believe) – Since erosive esophagitis is a complication of acid reflux disease, Nexium being better at healing erosive esophagitis **means** (is equivalent to) Nexium is better at treating acid reflux disease.

---

[5] Dupont TV Survey – page 4.

## An Appropriate Survey Design

a) Questionnaire

If one accepts that the underlying issue for which a survey can produce evidence comes down to whether Dupont's definition or the alternative definition better describes what consumers believe, then it follows that the goals of Dupont's survey should be to ascertain:

a)  Which of these two definitions reflects consumer understanding of the value of Nexium? In other words, if they knew all the facts, what definition of "better" would they use?

b)  If consumers do understand the definition of "better" to be the alternative definition, where does that understanding come from? That is, does the consumer have a preconception that "better" for prescription drugs is defined by the alternative definition above, or is it only because of the commercial that they adopt the alternative definition?

Dupont implicitly assumes that if they knew all the facts consumers would adopt his definition of better. As a result his survey is not designed to address what we consider the main issues that we think a survey must address in this case. First, his questionnaire provides no mechanism whatsoever to distinguish between which of these two alternative definitions of the word "better" each respondent is using.[6] As a result it is essentially impossible to interpret what each respondent meant by his or her answers. Thus, in our view, Dupont's survey questionnaire provides essentially no evidence relevant to the key survey issues in this case.

---

[6] Moreover as we will see in the next section, Dupont's screen questionnaire actually makes it harder than necessary to distinguish between the two possible definitions of "better".

Second, the same logic applies to Dupont's choice of a control. If the questionnaire should have been designed to distinguish which of the two definitions introduced above is used by consumers (Dupont's or the alternative), then the control should have been designed to provide data to test where that definition comes from. That is, data is needed on whether consumers use the alternative definition because that is their preconception of how to define "better" for prescription drugs, or instead consumers only use the alternative definition because of what was said in the commercial? Obviously, since Dupont assumed that consumers use his definition and not the alternative, the control wasn't designed to investigate where those consumers who use the alternative definition get their definition. Thus, in our view, <u>Dupont's control stimulus also provides essentially no evidence relevant to the key survey issues in this case.</u>

## IV – DUPONT'S TV SURVEY QUA SURVEY

Introduction

We turn now from a global view of the survey design to concentrate on the specifics of the TV survey design and implementation. That is, for the purposes of this section, we treat Dupont's questionnaire and controls as if they were in fact relevant to the issues in this case, and in that light critique the detailed survey design and implementation.

Our critique deals with three major aspects of any survey.

1. Methodology – We concur in the appropriateness of the use of mall intercept interviews, but have a question about the choice of malls.

2. Universe and Sample - We have both some general criticisms, and one specific significant criticism, about the actual sample frame as defined by the screen questionnaire.

3. Implementation – We have two problems with the implementation of the survey. We discuss first what we perceive as a serious problem with the interviewing in one of the locations used for the control stimulus, and a less serious problem with another location. We then turn to the editing used in creating the control commercial, and discuss how the combined impact of the problems in interviewing and the editing of the control commercial lead to a completely different understanding of the data.

Methodology

Dupont's general approach is mall intercept interviews. We agree that this is an appropriate approach for this survey.

Ten malls were used for each of the test and control samples. For reasons we do not understand these two sets of malls were not geographically distributed in the same way. To be specific:

- In the test cell one mall was used in each of eight of the nine census areas, along with two locations (Chicago and Detroit) in the East North Central area,

- In the control cell one mall was used in each of six of the nine census areas; two malls were used in each of the Pacific Coast and South Atlantic regions, while there was no mall used in the New England region.

While it is hard to know just how much difference not matching the two samples makes, it surely is inconsistent with the whole idea of geographically dispersed samples, and thus in our view reduces to some unknown degree the evidentiary value of the survey.


Universe and Sample

Dupont defined his universe as, "men and women age 25 or over who either have taken a prescription medicine to treat heartburn or acid reflux disease in the past six months, or intend to in the next six months."[7] Our understanding of the standard for the proper universe in a survey of this type is past and/or potential users of the product. We agree that Dupont's definition meets this standard. However, we have problems with how he defined a sampling frame to concretize his definition.


The sampling frame was defined in practice by a screening questionnaire that consisted of eight questions. Four of these questions are commonly used in surveys. Three of these questions screened out people under 25 and/or people who need glasses to read or watch TV and didn't have their glasses with them. We have no problem with these questions. A fourth screen question was designed to screen out people with specific forms of employment. In our opinion, it is problematic to screen out people "employed in the health care field." As we understand it, the law is about whether a significant proportion of users (past and/or potential) are misled by the commercial. Given this exclusion Dupont actually measures (and his results are only indicative of) the proportion of people who don't work in health care. Given that about 14% of the U.S. economy is health care, this constitutes a significant percentage of people excluded from the sample, which may well bias the overall results.


The remaining four screen questions were designed to produce a sample in conformity with Dupont's definition of the proper universe. While we agree with the general idea of

---

[7] Dupont TV survey – page 2.

using screen questions to structure the sampling frame, we have a serious problem with how it was done in this case. The questions were designed to limit the sample to people who either have taken a prescription medicine to treat heartburn or acid reflux disease in the past six months, or intend to in the next six months. While this is in keeping with the definition of the universe, unfortunately it accomplishes this in a way that in our opinion seriously biases the results of the survey. To be specific, every respondent is explicitly asked about heartburn or acid reflux disease <u>not once but between 2 and 4 times</u>, while erosive esophagitis is never mentioned. By the time respondents have gone through the screen, these multiple mentions of heartburn or acid reflux disease have surely created a very substantial likelihood that <u>the respondent will think the survey is about heartburn or acid reflux disease</u>, and will then answer the actual survey questions using this frame of reference. We note that the effect on respondents' perceptions of this repeated mention of acid reflux and heartburn may vary with the emphasis on these same words in the commercial each respondent sees.

Dupont's analysis revolves around measuring how often a respondent says the commercial talked about treating heartburn and/or acid reflux. In that light it is clear that prepping the respondent to think that the survey is about heartburn or acid reflux disease constitutes an obvious and serious bias, and we believe that even if there were nothing else wrong with Dupont's survey, this likely bias makes useful analysis very difficult, if not impossible.

<u>Implementation</u>

a) Interviewing - The general implementation of the survey followed "standard" procedures, and we have no criticism of it. However, we have serious problems with how the interviewing was conducted in one of the nine control cities (Kansas City).[8]

---

[8] We also see less significant, but still real, problems with the interviewing in a second control city, (Cincinnati). In the validation process, five of the 24 interviews conducted in Cincinnati resulted in "no such person". The average number of "no such person" validation failures in the other 19 location was about one and a half, and no other location had more than three "no such person" responses in the validation callbacks. Moreover, when we examined the interviews themselves, we found some patterns of responses that we did not see at other locations. For example, in successive interviews, we found:

• 1208 - The little purple pill that helps control heartburn and heals esophagus damage.

• 1209 – The purple pill that heals esophagus damage

Dupont's validation of the interviews (including the Kansas City interviews) followed the conventional practice of calling back respondents to see if they had actually been interviewed. This validation procedure does seem to indicate that the Kansas City interviews were in fact done.

However, call back type validation can offer only limited insight as to whether the Kansas City interviews were done correctly. For this we need to turn to the interviews themselves. When we do so we discover a pattern of responses in Kansas City that is not only completely out of line with all of the other control stimulus interviews, but by itself severely distorts the results of the control survey. This pattern shows both in the overall results, and in the details.

- Overall in Kansas City, just 3 of the 24 respondents (12%) said anything about treatment, relief or healing of acid reflux disease, heartburn or stomach problems.[9] In the nine other control stimulus locations, on average of almost 75%, and in no case less than 62%, of the respondents gave answers in this category.

- On the open ended questions an average of eight respondents (or about 33%) in the other nine control stimulus locations said something about the relief or healing of heartburn, but in Kansas City just two of the 24 respondents (8%) said anything at all about heartburn.

- In Kansas City, seven respondents used one or both of the words erosive or erosion. In the other nine control stimulus interviewing locations combined a total of nine respondents (an average of just one per location) used either of those words

---

- 1210 – The little purple pill that helps heal esophagus damage.

[9] This category does not include heals damage from acid reflux disease without mention of where the damage occurs,

b) Interpretation of the Data

In his conclusions[10], Dupont relies totally on his interpretation of the open questions. Indeed he explicitly rejects assigning any value to the closed end question (Q.6).[11]  In essence his reason for rejecting the closed question is that it yields results that are significantly different from those obtained from the open ended questions.  We disagree strongly, both because if anything we think the closed end question is clearer and more directed to the issues in the case, and because as we will see below the open ended results properly understood are actually quite similar to the closed end question results.

Summarizing his results,[12] Dupont finds that the net unduplicated mentions to the three open questions show that 72% of the test sample and only 47% of the control sample give answers he codes into the critical category, relieves/treats/heals/cures symptoms better/ best.  To understand why we feel strongly that this analysis is incorrect, we need to examine three separate aspects of his results.

1.  While the data purports to be unduplicated responses to three questions (Dupont questions 1, 2 and 5), the analysis in truth reflects almost solely Question 5. Specifically, the number of respondents answering in the critical category are shown by the following table

Table I
Relieves/treats/heals/cures symptoms better/ best.

|                       | Test Sample | Control Sample |
| --------------------- | ----------- | -------------- |
| Unduplicated Q1/2/5   | 72%         | 47%            |
| Question 5 alone      | 68%         | 43%            |

Thus, Questions 1 and 2 add only the same marginal 4% to the test result and the control result, or equivalently Question 5 is the primary data.

---

[10] Dupont TV Survey Report - Page 5.
[11] Dupont TV survey – page ***
[12] Dupont TV Survey – page 19 Table 7

2. Second, Kansas City distorts the results

Table II
Relieves/treats/heals/cures symptoms better/ best.

|  | Test Sample | Control Sample | Control Without KC |
|---|---|---|---|
| Unduplicated Q1/2/5 | 72% | 47% | 52% |
| Question 5 alone | 68% | 43% | 47% |

Thus, just removing the suspect interviews in Kansas City reduces the net difference in mentions of Q1/2/5 from 25% (72-47) to 20% (72-52).

3. Finally, Dupont asks Question 5, (which as we discussed in point 1 above, is overwhelmingly the primary data) ONLY of those individuals who answered yes to both Questions 3 and 4 (3 - Do you recall the commercial saying Nexium was better? and 4 - Did the commercial tell you what Nexium was better at?). In theory this makes sense, since respondents who do not see the commercial as comparative obviously cannot reasonably discuss what is being compared. The problem is that in practice this led to slightly over twice as many respondents in the control sample not qualifying for Question 5 as in the test sample.

We believe this was not an accident, but rather occurred because of a dramatic, albeit probably inadvertent, difference between the test commercial and the control commercial. In the test commercial, the word better is said eight separate times, often with emphasis, and provides a clear indication that the commercial is meant to be comparative. In the control commercial the word better is said only three times, and only once with a clear indication that the commercial is comparative. All our experience strongly argues that it was this change that led to the differences in people's perceptions of the comparative nature of the two commercials. But this change in the emphasis on better has nothing whatever to do with any claim made by TAP. To the contrary, any difference in the results for the test and control commercials that stem from a change in the use of better in the commercial that lead to changes in respondent perceptions of the comparative nature of the commercial are clearly unrelated to this case, and therefore need to be removed

from the analysis. The obvious way to do this is to percentage the results of Question 5 on the base of people asked the question, which we do in Table III.

Table III
Relieves/treats/heals/cures symptoms better/ best.

|  | Test Sample | Control Sample | Control Without KC |
|---|---|---|---|
| Unduplicated Q1/2/5 | 72% | 47% | 52% |
| Question 5 alone | 68% | 43% | 47% |
| Question 5 percentaged on those asked Question 5 | 79% | 60% | 66% |

Thus, simply repercentaging to take account of the fact that the changes in the control commercial changed the proportion of respondents seeing the commercial as comparative reduces the net difference in mentions in Q5 from 21% (68-47) to 13% (79-66).

This difference of 13% is consistent with the differences Dupont found in the closed Question 6, which gave respondents three options as to what the commercial communicates. Those results shown in an appendix to Dupont's TV Survey Report (Table 11, page 25) are that 78% of those who saw the test stimulus and 69% of those who saw the control stimulus thought the ad communicated that Nexium is better than Prevacid at relieving the symptoms of acid reflux such as heartburn.[13]

Averaging the two approaches, Dupont's data itself gives a survey estimate of only about 10-12% of the respondents perceiving the kind of differences between the test and control commercials that can by any standard be claimed as relevant to the issues in this case (i.e. differences other than whether the test commercial is comparative and the control commercial is not comparative). Thus, even if we consider Dupont's survey as actually measuring what is actually at issue, (and as we discussed at length above, we definitely do not), properly interpreted his results fall in the range courts have always in our experience held to be non-actionable as false advertising.

V – DUPONT'S INTERNET SURVEY

---

[13] Moreover if, as we believe they should be, the interviews in Kansas City are removed from the data base, the difference between test and control stimuli is about 8%.

We turn now to Dr. Dupont's second survey, which dealt with the display on the website. We recall that the objective of this study, as given by Dupont, is to determine "whether or not consumers understood that Nexium's claim of superiority in healing acid related damage to the esophagus applied only to the minority of patients with moderate to severe damage." Dupont's whole reason for testing this hypothesis is predicated on a critical assumption; namely that an ad (website) which was edited to remove all reference to an ability to heal moderate or severe damage

> "would no doubt be considered to be false on its face, since it does not disclose the limitations on the claim that Nexium heals acid related damage better than does Prevacid (i.e., that Nexium does only among patients with moderate to severe damage)."[14]

In a manner analogous to the discussion above about the relationship in the ordinary consumer's mind between the idea of healing the esophagus and the treatment of acid reflux disease, we think that Dupont is again making an unsupported, and in our view quite likely incorrect, assumption about how average consumers understand such distinctions. Dr. Dupont's argument assumes that people would consider the ad to be false if they knew all the facts, and in particular that Nexium is only proven to be "better" in patients with moderate to severe damage. For the time being let us assume that it is true that Nexium and Prevacid are equally effective at treating minor damage (e.g. perhaps they are both essentially totally successful at healing such minor damage).

Then we think it clear that it is far from unreasonable for a consumer who knew all the facts to take the position:

- Nexium is definitely better than Prevacid for some patients with esophageal damage (i.e. moderate and severe).
- Nexium is equal to Prevacid for the remaining patients with esophageal damage (i.e. lesser damage).

---

[14] Dupont Internet Survey – page 4. However, we understand that AstraZeneca's position is that the scientific data supports a claim that Nexium heals acid related damage better than Prevacid for the totality of patients with damage to the esophagus.

- Nexium is always at least as good and in some circumstances better, so Nexium is better overall at treating patients with damage to the esophagus.

If Nexium is in fact equally effective for minor damage and better for moderate to severe damage, is it really clear that most members of the consuming public will think it is false to state that Nexium is better overall? We do not believe the answer to this question to be obvious. Consequently, for a study of the website ad to be useful we believe it must provide direct evidence on this underlying aspect of consumer perceptions.

But, not surprisingly given his assumption that the website would be false on its face, Dr. Dupont's survey design simply pays no attention to this possibility. We are again in a situation where the result of Dr. Dupont making a critical (and in our view quite likely incorrect) assumption about how consumers perceive a reasonably complex situation, is that his basic survey design does not even deal with, and therefore cannot conceivably throw any light on, the underlying issue.

## VI – DUPONT'S INTERNET SURVEY QUA SURVEY

Introduction

Once again we turn from a global view of the survey design to concentrate on the specifics of the Internet Survey design and implementation. That is, just as we did above in Section IV for the TV Survey, for the purposes of this section, we treat Dupont's Internet survey as if it was in fact relevant to the issues in this case, and in that light we critique the detailed survey design and implementation.

Correction to Table 4

We begin with a correction to the Internet Report. Table 4 on page 13 of the Internet report presents data on the closed question (Q.7). In this question respondents were asked to choose between two possible groups of people for whom Nexium will heal acid related damage better than the other leading medicine (all people with damage to the esophagus vs only people with moderate or severe damage).

As reported by Dupont, Table 4 is incorrect. That is clear from the fact that, in a situation where there were no multiple responses, each column adds to significantly more than 100%. A corrected version of Table 4 is as follows:

### TABLE 4 CORRECTED

|  | TEST AD % | EDITED AD % |
|---|---|---|
| All People | 43 | 42 |
| Only moderate or severe damage | 39 | 38 |
| Don't Know | 9 | 10 |
| Not Asked | 9 | 10 |

Closed End and Open End Questions

We turn now to our understanding of the proper analysis of the Internet Survey data. In analyzing the Internet Survey data, Dr. Dupont has chosen to reverse the procedure he followed in the TV Survey. Where there he treated the closed question data as irrelevant, and essentially discussed only the open questions, here he emphasizes the results of the

closed end question, and plays down the results from the open ended questions. We would like to make clear that it is not whether there is any inconsistency between these two approaches that concerns us. Different surveys are designed to deal with different issues, so the approach of each survey (including the analysis approach) should be evaluated on its own merits, not whether on the surface it seems to conform or not conform to procedures followed in some other survey. What does concern us is that we think that in the analysis of the Internet Survey, Dr. Dupont should have placed at least equal emphasis on the open ended questions.

<u>Analysis of the Survey Data</u> – <u>The Open Ended Questions</u>

By their nature, open ended questions of the type used in this survey do not provide a respondent with any guide as to what is of interest. Consequently it is unsurprising that experience shows that responses to such open-ends will generally be limited in their scope and frequently will also be quite imprecise. This raises two problems in relying on the results of open ended questions.

First, many respondents may simply not talk about the issue of primary interest to the analyst. That is particularly likely to be the case in this survey since experience shows that whether or not they perceive the claim as limited to moderate and severe damage, respondents are liable to concentrate on what they perceive as the overall message (e.g. Nexium is superior), and omit mention of the details (moderate or severe damage).

The second problem inherent in open ended questions is potential problems in coding of the responses into categories. In many situations how to code each individual is to a degree subjective and arguable. For instance, in our opinion Dupont's overall net coding in the TV Survey is subject to considerable dispute. However, the code categories of greater interest in the Dupont Internet Survey are basically counts of whether a respondent did or did not mention moderate and severe damage, and thus are inherently more straight-forward and reliable.

So in the Dupont Internet Survey there is both a high likelihood of incomplete answers (i.e. of some people who perceive the limitation to moderate or severe damage not saying so in response to open ended questions), and a high likelihood of substantial reliability in those people who are coded as mentioning moderate and severe damage.  In other words, the responses to open ended questions in the Dupont Internet Survey provide a <u>lower bound</u> on the proportion of consumers perceiving AstraZeneca's claim on the website to be limited to Nexium being superior in the healing of moderate and severe damage.  Thus the results of the survey

- When respondents who saw the test stimulus, more than 11% mentioned moderate to severe damage.

  When respondents saw the control stimulus, just one person mentioned moderate to severe damage.[15]

provide a lower bound of at least 11% of the respondents who understood the claim to deal primarily with moderate and severe damage.


<u>Analysis of the Survey Data – The Closed End Question</u>

But if 11% is a lower bound on the proportion of respondents who perceived a limitation to moderate and severe damage, how then to explain the fact that in answer to the closed Question 7 there was no difference at all between the two cells (i.e. those who saw the test stimulus and those who saw the control stimulus)?[16]  Whatever is true of the test cell, because the edited (control) website they saw does not mention moderate or severe damage, the 38% who said the edited version dealt with moderate to severe damage could not have based that result on the website they saw.  Although we believe that it is not possible to determine the actual cause (or combination of causes) without further work, we can see several possible answers to this question.  For instance, two possible explanations each of which almost certainly accounts for some (but based only on this data, unknown) portion of the results are:

---

[15] This almost total lack of "noise" is one indication of how straight-forward the coding is.
[16] See corrected Table 4 above.

1.  The results of the closed question were biased by the mind set created by the wording of the previous open ended question(s). In particular, Question 3[17] can easily be understood to say that the ad refers to general damage. Specifically, even someone who was aware of the discussion in the ad of efficacy with respect to moderate and severe damage might easily conclude from the previous questions that the ad also was about efficacy in healing acid related damage in general.

2.  The closed-end results are basically a reflection of preconceptions that respondents brought to the survey. For instance, some fraction of the 38% who at this point in the survey responded that the edited (control) website dealt with moderate to severe damage were simply playing back their preconceptions. Given that the advertisements dealt with in the TV survey have been running intensively for some time, this is completely feasible. From this perspective, the eleven percent of respondents to the test stimulus who said in the closed ended questions that the website dealt with moderate to severe damage may have been sensitized to the importance of this message by their previous experience with the ads, which would account for the level of detail they provided in their answers to the open ended questions.

Conclusion

We conclude that the open ended questions demonstrate that a significant proportion of consumers will perceive the website as conveying as a primary message that Nexium is better (than Prevacid) at healing moderate to severe damage, but that beyond that essentially no conclusion can be drawn from the Dupont survey as to how people understand the material on the web page.

---

[17] Question 3 reads, "Do you recall the ad saying that Nexium heals acid related damage better than the other leading medicine?"

23

## VII – PERSONNEL AND REMUNERATION

Dr. Michael Rappeport was responsible for all aspects of this project. His resume is attached as Appendix A. R L Associates will receive $61,200 for all aspects of the work described in this report.

*Michael Rappeport*
*May 12, 2005*

APPENDIX A

DR. MICHAEL RAPPEPORT

Dr. Rappeport has worked in market and survey research areas for more than 35 years, the last 27 as a partner of R L Associates. As part of his function he has made more than 200 appearances as an expert witness in legal cases at trial and/or through deposition. His testimony has dealt with statistics and statistical analysis, marketing, and public opinion in cases in such disparate areas as trademark infringement, libel, damages for failure to fulfill a contract, and reapportionment. He has also testified as an expert in a number of quasi-legal proceedings before a range of public boards, agencies and regulatory bodies.

## Education

B.S. Physics, RPI, Troy, New York 1957

M.S. Electrical Engineering, Yale University, New Haven 1958

PH.D. Statistics, New York University, 1968

## Professional positions

1975 - present:  Founding partner, R L Associates, survey research and consulting firm

Dr. Rappeport has had wide experience both in the direction of all kinds of surveys of human populations and as a consultant in statistical, strategy planning and survey research areas.  Two areas in which he has been particularly active are studies on public policy, and studies for use in litigation.  Along with responsibility for the management of the firm, Dr. Rappeport has direct responsibility for all statistical aspects of the firm's work.  In the main this encompasses sample design and the use of a wide variety of statistical analysis techniques.  He has designed projectable national and regional probability samples of all civilian non-institutional telephone households, and a very wide range of specialized samples of all types.

1969 - 1972; 1973 - 1975:  Vice president and chief statistician, Opinion Research Corporation, Princeton, New Jersey

1972 - 1973:  Vice president, Response Analysis Corp. Princeton, New Jersey

1959 - 1969:  Supervisor, Bell Telephone Laboratories, Holmdel, New Jersey

## Teaching

At various times, Dr. Rappeport has taught or conducted guest lectures in a number of colleges and universities. He has been an adjunct instructor in both Research Methods and Political Public Opinion at Rutgers University, and taught a course in Marketing at Rider College.

## Articles and Speeches

Over the course of the last 25 years, Dr. Rappeport has written approximately 40 published articles, and given more than 70 speeches. He has spoken at a number of meetings of legal organizations including:

Faculty member – ABA-ALI seminar on Dilution – February 2004

Participation in a 2003 panel of the Amer. Intellectual Property Law Assoc.

Participation in a 2001 panel of the Advanced Practitioners Prog of the Intl. Trademark Assoc.

A 1998 speech to the Bar for the Federal Circuit

Witness at a mock trial at the Feb. 1998 Meeting - American Bar Association Antitrust Section

A 1996 speech to the New Jersey Intellectual Property chapter of the Inns of Court.

A 1995 panel presentation for the CLE program, American Bar Assoc. - Antitrust Section.

A 1995 speech to the CLE program, American Bar Assoc. - Intellectual Property Section

Witness at a mock trial at the 1995 meeting of the American Intellectual Property Law Assoc.

Among the wide cross-section of other types of organizations where he has spoken at an annual or other major meeting are Planned Parenthood Federation of America, United States Trademark Association, Travel and Tourism Research Association, Newspaper Research Council, Pennsylvania Hospital Association, and New Jersey Political Science Association.

## Other

Dr. Rappeport is currently listed in Who's Who in the East, and several other similar publications dealing with the Legal Profession, Social Sciences and Marketing. He has served on a variety of civic and professional boards. Among those most directly related to his professional activities:

Editorial Board of the "Trademark Reporter" 1993 - 1996, 1997 - 2004

Board of Advisors - Citizens Committee on Bio-Medical Ethics 1986 - 1994

New Jersey State Bio-Ethics Task Force on Public and Professional Education - 1989- 1992

Board of Directors, American Association for Public Opinion Research, 1976 - 1980; Standards
Chairman  1979 - 1980

Cases in which Michael Rappeport has appeared either by deposition or in trial as an expert witness 2001-2005. Date shown is first appearance. Unless noted all cases listed were in United States District Courts.

2005
April Deposition – Dosatron Intl v Agri-Pro – Middle District Florida
April Testimony Deposition – Franklin Loufrani v Wal-Mart Stores – Trademark Trial and Appeal Board
March Deposition – In the Matter of Certain Ink Markers – U.S. International Trade Commission
March Deposition – Mylan v Procter & Gamble – Southern District New York
Feb Deposition – Toyota Motor Sales v Ailments Lexus – Eastern District New York

2004
August Trial – Catamount v Microsoft – District of Vermont
Feb. Deposition - Weight Watchers v Luiginos – Southern Dis NY
Feb Trial – Trettco v HDS New England – Dis. of Massachusetts

2003
Dec. Deposition - Georgia Pacific v Procter & Gamble – No. Dis. of Georgia
Dec. Deposition and Feb 2004 Trial – Trettco v HDS New England – Dis. of Massachusetts
Sept. Deposition – Winn v. Eaton – Central Dis. of California
Aug. Deposition – In the matter of certain Agricultural Vehicles – Intl. Trademark Commission
Feb. Deposition – Microsoft v Lindows.com – West. Dis. Of Washington
Jan. Deposition and Feb. Trial - Pharmacia v GlaxoSmithKline II– District of New Jersey
Jan. Trial – Ardex v Chemrex – Western District Of Pennsylvania
Jan Deposition and Feb. Trial – Inliten v Santa's Best – Southern District Ohio

2002
Dec Deposition – Pharmacia v GlaxoSmithKline – District of New Jersey
Nov. Deposition – Maui v Del Monte – Central District California
Oct. Deposition and Nov. Trial – Spotless v A&E – E.D.N.Y.
Sept. Deposition – Twentieth Century Fox v Marvel Enterprises, Tribune Entertainment – SDNY
July Deposition – Philips Oral Healthcare v Salton – Western District of Washington
June Deposition and July Trial – Scotts v United Industries – So. District Florida
June Deposition – Eurotech v Cosmos European Travel – E. D. Virginia
April Testimony and December rebuttal Deposition – QVC v Weick Family Inc. – TTAB
April Deposition – Astra Zeneca v Ferndale – Eastern District Michigan
Feb. Deposition and August 2004 trial – Catamount v Microsoft – District of Vermont
February Trial – Koala Corp v Prince Lionheart – District of Colorado
February Trial – Morelli v Tiffany – Eastern District of Pennsylvania

2001
November Deposition – J&J Snackfoods v Earthgrains – District of New Jersey
November Deposition – Nissan Motors v Nissan Computer – Central District of California
November Trial Affidavit – ABC (Ford West) v Autonation – Central District of California
October Deposition – Qwest Communications v Worldquest Networks – Eastern. District of Virginia
October Deposition and February 2002 Trial– National Distillers v Refreshment Brands – SDNY
July Deposition and Nov. Testimony – Sara Lee v Kayser-Roth – Trademark Trial & Appeal Board
May Trial – SBCH v J&J Merck – Southern District of New York
February Deposition – Isenbeck v Beck – Southern District of New York
January Deposition – Cache v M.Z. Berger – Southern District of New York

List of publications of Michael Rappeport 1992-2005

The Democratic Ethos and the Positive Sum Society – Society – July-August 2003

A Rejoinder to a Critique – The Trademark Reporter; November-December 2002

Litigation Surveys – Social Science as Evidence – The Trademark Reporter; July-August 2002

Applying Daubert; National Law Journal, January 21, 2002

When Consumer Beliefs are Based on a Court's Intuition - One More Issue Arising From Conopco (with Sandra Kornstein-Cohen): The Trademark Reporter; March-April 1997

Is Judaism Splitting Into Two religions; Sh'ma; April 1996

The Role of the Survey "Expert" - A Response to Judge Posner; The Trademark Reporter, March-April 1995

The Future of the American Jewish Community; Sh'ma; December 1994

The Patient Self Determination Act; Implementation of the Law in Nursing Homes; (co-author); Paper presented at the 122nd Annual Meeting of the American Public Health Association November, 1994

Condition Critical; (co-author); Paper presented at the 1994 Annual Meeting of the American Society of Law, Medicine and Ethics; October 1994

Statistically Based Evidence; National Law Journal, Op-ed Page; August 1993

Prognosis Good for Lower Medical Care Inflation; Wall Street Journal Op-Ed page; February, 1993

Predicting the Election - Why Clinton Will Win; The Sunday Record (Bergen County, New Jersey); August 1992.  In addition Dr. Rappeport was a columnist on a weekly basis for the Bergen Record throughout much of 1991.  Columns dealt with a wide range of statistical and public opinion issues from crime in New Jersey to the proper reporting of retail sales.