IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ASTRAZENECA LP,                          )
                                         )
                Plaintiff,               )
                                         )
        vs.                              )     C.A. No. 04-1332-KAJ
                                         )
TAP PHARMACEUTICAL PRODUCTS, INC.,       )
                                         )
                Defendant.               )

## ASTRAZENECA'S APPENDIX IN SUPPORT OF ITS OPPOSITION TO THE MOTION OF DEFENDANT TAP PHARMACEUTICAL PRODUCTS, INC. TO EXCLUDE CERTAIN TESTIMONY BY MICHAEL RAPPEPORT

<div style="margin-left:40%">

Josy W. Ingersoll (No. 1088)
*jingersoll@ycst.com*
John W. Shaw (No. 3362)
*jshaw@ycst.com*
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware  19899-0391
(302) 571-6600

Attorneys for AstraZeneca LP

</div>

Of Counsel:

Harold P. Weinberger
Jonathan M. Wagner
Kerri Ann Law
Jeremy A. Cohen
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Dated:   December 14, 2005

**AstraZeneca's Appendix in Support of Its Oppostion
to the Motion of Defendant TAP Pharmaceutical Products, Inc.
To Exclude Certain Testimony by Michael Rappeport**

**Table of Contents**

Description                                                                    Tab

Ads for Nexium, Commentary on Two Surveys
    As Part of a Discussion of Public Understanding
    Of What the Ads Communicate, May 2005 ......................................................A

Preliminary Injunction Hearing Transcript and Order,
    December 20, 2004...............................................................................................B

Deposition Testimony of Michael Rappeport,
    October 25, 2005 ..................................................................................................C

Deposition Testimony of Thomas D. Dupont,
    October 12, 2005 ..................................................................................................D

TV Survey Questionnaires 416 and 423 ................................................................E

# EXHIBIT A

# ADS FOR NEXIUM

## COMMENTARY ON TWO SURVEYS BY TOM DUPONT
## AS PART OF
## A DISCUSSION OF PUBLIC UNDERSTANDING OF
## WHAT THE ADS COMMUNICATE

A REPORT PREPARED FOR
KRAMER LEVIN ET AL

MAY 2005

## RL ASSOCIATES

601 EWING STREET SUITE A-11
PRINCETON, NEW JERSEY 08540
(609) 683-9200
(609) 683-0855 FAX

TABLE OF CONTENTS

I  OVERVIEW
    BACKGROUND                                              1
    ABOUT THIS REPORT                                       2


II  THE UNDERLYING ISSUES
    THE NATURE OF ACID REFLUX                               3
    THE SURVEY PROBLEM                                      5


III  INTERPRETING DUPONT'S TV SURVEY
    DUPONT'S KEY ASSUMPTIONS IN THE TV SURVEY              7
    AN APPROPRIATE SURVEY DESIGN                            8


IV  DUPONT'S TV SURVEY QUA SURVEY
    INTRODUCTION                                           10
    METHODOLOGY                                            10
    UNIVERSE AND SAMPLE                                    11
    IMPLEMENTATION                                         12


V  DUPONT'S INTRNET SURVEY                                 17


VI  DUPONT'S INTRNET SURVEY QUA SURVEY
    INTRODUCTION                                           19
    CORRECTIONS TO TABLE 4                                 19
    CLOSED END AND OPEN END QUESTIONS                      19
    ANALYSIS - THE OPEN ENDED QUESTION                     20
    ANALYSIS – THE CLOSED ENDED QUESTION                   21
    CONCLUSION                                             22


VII  PERSONNEL AND REMUNERATION

    APPENDIX A – RESUME OF MICHAEL RAPPEPORT

## I – OVERVIEW

Background

We have prepared this commentary with the understanding that Nexium is a prescription drug, made by AstraZeneca, and indicated for the treatment of acid reflux disease and heartburn and the corollary healing of erosive esophagitis. We have also been told that Prevacid is a competing drug for the same indications. It is our understanding that there is clinical evidence comparing Nexium to Prevacid that demonstrates Nexium is better than Prevacid at "healing damage to the esophagus", at least with respect to patients with moderate to severe damage.[1] Presumably predicated on this clinical evidence, Nexium has been running television commercials, which make the claim "Nexium heals acid related damage to the esophagus better... in patients with moderate to severe damage."

TAP Pharmaceuticals (TAP), makers of Prevacid, has claimed that consumers will be misled by the commercials. As part of their case, TAP through its attorneys Patterson, Belknap, Webb and Tyler, commissioned two surveys from Dr. Thomas Dupont of D2 research (the Dupont TV survey, and the Dupont Internet survey).[2] The objective of the Dupont TV survey was:[3]

> "TAP Pharmaceuticals are concerned that the commercial also communicates to consumers a false message that Nexium is superior to other Rx products, including Prevacid, at relieving the symptoms of acid reflux disease, such as heartburn. Accordingly a consumer perception study was conducted to determine what the commercial communicates to consumers and specifically whether or not it communicates a message of superior relief of the symptoms of acid reflux disease."

The objective of the Dupont Internet Survey was:[4]
> "TAP Pharmaceuticals are concerned that consumers do not understand that Nexium's healing superiority is limited to patients with moderate to severe damage... Accordingly, a consumer perception study was conducted to determine what the ad communicates to consumers, and specifically whether or not consumers understood that Nexium's claim of superiority in healing acid related damage to the esophagus applied only to the minority of patients with moderate to severe damage."

---

[1] Everything in this report is predicated on the accuracy of this understanding.
[2] The title of the Dupont TV report is "Consumer Perception Test of Nexium 'Man Talks About Better': 45", and the title of the Dupont Internet Survey is "Consumer Perception Test of Nexium Internet Ad".
[3] Dupont TV Survey – page 2.
[4] Dupont Internet Survey – page 2.

2

## About This Report

Kramer Levin et al, counsel for AstraZeneca, asked R L Associates to comment on the two Dupont surveys. This report contains that commentary. In the course of developing our comments on the surveys, we became convinced that the problems underlying the meaning of the surveys were deeper and more complex than the technical problems we had with the surveys themselves. For that reason, this report is in five parts.

- A discussion of what we believe to be the underlying issues in this case.
- A discussion of the Dupont TV survey in the light of what we understand to be the underlying issues in this case. In this part of the discussion, we are concerned with both how the design of the Dupont TV survey treats what we perceive as the issues, and what the actual data from the Dupont TV survey has to say about those issues.
- A discussion of the Dupont TV survey qua survey. Here we are concerned with the usual subjects in a critique of a survey - e.g. the sample and the various parts of the questionnaire.
- A discussion of the assumption underlying the Dupont Internet and why we believe that assumption is unsupported, and quite likely incorrect.
- A discussion of the Dupont Internet survey qua survey.

3

## II – THE UNDERLYING ISSUES

<u>The Nature of Acid Reflux</u>

Acid reflux is a condition in which acidic stomach liquids flow back into the esophagus. Heartburn is a burning sensation in the chest caused by this flow of acid into the esophagus. Erosive esophagitis is the wearing away or eroding of the lining of the esophagus resulting over time from the flow of acid from the stomach back into the esophagus. Acid reflux disease, which as we understand it, is synonymous with the medical diagnosis known as gastroesophageal reflux disease, is the disease manifestation related to the occurrence of acid reflux leading to generation of heartburn symptoms on a frequent and persistent basis, usually at least twice a week for at least three months, and/or leading to the development of complications such as erosive esophagitis.

Thus, we get the following four definitions:

Acid reflux is a <u>condition</u> – the backup of acid from the stomach into the esophagus.

Heartburn is a <u>symptom</u> of acid reflux – the burning sensation occurring from acid reflux.

Erosive esophagitis is a <u>complication</u> of acid reflux disease – the separate medical condition, resulting from frequent and persistent acid reflux, which can lead to the wearing away of the lining of the esophagus.

Acid reflux disease is a <u>medical diagnosis</u> that reflects the frequency and persistency of the prototypical symptom resulting from acid reflux – if you get acid reflux (heartburn) often enough for a long enough period (i.e. 2x a week for 3 months) you have gone from having heartburn to having acid reflux disease. Acid reflux disease can also be diagnosed if a medical procedure has been performed that identifies complications such as erosive esophagitis or other reflux-related damage to the esophagus.

Looked at from this perspective, the data from the Dupont survey confirms that many consumers (indeed we would say the overwhelming majority) are unaware of these distinctions, let alone understand their implications. We found similar results in our own qualitative research. Indeed, we believe that many people do not understand even the basic idea that while the condition starts with acid in the stomach, any pain (heartburn) comes because some of that acid refluxes ("backs up") into the esophagus.

4

We want to emphasize as strongly as we can that this is not a criticism of the "stupid consumer". In a world full of commercials on how to reduce heartburn by eliminating (or reducing) stomach acid (e.g. everything from Tums to Tagamet), surely it is reasonable for viewers to think that heartburn has something to do with something actually happening in the stomach. And of course it does. The stomach does indeed generate the acid. But if the acid doesn't flow back into the esophagus, there is no pain. Given the emphasis on stomach acid, it is no surprise that as far as we can tell the vast majority of Americans are at most vaguely aware that pain and/or damage occurs only from acid reflux into the esophagus.

We come now to what we consider the real issue in this case.

If a typical consumer knew and understood the four definitions given above,

And if they also knew that one medicine did a better job than another medicine at healing the complication of acid reflux called erosive esophagitis,

And if they also knew that because of the complexity of the scientific measurements involved, there was at this point simply no evidence as to which product, if either, actually did a better job of reducing the amount of acid refluxed into the esophagus,

Would they believe that Nexium is better than Prevacid for "acid reflux disease"?

That is, regardless of the lack of specific test evidence, is doing a better job at healing one of the principal complications arising from acid reflux disease TANTAMOUNT IN THE MIND OF THE CONSUMER to doing a better job in some sense at treating acid reflux disease? In other words, are consumers who see this commercial, and interpret it to have something to say about relative efficacy with regard to acid reflux disease, doing so

a) because they are being misled by the commercial, or

b) because the commercial is presenting an abridged account of facts, which if they were known in their entirety would still lead them (the consumer not the experts) to the same conclusion?

5

The Survey Problem

A classic survey research problem is to find a way to understand how respondents understand the questions, and what the respondents meant by their answers. On its face the process appears straight-forward. The researcher asks a question. The respondent gives an answer. The researcher has to interpret that answer. The easiest, indeed the natural, interpretation by the researcher is that what the respondent meant by their answer is what the researcher would have meant if she or he had given the same answer. **But is that what the respondent meant?**

To clarify the problem in this case, consider the following hypothetical.

The researcher asks

"What did the commercial tell you about what Nexium was better at doing?"

The respondent answers,

"Treating acid reflux disease"

The researcher interprets,

I know there is no clinical evidence Nexium is better at reducing the frequency or severity of acid reflux, and therefore by my (i.e. the researcher's) definition of "better at treating acid reflux disease", this respondent is being misled.

The respondent meant,

What the commercial told me was that Nexium does a better job of healing a condition caused by acid reflux disease (i.e. erosive esophagitis). Because Nexium is better at healing a complication caused by acid reflux disease, by my definition Nexium does a better job of treating that disease. That is, whether or not I know that there is no clinical evidence Nexium is better at reducing the frequency or severity of acid reflux, I would still say that, by my definition of better, Nexium does a better job of treating acid reflux disease.

Clearly, to the degree this hypothetical represents the reality of a respondent's perception, the researcher is misinterpreting that respondent's answer. We believe that for a majority of consumers, the respondent's position in the hypothetical is a more reasonable interpretation of what is meant then is the researcher's position in the hypothetical. That

6

is, we think most consumers would say that even if they knew there is no clinical evidence Nexium is better at reducing the frequency or severity of acid reflux, because it heals a complication of acid reflux better <u>by their</u> (the respondent's) <u>definition of better</u> (i.e. Nexium does a better job of treating acid reflux disease). Indeed, we believe that it is simply ordinary common sense to feel that if I heal a result (complication) of a disease, I am in some sense treating that disease. If I have a head cold, and it is causing my throat to be sore, if I heal the sore throat, surely most people would say I have "treated" the head cold. A key difference here is between treating and curing. I may not have "cured" the cold, but surely the vast majority of people would agree I have treated it in some useful way.

But even if one disagreed and thought that in the hypothetical the researcher's definition was the most likely description of what respondents' meant, as long as there is some reasonable chance that respondent's definition (as given in the hypothetical) applies, the researcher has not successfully carried out his or her task (which is to be able to say with some <u>assurance</u> how respondents, not researchers, interpret the survey questions). Accordingly, since there is certainly a reasonable chance that the respondent's definition in the hypothetical reflects reality, the survey becomes essentially valueless as evidence that the commercial misleads.

7

## III – INTERPRETING DUPONT'S TV SURVEY

Dupont's Key Assumptions in the TV Survey

As part of his discussion of controls, Dupont makes reasonably explicit his basic assumption about how consumers' understand the meaning of the word "better" when it is used in discussing the complex of acid reflux disease/heartburn/erosive esophagitis. Talking about why he believes a "control" is unnecessary, Dupont says:[5]

"The issue here is not whether the commercial said Nexium is better – it is what the commercial said Nexium is better at doing. That analysis does not require a control commercial – just an analysis of what consumers said Nexium was better at doing."

From Dupont's perspective all that matters is, "What do consumers perceive the commercial to be saying about what Nexium is better at doing?" Thus, Dupont implicitly assumes that, from the consumers' viewpoint, being better at treating acid reflux disease and/or heartburn is distinct from being better at healing erosive esophagitis. To say this another way, Dupont's key assumption is that (knowing all the facts) consumers would not interpret "better at healing erosive esophagitis" as "better at healing a complication of acid reflux disease, and therefore better at treating acid reflux disease."

In short, from a survey perspective this whole case comes down to deciding which of the following two definitions of better reflects consumer understanding

Dupont's definition – Being better at healing erosive esophagitis says nothing about being better at treating acid reflux disease.

Alternative definition (which we think is what most consumers believe) – Since erosive esophagitis is a complication of acid reflux disease, Nexium being better at healing erosive esophagitis **means** (is equivalent to) Nexium is better at treating acid reflux disease.

---

[5] Dupont TV Survey – page 4.

8

An Appropriate Survey Design

a) Questionnaire

If one accepts that the underlying issue for which a survey can produce evidence comes down to whether Dupont's definition or the alternative definition better describes what consumers believe, then it follows that the goals of Dupont's survey should be to ascertain:

a) Which of these two definitions reflects consumer understanding of the value of Nexium? In other words, if they knew all the facts, what definition of "better" would they use?

b) If consumers do understand the definition of "better" to be the alternative definition, where does that understanding come from? That is, does the consumer have a preconception that "better" for prescription drugs is defined by the alternative definition above, or is it only because of the commercial that they adopt the alternative definition?

Dupont implicitly assumes that if they knew all the facts consumers would adopt his definition of better. As a result his survey is not designed to address what we consider the main issues that we think a survey must address in this case. First, his questionnaire provides no mechanism whatsoever to distinguish between which of these two alternative definitions of the word "better" each respondent is using.[6] As a result it is essentially impossible to interpret what each respondent meant by his or her answers. Thus, in our view, Dupont's survey questionnaire provides essentially no evidence relevant to the key survey issues in this case.

---

[6] Moreover as we will see in the next section, Dupont's screen questionnaire actually makes it harder than necessary to distinguish between the two possible definitions of "better".

9

Second, the same logic applies to Dupont's choice of a control. If the questionnaire should have been designed to distinguish which of the two definitions introduced above is used by consumers (Dupont's or the alternative), then the control should have been designed to provide data to test where that definition comes from. That is, data is needed on whether consumers use the alternative definition because that is their preconception of how to define "better" for prescription drugs, or instead consumers only use the alternative definition because of what was said in the commercial? Obviously, since Dupont assumed that consumers use his definition and not the alternative, the control wasn't designed to investigate where those consumers who use the alternative definition get their definition. Thus, in our view, Dupont's control stimulus also provides essentially no evidence relevant to the key survey issues in this case.

10

## IV – DUPONT'S TV SURVEY QUA SURVEY

Introduction

We turn now from a global view of the survey design to concentrate on the specifics of the TV survey design and implementation. That is, for the purposes of this section, we treat Dupont's questionnaire and controls as if they were in fact relevant to the issues in this case, and in that light critique the detailed survey design and implementation.

Our critique deals with three major aspects of any survey.

1. Methodology – We concur in the appropriateness of the use of mall intercept interviews, but have a question about the choice of malls.

2. Universe and Sample - We have both some general criticisms, and one specific significant criticism, about the actual sample frame as defined by the screen questionnaire.

3. Implementation – We have two problems with the implementation of the survey. We discuss first what we perceive as a serious problem with the interviewing in one of the locations used for the control stimulus, and a less serious problem with another location. We then turn to the editing used in creating the control commercial, and discuss how the combined impact of the problems in interviewing and the editing of the control commercial lead to a completely different understanding of the data.

Methodology

Dupont's general approach is mall intercept interviews. We agree that this is an appropriate approach for this survey.

Ten malls were used for each of the test and control samples. For reasons we do not understand these two sets of malls were not geographically distributed in the same way. To be specific:

• In the test cell one mall was used in each of eight of the nine census areas, along with two locations (Chicago and Detroit) in the East North Central area,

11

- In the control cell one mall was used in each of six of the nine census areas; two malls were used in each of the Pacific Coast and South Atlantic regions, while there was no mall used in the New England region.

While it is hard to know just how much difference not matching the two samples makes, it surely is inconsistent with the whole idea of geographically dispersed samples, and thus in our view reduces to some unknown degree the evidentiary value of the survey.

Universe and Sample

Dupont defined his universe as, "men and women age 25 or over who either have taken a prescription medicine to treat heartburn or acid reflux disease in the past six months, or intend to in the next six months."[7]  Our understanding of the standard for the proper universe in a survey of this type is past and/or potential users of the product.  We agree that Dupont's definition meets this standard.  However, we have problems with how he defined a sampling frame to concretize his definition.

The sampling frame was defined in practice by a screening questionnaire that consisted of eight questions.  Four of these questions are commonly used in surveys.  Three of these questions screened out people under 25 and/or people who need glasses to read or watch TV and didn't have their glasses with them.  We have no problem with these questions.   A fourth screen question was designed to screen out people with specific forms of employment.  In our opinion, it is problematic to screen out people "employed in the health care field."  As we understand it, the law is about whether a significant proportion of users (past and/or potential) are misled by the commercial.  Given this exclusion Dupont actually measures (and his results are only indicative of) the proportion of people who don't work in health care. Given that about 14% of the U.S. economy is health care, this constitutes a significant percentage of people excluded from the sample, which may well bias the overall results.

The remaining four screen questions were designed to produce a sample in conformity with Dupont's definition of the proper universe.  While we agree with the general idea of

[7] Dupont TV survey -- page 2.

12

using screen questions to structure the sampling frame, we have a serious problem with how it was done in this case. The questions were designed to limit the sample to people who either have taken a prescription medicine to treat heartburn or acid reflux disease in the past six months, or intend to in the next six months. While this is in keeping with the definition of the universe, unfortunately it accomplishes this in a way that in our opinion seriously biases the results of the survey. To be specific, every respondent is explicitly asked about heartburn or acid reflux disease <u>not once but between 2 and 4 times</u>, while erosive esophagitis is never mentioned. By the time respondents have gone through the screen, these multiple mentions of heartburn or acid reflux disease have surely created a very substantial likelihood that <u>the respondent will think the survey is about heartburn or acid reflux disease</u>, and will then answer the actual survey questions using this frame of reference. We note that the effect on respondents' perceptions of this repeated mention of acid reflux and heartburn may vary with the emphasis on these same words in the commercial each respondent sees.

Dupont's analysis revolves around measuring how often a respondent says the commercial talked about treating heartburn and/or acid reflux. In that light it is clear that prepping the respondent to think that the survey is about heartburn or acid reflux disease constitutes an obvious and serious bias, and we believe that even if there were nothing else wrong with Dupont's survey, this likely bias makes useful analysis very difficult, if not impossible.

<u>Implementation</u>

a) Interviewing - The general implementation of the survey followed "standard" procedures, and we have no criticism of it. However, we have serious problems with how the interviewing was conducted in one of the nine control cities (Kansas City).[8]

---

[8] We also see less significant, but still real, problems with the interviewing in a second control city, (Cincinnati). In the validation process, five of the 24 interviews conducted in Cincinnati resulted in "no such person". The average number of "no such person" validation failures in the other 19 location was about one and a half, and no other location had more than three "no such person" responses to the validation callbacks. Moreover, when we examined the interviews themselves, we found some patterns of responses that we did not see at other locations. For example, in successive interviews, we found:

- 1208 - The little purple pill that helps control heartburn and heals esophagus damage.
- 1209 – The purple pill that heals esophagus damage

13

Dupont's validation of the interviews (including the Kansas City interviews) followed the conventional practice of calling back respondents to see if they had actually been interviewed. This validation procedure does seem to indicate that the Kansas City interviews were in fact done.

However, call back type validation can offer only limited insight as to whether the Kansas City interviews were done correctly. For this we need to turn to the interviews themselves. When we do so we discover a pattern of responses in Kansas City that is not only completely out of line with all of the other control stimulus interviews, but by itself severely distorts the results of the control survey. This pattern shows both in the overall results, and in the details.

- Overall in Kansas City, just 3 of the 24 respondents (12%) said anything about treatment, relief or healing of acid reflux disease, heartburn or stomach problems.[9] In the nine other control stimulus locations, on average of almost 75%, and in no case less than 62%, of the respondents gave answers in this category.

- On the open ended questions an average of eight respondents (or about 33%) in the other nine control stimulus locations said something about the relief or healing of heartburn, but in Kansas City just two of the 24 respondents (8%) said anything at all about heartburn.

- In Kansas City, seven respondents used one or both of the words erosive or erosion. In the other nine control stimulus interviewing locations combined a total of nine respondents (an average of just one per location) used either of those words

---

- 1210 – The little purple pill that helps heal esophagus damage.
[9] This category does not include heals damage from acid reflux disease without mention of where the damage occurs,

14

b) Interpretation of the Data

In his conclusions[10], Dupont relies totally on his interpretation of the open questions. Indeed he explicitly rejects assigning any value to the closed end question (Q.6).[11]  In essence his reason for rejecting the closed question is that it yields results that are significantly different from those obtained from the open ended questions.  We disagree strongly, both because if anything we think the closed end question is clearer and more directed to the issues in the case, and because as we will see below the open ended results properly understood are actually quite similar to the closed end question results.

Summarizing his results,[12] Dupont finds that the net unduplicated mentions to the three open questions show that 72% of the test sample and only 47% of the control sample give answers he codes into the critical category, relieves/treats/heals/cures symptoms better/ best.  To understand why we feel strongly that this analysis is incorrect, we need to examine three separate aspects of his results.

1.  While the data purports to be unduplicated responses to three questions (Dupont questions 1, 2 and 5), the analysis in truth reflects almost solely Question 5. Specifically, the number of respondents answering in the critical category are shown by the following table

Table I
Relieves/treats/heals/cures symptoms better/ best.

|  | Test Sample | Control Sample |
|---|---|---|
| Unduplicated Q1/2/5 | 72% | 47% |
| Question 5 alone | 68% | 43% |

Thus, Questions 1 and 2 add only the same marginal 4% to the test result and the control result, or equivalently Question 5 is the primary data.

---

[10] Dupont TV Survey Report - Page 5.
[11] Dupont TV survey – page ***
[12] Dupont TV Survey – page 19 Table 7

15

2. Second, Kansas City distorts the results

Table II
Relieves/treats/heals/cures symptoms better/ best.

|  | Test Sample | Control Sample | Control Without KC |
|---|---|---|---|
| Unduplicated Q1/2/5 | 72% | 47% | 52% |
| Question 5 alone | 68% | 43% | 47% |

Thus, just removing the suspect interviews in Kansas City reduces the net difference in mentions of Q1/2/5 from 25% (72-47) to 20% (72-52).

3. Finally, Dupont asks Question 5, (which as we discussed in point 1 above, is overwhelmingly the primary data) ONLY of those individuals who answered yes to both Questions 3 and 4 (3 - Do you recall the commercial saying Nexium was better? and 4 - Did the commercial tell you what Nexium was better at?). In theory this makes sense, since respondents who do not see the commercial as comparative obviously cannot reasonably discuss what is being compared. The problem is that in practice this led to slightly over twice as many respondents in the control sample not qualifying for Question 5 as in the test sample.

We believe this was not an accident, but rather occurred because of a dramatic, albeit probably inadvertent, difference between the test commercial and the control commercial. In the test commercial, the word better is said eight separate times, often with emphasis, and provides a clear indication that the commercial is meant to be comparative. In the control commercial the word better is said only three times, and only once with a clear indication that the commercial is comparative. All our experience strongly argues that it was this change that led to the differences in people's perceptions of the comparative nature of the two commercials. But this change in the emphasis on better has nothing whatever to do with any claim made by TAP. To the contrary, any difference in the results for the test and control commercials that stem from a change in the use of better in the commercial that lead to changes in respondent perceptions of the comparative nature of the commercial are clearly unrelated to this case, and therefore need to be removed

16

from the analysis. The obvious way to do this is to percentage the results of Question 5 on the base of people asked the question, which we do in Table III.

Table III
Relieves/treats/heals/cures symptoms better/ best.

|  | Test Sample | Control Sample | Control Without KC |
|---|---|---|---|
| Unduplicated Q1/2/5 | 72% | 47% | 52% |
| Question 5 alone | 68% | 43% | 47% |
| Question 5 percentaged on those asked Question 5 | 79% | 60% | 66% |

Thus, simply repercentaging to take account of the fact that the changes in the control commercial changed the proportion of respondents seeing the commercial as comparative reduces the net difference in mentions in Q5 from 21% (68-47) to 13% (79-66).

This difference of 13% is consistent with the differences Dupont found in the closed Question 6, which gave respondents three options as to what the commercial communicates. Those results shown in an appendix to Dupont's TV Survey Report (Table 11, page 25) are that 78% of those who saw the test stimulus and 69% of those who saw the control stimulus thought the ad communicated that Nexium is better than Prevacid at relieving the symptoms of acid reflux such as heartburn.[13]

Averaging the two approaches, Dupont's data itself gives a survey estimate of only about 10-12% of the respondents perceiving the kind of differences between the test and control commercials that can by any standard be claimed as relevant to the issues in this case (i.e. differences other than whether the test commercial is comparative and the control commercial is not comparative). Thus, even if we consider Dupont's survey as actually measuring what is actually at issue, (and as we discussed at length above, we definitely do not), properly interpreted his results fall in the range courts have always in our experience held to be non-actionable as false advertising.

V – DUPONT'S INTERNET SURVEY

---

[13] Moreover if, as we believe they should be, the interviews in Kansas City are removed from the data base, the difference between test and control stimuli is about 8%.

17

We turn now to Dr. Dupont's second survey, which dealt with the display on the website. We recall that the objective of this study, as given by Dupont, is to determine "whether or not consumers understood that Nexium's claim of superiority in healing acid related damage to the esophagus applied only to the minority of patients with moderate to severe damage." Dupont's whole reason for testing this hypothesis is predicated on a critical assumption; namely that an ad (website) which was edited to remove all reference to an ability to heal moderate or severe damage

"would no doubt be considered to be false on its face, since it does not disclose the limitations on the claim that Nexium heals acid related damage better than does Prevacid (i.e., that Nexium does only among patients with moderate to severe damage)."[14]

In a manner analogous to the discussion above about the relationship in the ordinary consumer's mind between the idea of healing the esophagus and the treatment of acid reflux disease, we think that Dupont is again making an unsupported, and in our view quite likely incorrect, assumption about how average consumers understand such distinctions. Dr. Dupont's argument assumes that people would consider the ad to be false if they knew all the facts, and in particular that Nexium is only proven to be "better" in patients with moderate to severe damage. For the time being let us assume that it is true that Nexium and Prevacid are equally effective at treating minor damage (e.g. perhaps they are both essentially totally successful at healing such minor damage).

Then we think it clear that it is far from unreasonable for a consumer who knew all the facts to take the position:

- Nexium is definitely better than Prevacid for some patients with esophageal damage (i.e. moderate and severe).
- Nexium is equal to Prevacid for the remaining patients with esophageal damage (i.e. lesser damage).

---

[14] Dupont Internet Survey – page 4. However, we understand that AstraZeneca's position is that the scientific data supports a claim that Nexium heals acid related damage better than Prevacid for the totality of patients with damage to the esophagus.

18

- Nexium is always at least as good and in some circumstances better, so Nexium is better overall at treating patients with damage to the esophagus.

If Nexium is in fact equally effective for minor damage and better for moderate to severe damage, is it really clear that most members of the consuming public will think it is false to state that Nexium is better overall? We do not believe the answer to this question to be obvious. Consequently, for a study of the website ad to be useful we believe it must provide direct evidence on this underlying aspect of consumer perceptions.

But, not surprisingly given his assumption that the website would be false on its face, Dr. Dupont's survey design simply pays no attention to this possibility. We are again in a situation where the result of Dr. Dupont making a critical (and in our view quite likely incorrect) assumption about how consumers perceive a reasonably complex situation, is that his basic survey design does not even deal with, and therefore cannot conceivably throw any light on, the underlying issue.

19

## VI – DUPONT'S INTERNET SURVEY QUA SURVEY

Introduction

Once again we turn from a global view of the survey design to concentrate on the specifics of the Internet Survey design and implementation. That is, just as we did above in Section IV for the TV Survey, for the purposes of this section, we treat Dupont's Internet survey as if it was in fact relevant to the issues in this case, and in that light we critique the detailed survey design and implementation.

Correction to Table 4

We begin with a correction to the Internet Report. Table 4 on page 13 of the Internet report presents data on the closed question (Q.7). In this question respondents were asked to choose between two possible groups of people for whom Nexium will heal acid related damage better than the other leading medicine (all people with damage to the esophagus vs only people with moderate or severe damage).

As reported by Dupont, Table 4 is incorrect. That is clear from the fact that, in a situation where there were no multiple responses, each column adds to significantly more than 100%. A corrected version of Table 4 is as follows:

### TABLE 4 CORRECTED

|  | TEST AD % | EDITED AD % |
|---|---|---|
| All People | 43 | 42 |
| Only moderate or severe damage | 39 | 38 |
| Don't Know | 9 | 10 |
| Not Asked | 9 | 10 |

Closed End and Open End Questions

We turn now to our understanding of the proper analysis of the Internet Survey data. In analyzing the Internet Survey data, Dr. Dupont has chosen to reverse the procedure he followed in the TV Survey. Where there he treated the closed question data as irrelevant, and essentially discussed only the open questions, here he emphasizes the results of the

20

closed end question, and plays down the results from the open ended questions. We would like to make clear that it is not whether there is any inconsistency between these two approaches that concerns us. Different surveys are designed to deal with different issues, so the approach of each survey (including the analysis approach) should be evaluated on its own merits, not whether on the surface it seems to conform or not conform to procedures followed in some other survey. What does concern us is that we think that in the analysis of the Internet Survey, Dr. Dupont should have placed at least equal emphasis on the open ended questions.

Analysis of the Survey Data – The Open Ended Questions

By their nature, open ended questions of the type used in this survey do not provide a respondent with any guide as to what is of interest. Consequently it is unsurprising that experience shows that responses to such open-ends will generally be limited in their scope and frequently will also be quite imprecise. This raises two problems in relying on the results of open ended questions.

First, many respondents may simply not talk about the issue of primary interest to the analyst. That is particularly likely to be the case in this survey since experience shows that whether or not they perceive the claim as limited to moderate and severe damage, respondents are liable to concentrate on what they perceive as the overall message (e.g. Nexium is superior), and omit mention of the details (moderate or severe damage).

The second problem inherent in open ended questions is potential problems in coding of the responses into categories. In many situations how to code each individual is to a degree subjective and arguable. For instance, in our opinion Dupont's overall net coding in the TV Survey is subject to considerable dispute. However, the code categories of greater interest in the Dupont Internet Survey are basically counts of whether a respondent did or did not mention moderate and severe damage, and thus are inherently more straight-forward and reliable.

21

So in the Dupont Internet Survey there is both a high likelihood of incomplete answers (i.e. of some people who perceive the limitation to moderate or severe damage not saying so in response to open ended questions), and a high likelihood of substantial reliability in those people who are coded as mentioning moderate and severe damage. In other words, the responses to open ended questions in the Dupont Internet Survey provide a lower bound on the proportion of consumers perceiving AstraZeneca's claim on the website to be limited to Nexium being superior in the healing of moderate and severe damage. Thus the results of the survey

> When respondents who saw the test stimulus, more than 11% mentioned moderate to severe damage.
>
> When respondents saw the control stimulus, just one person mentioned moderate to severe damage.[15]

provide a lower bound of at least 11% of the respondents who understood the claim to deal primarily with moderate and severe damage.


Analysis of the Survey Data – The Closed End Question

But if 11% is a lower bound on the proportion of respondents who perceived a limitation to moderate and severe damage, how then to explain the fact that in answer to the closed Question 7 there was no difference at all between the two cells (i.e. those who saw the test stimulus and those who saw the control stimulus)?[16] Whatever is true of the test cell, because the edited (control) website they saw does not mention moderate or severe damage, the 38% who said the edited version dealt with moderate to severe damage could not have based that result on the website they saw. Although we believe that it is not possible to determine the actual cause (or combination of causes) without further work, we can see several possible answers to this question. For instance, two possible explanations each of which almost certainly accounts for some (but based only on this data, unknown) portion of the results are:

---

[15] This almost total lack of "noise" is one indication of how straight-forward the coding is.
[16] See corrected Table 4 above.

22

1. The results of the closed question were biased by the mind set created by the wording of the previous open ended question(s). In particular, Question 3[17] can easily be understood to say that the ad refers to general damage. Specifically, even someone who was aware of the discussion in the ad of efficacy with respect to moderate and severe damage might easily conclude from the previous questions that the ad also was about efficacy in healing acid related damage in general.

2. The closed-end results are basically a reflection of preconceptions that respondents brought to the survey. For instance, some fraction of the 38% who at this point in the survey responded that the edited (control) website dealt with moderate to severe damage were simply playing back their preconceptions. Given that the advertisements dealt with in the TV survey have been running intensively for some time, this is completely feasible. From this perspective, the eleven percent of respondents to the test stimulus who said in the closed ended questions that the website dealt with moderate to severe damage may have been sensitized to the importance of this message by their previous experience with the ads, which would account for the level of detail they provided in their answers to the open ended questions.

Conclusion

We conclude that the open ended questions demonstrate that a significant proportion of consumers will perceive the website as conveying as a primary message that Nexium is better (than Prevacid) at healing moderate to severe damage, but that beyond that essentially no conclusion can be drawn from the Dupont survey as to how people understand the material on the web page.

---

[17] Question 3 reads, "Do you recall the ad saying that Nexium heals acid related damage better than the other leading medicine?"

23

## VII – PERSONNEL AND REMUNERATION

Dr. Michael Rappeport was responsible for all aspects of this project.  His resume is attached as Appendix A.  R L Associates will receive $61,200 for all aspects of the work described in this report.

*Michael Rappeport*
*May 12, 2005*

APPENDIX A

## DR. MICHAEL RAPPEPORT

Dr. Rappeport has worked in market and survey research areas for more than 35 years, the last 27 as a partner of R L Associates. As part of his function he has made more than 200 appearances as an expert witness in legal cases at trial and/or through deposition. His testimony has dealt with statistics and statistical analysis, marketing, and public opinion in cases in such disparate areas as trademark infringement, libel, damages for failure to fulfill a contract, and reapportionment. He has also testified as an expert in a number of quasi-legal proceedings before a range of public boards, agencies and regulatory bodies.

Education

B.S.  Physics, RPI, Troy, New York 1957

M.S.  Electrical Engineering, Yale University, New Haven 1958

PH.D.  Statistics, New York University, 1968

Professional positions

1975 - present:  Founding partner, R L Associates, survey research and consulting firm

Dr. Rappeport has had wide experience both in the direction of all kinds of surveys of human populations and as a consultant in statistical, strategy planning and survey research areas. Two areas in which he has been particularly active are studies on public policy, and studies for use in litigation. Along with responsibility for the management of the firm, Dr. Rappeport has direct responsibility for all statistical aspects of the firm's work. In the main this encompasses sample design and the use of a wide variety of statistical analysis techniques. He has designed projectable national and regional probability samples of all civilian non-institutional telephone households, and a very wide range of specialized samples of all types.

1969 - 1972; 1973 - 1975:  Vice president and chief statistician, Opinion Research Corporation, Princeton, New Jersey

1972 - 1973:  Vice president, Response Analysis Corp. Princeton, New Jersey

1959 - 1969:  Supervisor, Bell Telephone Laboratories, Holmdel, New Jersey

2

Teaching

At various times, Dr. Rappeport has taught or conducted guest lectures in a number of colleges and universities. He has been an adjunct instructor in both Research Methods and Political Public Opinion at Rutgers University, and taught a course in Marketing at Rider College.

Articles and Speeches

Over the course of the last 25 years, Dr. Rappeport has written approximately 40 published articles, and given more than 70 speeches.   He has spoken at a number of meetings of legal organizations including:

Faculty member – ABA-ALI seminar on Dilution – February 2004

Participation in a 2003 panel of the Amer. Intellectual Property Law Assoc.

Participation in a 2001 panel of the Advanced Practitioners Prog of the Intl. Trademark Assoc.

A 1998 speech to the Bar for the Federal Circuit

Witness at a mock trial at the Feb. 1998 Meeting - American Bar Association Antitrust Section

A 1996 speech to the New Jersey Intellectual Property chapter of the Inns of Court.

A 1995 panel presentation for the CLE program, American Bar Assoc. - Antitrust Section.

A 1995 speech to the CLE program, American Bar Assoc. - Intellectual Property Section

Witness at a mock trial at the 1995 meeting of the American Intellectual Property Law Assoc.

Among the wide cross-section of other types of organizations where he has spoken at an annual or other major meeting are Planned Parenthood Federation of America, United States Trademark Association, Travel and Tourism Research Association, Newspaper Research Council, Pennsylvania Hospital Association, and New Jersey Political Science Association.

Other

Dr. Rappeport is currently listed in Who's Who in the East, and several other similar publications dealing with the Legal Profession, Social Sciences and Marketing. He has served on a variety of civic and professional boards. Among those most directly related to his professional activities:

Editorial Board of the "Trademark Reporter" 1993 - 1996, 1997 - 2004

Board of Advisors - Citizens Committee on Bio-Medical Ethics 1986 - 1994

New Jersey State Bio-Ethics Task Force on Public and Professional Education - 1989- 1992

Board of Directors, American Association for Public Opinion Research, 1976 - 1980; Standards
        Chairman  1979 - 1980

3

Cases in which Michael Rappeport has appeared either by deposition or in trial as an expert witness 2001-2005. Date shown is first appearance. Unless noted all cases listed were in United States District Courts.

2005

April Deposition – Dosatron Intl v Agri-Pro – Middle District Florida
April Testimony Deposition – Franklin Loufrani v Wal-Mart Stores – Trademark Trial and Appeal Board
March Deposition – In the Matter of Certain Ink Markers – U.S. International Trade Commission
March Deposition – Mylan v Procter & Gamble – Southern District New York
Feb Deposition – Toyota Motor Sales v Ailments Lexus – Eastern District New York

2004

August Trial – Catamount v Microsoft – District of Vermont
Feb. Deposition - Weight Watchers v Luiginos – Southern Dis NY
Feb Trial – Trettco v HDS New England – Dis. of Massachusetts

2003

Dec. Deposition - Georgia Pacific v Procter & Gamble – No. Dis. of Georgia
Dec. Deposition and Feb 2004 Trial – Trettco v HDS New England – Dis. of Massachusetts
Sept. Deposition – Winn v. Eaton – Central Dis. of California
Aug. Deposition – In the matter of certain Agricultural Vehicles – Intl. Trademark Commission
Feb. Deposition – Microsoft v Lindows.com – West. Dis. Of Washington
Jan. Deposition and Feb. Trial - Pharmacia v GlaxoSmithKline II– District of New Jersey
Jan. Trial – Ardex v Chemrex – Western District Of Pennsylvania
Jan Deposition and Feb. Trial – Inliten v Santa's Best – Southern District Ohio

2002

Dec Deposition – Pharmacia v GlaxoSmithKline – District of New Jersey
Nov. Deposition – Maui v Del Monte – Central District California
Oct. Deposition and Nov. Trial – Spotless v A&E – E.D.N.Y.
Sept. Deposition – Twentieth Century Fox v Marvel Enterprises, Tribune Entertainment – SDNY
July Deposition – Philips Oral Healthcare v Salton – Western District of Washington
June Deposition and July Trial – Scotts v United Industries – So. District Florida
June Deposition – Eurotech v Cosmos European Travel – E. D. Virginia
April Testimony and December rebuttal Deposition – QVC v Weick Family Inc. – TTAB
April Deposition – Astra Zeneca v Ferndale – Eastern District Michigan
Feb. Deposition and August 2004 trial – Catamount v Microsoft – District of Vermont
February Trial – Koala Corp v Prince Lionheart – District of Colorado
February Trial – Morelli v Tiffany – Eastern District of Pennsylvania

2001

November Deposition – J&J Snackfoods v Earthgrains – District of New Jersey
November Deposition – Nissan Motors v Nissan Computer – Central District of California
November Trial Affidavit – ABC (Ford West) v Autonation – Central District of California
October Deposition – Qwest Communications v Worldquest Networks – Eastern. District of Virginia
October Deposition and February 2002 Trial– National Distillers v Refreshment Brands – SDNY
July Deposition and Nov. Testimony – Sara Lee v Kayser-Roth – Trademark Trial & Appeal Board
May Trial – SBCH v J&J Merck – Southern District of New York
February Deposition – Isenbeck v Beck – Southern District of New York
January Deposition – Cache v M.Z. Berger – Southern District of New York

4

List of publications of Michael Rappeport 1992-2005

The Democratic Ethos and the Positive Sum Society – Society – July-August 2003

A Rejoinder to a Critique – The Trademark Reporter; November-December 2002

Litigation Surveys – Social Science as Evidence – The Trademark Reporter; July-August 2002

Applying Daubert; National Law Journal, January 21, 2002

When Consumer Beliefs are Based on a Court's Intuition - One More Issue Arising From
Conopco (with Sandra Kornstein-Cohen): The Trademark Reporter; March-April 1997

Is Judaism Splitting Into Two religions; Sh'ma; April 1996

The Role of the Survey "Expert" - A Response to Judge Posner; The Trademark Reporter, March-
April 1995

The Future of the American Jewish Community; Sh'ma; December 1994

The Patient Self Determination Act; Implementation of the Law in Nursing Homes; (co-author);
Paper presented at the 122nd Annual Meeting of the American Public Health Association
November, 1994

Condition Critical; (co-author); Paper presented at the 1994 Annual Meeting of the American
Society of Law, Medicine and Ethics; October 1994

Statistically Based Evidence; National Law Journal, Op-ed Page; August 1993

Prognosis Good for Lower Medical Care Inflation; Wall Street Journal Op-Ed page;
February, 1993

Predicting the Election - Why Clinton Will Win; The Sunday Record (Bergen County, New
Jersey); August 1992.  In addition Dr. Rappeport was a columnist on a weekly basis for the
Bergen Record throughout much of 1991. Columns dealt with a wide range of statistical and
public opinion issues from crime in New Jersey to the proper reporting of retail sales.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2004 DEC 20  PH 1: 05

ASTRAZENECA LP,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )       Civil Action No. 04-1332-KAJ
                                         )
TAP PHARMACEUTICAL PRODUCTS,             )
INC.,                                    )
                                         )
            Defendant.                   )

## ORDER

For the reasons stated in open court today, the Motion for Preliminary Injunction

(D.I. 9) filed by Tap Pharmaceutical Products, Inc., is hereby DENIED.


UNITED STATES DISTRICT JUDGE

December 20, 2004
Wilmington, Delaware

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2004 DEC 20  PM 1: 05

ASTRAZENECA LP,                          )
                                         )
            Plaintiff,                    )
                                         )
      v.                                  )        Civil Action No. 04-1332-KAJ
                                         )
TAP PHARMACEUTICAL PRODUCTS,              )
INC.,                                     )
                                         )
            Defendant.                    )

## ORDER

For the reasons stated in open court today, the Motion for Preliminary Injunction

(D.I. 9) filed by Tap Pharmaceutical Products, Inc., is hereby DENIED.

UNITED STATES DISTRICT JUDGE

December 20, 2004
Wilmington, Delaware

CondenseIt™                                                    December 20, 2004

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
           IN AND FOR THE DISTRICT OF DELAWARE
2
                       - - -
3
   ASTRAZENECA L.P.,            :      Civil Action
4
           Plaintiff and       :
5          Counter-defendant,  :
6     v.                        :
7   TAP PHARMACEUTICAL PRODUCTS :
    INC.,                       :
8                               :
           Defendant and        :
9          Counter-claimant.   :   No. 04-1332 (KAJ)
10                     - - -
               Wilmington, Delaware
11           Monday, December 20, 2004
                   10:00 a.m.
12                     - - -
13   BEFORE:  HONORABLE KENT A. JORDAN, U.S.D.C.J.
14   APPEARANCES:
15         JOHN W. SHAW, ESQ., and
           KEVIN M BAIRD, ESQ.
16         Young Conaway Stargatt & Taylor, LLP
                -and-
17         HAROLD B. WEINBERGER, ESQ.,
           JEREMY A. COHEN, ESQ., and
18         JONATHAN M WAGNER, ESQ.
           Kramer, Levin, Naftalis & Frankel, LLP
19         (New York, New York)
20              Counsel for Plaintiff
21         STEVEN J. BALICK, ESQ.
           Ashby & Geddes
22              -and-
           THOMAS C. MORRISON, ESQ., and
23         KARLA G. SANCHEZ, ESQ.
           Patterson, Belknap, Webb & Tyler, LLP
24         (New York, New York)
25              Counsel for Defendant
```

Page 2

```
1          THE COURT:  Good morning.  Please be seated.
2          All right.  Let's begin with some introductions.
3   We are here to handle two matters.  First is the preliminary
4   injunction hearing.  Second is a scheduling hearing.  We will
5   go ahead and deal with the preliminary injunction piece of
6   this first.
7          Mr. Shaw, do you want to go ahead and introduce
8   the folks on your side of the courtroom  Then I will turn to
9   Mr. Balick.
10         MR. SHAW:  Good morning, Your Honor.  Harold
11  Weinberger, Jonathan Wagner and Jeremy Cohen from Kramer
12  Levin, Stuart Fullerton from AstraZeneca, and Kevin Baird
13  from my office, Young Conaway.
14         THE COURT:  Who is going to be making the
15  argument for AstraZeneca?
16         MR. SHAW:  Mr. Weinberger will, Your Honor
17         THE COURT:  Mr. Balick.
18         MR. BALICK:  Your Honor, good morning.
19         THE COURT:  Good morning.
20         MR. BALICK:  Your Honor, from the Patterson
21  Belknap firm in New York we have Thomas Morrison and Karla
22  Sanchez
23         (Counsel respond "Good morning.")
24         MR. BALICK:  Also, Kenneth Greisman from TAP
25  Pharmaceutical.
```

Page 3

```
1   Mr. Morrison will be making our presentation,
2   Your Honor.
3          THE COURT:  All right.  Mr. Morrison, it's your
4   motion.  The podium is yours.
5          MR MORRISON:  Thank you, Your Honor.
6          Your Honor, I think that the advertising in this
7   case, particularly the TV commercial, is a primary example of
8   how direct-to-consumer prescription drug advertising can be
9   abused.  If you think back to the initial days when companies
10  began running direct-to-consumer advertising for Rx drugs,
11  the ads barely did more than mention the name of the drug,
12  Then there came a second generation of ads when the companies
13  began actually talking about the benefits of their drugs.
14  And that's when they had to start disclosing the adverse
15  reactions and so forth.
16         Those ads are very common today.  For example,
17  Prevacid has been advertising on television for several
18  years, used John Elway as its spokesman this past year.  And
19  they basically talk about the benefits of Prevacid for relief
20  of heartburn pain, just talking about your own drug and its
21  benefits.
22         AstraZeneca has really pioneered a new generation
23  of direct-to-consumer advertising where for the first time
24  companies are doing in consumer advertising what they have
25  traditionally done in medical advertising, in the medical
```

Page 4

```
1   profession.  That is running directly comparative ads
2   featuring their drug versus the competitive drug.
3          AstraZeneca has been extraordinarily aggressive
4   in this manner.  That's how they built the Nexium brand.
5   They had comparative advertising, comparing Nexium to
6   Prilosec, which had been their drug and had at one time been
7   the best-selling drug in the world.  But they used the
8   comparative advertising to build the Nexium brand, and within
9   three years of its introduction it had not only surpassed
10  Prilosec, it had caught up with Prevacid, our drug, which was
11  introduced in 1995.  Their drug, Nexium, was only introduced
12  in 2001.
13         So this kind of advertising can be
14  extraordinarily effective.
15         Now, as I said, companies have long utilized
16  comparative advertising directly to doctors.  And, for
17  example, some of the ads that they showed you in their
18  answering papers were print ads that TAP utilizes to promote
19  Prevacid to doctors, and those ads are comparative.  But
20  there is a huge difference when you are running a comparative
21  ad campaign focused on doctors.  Number one, doctors are
22  trained to understand what clinical studies are all about.
23  Number two, there is a day-to-day interaction.  As the sales
24  rep meets with the doctor or shows him or her the promotional
25  piece and the study, there is a back-and-forth where the
```

Page 5

1  doctor can probe what the study really shows, what it doesn't
2  show. None of that happens when you have direct-to-consumer
3  advertising, particularly a TV commercial, where you have a
4  consumer sitting in front of his or her television station
5  and seeing this ad.
6        THE COURT: Let me ask you a question, because I
7  noted this theme in your papers, too, Mr. Morrison. A lot of
8  the argument that TAP seems to be making to me is, if not
9  directly, at least by implication, that this
10 direct-to-consumer advertising is a dangerous game, a place
11 where bad things can happen. An interesting point coming
12 from a company that spent about 133 million on Prevacid ads,
13 according to stuff you have given me yourself, and one that
14 may well have a lot of merit to it.
15       Does it really bear on this case? Aren't I here
16 today not to question generally the public policy wisdom of
17 direct-to-consumer pharmaceutical ads, a point on which you
18 spent, as I noted, some time in your papers and in the
19 attachments you have provided, but to ask whether you have
20 made a case specifically as to literal falsity? Because I
21 don't have anything in the record before me about misleading,
22 do I?
23       MR. MORRISON: Your Honor, everything that you
24 have just said is absolutely correct. I don't mean to say
25 the direct-to-consumer advertising is inherently bad. No

Page 6

1  question, TAP does it, has done it historically for
2  Prevacid. What I am saying is direct-to-consumer advertising
3  has a potential to be abused, because when you begin running
4  comparative advertising, comparing drug A to drug B, using
5  technical terms, the audience that you target that ad to
6  makes a huge difference. And that's my only point. I don't
7  mean to say it is inherently bad. I do say it can be abused.
8  And I think that's what this case is about.
9        THE COURT: But we are here, are we not,
10 specifically on the question of literal falsity?
11       MR. MORRISON: Absolutely.
12       THE COURT: Because your opponent has said, and
13 it looks like it's right to me -- you point out to me where
14 they are wrong, if they are -- that you don't have evidence
15 of actual confusion and misleading. What you have got is an
16 assertion here that this "Better" campaign, the Nexium,
17 quote, "Better," unquote, campaign, is literally false.
18       MR. MORRISON: That is our contention.
19       THE COURT: That is where I need you to take me
20 to make your case.
21       MR. MORRISON: I think you have put your finger
22 on it. In any false advertising case, there are obviously
23 two key issues. A, what does the advertising communicate,
24 and B, what does the science show about the truth or falsity
25 of that message?

Page 7

1        There is no question, we contend that this
2  advertising expressly conveys and/or by necessary implication
3  conveys two messages, A, message A, that Nexium is better
4  than Prevacid overall for the relief of heartburn and the
5  symptoms of acid reflux disease, and B, that it is better
6  overall for the treatment of erosive esophagitis. And we
7  believe those two messages are either literal or literal by
8  necessary implication.
9        If I may, I would like to talk briefly about the
10 science, because the science will tell us what could they
11 have legitimately said about this drug. I think that would
12 be a better context to get to the message.
13       As we said in our reply brief, I think there were
14 three scientific questions that need to be addressed here.
15 One is, question one, what do their studies show about the
16 relief of acid reflux disease symptoms in general? What do
17 they show about symptoms? Two, what do their studies show
18 about healing of EE in general? And then number three, given
19 what the studies show about EE, what if anything is the
20 clinical significance of what those studies show?
21       As I say, we address these in our reply brief.
22 And I would like to hand up at this time a, sort of really an
23 oral argument, and I have given a copy to Mr. Weinberger,
24 that will just help you follow I think the points that I
25 would like to make.

Page 8

1        So Page 1, Your Honor, addresses the first
2  scientific question, what if anything do their studies show
3  about the relief of symptoms of acid reflux disease.
4        Now, neither study, as is clear from reading the
5  studies themselves, was primarily designed to measure symptom
6  relief. They were primarily designed to measure healing of
7  EE. They did, however, have secondary measurements in the
8  study having to do with heartburn relief where the patients
9  filled out diaries.
10       The Castell study, which is their bigger study --
11 Dr. Spilker in his initial declaration reviewed the Castell
12 study. Now, Dr. Spilker is an expert and an author of
13 several textbooks on the design and execution of clinical
14 trials. He has worked for several different pharmaceutical
15 companies during his career. He looked at the results in
16 Castell regarding symptom relief, i.e., heartburn, and he
17 found seven variables that were measured. Three had
18 statistically significant differences. But those differences
19 were in the neighborhood of one, two and three percent. And
20 he found that none of those were clinically significant.
21       Dr. Robinson, who is our other expert, he is a
22 gastroenterologist in Oklahoma, he looked at the same
23 studies, reached the same conclusion. He actually found 16
24 heartburn symptom factors that were measured. Again, he
25 found only three that had any statistical significance. None

Page 9

1  of them had any clinical significance.
2        The most significant point here, Your Honor, is
3  that even Dr. Castell, the author of the Castell study, and
4  one of AstraZeneca's experts, he does not even claim in his
5  declaration that his study shows superiority for acid reflux
6  disease symptoms. If you look very carefully at Paragraph 16
7  and 17 of his declaration, it is very clear that the only
8  claim he makes for his study is that there was superiority on
9  EE healing.
10        Now, the only other study they have is Dr.
11  Fennerty's study. At the time we filed our motion, all we
12  had was the one-page abstract, so we couldn't really tell
13  much. When we got their papers, AstraZeneca itself in house
14  has written up the results of Dr. Fennerty's studies, so we
15  now have his data. And again, Dr. Fennerty has not claimed
16  any significance, any superiority significance for his
17  heartburn symptom findings. Dr. Robinson, our expert, in his
18  reply declaration, said again there were a couple of
19  measurements that were statistically significant, none that
20  were clinically significant.
21        Then we have all of these other studies that are
22  mentioned on Page 1. There were a group of EE studies
23  conducted by TAP, and again, heartburn was a secondary end
24  point. There were no clinically significant differences.
25        And then the most important thing, on Page 1, in

Page 10

1  my judgment is Item 4, the Chase study. That was a huge
2  study commissioned by TAP. There were over 3,000 patients in
3  that study. The primary end point, the focus of the study,
4  was symptoms of acid reflux disease.
5        THE COURT: Let's stop there for a second. I am
6  going to ask you to stay right there and ask Mr. Weinberger
7  to get up, because two things I want to get Mr. Weinberger's
8  reaction to right now are the assertion that there was
9  nothing clinically significant in the Castell study and
10  nothing clinically significant in the Fennerty study.
11        MR. WEINBERGER: Well, I think the problem is
12  that Mr. Morrison is focusing on things that aren't being
13  claimed in the advertisement. This is not a claim for GERD.
14  Overall, it is a claim for moderate to severe EE. That is
15  what the studies were investigating.
16        THE COURT: Let me be more precise. Is it
17  AstraZeneca's position that as to healing in moderate to
18  severe cases of EE that there are clinically significant
19  findings in the Castell and the Fennerty studies?
20        MR. WEINBERGER: Absolutely.
21        THE COURT: Do you disagree that there are
22  clinically significant findings in the Castell and Fennerty
23  studies, Mr. Morrison, as to healing of EE in moderate to
24  severe cases?
25        MR. MORRISON: I think we will, for purposes of

Page 11

1  this motion, we will concede, and that's where I was going,
2  we agree for purposes of this motion that they found some
3  minor differences in healing of erosive esophagitis for Grade
4  C and D. What I have been talking about until now was
5  heartburn symptoms.
6        THE COURT: I am just trying to pin you down,
7  because when you say no clinically significant findings, one
8  might be led to think that that statement there was nothing
9  clinically significant.
10        MR. MORRISON: I didn't mean to say that. That
11  is why Item 1 here is symptom relief. That is all I was
12  talking about. I have now exhausted that point. I don't
13  think Mr. Weinberger would contend that either Castell or
14  Fennerty claims that their studies show superiority for
15  symptom relief.
16        Now, if we could turn to Page 2, Your Honor, now
17  we go to the question of EE, what do the studies show about
18  EE. Here, Your Honor, I don't think there is any real
19  dispute among the experts about the data. I think the only
20  dispute is to what conclusions can be drawn from that data.
21        First of all, if we look at Grades C and D, there
22  is no question, Castell and Fennerty found differences.
23  Castell found a 12.7-percent difference healing Grades C and
24  D. Fennerty found a 4.9-percent difference in healing rates
25  for Grades C and D.

Page 12

1        Now, one thing that I would like to point out,
2  they have been trumpeting Castell as saying the
3  12.7-advantage is huge. Dr. Fennerty's data shows less than
4  half of that. And Dr. Fennerty's study was a large study.
5  He had 999 people with Grade C and D. Castell had 1286.
6        So with respect to that category, we will concede
7  for the purposes of this motion that their studies show a
8  benefit for those patients in C and D.
9        But I don't want to stop there. I want to go
10  back and look now at the whole EE population, because, after
11  all, Castell looked at Grades A, B, C and D.
12        THE COURT: You can take it as a given that I
13  have looked at your papers. I understand your assertion that
14  this set, this Grade C and D set of sufferers is a minority
15  population in the population of people who suffer from EE. I
16  took your point. I understand your factual assertion for
17  that and I don't understand from your opponent's papers that
18  they disagree with that.
19        MR. MORRISON: That is fair enough. What I do
20  want to point out in this regard, though, Your Honor, is I
21  don't think we can disregard Castell's findings for the A and
22  B group. Remember, that was 75 percent of the population of
23  his study had either Grade A or Grade B. As to that 75
24  percent of people in his study, there was no difference.
25  These weren't even statistically significant differences.

Page 13

1  These were no differences at all.
2        You can combine A and B, as we did on this Page 2
3  of this chart, and you can see the combined difference isn't
4  either statistically or clinically significant.
5        THE COURT: Let me drive you to whatever the end
6  point is you want to take me to on this scientific
7  information. And I will reemphasize that I have taken a look
8  at what you have given me in your papers, because I want you
9  to talk to me mostly about how this amounts to -- let me
10  frame it for you this way.
11        I watched the ads. I watched them several
12  times. I read the little subscript on the screen, which,
13  interestingly, is called a super, I am not sure why.
14        MR. MORRISON: That's what they call it in
15  advertising.
16        THE COURT: I guess that is the jargon.
17        I read the super as it was on the screen. I
18  tried to get a sense of the time it was on the screen, the
19  size of the super on the screen. I read the print ads, the
20  brochures. I went back and read the super as it's reproduced
21  in the exhibit to Mr. Spitalli's declaration, Docket Item 14
22  at Exhibit F. And I understand from what you have given me
23  that you are saying, gee, a consumer would come away from
24  this believing this is about acid reflux, and a consumer
25  would come away from this, even if they were smart enough to

Page 14

1  see it isn't about acid reflux generally, it is just about
2  EE, thinking it was about EE generally, it isn't even that,
3  it is about a subset.
4        What I want you to answer for me is the assertion
5  that I take your opponents to be making that you are really
6  talking about misleading. You are saying people will look at
7  this and they won't get it because they will be misled into
8  thinking this is about GERD or about EE generally. And you
9  have staked your claim here, given the state of the record,
10  on literal falsity.
11        So that puts you in the framework of having to
12  say that what is in this ad is literally false, or as you put
13  it, by necessary implication. That is where -- in the time
14  you have got left, and I am dividing your time about evenly
15  here, which means I am giving you both about a half-hour, you
16  have got roughly between five and ten minutes left here --
17  where you are most productively going to be able to argue to
18  me.
19        MR. MORRISON: That is fair enough, as long as we
20  understand -- before I say that -- as long as we understand
21  that among the entire population of acid reflux sufferers, we
22  are talking about one percent of patients who might benefit
23  from this alleged superiority among C and D patients. That's
24  what we are talking about.
25        That being said, let me go to the ads. There is

Page 15

1  no question, they point to the language in the middle of the
2  ad that talks about the studies being about healing of EE.
3  And they also point to the super, as it is called in the
4  trade, that says among patients with moderate and severe
5  damage. There is a problem with approaching it that way,
6  Your Honor. That is that the courts have long said that you
7  cannot just look at certain words in an ad out of context.
8        That concept goes back to FTC case law that was
9  adopted by the Second Circuit in the Avis v. Hertz case in
10  1986, a famous quote that has been followed by courts ever
11  since, the gist of which is that you must look at words in an
12  advertisement in the context in which the whole ad appears.
13  There is wonderful phrases the Court used, text must yield a
14  context. The Court must consider the ad in its entirety and
15  not engage in disputatious dissection. The entire mosaic
16  should be viewed rather than each tile separately.
17        And when you look at the entire mosaic of these
18  ads, I don't think there is any question but what these ads
19  are talking about are two things, acid reflux disease in
20  general and EE damage also in general.
21        Look at the very beginning of the ad, when James
22  Naughton, the actor, walks out. We say in our papers that
23  the word better and acid reflux disease are imposed across
24  the entire screen. It is actually on the floor, he walks
25  across the floor. And what they are talking about -- this is

Page 16

1  the context of the ad. This is the entire mosaic. It is
2  acid reflux disease. He is using the word better at the
3  beginning. And at the end of the ad, he says, with Nexium,
4  you don't just feel better.
5        Well, the evidence is undisputed, Your Honor, you
6  don't feel good, bad, or indifferent because you have a
7  damaged esophagus. You feel bad because you have heartburn
8  and acid indigestion. That is the symptom. Their own
9  experts basically concede that to the average consumer acid
10  reflux disease means heartburn and its symptoms. Dr.
11  Fennerty, one of their two study authors, in Paragraph 5 of
12  his declaration, said, acid reflux disease is a disease,
13  quote, known to most patients as acid indigestion, heartburn,
14  or regurgitation of acid contents.
15        That is what consumers understand acid reflux
16  disease to be.
17        And so my point, Your Honor, is the obvious one.
18  Acid reflux disease, they knew when they drafted this
19  commercial, and you can tell by looking at it, that's what
20  Mr. Naughton is talking about. That is the overall context.
21  The commercial begins with it. It has it on the screen. And
22  it ends with the concept of feeling better.
23        Now, even this footnote, or the super, where they
24  say, patients -- the study was in patients with moderate to
25  severe damage --

Page 17

1    THE COURT: Before you go to the super, you want
2  me to pay attention to what he is saying. What am I to make
3  of the language where he says, if I told you prescription
4  Nexium heals acid-related damage in the esophagus better, you
5  would want proof, and now your doctor has that proof. Recent
6  medical studies prove Nexium heals that damage better than
7  the other leading prescription medicine? What is your take
8  on that?
9    MR. MORRISON: My answer is, they are positioning
10  these studies about esophagus healing as the proof, as the
11  proof that Nexium is better than Prevacid for acid reflux
12  disease.
13    That whole thing you just quoted, Your Honor, is
14  preceded by the words so if you suffer from acid reflux
15  disease, frequent heartburn. It doesn't say if you suffer
16  from an eroded esophagus you might want proof.
17    THE COURT: Let me ask you this: Scientifically,
18  how does one get EE?
19    MR. MORRISON: One gets EE because you have
20  constant heartburn.
21    THE COURT: Because you have acid reflux.
22    MR. MORRISON: Because you have the acid reflux
23  and over time that can damage your esophagus. The treatment,
24  though, isn't a pill that magically heals your esophagus.
25  Neither Nexium or Prevacid heals the esophagus. All they do

Page 18

1  is stop the acid from coming up through the esophagus, and by
2  stopping that, then the esophagus heals naturally. That is
3  an undisputed fact scientifically.
4    THE COURT: So it is the assertion of the
5  statement about esophagus healing in the context of acid
6  reflux that bothers you? I am trying to follow your
7  argument. You are saying they start with acid reflux disease
8  and then he says, if you have got damage to your esophagus,
9  there is a study that shows Nexium heals that better.
10    MR. MORRISON: Yes.
11    THE COURT: It is the starting with the context
12  of if you have acid reflux that is the nub of the problem as
13  far as TAP is concerned.
14    MR. MORRISON: Yes. Your Honor, you are a
15  consumer sitting in front of your television and you see
16  this. You know what acid reflux disease is. You know you
17  get heartburn and you feel bad. You see this ad, and all of
18  a sudden they are talking about erosive esophagitis. What do
19  you or I know about erosive esophagitis? A doctor might
20  know. Again, that is why I put this in the context of the
21  danger of this kind of advertisement. Well, the downfall of
22  erosive esophagitis, a half of my patients, 20 percent of my
23  patients with EE may have moderate to severe damage, and one
24  percent of every patient I see notice acid reflux disease,
25  you know, maybe a doctor would take that into account. But a

Page 19

1  patient sitting in front of his television, his or her
2  television, seeing this ad, knows nothing about erosive
3  esophagitis. All they know is they have got heartburn, once
4  a day, twice a day, five times a week. It hurts. They want
5  to feel better. The proof that Nexium makes you feel better
6  is these studies. That is the whole point about this
7  commercial. These commercials are designed to posit the
8  studies as the proof, the proof that Nexium is better
9  overall.
10    And again, the message is better overall for the
11  symptoms. But even if you want to go beyond that and say,
12  well, it's not about symptoms, it's just about erosive
13  esophagitis, even there, even there, the studies only pertain
14  to a small percent of the people with erosive esophagitis.
15    The last thing I want to say about the ads is the
16  language in the super studies versus Prevacid in patients
17  with moderate to severe damage. Well, that's not true. This
18  wasn't a study in patients with moderate to severe damage.
19  This was a study in patients with all kinds of damages. A
20  through D, 75 percent of those patients saw no difference.
21    So put it another way, Your Honor. You are a
22  consumer, sitting in front of your commercial, and they say,
23  hey, if you have acid reflux disease, maybe you have erosive
24  esophagitis. 20 or 30 percent of you are going to have
25  erosive esophagitis. Then they say, if you are in that 20 or

Page 20

1  30 percent, five percent of you, according to Fennerty, may
2  benefit from taking Nexium. That's one in 100. Now, do you
3  think that average consumer is going to run out and say to
4  their doctor, I think I am one of these -- this one person in
5  100, I think I have got moderate to severe EE, you better
6  give me Nexium? That is not going to happen. And that's the
7  vice of this advertising, is taking this tiny sliver of
8  advantage, that again we would concede for purposes of this
9  motion, and converting it into a broad message of superiority
10  that just is not true. The Lanham Act doesn't allow you to
11  do that.
12    If I may just briefly refer to two cases that I
13  think are perfect bookends for this. One of the leading
14  cases that established Lanham Act case law was American Home
15  Products v. Johnson & Johnson. Anacin, the makers of Anacin,
16  were running this advertising touting Anacin's
17  anti-inflammatory benefits. Well, Anacin did have
18  anti-inflammatory benefits, and Tylenol did not.
19  Nevertheless, the Court found those benefits did not make
20  Anacin a superior analgesic. And the Second Circuit was very
21  careful in saying, if you want to craft advertising talking
22  about, solely about the anti-inflammatory benefit of Anacin,
23  you can, but you cannot convey a message about its overall
24  superior pain relief.
25    The flip-side was promoting Tylenol as being you

## Page 21

1  can't buy a better pain reliever -- you can't find a more
2  powerful pain reliever. That claim was only true for mild
3  and moderate pain. It wasn't true for severe pain. Again,
4  the Court said, you can't do that. You can't run an
5  advertisement saying you can't buy a better pain reliever
6  because that is false with respect to people with moderate to
7  severe pain. So I think the Lanham Act case law is clear,
8  you can't do that, and I think --
9        THE COURT: What was the context of those
10 decisions? Were those preliminary injunction cases?
11       MR. MORRISON: The first case, the Anacin-Tylenol
12 case, was following a trial on the merits. There had been a
13 preliminary injunction motion. The motion was denied on the
14 grounds that the plaintiff, which is our client, had not
15 proven irreparable injury, not that they hadn't proven the
16 ad. Now, Mr. Weinberger will point out rightly that in that
17 case there was market research, because there was nothing in
18 the Anacin ads that directly or by implication said superior
19 pain relief. All it did was talk about inflammation. In
20 that case the Court rightly required market research.
21       The second case was, I believe, a preliminary
22 injunction case. And there was no market research. This was
23 a print ad. And the Judge said, it's just not true that
24 Tylenol is equipotent to the ibuprofen pain relievers.
25       THE COURT: Let me ask you a question

## Page 22

1  specifically about your assertion that it's just not true as
2  to the super that the study was with patients with moderate
3  to severe. I understand you to be saying the studies
4  encompassed all categories of people with EE.
5        MR. MORRISON: Right.
6        THE COURT: So you would have me read with
7  moderate to severe as saying in studies with patients limited
8  to moderate to severe.
9        MR. MORRISON: Well, I could ask you to read it
10 that way. What I really would say is to the extent that they
11 want to point to that super and say that cures everything, my
12 answer is it doesn't cure everything because it, itself, is
13 not literally, it is not literally true.
14       THE COURT: You are right on the point I want to
15 be on. How is it not literally true? These were studies
16 that were on patients, and in that group of patients, there
17 were people with moderate to severe. Right?
18       MR. MORRISON: Sure.
19       THE COURT: So I can read the word with to mean
20 patients with this and nothing else, or I could read the word
21 with to mean some group of people in the study had this.
22 There are people in the group that had this. You tell me how
23 I need to read that.
24       MR. MORRISON: Your Honor, if you were a doctor
25 and AstraZeneca came to you with those words, you might go

## Page 23

1  through that process, and you might say as a doctor, well,
2  gee, did the study only have people with moderate and severe?
3  And the AstraZeneca rep would say well, no, we had 75 percent
4  of them actually have the lower grades.
5        And the doctor would say, gee, what did you find
6  there? The rep would say, well, we found they were really
7  similar. But if you look at this top group, we found a
8  difference.
9        The consumer watching the television in a
10 45-second ad isn't going to go through that process. Again,
11 I keep coming back to this. That's the vice of this
12 advertising. They are promoting consumers who aren't in a
13 position to have this kind of discourse that they are
14 having. A doctor might have it. But a consumer is just not
15 going to have it. That is the vice of the advertising.
16       THE COURT: Okay. Thank you very much.
17       MR. MORRISON: Thank you very much, Your Honor.
18       THE COURT: I will give you a couple minutes at
19 the end of Mr. Weinberger's presentation for rebuttal, if you
20 would like.
21       THE COURT: Thank you, Your Honor.
22       THE COURT: Go ahead, Mr. Weinberger.
23       MR. WEINBERGER: Thank you, Your Honor.
24       Given Mr. Morrison's statement at the beginning,
25 his concession with respect to clinical significance, I am

## Page 24

1  going to focus on what we believe are the implied claims
2  here. There are two of them that TAP has focused on. One,
3  they say we are making a claim of superiority for healing all
4  types of EE, not just moderate to severe. Second, that
5  Nexium is superior to Prevacid for the treatment of acid
6  reflux disease generally.
7        With the discourse we had here this morning, I
8  think it illustrates precisely why the courts require survey
9  evidence of this, because while Mr. Morrison's interpretation
10 of what a consumer might take away from this might be
11 plausible and Your Honor's interpretation, whatever it may
12 be, might be plausible, that is not the issue.
13       The courts have basically said, we want to see
14 evidence. If you are going to go beyond the literal words of
15 what is in the advertisement or even if the advertisement is
16 ambiguous, if it's ambiguous, we want to see evidence as to
17 what it's communicating to a significant number of consumers
18 before we find it to be actionable.
19       THE COURT: Talk to me about the necessarily
20 implied line of cases and assertions that you saw in your
21 opponent's papers and which you heard emphasized by Mr.
22 Morrison here this morning.
23       MR. WEINBERGER: Let me first talk about the line
24 of cases, Your Honor. I think the paradigm of the necessary
25 implication case is Castrol v. Pennzoil in the Third

Page 25

1  Circuit. If I can describe that in shorthand, what Pennzoil
2  says is if you say A equals B, and B equals C, then you
3  necessarily imply that A equals C. So what happened in that
4  case, they were making a claim that their engine oil was
5  superior for viscosity. And they said that viscosity was
6  related to engine wear. The better the viscosity, the less
7  engine wear breakdown you were going to have. Therefore, the
8  court said you were making a claim that your engine oil was
9  better for engine wear. It was the only interpretation.
10  There was no other interpretation. It necessarily followed.
11      The reason -- I will go through the other cases
12  as well -- the reason you can't use the necessary implication
13  as an excuse to avoid a survey in every case where you think
14  a consumer might take away a message is because otherwise the
15  exception will drive the rule out. The reason for the rule
16  is critical because the First Amendment permits truthful
17  commercial speech. If you are going to argue that it is not
18  truthful or misleading, you have to have proof.
19      The second case that they cited was the
20  Pharmacia -- I am sorry, was the Clorox case. I know that
21  one because I was in it. First of all, the Clorox case was a
22  dismissal motion. The judge sua sponte dismissed a motion
23  that had been made on a preliminary injunction on a Lanham
24  Act claim and they threw it out.
25      All the First Circuit held was necessary

Page 26

1  implication had been pleaded in the complaint, not that it
2  had been proven. In that case, as I recall it, they showed a
3  woman washing her clothes with detergent and bleach and then
4  she used a product that was called abacon blonculor, it is a
5  detergent with a bleach substitute built in.
6      It used the phrase whiter is not possible. And
7  they said, the complaint adequately pleaded that the
8  necessarily implication of the woman saying whiter is not
9  possible when she wasn't using the bleach was that the second
10  product got the clothes just as white or whiter than the
11  bleach got it. Again, it was a pleading motion. Again, it
12  was, in fact, arguably a necessary implication.
13      The third case was Pharmacia against GlaxoSmith.
14  And there, Pharmacia said that its product was superior
15  for -- Pharmacia said that the other product caused sleep
16  disturbances and that its product was specially formulated to
17  help consumers sleep. So the Court found that the necessary
18  implication of that claim was that its product was better for
19  avoiding sleep disturbances at night. This was a product for
20  quitting smoking. Again, it is not what we have in this
21  case.
22      The last one is Spalding. Spalding involved a
23  golf ball which they tested in a laboratory the way in which
24  the balls were balanced. And they said in the ad you could
25  putt truer, something we would all like to do, you could putt

Page 27

1  truer with their golf ball. And the Court said the necessary
2  implication of that was that you had proven it, because it
3  was an establishment claim, you had proven it on a putting
4  green, where it is the only place you putt, and not in a
5  laboratory.
6      So those cases are all very, very different.
7      This is your classic case. Indeed, it is exactly
8  like the case that Mr. Morrison cited, where the claim was
9  made for a broader, I think it was the Anacin case that he
10  cited, for a broader -- the argument was that the
11  advertisement was conveying a message that the Anacin product
12  was better than the Tylenol product on a broader basis. The
13  proof and the express words of the commercial were limited to
14  a specific benefit. I don't remember whether it was tougher
15  headaches, something very specific.
16      The only reason that the J&J side of that case
17  prevailed was because they had a survey which proved that
18  they were communicating that. That's what's missing in this
19  case.
20      The second case he cited, I think it was the
21  American Home Products case, there was no issue as to what
22  was being communicated in that case. The parties agreed that
23  a broader benefit was being communicated, so no survey was
24  required.
25      I have been involved in a case exactly like that

Page 28

1  as well between American Home Products and Procter & Gamble.
2  Again, a survey was introduced to try and prove that a
3  broader benefit was being communicated than the literal words
4  of the commercial. In that case, the plaintiff was
5  unsuccessful because the survey was rejected.
6      But that is precisely what is missing here. Your
7  Honor, what they essentially are asking you to do is change a
8  couple of decades worth of law in the Third Circuit and
9  elsewhere that says you have to have this kind of proof.
10      I don't know why they didn't get it. Maybe they
11  tried and didn't succeed, I don't know. But without it, they
12  cannot make this claim.
13      Now, in terms of the EE overall claim, if Your
14  Honor were to somehow to find that claim is being made, the
15  proof is there in the Castell study. The Castell study had
16  all grades of EE in it and the superiority shown in the
17  Castell study was on an overall basis. The Fennerty study
18  was specifically designed only to deal with moderate to
19  severe.
20      THE COURT: Let me stop you for a second.
21  Castell, Fennerty, they show a statistically significant
22  difference in a subset, if I understand your opponents
23  correctly, they say maybe one-quarter of folks who suffer
24  from EE, and in the overall group of folks who suffer from
25  acid reflux that amounts to one percent.

CondenseIt™                                December 20, 2004

Page 29

1   As to that subset, Mr. Morrison was pointing to
2   the super that states, quote, Studies versus Prevacid -- I am
3   not going to try to pronounce the chemical name -- in
4   patients with moderate to severe damage, and says, that isn't
5   right because the studies weren't in patients with moderate
6   to severe EE. It was in all patients with EE. What is your
7   response to that?
8       MR. WEINBERGER: Actually, one of them, the
9   Fennerty study was only in patients with moderate to severe
10  EE. What they did was, when they saw the results of the
11  Castell study, which showed a greater benefit in C and D,
12  they specifically designed a study with only those patients.
13  So the statement is, no matter how you read it, is absolutely
14  indisputably true with respect to the Fennerty study.
15      With respect to the Castell study, I think Your
16  Honor made the point. Those are patients, patients in that
17  study had moderate to severe EE. So the statement is
18  absolutely correct. That is a study with patients who had
19  moderate to severe EE.
20      So I think it's a true statement.
21      I don't know if Your Honor wants me to address
22  this point about the one percent. I think it is an important
23  point. First of all, I think the math is a little
24  one-sided. I think if you were to use the highest number
25  that the experts have testified, the highest percentage of

Page 30

1   people with EE, and then you were to use the results of the
2   Castell study and apply it to that, you would probably come
3   up with a number like three to four percent rather than one
4   percent.
5       But let's take the one percent. If we take the
6   one percent and you take about a hundred -- about ten million
7   GERD sufferers in the United States, you are talking about
8   100,000 people, 100,000 people who on their one percent would
9   be healed after eight weeks using Nexium and not healed after
10  eight weeks using Prevacid.
11      This isn't a case where you are talking about
12  gradations, continuous variables -- my skin is a Grade 5.2
13  and this is a 5.3 and nobody can see the difference. We are
14  talking about people. We are talking about bodies. People
15  who are going to experience healing with one drug and not
16  with another. And there is no case at all, no authority
17  whatsoever for the proposition that we aren't entitled to
18  tell people about it, people are not entitled to discuss it
19  with their doctors. And after all --
20      THE COURT: I don't take them to be saying that.
21  I take them to be saying you found something from which you
22  could argue to the public that you could help 100,000 people
23  out of ten million. But you tried to make it sound like you
24  could help the ten million, and the ten million that are out
25  there watching your ad would be fooled into thinking, gee, if

Page 31

1   I can swallow this enormous pill that Mr. Naughton is
2   standing next to, I will be better.
3       MR. WEINBERGER: First of all, if they think
4   people are being misled that way, there is a way in which the
5   cases say they can prove it. It is not enough for Mr.
6   Morrison to get up here and say that is how I read it or that
7   is how an ordinary consumer would read it. That is just not
8   what the law is in the area.
9       Second of all, I might add that I can't go to the
10  store and buy Nexium even if I am fooled by this. I have to
11  go to my doctor. My doctor is going to have all of those ads
12  and all of that information, and he will tell me, no, no, no,
13  this reading, it doesn't apply to people who don't have
14  moderate to severe.
15      The other point I should make is that, as the
16  experts have all pretty much acknowledged, when you walk into
17  your doctor's office with GERD, they do not put an instrument
18  down your throat and do an endoscopy. So they don't know
19  when you are being treated for GERD if you have EE or
20  moderate to severe EE. It is treated symptomatically.
21      In terms of any given patient, it is really
22  impossible to tell at the outset for the physician whether or
23  not that person is in or is not in the category. And
24  therefore, I think that's why you see Dr. Johnson, as well as
25  Dr. Castell and Dr. Fennerty say, this is important to us

Page 32

1   because of the way we treat patients. And if we have two
2   drugs that cost the same, that have the same side effects,
3   and I understand that one of those drugs may be more
4   effective in this respect than the other, it is important to
5   me and it is important to my patients. And I don't think
6   there is any reason in the world why we should be prohibited
7   from telling people that unless the appropriate proof is in
8   the record -- and, frankly, TAP had every opportunity to
9   generate that proof and made the judgment not to do that.
10      You know, I think, Your Honor, that as it was
11  initially framed, TAP was claiming that we were advertising
12  to a subgroup and the percentage change wasn't that great, it
13  was only ten percent or whatever in the Castell and three
14  point something percent in Fennerty. I think they walk away
15  from that in their reply brief because I think we have shown
16  that the law permits that and permitted it in both respects
17  in a case in which we cited, the SmithKline case, and there
18  is just nothing wrong with that.
19      To sum up, Your Honor, I think that AstraZeneca
20  has done studies, studies that show a benefit. The benefit
21  is a meaningful benefit to gastroenterologists. Dr. Spilker,
22  with all due respect, is not a gastroenterologist, his
23  20-percent rule, there is no foundation for that rule
24  whatsoever. The notion that human variability is 20 percent
25  and therefore there should be a 20-percent rule is

## Page 33

1  preposterous, among other reasons, when you do a randomized
2  clinical trial, you have people randomized into the
3  treatments and that 20-percent variability is going to equal
4  out. The FDA has approved drugs on far less than 20
5  percent. The 30 percent he is citing as the FDA criteria is
6  actually against placebos, not between two active products,
7  and isn't even the rule. There is just no support for it
8  whatsoever.
9      The last thing I will say is just to reiterate
10  again, the law is clear, TAP had the ability to put in the
11  kind of proof that might have entitled it to relief if it
12  could have proved it. It didn't do it, for whatever reason.
13  And I don't think that our own interpretations of this
14  advertising are going to solve that problem.
15      THE COURT: All right. Mr. Morrison.
16      MR. MORRISON: I want to cover two brief points
17  if I may, Your Honor. On the false by necessary implication,
18  the one case Mr. Weinberger did not talk about is the
19  Novartis v. J&J case, Third Circuit 2002. I think that is
20  instructive, because the Court accepted one necessary
21  implication, rejected the other. The product was a new line
22  extension to Mylanta called Nighttime Strength Mylanta. The
23  plaintiff argued that that necessarily implied two messages.
24  One, that it was stronger and more effective than other
25  medications, such as Extra Strength Maalox, Super Strength

## Page 34

1  Maalox, Maximum Strength Maalox. The Court rejected that and
2  said, no, there is nothing in the commercial to necessarily
3  imply that. But on the other hand, the Court accepted the
4  argument that it did necessarily imply that Nighttime
5  Strength Mylanta had been spatially formulated for nighttime
6  use, and there was something about that product that was
7  unique for nighttime use. Otherwise, why refer to it as
8  Nighttime Strength?
9      I think that's a very instructive case.
10      On the clinical significance point, I want to say
11  just two things, Your Honor.
12      First of all, I would cite to you Dr. Castell's
13  own conclusion in his declaration, Paragraph 17, where he
14  says, quote, Clinically, the results of this study, i.e., his
15  own study, confirm that Nexium and Prevacid, like all
16  available medications in this class, are highly effective in
17  healing esophagitis.
18      This is the author of the study saying that both
19  medications have been proven to be, quote, highly effective
20  in healing esophagitis. The only thing his study shows is
21  for this tiny subset of patients Nexium might be a little
22  better. Now, what's the clinical significance of that? We
23  are conceding that there is a difference among that subset.
24  But is that a clinically significant difference that would
25  make a doctor or a patient ask for Nexium over Prevacid?

## Page 35

1      THE COURT: The ad says that there are studies
2  that show it's better for people with those -- well, I am
3  sorry. I interrupted you. I take your point.
4      MR. MORRISON: Obviously, if you conclude that
5  that is all the ad says, there is nothing I am going to be
6  able to do to convince you to the contrary. I think the ad
7  says a whole lot more.
8      My point is, Your Honor, what does all of this
9  mean? They have these studies that they are touting, they
10  are spending hundreds of millions of dollars to tout them.
11  What does it mean? Even Dr. Fennerty and Dr. Johnson, their
12  third expert, say we don't like Dr. Spilker's 20-percent
13  rule. We don't see where that comes from. But the
14  measurement of clinical significance is how would it affect
15  what they call the number needed to treat analysis. In other
16  words, how many patients would a doctor have to see before he
17  or she said, oh, I am going to switch that patient from drug
18  A to drug B. And if you do that analysis, and you limit it,
19  if you limit it to patients with moderate to severe EE, that
20  number is only somewhere between 4.9 percent, Fennerty's
21  number, and 12.7, Castell's number. If you extend it to all
22  EE patients, that number becomes very, very small. And if
23  you extend it to the entire population of GERD patients,
24  that's where you get the one percent. And we are not asking
25  you to take our math for that. That is their own experts,

## Page 36

1  using their intent to treat analysis. That was the whole
2  point of points 1, 2 and 3 of our reply brief, using their
3  numbers and their data, one in 100 patients seeing this
4  commercial might benefit from taking this drug. And I don't
5  think -- if you just think about it, Your Honor, is a company
6  going to spend hundreds of millions of dollars in consumer
7  advertising to tell the American public that one in 100
8  patients is going to get a benefit if they take this drug? I
9  think the clear answer to that question is no, and that's why
10  this advertising is false and should be enjoined.
11      THE COURT: All right.
12      MR. MORRISON: Thank you.
13      THE COURT: Thanks.
14      Well, I am going to give you a ruling right now,
15  and then we will turn to schedule.
16      I am denying the preliminary injunction. The
17  standard here is very clear. You have four things you are
18  supposed to meet. You have got to show a likelihood of
19  success on the merits. You have got to show irreparable harm
20  in the absence of an injunction. You have to show as the
21  proponent of the injunction that you win on the balance of
22  equities. And you have to show that the public interest
23  swings in your favor.
24      You have to show all those things.
25      I have looked at the evidence that has been given

Page 37

1  to me, and I have seen the arguments in the papers and heard
2  it here today, and find that this heavy burden -- and it is a
3  heavy burden, for extraordinary relief at the preliminary
4  stage -- has not been met by TAP in this case.
5      The assertion is that there is a false claim of
6  overall superiority. That's what the complaint asserts -- I
7  should say the counterclaim. But having viewed the ad and
8  watched it several times, read the things over in print, you
9  could definitely argue, and Mr. Morrison has done that
10 effectively here today, that this is artfully presented and
11 that it could well mislead consumers. But you haven't shown
12 me that it is literally false.
13     Without evidence of literal falsity, I am left to
14 say, where is your evidence that it is misleading? And you
15 don't have it. You don't have consumer proof. You don't
16 have a study to show consumer confusion. All the argument
17 has been around the notion of misleading, that if you looked
18 at this you would think that this is what that meant. That
19 is the language of misleading. In trying to press to show me
20 where it is false, how is it literally false, I get the
21 generalities of you have to take it in context, you have to
22 see it in context.
23     The bottom line is, you haven't demonstrated a
24 likelihood of success on literal falsity. At least on this
25 record it is not there. And there is not evidence of

Page 38

1  misleading, which isn't to say it may not be out there.
2  There may well be tremendous success in a consumer survey
3  that shows that people, doing just what Mr. Morrison said,
4  sitting in front of their television set, watching the news
5  while they are eating dinner, think, acid reflux, big letters
6  on the screen, Nexium is better for acid reflux is the
7  conclusion that they draw, that could be the case, but you
8  don't have proof of it. And I need proof in order to give
9  relief of the sort you are looking for here. So at this
10 stage I have to say you haven't demonstrated that.
11     I want to point out that I think it's noteworthy
12 that in addressing its claim to the FDA, it appeared that TAP
13 was couching it in terms of misleading as well, not in terms
14 of literal falsity but in terms of misleading. When I read
15 in Mr. Spitalli's declaration the copy of the September 27,
16 2004 letter that TAP sent to the FDA, I noted that it spoke
17 of misleading. And I quote from the first page at the
18 bottom of the page: "Until studies demonstrating superiority
19 are completed against the 20-milligram approved dose as well
20 as the 40-milligram approved dose we believe this commercial
21 misleads the consumer."
22     Going over to the next page, it says, quote, "The
23 tiny 'super' referring to studies against Prevacid in
24 moderate to severe disease is not sufficient to correct this
25 overwhelming impression of superiority in all cases..."

Page 39

1      That doesn't complete the sentence. That's where
2  I was quoting.
3      In short, TAP was saying, and it makes sense for
4  it to say, people are going to be misled by this. Again,
5  that is not the claim of literal falsity.
6      The necessary implication cases cited don't help
7  because I believe Mr. Weinberger had it right, and my
8  interpretation of those cases was in line that it has to be
9  an unbroken logical chain, an unavoidable -- that's what it
10 means. It's necessary by implication. And you haven't drawn
11 that kind of implication here. All you have said on the TAP
12 side is "acid reflux" in big letters across the screen sets a
13 context in which people will be confused. It doesn't lay out
14 the logical chain you have to have. And the literal words of
15 the ad, coming out of the actor's mouth and the super, in
16 combination, I am looking at that context to say what they
17 say, which is, we are talking about esophageal damage, super,
18 moderate to severe cases, maybe that is not enough to avoid
19 confusion, but it's also not literally false by implication
20 or otherwise.
21     I should also point out that I think when the FDA
22 responded in the way it did -- and there is an affidavit in
23 the papers by TAP -- that the FDA said, and again I quote,
24 "We have considered your complaint and have concluded that
25 it appears to have merit and will be carefully evaluated for

Page 40

1  further action," that they were saying that in the context of
2  the assertion that these ads are misleading. And they did
3  the prudent thing, which is to say, you know, you know what?
4  This really could be misleading. We are going to look at
5  it. If it is misleading, we are going to do something about
6  it.
7      I will tell you roughly the same thing, which is
8  if you give me evidence of actual confusion to show the ad is
9  misleading, I will carefully evaluate it, and at an
10 appropriate time maybe we will be in a position to talk about
11 relief. But we are not there now.
12     So the long and short of it is that you haven't
13 shown likelihood of success on the merits on the record you
14 have given me.
15     As to the irreparable harm, in the absence of an
16 injunction, I note again you failed to show that. Indeed,
17 you are asking me to presume harm because of the whole
18 context you have raised, which is, this is likely to confuse
19 ordinary folks out there who will now go to their doctor and
20 say give me something they don't really need and that that
21 must hurt you. But you don't address the AstraZeneca
22 argument in your reply brief on irreparable harm, and I am
23 not in a position to presume it.
24     By all appearances, I should know TAP is a
25 sophisticated, thoroughly capable, well-financed

Page 41

1  pharmaceutical company, which itself, by the record it itself
2  has given me, has spent on the order of 133 million dollars
3  to promote Prevacid. The implication that it can't defend
4  itself in the market just doesn't persuade me much at all,
5  particularly on this truncated record.
6      Balance of hardships, again, TAP doesn't address
7  this in the reply brief. It leaves AstraZeneca's argument
8  unanswered. I can't leave it unanswered. It is one of the
9  four factors I have to consider. AstraZeneca asserts that,
10 hey, we have spent millions on this ad campaign. If you make
11 us pull it right now, we are going to suffer real damage
12 here. With nothing but speculation to counter that, it is a
13 credible assertion. Even on the balance of hardship, here I
14 am talking about the hardship to TAP, not the hardship to the
15 public, because the argument thrown at me by TAP -- thrown is
16 the wrong word. It implies it wasn't well-crafted. It was
17 well-crafted. The argument presented to me by TAP focuses
18 strongly, as is appropriate in one respect, on the public, it
19 is the public suffering here.
20     But when it comes to the balance of the
21 hardships, I am looking at the hardships between the
22 parties. And on that balance, AstraZeneca said, we are going
23 to be hurt, and TAP has said nothing to show me how it's
24 being hurt, how it's being hurt would be more than
25 AstraZeneca would be hurt.

Page 42

1      So on the balance of hardship, TAP has to come up
2  short on that one as well.
3      Finally, the public interest -- and this is a
4  fascinating case, because it does point out a very
5  interesting social problem, and it invites me as a judge to
6  step in and say, well, this is bad public policy. We have
7  got consumers out there who are going to be sucked in by
8  direct-to-consumer advertising by pharmaceutical ads artfully
9  drawn, good production values, and superscripts
10 notwithstanding, consumers will be fooled into thinking that
11 other drugs that are good, adequate, and in some cases, if I
12 take the Prilosec example which was pushed at me in the
13 papers and mentioned here today again, indeed, would be
14 cheaper, that the consumers are going to be fooled into
15 thinking that is not good, that this Nexium pill is better,
16 when really all it's better for is AstraZeneca's bottom
17 line.
18     That is the argument I am getting from the folks
19 at TAP. It certainly generates some interest in the press.
20 They have what appears to be, I don't know if it is front
21 page, but they have big-page press in the New York Times that
22 they cite to and other kind of attention in the media to this
23 issue. But you know what? Definitely not at this stage, and
24 I question whether at any stage, am I in a position to say
25 the public policy here that I might think is right has got to

Page 43

1  override the legal standards and what is being permitted by
2  regulatory authorities.
3      So while I think I was held up more on the public
4  interest point than any other, in the final analysis, I have
5  to defer to and believe that the public interest is being
6  adequately protected by those regulatory authorities who are
7  specifically empowered to look to and make sure that
8  direct-to-consumer advertising, which is permitted under law,
9  is properly being handled.
10     You made your pitch to the FDA on this point. By
11 all means, push it, if you think you have got a point to win
12 there. But I am not going to turn myself into a super FDA or
13 legislator on this point, and certainly not on this record.
14     All right. So for all of those reasons, the
15 preliminary injunction motion is denied. The order you will
16 get out of me will say nothing but Denied for the reasons
17 stated in open court.
18     Now let's turn to the matter of scheduling.
19     When we met in November, I specifically asked the
20 parties to meet and confer on a schedule. And then the order
21 that I put out following that meeting, this was the 19th of
22 November, said, quote, the Court will hold a Rule 16
23 scheduling conference on December 20th. That would be
24 today. Counsel shall file their proposed joint scheduling
25 order with the Court three business days prior to the

Page 44

1  scheduling conference. We might have missed it, but I don't
2  think we got it.
3      Mr. Morrison.
4      MR. MORRISON: Your Honor, Ms. Sanchez is going
5  to be prepared to discuss the scheduling order in general.
6  One of the problems is we weren't able to work out an
7  agreement because there is a dispute about when we want to
8  have a trial. We obviously want to do it sooner than they
9  do.
10     One thing I would like to ask Your Honor, in view
11 of your ruling, because I think the schedule would depend on
12 your answer to this question, we would respectfully request
13 that either you award us an expedited trial on the merits or,
14 alternatively, an opportunity to renew our motion for a PI.
15     We in fact did do a consumer survey. It wasn't
16 completed until right before their papers were due. We knew
17 if we interjected it in the case at that point, we would lose
18 the ability to come before you in December and have a hearing
19 on the motion.
20     So we would like to request -- I think everything
21 flows in terms of scheduling from whether we can either have
22 a renewed hearing date on a motion or an expedited trial on
23 the merits.
24     THE COURT: Mr. Weinberger.
25     MR. WEINBERGER: It just seems to me, Your Honor,

Page 45

1  you have one shot to make a preliminary injunction motion.
2  As I said in my argument, it is not as if they came running
3  in here the day after this declaratory judgment action was
4  filed with a PI motion. It took six weeks from the time the
5  case was filed until they made the motion. In my experience,
6  you can do a survey in two or three. So it just seems to me
7  they have had their opportunity to make a preliminary
8  injunction motion. They have made whatever tactical decision
9  they made.
10     While Your Honor may want to provide them with a
11  trial date somewhat sooner than necessary, I don't see
12  renewing the preliminary injunction motion as an appropriate
13  thing to do.
14     THE COURT: Well, you are not getting another
15  bite at the apple for a preliminary injunction. It is what
16  it is. You have made your record. You argued. We have done
17  that. That chapter is closed. Now the question is, when is
18  trial going to be and what do you need to get there.
19     I have a scheduling order right here. I am ready
20  to hand it to you, because you guys didn't give me what I
21  asked you for. Very specifically, I said, give me your
22  positions three days in advance. The fact you couldn't agree
23  doesn't mean you couldn't give me something. Every day I get
24  scheduling orders where parties disagree and one side says
25  this is what I want and the other side says this is what I

Page 46

1  want, and we talk about it. But at least then I have had the
2  chance to look at my calendar, to think about your
3  alternative proposals. We don't waste our time, which we are
4  going to do now -- you put me in a posture where you have to
5  do one of two things. I hand you the schedule I prepared
6  because you guys wouldn't prepare one, chose not to, or I
7  hear what you have to say today, I make you do what I asked
8  you to do before, which is give it to me on paper and we
9  reconvene this, either by teleconference, or I choose
10  something and hand it to you anyway.
11     The reason I want you involved in the process is
12  it's more beneficial for all of us. In other words, I would
13  rather not say, well, I have come up with this order, here it
14  is. I am interested in what you want to know.
15     So that is enough whining by me. I am
16  disappointed you didn't give me what we needed so we could be
17  done with it today. I am not going to jam an order down on
18  you without hearing from you. So if you want to talk to me
19  about it, we will do it on a teleconference later.
20     Here is what you guys need to do. Do what I
21  asked you to do in November, speak to each other, then give
22  me a form of order. If you have a disagreement, your local
23  counsel have been through this process with me dozens of
24  times, put down the alternatives -- plaintiff wants this,
25  defendant wants this. We will get on the phone and we will

Page 47

1  talk about it then, after I have had a chance to see what you
2  want, look at my own calendar and make some judgments about
3  what seems fair and what will fit.
4     All right? Now, hold with me just a second
5  here. I am going to give you a date and time if I can for
6  the scheduling teleconference.
7     (Pause.)
8     We will have a scheduling conference at 4:30 p.m.
9  on Monday, January 10th. And I will ask AstraZeneca as the
10  plaintiff in the case to set up the call. I will expect to
11  have that scheduling order to me in advance. I will see it
12  on the 4th at the latest, the 4th of January.
13     All right. Mr. Morrison, anything else from your
14  side of the courtroom, sir?
15     MR. MORRISON: No, Your Honor.
16     THE COURT: Mr. Weinberger?
17     MR. WEINBERGER: No, Your Honor.
18     THE COURT: All right. We stand in recess.
19  Thanks for your time.
20     (Hearing concluded at 11:17 a.m.)
21                    - - -
22  Reporter: Kevin Maurer
23
24
25

'super' [1]              38:23
-and [2]  1:16    1:22
00 [1]    1:11
04-1332 [1]          1:9
1 [4]     9:22    9:25
11:11   36:2
10 [1]    1:11
100 [4]   20:2    20:5
36:3    36:7
100,000 [3]          30:8
30:8   30:22
10th [1]  47:9
11 [1]    47:20
12.7 [1]  35:21
12.7-advantage [1]
12:3
12.7-percent [1]
11:23
1286 [1]  12:5
133 [2]   5:12    41:2
14 [1]    13:21
16 [2]    8:23    9:6
17 [3]    9:7     34:13
47:20
1986 [1]  15:10
1995 [1]  4:11
19th [1]  43:21
2 [3]     11:16   13:2
36:2
20 [6]    1:11    18:22
19:24   19:25   32:24
33:4
20-milligram [1]
38:19
20-percent [4]   32:23
32:25   33:3    35:12
2001 [1]  4:12
2002 [1]  33:19
2004 [2]  1:11    38:16
20th [1]  43:23
27 [1]    38:15
3 [1]     36:2
3,000 [1]         10:2
30 [3]    19:24   33:5
47:8
4 [1]     47:8
4.9 [1]   35:20
4.9-percent [1]  11:24
40-milligram [1]
38:20
45-second [1]    23:10
4th [2]   47:12   47:12
5 [1]     16:11
5.2 [1]   30:12
5.3 [1]   30:13
75 [4]    12:22   12:23
19:20   23:3
999 [1]   12:5
a.m [2]   1:11    47:20
abacon [1]        26:4
ability [2]       33:10
44:18

able [3]  14:17   35:6
44:6
absence [2]      36:20
40:15
absolutely [5]   5:24
6:11   10:20   29:13
29:18
abstract [1]      9:12
abused [3]        3:9
6:3    6:7
accepted [2]     33:20
34:3
according [1]    5:13
account [1]      18:25
acid [32] 7:5    7:16
8:3    9:5    10:4
13:24   14:21   15:19
15:23   16:2    16:8
16:9   16:12   16:13
16:14   16:15   16:18
17:11   17:14   17:21
17:22   18:5    18:7
18:12   18:16   18:24
19:23   24:5    28:25
38:5    38:6    39:12
acid-related [1] 17:4
acknowledged [1]
31:16
Act [4]   20:10   20:14
21:7   25:24
action [2]        1:3
45:3
actionable [1]   24:18
active [1]        33:6
actor [1] 15:22
actor's [1]       39:15
actual [2]        6:15
40:8
ad [23]   4:21    5:5
6:5    14:12   15:2
15:7   15:12   15:14
15:21   16:3    18:17
19:2   21:16   21:23
23:10   26:24   30:25
35:5   35:6    37:7
39:15   40:8    41:10
add [1]   31:9
address [4]       7:21
29:21   40:21   41:6
addressed [1]    7:14
addressing [1]   38:12
adequate [1]     42:11
adequately [1]   26:7
43:6
adopted [1]      15:9
ads [18]  3:11    3:12
3:16   4:17    4:18
4:19   5:12    5:17
13:11   13:19   14:25
15:18   15:18   19:15
21:18   31:11   40:2
42:8
advance [2]      45:22
47:11
advantage [1]    20:8
adverse [1]      3:14

advertisement [7]
10:13   15:12   18:21
21:5   24:15   24:15
27:11
advertising [31] 3:6
3:8    3:10    3:17
3:23   3:24    3:25
4:5    4:8    4:13
4:16   5:3    5:10
5:25   6:2    6:4
6:22   6:23    7:2
13:15   20:7   20:16
20:21   23:12   23:15
32:11   33:14   36:7
36:10   42:8   43:8
affect [1]        35:14
affidavit [1]    39:22
again [19]        8:24
9:15   9:18   9:23
18:20   19:10   20:8
21:3   23:10   26:14
26:11   26:20   28:2
33:10   39:4   39:23
40:16   41:6   42:13
against [1]      26:13
33:6   38:19   38:23
aggressive [1]   4:3
agree [2] 11:2   45:22
agreed [1]       27:22
agreement [1]    44:7
ahead [3]         2:5
2:7    23:22
alleged [1]      14:23
allow [1]        20:10
alternative [1]  46:3
alternatively [1]
44:14
alternatives [1] 46:24
ambiguous [2]    24:16
24:16
Amendment [1] 25:16
American [3]     20:14
27:21   36:7
among [5]        11:19
14:21   14:23   15:4
34:23
amounts [2]      13:9
28:25
Anacin [8]       20:15
20:15   20:17   20:20
20:22   21:18   27:9
27:11
Anacin's [1]     20:16
Anacin-Tylenol [1]
21:11
analgesic [1]    20:20
analysis [3]     35:15
35:18   43:4
answer [5]        14:4
17:9   22:12   36:9
44:12
answering [1]    4:18
anti-inflammatory [3]
20:17   20:18   20:22
anyway [1]       46:10

appearances [2]
1:14   40:24
appeared [1]     38:12
apple [1]        45:15
apply [2]        30:2
31:13
approaching [1]
15:5
appropriate [4]  32:7
40:10   41:18   45:12
approved [3]     33:4
38:19   38:20
area [1]  31:8
arguably [1]     26:12
argue [4]        14:17
25:17   30:22   37:9
argued [3]       33:23
45:16
argument [13]    2:15
5:8    7:23    18:7
27:10   34:4   37:16
40:22   41:7   41:15
41:17   42:18   45:2
artfully [2]     37:10
42:8
Ashby [1]         1:21
assertion [9]    6:16
10:8   12:13   12:16
14:4   18:4    37:5
40:2   41:13
assertions [1]   24:20
asserts [2]      37:6
41:9
AstraZeneca [14]
1:3    2:12   2:15
3:22   4:3    9:13
22:25   23:3   32:19
40:21   41:9   41:22
41:25   47:9
AstraZeneca's [4]
9:4    10:17   41:7
42:16
attachments [1] 5:19
attention [2]     17:2
42:22
audience [1]     6:5
author [3]        8:12
9:3    34:18
authorities [2]  43:2
43:6
authority [1]    30:16
authors [1]      16:11
available [1]    34:16
average [2]       16:9
20:3
Avis [1]  15:9
avoid [1]        25:13
39:18
avoiding [1]     26:19
award [1]        44:13
away [5] 13:25   13:25
24:10   25:14   32:14
B [11]    1:17    6:4
6:24   7:5    12:11
12:22   12:23   13:2
25:2   25:2   35:18

back-and-forth [1]
4:25
bad [7]   5:11    5:25
6:7    16:6    16:7
18:17   42:6
Baird [2]         1:15
2:12
balance [5]      36:21
41:6   41:13   41:20
41:22
balanced [1]     26:24
Balick [6]        1:21
2:9    2:17    2:18
2:20   2:24
ball [2]  26:23
balls [1] 26:24
barely [1]        3:11
basis [2] 27:12   28:17
bear [1]  5:15
becomes [1]      35:22
began [2]        3:10
3:13
begin [2]        2:2
6:3
beginning [3]    15:21
16:3   23:24
begins [1]       16:21
believing [1]    13:24
Belknap [2]       1:23
2:21
beneficial [1]   46:12
benefit [13]     12:8
14:22   20:2   20:22
27:14   27:23   28:3
29:11   33:20   32:20
32:21   36:4   36:8
benefits [6]     3:13
3:19   3:21   20:17
20:18   20:19
best-selling [1] 4:7
better [29]      6:16
6:17   7:3    7:5
7:12   15:23   16:2
16:4   16:22   17:4
17:6   17:11   18:9
19:5   19:5   19:8
19:10   20:5   21:5
25:6   25:9   26:18
27:12   31:2   34:22
35:2   38:6   42:15
42:16
between [4]      14:16
14:16   35:20   43:21
beyond [1]       19:11
24:14
big [2]   38:5    39:12
big-page [1]     42:21
bigger [1]       8:10
bite [1]  45:15
bleach [4]       26:3
26:5   26:9   26:11
bloncolor [1]    26:4
bodies [1]       30:14
bookends [1]     20:13
bothers [1]      18:6

**bottom** [3]          37:23
38:18    42:16
**brand** [2]             4:4
4:8
**breakdown** [1]    25:7
**brief** [7] 7:13      7:21
32:15    33:16    36:2
40:22    41:7
**briefly** [2]           7:9
20:12
**broad** [1]            20:9
**broader** [5]        27:9
27:10    27:12    27:23
28:3
**brochures** [1]    13:20
**build** [1] 4:8
**built** [2] 4:4        26:5
**burden** [2]         37:2
37:3
**business** [1]      43:25
**buy** [2]  21:5      31:10
**C** [13]   1:22       11:4
11:21    11:23    11:25
12:5     12:8     12:11
12:14    14:23    15:2
25:3     29:11
**calendar** [2]       46:2
47:2
**campaign** [4]     4:21
6:16     6:17     41:10
**cannot** [3]         15:7
20:23    28:12
**capable** [1]       40:25
**career** [1]         8:15
**careful** [1]        20:21
**carefully** [3]       9:6
39:25    40:9
**case** [48] 3:7     5:15
5:20     6:8     6:20
6:22     15:8     15:9
20:14    21:7     21:11
21:12    21:17    21:20
22:21    21:22    24:25
25:4     25:13    25:19
25:20    25:21    26:2
26:13    26:21    27:7
27:8     27:9     27:16
27:19    27:20    27:21
27:22    27:25    28:4
30:11    30:16    32:17
32:17    33:18    33:19
34:9     37:4     38:7
42:4     44:17    45:5
47:10
**cases** [15]        10:18
10:24    20:12    20:14
21:10    24:20    24:24
25:11    27:6     31:5
38:25    39:6     39:8
39:18    42:11
**Castell** [23]       8:10
8:11     8:16     9:3
9:3     10:9     10:19
10:22    11:13    11:22
11:23    12:2     12:5
12:11    28:15    28:15
28:17    28:21    29:11
29:15    30:2     31:25

32:13
**Castell's** [3]
34:12    35:21       12:21
**Castrol** [1]        24:25
**categories** [1]    22:4
**category** [2]      12:6
31:23
**caught** [1]        4:10
**caused** [1]       26:15
**certain** [1]        15:7
**certainly** [2]     42:19
43:13
**chain** [2]          39:9
39:14
**chance** [1]        46:2
**change** [1]       28:7
32:12
**chapter** [1]      45:17
**chart** [1] 13:3
**cheaper** [1]      42:14
**chemical** [1]     29:3
**choose** [1]       46:9
**chose** [1]         46:6
**Circuit** [5]        15:9
20:20    25:25    28:8
33:19
**cite** [2]  34:12    42:22
**cited** [6] 25:19    27:8
27:10    27:20    32:17
39:6
**citing** [1]         33:5
**Civil** [1] 1:3
**claim** [19]        9:4
9:8     10:13    10:14
14:9     21:2     24:3
25:4     25:8     25:24
26:18    27:3     27:8
28:12    28:13    28:14
37:5     38:12    39:5
**claimed** [2]       9:15
10:13
**claiming** [1]     32:11
**claims** [1]       11:14
**class** [1] 34:16
**classic** [1]       27:7
**clear** [6] 8:4     9:7
21:7     33:10    36:9
36:17
**client** [1]        21:14
**clinical** [8]      4:22
7:20     8:13    23:25
33:2     34:10    34:22
35:14
**clinically** [12]    8:20
9:20     9:24    10:9
10:10    10:18    10:22
11:7     11:9     13:4
34:14    34:24
**Clorox** [2]       25:20
25:21
**closed** [1]       45:17
**clothes** [2]       26:3
26:10
**Cohen** [2]        1:17
2:11

**combination** [1]
39:16
**combine** [1]      13:2
**combined** [1]    13:2
**coming** [3]       5:11
23:11    39:15
**commercial** [12]
3:7     5:3     16:19
16:21    19:7    19:22
25:17    27:13    28:4
34:2     36:4     38:20
**commercials** [1]
19:7
**commissioned** [1]
10:2
**common** [1]      3:16
**communicate** [1]
6:23
**communicated** [3]
27:22    27:23    28:3
**communicating** [2]
24:17    27:18
**companies** [5]    3:9
3:12     3:24     4:15
8:15
**company** [2]     5:12
36:5
**comparative** [6]
4:5     4:8     4:16
4:19     4:20    6:4
**comparing** [2]    4:5
6:4
**competitive** [1] 4:2
**complaint** [3]    26:7
37:6     39:24
**completed** [2]   38:19
44:16
**Conaway** [2]     1:16
2:13
**concede** [3]      12:6
16:9     20:8
**conceding** [1]   34:23
**concept** [1]      15:8
16:22
**concerned** [1]   18:13
**concession** [1]  23:25
**conclude** [1]     35:4
**concluded** [3]    39:24
47:20
**conclusion** [3]   8:23
34:13    38:7
**conclusions** [1] 11:20
**conducted** [1]   9:23
**confer** [1]        43:20
**conference** [3]   43:23
47:8
**confirm** [1]      34:15
**confuse** [1]      40:18
**confusion** [4]    6:15
37:16    39:19    40:8
**consider** [2]     15:14
41:9
**considered** [1]   39:24
**constant** [1]     17:20

**consumer** [19]    3:24
5:4     13:23    13:24
16:9     18:15    19:22
20:3     23:9     23:14
24:10    25:14    31:7
36:6     37:15    37:16
38:2     38:21    44:15
**consumers** [8]    16:15
23:12    24:17    26:17
37:11    42:7     42:10
42:14
**contend** [1]      11:13
**contention** [1]   6:18
**contents** [1]     16:14
**context** [14]     7:12
15:7     15:12    15:14
16:20    18:5     18:11
18:20    21:9     37:21
37:22    39:13    39:16
40:18
**continuous** [1]   30:12
**contrary** [1]     35:6
**converting** [1]   20:9
**convey** [1]       20:23
**conveying** [1]    27:11
**conveys** [2]      7:2
7:3
**convince** [1]     35:6
**copy** [2] 7:23    38:15
**correct** [3]       5:24
29:18    38:24
**correctly** [1]     28:23
**cost** [1]  32:2
**couching** [1]     38:13
**counsel** [1]      1:20
1:25     2:23     43:24
46:23
**counter** [1]      41:12
**Counter-claimant** [1]
1:9
**Counter-defendant** [1]
1:5
**counterclaim** [1]
37:7
**couple** [3]        9:18
23:18    28:8
**court** [50]        2:14
2:17     2:19     3:3
5:6     6:9     6:12
6:19     10:5     10:16
10:21    11:6     12:12
13:5     13:16    15:13
15:14    17:17    17:21
18:4     18:11    20:19
21:4     21:9     21:20
21:25    22:6     22:14
22:19    23:16    23:18
23:21    23:22    24:19
25:8     26:17    28:20
30:20    33:15    33:20
34:3     36:11    36:13
43:17    43:22    43:25
44:24    45:14    47:16
47:18
**courtroom** [2]    2:8
47:14
**courts** [4]        15:6

15:10    24:8    24:13
**cover** [1]                 33:16
**craft** [1] 20:21
**credible** [1]            41:13
**criteria** [1]            33:5
**critical** [1]           25:16
**cure** [1] 22:11
**cures** [2] 22:11
**D** [11]   11:4      11:21
11:24    11:25    12:5
12:8     12:11    12:14
14:23    19:20    29:11
**damage** [13]        15:5
15:20    16:25    17:4
17:6     17:23    18:8
18:23    19:17    19:18
29:4     39:17    41:11
**damaged** [1]         16:7
**damages** [1]        19:19
**danger** [1]         18:21
**dangerous** [1]      5:10
**data** [9] 9:15     11:19
11:20    12:3     36:3
**date** [4] 44:22    45:11
47:5
**day-to-day** [1]     4:23
**days** [2] 3:9      43:25
45:22
**deal** [2]  2:5      28:18
**decades** [1]       28:8
**December** [3]     1:11
43:23    44:18
**decision** [1]       45:8
**decisions** [1]     21:10
**declaration** [8]    8:11
9:5     9:7     9:18
13:21    16:12    34:13
38:15
**declaratory** [1]   45:3
**defend** [1]        41:3
**defendant** [1]    1:8
1:25     46:25
**defer** [1] 43:5
**definitely** [2]     37:9
42:23
**Delaware** [1]     1:1
1:10
**demonstrated** [2]
37:23    38:10
**demonstrating** [1]
38:18
**denied** [3]        21:13
43:15    43:16
**denying** [1]       36:16
**depend** [1]       44:11
**design** [1]        8:13
**designed** [5]      8:5
8:6     19:7     28:18
29:12
**detergent** [2]     26:3
26:5
**diaries** [1]        8:9
**difference** [12]    4:20
6:6     11:23    11:24

CondenseIt™

measurement - point

measurement [1] 35:14
measurements [2] 8:7  9:14
media [1] 42:22
medical [3] 3:25  3:25  17:6
medications [3] 33:25  34:16  34:19
medicine [1] 17:7
meet [2] 36:18  43:20
meeting [1] 43:21
meets [1] 4:24
mention [1] 3:11
mentioned [2] 9:22  42:13
merit [2] 5:14  39:25
merits [5] 21:12  36:19  40:13  44:13  44:23
message [8] 6:25  7:3  7:12  19:10  20:9  20:23  25:14  27:11
messages [3] 7:3  7:7  33:23
met [2] 37:4  43:19
might [15] 11:8  14:22  17:16  18:19  22:25  23:14  24:10  24:10  24:12  25:14  31:9  33:11  34:21  36:4  42:25
mild [1] 21:2
million [6] 5:12  30:6  30:23  30:24  30:24  41:2
millions [3] 35:10  36:6  41:10
minor [1] 11:3
minority [1] 12:14
minutes [2] 14:16  23:18
mislead [1] 37:11
misleading [14] 6:12  6:15  14:6  25:18  37:14  37:17  37:19  38:13  38:14  38:17  40:2  40:4  40:5  40:9
misleads [1] 38:21
misled [3] 14:7  31:4  39:4
missing [2] 27:18  28:6
moderate [1] 10:14  10:17  10:23  15:4  16:24  18:23  19:17  19:18  20:5  21:3  21:6  22:2  22:7  22:8  22:17  23:2  24:4  28:18  29:4  29:5  29:9  29:17  29:19  31:14  31:20  35:19  38:24  39:18
Monday [2] 1:11  47:9

morning [6] 2:10  2:18  2:19  2:23  24:7  24:22
Morrison [40] 1:22  2:21  3:3  3:5  5:7  5:23  6:11  6:18  6:21  10:12  10:23  10:25  11:10  12:19  13:14  14:19  17:9  17:19  17:22  18:10  18:14  21:11  22:5  22:9  22:18  22:24  23:17  24:22  27:8  31:6  33:15  33:16  35:4  36:12  37:9  38:3  44:3  44:4  47:13  47:15
Morrison's [2] 23:24  24:9
mosaic [1] 15:15  15:17
most [4] 9:2  9:25  14:17  16:13
mostly [1] 13:9
motion [18] 3:4  9:11  11:2  12:7  20:9  21:13  21:13  25:22  25:22  26:11  43:15  44:14  44:19  44:22  45:4  45:5  45:8  45:12
mouth [1] 39:15
Ms [1] 44:4
must [4] 15:11  15:13  15:14  40:21
Mylanta [3] 33:22  33:22  34:5
Naftalis [1] 1:18
name [2] 3:11  29:3
naturally [1] 18:2
Naughton [2] 15:22  16:20
necessarily [7] 24:19  25:3  25:10  26:8  33:23  34:2  34:4
necessary [13] 7:2  7:8  14:13  24:24  25:12  25:25  26:12  26:17  33:17  33:20  39:6  39:10  45:11
need [7] 6:19  7:14  22:23  38:8  40:20  45:18  46:20
needed [2] 35:15  46:16
neighborhood [1] 8:19
neither [2] 8:4  17:25
Nevertheless [1] 20:19
new [8] 1:19  1:19  1:24  1:24  2:21  3:22  33:21  42:21
news [1] 38:4
Nexium [24] 4:4  4:5  4:8  4:11  6:16  7:3  16:3

17:4  17:6  17:11  17:25  18:9  19:5  19:8  20:2  20:6  25:4  30:9  31:10  34:15  34:21  34:25  38:6  42:15
next [2] 31:2  38:22
night [1] 26:19
nighttime [5] 33:22  34:4  34:5  34:7  34:8
nobody [1] 30:13
none [4] 5:2  8:20  8:25  9:19
note [1] 40:16
noted [1] 5:7  5:18  38:16
noteworthy [1] 38:11
nothing [12] 10:9  10:10  11:8  19:2  21:17  22:20  32:18  34:2  35:5  41:12  41:23  43:16
notice [1] 18:24
notion [2] 32:24  37:17
notwithstanding [1] 42:10
Novartis [1] 33:19
November [3] 43:19  43:22  46:21
now [25] 4:15  8:4  8:12  9:10  9:15  10:8  11:4  11:12  11:16  11:16  12:10  16:23  17:5  47:2  21:16  28:13  34:22  36:14  40:11  40:19  41:11  43:18  45:17  46:4  47:4
nub [1] 18:12
number [11] 4:21  4:23  7:18  24:17  29:24  30:3  35:15  35:20  35:21  35:22  35:22
numbers [1] 36:3
obvious [1] 16:17
obviously [3] 6:22  35:4  44:8
office [2] 2:13  31:17
oil [2] 25:4  25:8
Oklahoma [1] 8:22
once [1] 19:3
one [44] 4:6  4:21  5:13  7:15  7:15  8:19  9:4  11:7  14:22  16:11  16:17  17:18  17:19  18:23  20:2  20:4  20:4  20:13  24:2  25:21  26:22  28:25  29:8  29:22  30:3  30:5  30:6  30:8  30:15  33:2  33:18  33:20  33:24  35:24  36:3  36:7  41:8  41:18

44:2  44:6  44:10  45:24  46:5  46:6
one-page [1] 9:12
one-quarter [1] 28:23
one-sided [1] 29:24
open [1] 43:17
opponent [1] 6:12
opponent's [2] 12:17  24:21
opponents [2] 14:5  28:22
opportunity [3] 32:8  44:14  45:7
oral [1] 7:23
order [11] 38:8  41:2  43:15  43:20  43:25  44:5  45:19  46:13  46:17  46:22  47:11
orders [1] 45:24
ordinary [2] 31:7  40:19
otherwise [3] 25:14  34:7  39:20
outset [1] 31:22
overall [1] 7:4  7:6  10:14  16:20  19:9  19:10  20:23  28:13  28:17  28:24  37:6
overwhelming [1] 38:25
own [7] 3:20  16:8  33:13  34:13  34:15  35:25  47:2
p.m [1] 47:8
page [8] 9:22  9:25  11:16  13:2  38:17  38:18  38:22  42:21
pain [9] 3:20  20:24  21:2  21:3  21:3  21:5  21:7  21:19  21:24
paper [1] 46:8
papers [12] 4:18  5:7  5:18  9:13  12:13  12:17  13:8  15:22  24:21  39:23  42:13  44:16
paradigm [1] 24:24
Paragraph [3] 9:6  16:11  34:13
particularly [3] 3:7  5:3  41:5
parties [4] 27:22  41:22  43:20  45:24
past [1] 3:18
patient [4] 18:24  31:21  34:25  35:17
patients [36] 8:8  10:2  12:8  14:22  14:23  15:4  16:13  16:24  16:24  18:22  18:23  19:16  19:18  19:19  19:20  22:2  22:7  22:16  22:16  22:20  29:4  29:5

29:6  29:9  29:12  29:16  29:16  29:18  32:5  34:21  35:16  35:19  35:22  35:23  36:3  36:8
Patterson [2] 1:23  2:20
Pause [1] 47:7
pay [1] 17:2
Pennzoil [1] 24:25
people [26] 12:5  12:15  12:24  14:6  19:14  21:6  22:4  22:17  22:21  22:22  23:2  30:8  30:8  30:14  30:14  30:18  30:18  30:22  31:4  31:13  32:7  33:2  35:2  38:3  39:4  39:13
percent [24] 8:19  12:22  12:24  14:22  18:22  18:24  19:14  19:20  19:24  23:3  28:25  29:22  30:3  30:4  30:5  30:6  30:8  32:13  32:14  32:24  33:5  33:5  35:20  35:24
percentage [2] 29:25  32:12
perfect [1] 20:13
permits [2] 25:16  32:16
permitted [2] 32:16  43:8
person [2] 20:4  31:23
persuade [1] 41:4
pertain [1] 19:13
pharmaceutical [5] 1:7  2:25  5:17  8:14  42:8
Pharmacia [4] 25:20  26:13  26:14  26:15
phone [1] 46:25
phrase [1] 26:6
phrases [1] 15:13
physician [1] 31:22
PI [2] 44:14  45:4
piece [2] 2:5  4:25
pill [2] 17:24  42:15
pin [1] 11:6
pioneered [1] 3:22
pitch [1] 43:10
place [2] 5:10  27:4
placebos [1] 33:6
plaintiff [1] 1:4  1:20  21:14  28:4  33:23  46:24  47:10
plausible [2] 24:11  24:12
pleaded [1] 26:7
pleading [1] 26:11
podium [1] 3:4
point [34] 5:11

CondenseIt™                                                             points - Shaw

| | | |
|---|---|---|
| 5:17 | 6:6 | 6:13 |
| 9:2 | 9:24 | 10:3 |
| 11:12 | 12:16 | 12:20 |
| 13:6 | 15:3 | 16:17 |
| 19:6 | 21:16 | 22:11 |
| 22:14 | 29:16 | 29:22 |
| 29:23 | 31:15 | 32:14 |
| 34:10 | 35:3 | 35:8 |
| 36:2 | 38:11 | 39:21 |
| 42:4 | 43:4 | 43:10 |
| 43:11 | 43:13 | 44:17 |

**points** [3]                    7:24
33:16   36:2

**policy** [3]                    5:16
42:6   42:25

**population** [6]    12:10
12:15   12:15   12:22
14:21   35:23

**posit** [1] 19:7

**position** [5]          10:17
23:13   40:10   40:23
42:24

**positioning** [1] 17:9

**positions** [1]        45:22

**possible** [2]          26:6
26:9

**posture** [1]            46:4

**potential** [1]          6:3

**powerful** [1]          21:2

**preceded** [1]        17:14

**precise** [1]            10:16

**precisely** [2]          24:8
28:6

**preliminary** [12]
2:3   2:5   21:10
21:13   21:21   25:23
36:16   37:3   43:15
45:7   45:12   45:15

**prepare** [1]            46:6

**prepared** [1]          44:5
46:5

**prescription** [3]3:8
17:3   17:7

**presentation** [1]
23:19

**presented** [2]    37:10
41:17

**press** [3] 37:19    42:19
42:21

**presume** [2]        40:17
40:23

**pretty** [1]              31:16

**Prevacid** [7]          3:17
3:19   4:10   4:19
5:12   6:2   7:4
17:11   17:25   19:16
24:5   29:2   30:10
34:15   34:25   38:23
41:3

**prevailed** [1]        27:17

**Prilosec** [3]            4:6
4:10   42:12

**primarily** [2]          8:5
8:6

**primary** [2]            3:7
10:3

**print** [4] 4:18        13:19

| | |
|---|---|
| 21:23 | 37:8 |

**problem** [5]            10:11
15:5   18:12   33:14
42:5

**problems** [1]        44:6

**process** [3]          23:10
46:11   46:23

**product** [11]          26:4
26:10   26:14   26:15
26:16   26:18   26:19
27:11   27:12   33:21
34:6

**production** [1] 42:9

**productively** [1]
14:17

**products** [4]          1:7
20:15   27:21   33:6

**prohibited** [1]        32:6

**promote** [2]          4:18
41:3

**promoting** [2]    20:25
23:12

**promotional** [1]
4:24

**pronounce** [1]    29:3

**proof** [18]              17:5
17:5   17:10   17:11
17:16   19:5   19:8
19:8   25:18   27:13
28:9   28:15   32:7
32:9   33:11   37:15
38:8   38:8

**properly** [1]          43:9

**proponent** [1]    36:21

**proposals** [1]        46:3

**proposed** [1]        43:24

**proposition** [1] 30:17

**protected** [1]        43:6

**prove** [3]              17:6
28:2   31:5

**proved** [2]            27:17
33:12

**proven** [6]            21:15
21:15   26:2   27:2
27:3   34:19

**provide** [1]          45:10

**provided** [1]          5:19

**prudent** [1]          40:3

**public** [12]            5:16
30:22   36:7   36:22
41:15   41:18   41:19
42:3   42:6   42:25
43:3   43:5

**pull** [1]  41:11

**purposes** [4]      10:25
11:2   12:7   20:8

**push** [1] 43:11

**pushed** [1]          42:12

**put** [9]    6:21   14:12
18:20   19:21   31:17
33:10   43:21   46:4
46:24

**puts** [1]  14:11

**putt** [3]  26:25   26:25
27:4

**putting** [1]            27:3

**questions** [1]          7:14

**quitting** [1]          26:20

**quote** [10]              6:17
15:10   16:13   29:2
34:14   34:19   38:17
38:22   39:23   43:22

**quoted** [1]            17:13

**quoting** [1]            39:2

**raised** [1]            40:18

**randomized** [1] 33:2

**rates** [1] 11:24

**rather** [3]            15:16
30:3   46:13

**reached** [1]            8:23

**reaction** [1]          10:8

**reactions** [1]          6:15

**read** [14] 13:12    13:17
13:19   13:20   13:24
22:9   22:19   22:20
22:23   29:13   31:6
31:7   37:8   38:14

**reading** [2]            8:4
31:13

**ready** [1]            45:19

**real** [2]  11:18    41:11

**really** [11]
5:15   7:22   9:12
14:5   22:10   23:6
31:21   40:4   40:20
42:16

**reason** [7]            25:11
25:12   25:15   27:16
32:6   33:12   46:11

**reasons** [2]          43:14
43:16

**rebuttal** [1]          23:19

**Recent** [1]            17:5

**recess** [1]            47:18

**reconvene** [1]      46:9

**record** [8]            5:21
14:9   32:8   37:25
40:13   41:5   43:13
45:16

**reemphasize** [1]
13:7

**refer** [2] 20:12    34:7

**referring** [1]          38:23

**reflux** [29]              7:5
7:16   8:3   9:5
10:4   13:24   14:21
15:19   15:23   16:2
16:10   16:12   16:15
16:18   17:11   17:14
17:21   17:22   18:6
18:7   18:12   18:16
18:24   19:23   24:6
28:25   38:5   38:6
39:12

**regard** [1]            12:20

**regarding** [1]          8:16

**regulatory** [1]      43:2
43:6

**regurgitation** [1]
16:14

**reiterate** [1]          33:9

**rejected** [2]          28:5
33:21

**related** [1]          25:6

**relief** [15]            3:19
7:4   7:16   8:3
8:6   8:8   8:16
11:11   11:15   20:24
21:19   33:11   37:3
38:9   40:11

**reliever** [2]          21:2
21:5

**relievers** [1]      21:24

**remember** [2]      12:22
27:14

**renew** [1]            44:14

**renewed** [1]        44:22

**renewing** [1]        45:12
47:11

**rep** [3]  4:24        23:3
23:6

**reply** [7] 7:13        7:21
9:18   32:15   36:2
40:22   41:7

**Reporter** [1]        47:22

**reproduced** [1]    13:20

**request** [2]          44:12
44:20

**require** [1]          24:8

**required** [2]          21:20
27:24

**research** [3]        21:17
21:20   21:22

**respect** [8]            12:6
21:6   23:25   29:14
29:15   32:4   32:22
41:18

**respectfully** [1] 44:12

**respects** [1]        32:16

**respond** [1]          2:23

**responded** [1]    39:22

**response** [1]          29:7

**results** [4]            8:15
9:14   29:10   34:14

**reviewed** [1]          8:11

**right** [21]              2:2
3:3   6:13   10:6
10:8   22:5   22:14
22:17   29:5   33:15
36:11   36:14   39:7
41:11   42:25   43:14
44:16   45:19   47:4
47:13   47:18

**rightly** [2]            21:16
21:20

**Robinson** [2]        8:21
9:17

**roughly** [2]          14:16
40:7

**rule** [8]    25:15    25:15
32:23   32:23   32:25
33:7   35:13   43:22

**ruling** [2]            36:14
44:11

**run** [2]  20:3        21:4

**running** [5]            3:10
4:20   6:3   20:16
45:2

**Rx** [1]    3:10

**sales** [1] 4:23

**Sanchez** [3]            1:23
2:22   44:4

**saw** [3]  19:20    24:20
29:10

**says** [13] 15:4        16:3
17:3   18:8   25:2
28:9   29:4   34:14
35:5   35:7   38:22
45:24   45:25

**schedule** [4]        36:15
43:20   44:11   46:5

**scheduling** [11]  2:4
43:18   43:23   43:24
44:5   44:21   45:19
45:24   47:6   47:8
47:11

**science** [3]            6:24
7:10   7:10

**scientific** [3]        7:14
8:2   13:16

**scientifically** [2]
17:17   18:3

**screen** [8]            13:12
13:17   13:18   13:19
15:24   16:21   38:6
39:12

**second** [13]            2:4
3:12   10:5   15:9
20:20   21:21   24:4
25:19   26:9   27:20
28:20   31:9   47:4

**secondary** [2]        8:7
9:23

**see** [13]  13:3        18:15
18:17   18:24   24:13
24:16   30:13   31:24
35:13   35:16   37:22
45:11   47:11

**seeing** [3]            5:5
19:2   36:3

**sense** [2]            13:18
39:3

**sent** [1] 38:16

**separately** [1]      15:16

**September** [1]      38:15

**set** [4]    12:14    12:14
38:4   47:10

**sets** [1]  39:12

**seven** [1]            8:17

**several** [5]            3:17
8:13   8:14   13:11
37:8

**severe** [28]          10:14
10:18   10:24   15:4
16:25   18:23   19:17
19:18   20:5   21:3
21:7   22:3   22:7
22:8   22:17   23:2
24:4   28:19   29:4
29:6   29:9   29:17
29:19   31:14   31:20
35:19   38:24   39:18

**shall** [1] 43:24

**Shaw** [4]              1:15
2:7   2:10   2:16

**short** [3] 39:3     40:12
42:2
**show** [24]     5:2
6:24     7:15     7:17
7:17     7:19     7:20
8:2     11:14     11:17
12:7     28:21     32:20
35:2     36:18     36:19
36:20     36:22     36:24
37:16     37:19     40:8
40:16     41:23
**showed** [3]     4:17
26:2     29:11
**shown** [4]     28:16
32:15     37:11     40:13
**shows** [6]     4:24
9:5     12:3     18:9
34:20     38:3
**side** [7]     2:8     27:16
32:2     39:12     45:24
45:25     47:14
**significance** [8]
7:20     8:25     9:16
9:16     23:25     34:10
34:22     35:14
**significant** [17] 8:18
8:20     9:2     9:19
9:20     9:24     10:9
10:10     10:18     10:22
11:7     11:9     12:25
13:4     24:17     28:21
34:24
**similar** [1]     23:7
**sitting** [4]     5:4
18:15     19:22     38:4
**six** [1]     45:4
**size** [1]     13:19
**skin** [1]     30:12
**sleep** [3] 26:15     26:17
26:19
**sliver** [1]     20:7
**small** [2]     19:14
35:22
**smart** [1]     13:25
**SmithKline** [1] 32:17
**smoking** [1]     26:20
**social** [1]     42:5
**solely** [1]     10:22
**solve** [1] 33:14
**somewhat** [1]     45:11
**somewhere** [1] 35:20
**sooner** [2]     44:8
45:11
**sophisticated** [1]
40:25
**sorry** [2] 25:20     35:3
**sort** [2]     7:22     38:9
**sound** [1]     30:23
**Spalding** [2]     26:22
26:22
**spatially** [1]     34:5
**speak** [1]     46:21
**specially** [1]     26:16
**specific** [2]     27:14
27:15

**specifically** [7] 5:20
6:10     28:18     29:12
43:7     43:19     45:21
**speculation** [1] 41:12
**speech** [1]     25:17
**spend** [1]     36:6
**spending** [1]     35:10
**spent** [4]     5:12
5:18     41:2     41:10
**Spilker** [3]     8:11
8:12     32:21
**Spilker's** [1]     35:12
**Spitalli's** [2]     13:21
38:15
**spoke** [1]     38:16
**spokesman** [1]     3:18
**sponte** [1]     25:22
**stage** [4] 37:4     38:10
42:23     42:24
**staked** [1]     14:9
**stand** [1]     47:18
**standard** [1]     36:17
**standing** [1]     31:2
**Stargatt** [1]     1:16
**start** [2] 3:14     18:7
**starting** [1]     18:11
**state** [1] 14:9
**statement** [1] 11:8
18:5     23:24     29:13
29:17     29:20
**states** [2]     29:2
30:7
**station** [1]     5:4
**statistical** [1]     8:25
**statistically** [5] 8:18
9:19     12:25     13:4
28:21
**stay** [1] 10:6
**step** [1] 42:6
**STEVEN** [1]     1:21
**stop** [3] 10:5     12:9
28:20
**stopping** [1]     18:2
**store** [1] 31:10
**Strength** [5]     33:22
33:25     33:25     34:5
34:8
**stronger** [1]     33:24
**strongly** [1]     41:18
**Stuart** [1]     2:12
**studies** [34]     4:22
7:15     7:17     7:19
7:20     8:2     8:5
8:23     9:14     9:21
9:22     10:15     10:19
10:23     11:14     11:17
12:7     15:2     17:6
17:10     19:6     19:8
19:13     19:16     22:3
22:7     22:15     29:2
29:5     32:12     32:20
35:9     38:18     38:23
**study** [45]     4:25
8:4     8:8     8:10
8:10     8:12     9:3

9:5     9:8     9:10
9:11     10:2     10:3
10:3     10:9     10:10
12:4     12:4     12:23
12:24     16:11     16:24
18:9     19:18     19:19
22:2     22:21     23:2
28:15     28:15     28:17
28:17     29:9     29:11
29:12     29:14     29:15
29:17     29:18     30:2
34:14     34:15     34:18
34:20     37:16
**stuff** [1] 5:13
**sua** [1] 25:22
**subgroup** [2]     32:12
**subscript** [1]     13:12
**subset** [4]     14:3
28:22     34:21     34:23
**substitute** [1]     26:5
**succeed** [1]     28:11
**success** [4]     36:19
37:24     38:2     40:13
**such** [1] 33:25
**sucked** [1]     42:7
**sudden** [1]     18:18
**suffer** [6]     12:15
17:14     17:15     28:23
28:24     41:11
**sufferers** [3]     12:14
14:21     30:7
**suffering** [1]     41:19
**sufficient** [1]     38:24
**sum** [1]     32:19
**super** [14]     13:13
13:17     13:19     13:20
15:3     16:23     19:16
22:2     22:11     29:2
33:25     39:15     39:17
43:12
**superior** [6]     20:20
20:24     21:18     24:5
25:5     26:14
**superiority** [11] 9:5
9:8     9:16     11:14
14:23     20:9     24:3
28:16     37:6     38:18
38:25
**superscripts** [1]
42:9
**support** [1]     33:7
**supposed** [1]     36:18
**surpassed** [1]     4:9
**survey** [9]     24:8
25:13     27:17     27:23
28:2     28:5     38:2
44:15     45:6
**swings** [1]     36:23
**switch** [1]     35:17
**symptom** [7]     8:12
8:16     8:24     9:17
11:11     11:15     16:8
**symptomatically** [1]
31:20
**symptoms** [10]     7:5
7:16     7:17     8:3
9:6     10:4     11:5

16:10     19:11     19:12
**tactical** [1]     45:8
**taking** [3]     20:2
20:7     36:4
**talks** [1] 15:2
**TAP** [24]     1:7
2:24     4:18     5:8
9:23     10:2     18:13
24:2     32:8     32:11
33:10     37:4     38:12
38:16     39:3     39:11
39:23     40:24     41:6
41:14     41:15     41:17
41:23     42:19
**target** [1]     6:5
**Taylor** [1]     1:16
**technical** [1]     6:5
**teleconference** [3]
46:9     46:19     47:6
**television** [6]     3:17
5:4     18:15     19:2
23:9     38:4
**telling** [1]     32:7
**ten** [6]     14:16     30:6
30:23     30:24     30:24
32:13
**terms** [7]     6:5
28:13     31:21     38:13
38:13     38:14     44:21
**tested** [1]     26:23
**testified** [1]     29:25
**text** [1]     15:13
**textbooks** [1]     8:13
**Thank** [6]     3:5
23:16     23:17     23:21
23:23     36:12
**Thanks** [2]     36:13
47:19
**theme** [1]     5:7
**themselves** [1]     8:5
**therefore** [3]     25:7
31:24     32:21
**thinking** [5]     14:2
14:8     30:25     42:10
42:15
**third** [5] 24:25     26:13
28:8     33:19     35:12
**Thomas** [2]     1:22
2:21
**thoroughly** [1] 40:25
**three** [11]     4:9
7:14     7:18     8:17
8:19     8:25     30:3
32:13     43:25     45:6
45:22
**threw** [1]     25:24
**throat** [1]     31:18
**through** [4]     19:20
23:10     25:11     46:23
**thrown** [2]     41:15
41:15
**tile** [1]     15:16
**times** [5]     13:12
19:4     37:8     42:21
46:24
**tiny** [3]     20:7     34:21

38:23
**today** [8]     3:16
5:16     37:2     37:10
42:13     43:24     46:7
46:17
**too** [1]     5:7
**took** [2]     12:16     45:4
**top** [1]     23:7
**tougher** [1]     27:14
**tout** [1]     35:10
**touting** [2]     20:16
35:9
**trade** [1] 15:4
**traditionally** [1]
3:25
**trained** [1]     4:22
**treat** [1] 35:15
**treated** [2]     31:19
31:20
**treatment** [3]     7:6
17:23     24:5
**treatments** [1]     33:3
**tremendous** [1] 38:2
**trial** [7]     21:12     33:2
44:8     44:13     44:22
45:11     45:18
**trials** [1] 8:14
**tried** [3] 13:18     28:11
30:23
**true** [9]     19:17     20:10
21:2     21:3     21:23
22:13     22:15     29:14
29:20
**truer** [1] 26:25
**trumpeting** [1]     12:2
**truncated** [1]     41:5
**truth** [1] 6:24
**truthful** [2]     25:16
25:18
**try** [2]     28:2     29:3
**trying** [3]     11:6
18:6     37:19
**turn** [5]     2:8     11:16
36:15     43:12     43:18
**TV** [2]     3:7     5:3
**twice** [1]     19:4
**two** [18]     2:3     4:23
6:23     7:3     7:7
7:17     8:19     10:7
15:19     16:11     20:12
24:2     33:6     33:16
33:23     34:11     45:6
46:5
**Tylenol** [4]     20:18
20:25     21:24     27:12
**Tyler** [1]     1:23
**types** [1]     24:4
**U.S.D.C.J** [1]     1:13
**unanswered** [2] 41:8
41:8
**unavoidable** [1]
39:9
**unbroken** [1]     39:9
**under** [1]     43:8

**understand** [11] 4:22
  12:13   12:16   12:17
  13:22   14:20   14:20
  16:15   22:3    28:22
  32:3
**undisputed** [2]   16:5
  18:3
**unique** [1]              34:7
**United** [1]            30:7
**unless** [1]             32:7
**unquote** [1]          6:17
**unsuccessful** [1]
  28:5
**up** [10]   4:10    7:22
  9:14    10:7    30:3
  31:6    32:19   43:3
  46:13   47:10
**used** [5]  3:18    4:7
  15:13   26:4    26:6
**using** [6]              6:4
  16:2    26:9    30:9
  30:10   36:2
**utilized** [1]          4:15
**utilizes** [1]          4:18
**v** [5]      1:6     15:9
  20:15   24:25   33:19
**values** [1]           42:9
**variability** [2]   32:24
  33:3
**variables** [2]      8:17
  30:12
**versus** [3]           4:2
  19:16   29:2
**vice** [3]  20:7     23:11
  23:15
**view** [1] 44:10
**viewed** [2]          15:16
  37:7
**viscosity** [3]       25:5
  25:5    25:6
**W** [2]     1:15     1:18
**Wagner** [2]          1:18
  2:11
**walk** [2] 31:16    32:14
**walks** [2]           15:22
  15:24
**wants** [3]          29:21
  46:24   46:25
**washing** [1]        26:3
**waste** [1]           46:3
**watched** [3]        13:11
  13:11   37:8
**watching** [3]       23:9
  30:25   38:4
**wear** [3] 25:6     25:7
  25:9
**Webb** [1]           1:23
**week** [1] 19:4
**weeks** [3]          30:9
  30:10   45:4
**Weinberger** [20]
  1:17    2:11    2:16
  7:23    10:6    10:11
  10:20   11:13   21:16
  23:22   23:23   24:23

  29:8    31:3    33:18
  39:7    44:24   44:25
  47:16   47:17
**Weinberger's** [2]
  10:7    23:19
**well-crafted** [2]
  41:16   41:17
**well-financed** [1]
  40:25
**whatsoever** [3]  30:17
  32:24   33:8
**whining** [1]        46:15
**white** [1]          26:10
**whiter** [3]         26:6
  26:8    26:10
**whole** [6]          12:10
  15:12   17:13   19:6
  35:7    40:17
**Wilmington** [1] 1:10
**win** [2]  36:21    43:11
**wisdom** [1]         5:16
**within** [1]         4:8
**without** [3]        28:11
  37:13   46:18
**woman** [2]          26:3
  26:8
**wonderful** [1]     15:13
**word** [5] 15:23    16:2
  22:19   22:20   41:16
**words** [10]         15:7
  15:11   17:14   22:25
  24:14   27:13   28:3
  35:16   39:14   46:12
**worked** [1]         8:14
**world** [2]          4:7
  32:6
**worth** [1]          28:8
**written** [1]        9:14
**wrong** [3]          6:14
  32:18   41:16
**year** [1] 3:18
**years** [2] 3:18     4:9
**yield** [1] 15:13
**York** [6] 1:19     1:19
  1:24    1:24    2:21
  42:21
**Young** [2]          1:16
  2:13
**yourself** [1]       5:13

12:24    13:3    19:20
23:8    28:22    30:13
34:23    34:24
differences [6] 8:18
8:18    9:24    11:3
11:22    12:9
different [2]    8:14
27:6
dinner [1]    38:5
direct-to-consumer
[10]    3:8    3:10
3:23    5:2    5:10
5:17    5:25    6:2
42:8    43:8
directly [1]    4:16
5:9    21:18
disagree [3]    10:21
12:18    45:24
disagreement [1]
46:22
disappointed [1]
46:16
disclosing [1]    3:14
discourse [2]    23:13
24:7
discuss [2]    30:18
44:5
disease [21]    7:5
7:16    8:3    9:6
10:4    15:19    15:23
16:2    16:10    16:12
16:12    16:16    16:18
17:12    17:15    18:7
18:16    18:24    19:23
24:6    38:24
dismissal [1]    25:22
dismissed [1]    25:22
disputatious [1]
15:15
dispute [3]    11:19
11:20    44:7
disregard [1]    12:21
dissection [1]    15:17
DISTRICT [1]    1:1
disturbances [2]
26:16    26:19
dividing [1]    14:14
Docket [1]    13:21
doctor [13]    4:24
17:5    18:19    18:25
20:4    22:24    23:5
23:14    31:11    31:11
34:25    35:16    40:19
doctor's [1]    31:17
doctors [5]    4:16
4:19    4:21    4:21
30:19
doesn't [8]    17:15
20:10    22:12    31:13
39:13    41:4    41:6
45:23
dollars [3]    35:10
36:6    41:2
done [5] 3:25    32:20
37:9    45:16    46:17
dose [2] 38:19    38:20

down [4]    11:6
31:18    46:17    46:24
downfall [1]    18:21
dozens [1]    46:23
Dr [19]    8:11    8:12
8:21    9:3    9:10
9:14    9:15    9:17
12:3    12:4    16:10
31:24    31:25    31:25
32:21    34:12    35:11
35:11    35:12
drafted [1]    16:18
draw [1] 38:7
drawn [3]    11:20
39:10    42:9
drive [2] 13:5    23:15
drug [17]3:8    3:11
3:20    4:2    4:2
4:6    4:7    4:10
4:11    6:4    6:4
7:11    30:15    35:17
35:18    36:4    36:8
drugs [6]    3:10
3:13    3:2    32:3
33:4    42:11
due [2]    32:22    44:16
during [1]    8:15
eating [1]    38:5
EE [35]    7:18    7:19
8:7    9:9    9:22
10:14    10:18    10:23
11:17    11:18    12:10
12:15    14:2    14:2
14:8    15:2    15:20
17:18    17:19    18:23
20:5    22:4    24:4
28:13    28:16    28:24
29:6    29:6    29:10
29:17    29:19    31:19
31:20    35:19    35:22
effective [5]    4:14
32:4    33:24    34:16
34:19
effectively [1] 37:10
effects [1]    32:2
eight [2] 30:9    30:10
either [7]    7:7
11:13    12:23    13:4
44:13    44:21    46:9
elsewhere [1]    18:5
Elway [1]    3:18
emphasized [1] 24:21
empowered [1] 43:7
encompassed [1]
22:4
end [5]    9:23    10:3
13:5    16:3    23:19
endoscopy [1] 31:18
ends [1] 16:22
engage [1]    15:15
engine [5]    25:4
25:6    25:7    25:8
25:9
enjoined [1]    36:10
entire [5]    14:21
15:15    15:17    15:24

35:23
entirety [1]    15:14
entitled [1]    30:17
30:18    33:11
equal [1]    33:3
equals [3]    25:2
25:2    25:3
equipotent [1]    21:24
equities [1]    36:22
eroded [1]    17:16
erosive [10]    7:6
11:3    18:18    18:19
18:22    19:2    19:12
19:14    19:23    19:25
esophageal [1] 39:17
esophagitis [12]7:6
11:3    18:18    18:19
18:22    19:3    19:13
19:14    19:24    19:25
34:17    34:20
esophagus [10] 16:7
17:4    17:10    17:16
17:23    17:24    17:25
18:2    18:5    18:8
ESQ [8] 1:15    1:15
1:17    1:17    1:18
1:21    1:22    1:23
essentially [1]    28:7
established [1]    20:14
establishment [1]
27:3
evaluate [1]    40:9
evaluated [1]    39:25
evenly [1]    14:14
evidence [10]    6:14
16:5    24:9    24:14
24:16    36:25    37:13
37:14    37:25    40:8
exactly [2]    27:7
27:25
example [4]    3:7
3:16    4:17    42:12
exception [1]    25:15
excuse [1]    25:13
execution [1]    8:13
exhausted [1]    11:12
exhibit [2]    13:21
13:22
expect [1]    47:10
expedited [2]    44:13
44:22
experience [2]    30:15
45:5
expert [4]    8:12
8:21    9:17    35:12
experts [6]    9:4
11:19    16:9    29:25
31:16    35:25
express [1]    27:13
expressly [1]    7:2
extend [2]    35:21
35:23
extension [1]    33:22
extent [1]    22:10
Extra [1]    33:25

extraordinarily [2]
4:3    4:14
extraordinary [1]
37:3
F [1]    13:22
fact [4]    18:3    26:12
44:15    45:22
factors [2]    8:24
41:9
factual [1]    12:16
failed [1]    40:16
fair [3]    12:19    14:19
47:3
false [11]    6:17
6:22    14:12    21:6
33:17    36:10    37:5
37:12    37:20    37:20
39:19
falsity [8]    5:20
6:10    6:24    14:10
37:13    37:24    38:14
39:5
famous [1]    15:10
far [2]    18:13    33:4
fascinating [1]    42:4
favor [1]    36:23
FDA [8] 33:4    33:5
38:12    38:16    39:21
39:23    43:10    43:12
featuring [1]    4:2
feeling [1]    16:22
Fennerty [15]    9:15
10:10    10:19    10:22
11:14    11:22    11:24
16:11    28:17    28:21
29:9    29:14    31:25
32:14    35:11
Fennerty's [5]    9:11
9:14    12:3    12:4
35:20
file [1]    43:24
filed [3] 9:11    45:4
45:5
filled [1]    8:9
final [1] 43:4
Finally [1]    42:3
findings [5]    9:17
10:19    10:22    11:7
12:21
finger [1]    6:21
firm [1] 2:21
first [13] 2:3    2:6
3:23    11:21    21:11
24:23    25:16    25:21
25:25    29:23    31:3
34:12    38:17
fit [1]    47:3
five [2] 14:16    19:4
flip-side [1]    20:25
floor [1] 15:24    15:25
flows [1]    44:21
focus [1]    10:3
focused [2]    4:21
24:2
focuses [1]    41:17

focusing [1]    10:12
folks [5] 2:8    28:23
28:24    40:19    42:18
follow [2]    7:24
18:6
followed [1]    15:10
25:10
following [2]    21:12
43:21
fooled [4]    30:25
31:10    42:10    42:14
footnote [1]    16:23
form [1] 46:22
formulated [2]    26:16
34:5
forth [1] 3:15
found [13]    8:17
8:20    8:23    8:25
11:2    11:22    11:23
11:24    20:19    23:6
23:7    26:17    30:21
foundation [1] 32:23
four [3] 30:3    36:17
41:9
frame [1]    13:10
framed [1]    32:11
framework [1]    14:11
Frankel [1]    1:18
frankly [1]    32:8
frequent [1]    17:15
front [5] 5:4    18:15
19:22    38:4    42:20
FTC [1] 15:8
Fullerton [1]    2:12
G [1]    1:23
game [1]    1:23
gastroenterologist [2]
8:22    32:22
gastroenterologists [1]
32:21
Geddes [1]    1:21
gee [4]    13:23    23:2
23:5    30:25
general [5]    7:16
7:18    15:20    15:20
44:5
generalities [1] 37:21
generally [4]    5:16
14:2    14:8    24:6
generate [1]    32:9
generates [1]    42:19
generation [2]    3:12
3:22
GERD [6]    10:13
14:8    30:7    31:17
31:19    35:23
gist [1]    15:11
given [12]    5:13
7:18    7:23    12:12
13:8    13:22    14:9
23:24    31:21    36:25
40:14    41:2
giving [1]    14:15
GlaxoSmith [1]26:13

goes [1]  15:8
golf [1]  26:23
good [8] 2:10     2:18
2:19    2:23    16:6
42:9    42:11    42:15
gradations [1]  30:12
Grade [6]        11:3
12:5    12:14    12:23
12:23   30:12
grades [6]       11:21
11:23   11:25   12:11
23:4    28:16
great [1] 32:12
greater [1]      29:11
green [1]        27:4
Greisman [1]     2:24
grounds [1]      21:14
group [7]        9:22
12:22   22:16   22:21
22:22   23:7    28:24
guess [1]        13:16
guys [3] 45:20   46:6
46:20
half [2]  12:4   18:22
half-hour [1]    14:15
hand [5] 7:22    34:3
45:20   46:5    46:10
handle [1]       2:3
handled [1]      43:9
hardship [3]     41:13
41:14   41:14
hardships [3]    41:6
41:21   41:21
harm [4] 36:19   40:15
40:17   40:22
Harold [2]       1:17
2:10
headaches [1]    27:15
healed [2]       30:9
30:9
healing [15]     7:18
8:6     9:9     10:17
10:23   11:3    11:23
11:24   15:2    17:10
18:5    24:3    30:15
34:17   34:20
heals [6] 17:4   17:6
17:24   17:25   18:2
18:9
hear [1] 46:7
heard [1]        24:21
hearing [6]      2:4
2:4     44:18   44:22
46:18   47:20
heartburn [15]   3:20
7:4     8:8     8:16
8:24    9:17    9:23
11:5    16:7    16:10
16:13   17:1    17:20
18:17   19:3
heavy [1]        37:2
37:3
held [2] 25:25   43:3
help [5] 7:24    26:17
30:22   30:24   39:6

Hertz [1]        15:9
hey [2]  19:23   41:10
highest [2]      29:24
29:25
highly [1]       34:16
34:19
hold [2] 43:22   47:4
Home [2]         20:14
27:21
Honor [39]       2:10
2:16    2:18    2:20
3:2     3:5     3:6
5:23    9:2     11:16
11:18   12:20   15:6
16:5    16:17   17:13
18:14   19:21   22:24
23:17   23:21   23:23
24:24   28:7    28:14
29:16   29:21   32:10
32:19   33:17   34:11
35:8    36:5    44:4
44:10   44:25   45:10
47:15   47:17
Honor's [1]      24:11
HONORABLE [1]
1:13
house [1]        9:13
huge [3] 4:20    6:6
12:3
human [1]        32:24
hundred [1]      30:6
hundreds [2]     35:10
36:6
hurt [5] 40:21   41:23
41:24   41:24   41:25
hurts [1] 19:4
i.e [2]  8:16    34:14
ibuprofen [1]    21:24
illustrates [1]  24:8
implication [18]
5:9     7:2     7:8
14:13   21:18   24:25
25:12   26:8    26:12
26:18   27:2    33:17
33:21   39:6    39:10
39:11   39:19   41:3
implied [2]      24:20
33:23
implies [1]      41:16
imply [3]        25:3
34:3    34:4
important [5]    9:25
29:22   31:25   32:4
32:5
imposed [1]      15:23
impossible [1]   31:22
impression [1]   38:25
INC [1]  1:7
indeed [3]       27:7
40:16   42:13
indifferent [1]  16:6
indigestion [2]  16:8
16:13
indisputably [1]
29:14

inflammation [1]
21:19
information [2] 13:7
31:12
inherently [2]   5:25
6:7
initial [2]      3:9
8:11
injunction [14]  2:4
2:5     21:10   21:13
21:22   25:23   36:16
36:20   36:21   40:16
43:15   45:8    45:12
45:15
injury [1]       21:15
instructive [2]  33:20
34:9
instrument [1]   31:17
interaction [1]  4:23
interest [5]     36:22
42:3    42:19   43:4
43:5
interested [1]   46:14
interesting [2]  5:11
42:5
interestingly [1]
13:13
interjected [1]  44:17
interpretation [5]
24:9    24:11   25:9
25:10   39:8
interpretations [1]
33:13
interrupted [1]  35:3
introduce [1]    2:7
introduced [3]   4:11
4:11    28:2
introduction [1]
4:9
introductions [1]
2:2
investigating [1]
10:15
invites [1]      42:5
involved [3]     26:22
27:25   46:11
irreparable [4]  21:15
36:19   40:15   40:22
issue [3] 24:12  27:21
42:23
issues [1]       6:23
Item [2] 11:11   13:21
itself [3]9:13   22:12
41:4
J [1]    1:21
J&J [2]  27:16   33:19
jam [1]  46:17
James [1]        15:21
January [2]      47:9
47:12
jargon [1]       13:16
Jeremy [2]       1:17
2:11
John [2] 1:15    3:18
Johnson [4]      20:15

20:15   31:24   35:11
joint [1] 43:24
Jonathan [1]     1:18
2:11
JORDAN [1]       1:13
judge [3]        21:23
25:22   42:5
judgment [1]     32:9
45:3
judgments [1]    47:2
KAJ [1] 1:9
Karla [1]        1:23
2:21
keep [1] 23:11
Kenneth [1]      2:24
KENT [1]         1:13
Kevin [1]        1:15
2:12    47:22
key [1]  6:23
kind [7] 4:13    18:21
23:13   28:9    33:11
39:11   42:22
kinds [1]        19:19
knew [2]         16:18
44:16
known [1]        16:13
knows [1]        19:2
Kramer [2]       1:18
2:11
L.P [1]  1:3
16 [1]   43:22
laboratory [2]   26:23
27:5
language [3]     17:3
19:16   37:19
Lanham [4]       20:10
20:14   21:7    25:23
large [1] 12:4
last [3] 19:15   26:22
33:9
latest [1]       47:12
law [8]  15:8    20:14
21:7    28:8    31:8
32:16   33:10   43:8
lay [1]  39:13
leading [2]      17:7
20:13
least [2] 5:9    37:24
leave [1]41:8
leaves [1]       41:7
led [1]  11:8
left [2] 14:14   14:16
37:13
legislator [1]   43:13
legitimately [1] 7:11
less [3] 12:3    25:6
33:4
letter [1]38:16
letters [2]      38:5
39:12
Levin [2]        1:18
2:12
likelihood [3]   36:18

37:24   40:13
likely [1]       40:18
limit [2] 35:18  35:19
limited [2]      22:7
27:13
line [26] 24:20  24:23
33:21   37:23   39:8
42:17
literal [12]     5:20
6:10    7:7     7:7
14:10   24:14   28:3
37:13   37:24   38:14
39:5    39:14
literally [8]    6:17
14:12   22:13   22:13
22:15   37:12   37:20
39:19
LLP [3]  1:16    1:18
1:23
local [1] 46:22
logical [2]      39:9
39:14
look [14]9:6     11:21
12:10   13:7    14:6
15:7    15:11   15:17
15:21   23:7    40:4
43:7    46:2    47:2
looked [6]       8:15
8:22    12:11   12:13
36:25   37:17
looking [4]      16:19
38:9    39:16   41:21
looks [1]        6:13
lose [1] 44:17
lower [1]        23:4
M [1]    1:15
Maalox [1]       33:25
magically [1]    17:24
makers [1]       20:15
makes [4]        6:6
9:8     19:5    39:3
manner [1]       4:4
market [4]       21:17
21:20   21:22   41:4
math [2] 29:23   35:25
matter [2]       29:13
43:18
matters [1]      2:3
Maurer [1]       47:22
may [9]  5:14    7:9
18:23   20:12   24:11
32:3    33:17   38:2
45:10
mean [8]5:24     6:7
11:10   22:19   22:21
35:9    35:11   45:23
meaningful [1]   32:21
means [4]        14:15
16:10   39:10   43:11
meant [1]        37:18
measure [2]      8:5
8:6
measured [2]     8:17
8:24