IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ASTRAZENECA LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 04-1332-KAJ |
| | ) | |
| TAP PHARMACEUTICAL PRODUCTS, INC., | ) | **REDACTED – PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |

## OPENING BRIEF OF PLAINTIFF ASTRAZENECA LP IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF THOMAS DUPONT AND OF SUSAN S. MCDONALD

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6600
jingersoll@ycst.com

Attorneys for AstraZeneca LP

Of Counsel:

Harold P. Weinberger
Jonathan M. Wagner
Kerri Ann Law
Jeremy A. Cohen
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Dated: November 23, 2005

Table of Contents

Page

Table of Authorities ............................................................................................................. ii

Nature and Stage of Proceedings ............................................................................................1

Summary of Argument ..........................................................................................................2

Facts .......................................................................................................................................3

    A.   The TV Survey......................................................................................................4

    B.   The Internet Survey..............................................................................................6

    C.   The McDonald Reports.........................................................................................8

Argument ...............................................................................................................................9

    Point I

        DR. DUPONT'S SURVEYS ARE BOTH FATALLY FLAWED
        BECAUSE THEY FAIL TO ASK CRITICAL QUESTIONS AND
        REACH CONCLUSIONS NOT SUPPORTED BY THE DATA ..............................9

        A.   The TV Survey Fails to Address Critical Questions.........................................10

            1.   According to TAP's own expert, Dr. McDonald, the TV Survey
                failed to address the relevant questions ...................................................10

            2.   The TV Survey provides no information as to the basis for the
                subjects' belief.........................................................................................13

        B.   Dr. Dupont's Analysis of the TV Survey Ignores Contradictory Data
            and Relies on Suspect Data.............................................................................15

        C.   There Is No Valid Data in the Internet Study Supporting Dr. Dupont's
            Conclusions....................................................................................................16

    Point II

        THE PROBATIVE VALUE OF THE SURVEYS ARE
        OUTWEIGHED BY THEIR PREJUDICIAL EFFECT...........................................17

    Point III

        THE TESTIMONY OF DR. McDONALD BASED ON HER
        SUPPLEMENTAL REPORT SHOULD BE EXCLUDED ......................................18

Conclusion ...........................................................................................................................21

Table of Authorities

Page

Cases:

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) .......................................................................................11

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002) .................................................................12

*Chemipal Ltd. v. Slim-Fast Nutritional Foods In'l, Inc.*,
  350 F. Supp. 2d 582 (D. Del. 2004)..................................................................4, 19

*Citizens Financial Group, Inc. v. Citizens National Bank of Evans City*,
  383 F.3d 110 (3d Cir. 2004) .......................................................................................17

*ConAgra, Inc. v. Geo. A Hormel & Co.*,
  784 F. Supp. 700 (D. Neb. 1992).........................................................................15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...............................................1, 2, 9, 10, 12, 15, 17, 18, 20

*Edge Wireless, LLC v. US Cellular Corp., No. Civ. 03-1361-AA*,
  2004 WL 1661992 (D. Ore. 2004).......................................................................15

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).................................................................................................12

*Kreppel v. Guttman Breast Diagnostic Inst., Inc.*,
  No. 95 CIV 10830 (SWK)
  1999 WL 1243891 (S.D.N.Y. Dec. 21, 1999) ...................................................11

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)...................................................................................................9

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*,
  No. 02 Civ. 3691, 03 Civ. 707, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) .......................18

*McGowan v. Cooper Indus., Inc.*,
  863 F.2d 1266 (6th Cir. 1987) .................................................................................19

*Oxford Gene Technology Ltd. V. Mergen Ltd.*,
  345 F. Supp. 2d 431 (D. Del. 2004)..................................................9, 10, 19, 20

*Pasteur v. Simon*,
  No. 98-727, 2005 WL 1993748 (E.D. Pa. Aug. 16, 2005)..................................19

Table of Authorities
(continued)

Page

*Revlon Consumer Products Corp. v L'Oreal S.A.,*
   No. 96-192 MMS, 1997 WL 158281 (D. Del. Mar. 26, 1997)................................................19

*Rezulin Products Liability Litigation,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................................................19

*SEC v. Lipson,*
   46 F. Supp. 2d 758 (N.D. Ill. 1998)......................................................................................19

*Sears, Roebuck & Co. v. Menard, Inc.,*
   No. 01 C 9843, 2003 WL 168642 (N.D. Ill. Jan. 24, 2003) ....................................................14

*Wells Fargo & Co. v. WhenU.com, Inc.,*
   293 F. Supp. 2d 734 (E.D. Mich. 2003) .................................................................................15

Statutes:

15 U.S.C. § 1125(a)(1)(B) .......................................................................................................1

Fed. R. Evid. 403 ........................................................................................................2, 17, 18

Fed. R. Evid. 702 .................................................................................1, 2, 9, 10, 17, 18, 19

Fed. R. Evid. 801(d)(2) .........................................................................................................11

Miscellaneous:

5 *McCarthy on Trademarks* § 32:175 at 32-287) (4th ed. 2002)....................................................15

<u>Nature and Stage of Proceedings</u>

Plaintiff AstraZeneca LP ("AstraZeneca") respectfully submits this memorandum of law in support of its motion, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the testimony of Dr. Thomas Dupont, expert consumer survey witness for defendant TAP Pharmaceutical Products, Inc. ("TAP"), and the testimony of TAP's second survey expert, Dr. Susan Schwartz McDonald.

AstraZeneca filed this action on October 6, 2004 seeking a declaration that its "Better is Better" advertising campaign for NEXIUM® (esomeprazole magnesium) was not false. TAP counterclaimed, alleging that AstraZeneca falsely advertised Nexium under Section 43(a) of the Lanham Act, which provides a civil remedy for those damaged by any person who, in connection with the sale of goods and services, uses a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her or another person's goods." 15 U.S.C. § 1125(a)(1)(B).

Unable to demonstrate that AstraZeneca's "Better is Better" advertisements for its Nexium product (the "Better ads") were literally false (*see* Prelim. Inj. Hearing Tr. and Order Dec. 20, 2004; Exh. A) (D.I. 42),[1] TAP now seeks to rely on two surveys conducted by Dr. Dupont (respectively, the "TV Survey" and the "Internet Survey") in an effort to show that the Better is Better television commercial and internet advertisement contain implicitly false claims. We show below that both surveys are so fraught with methodological and analytical flaws that

---

[1]    "Exh. __" references the exhibits set forth in AstraZeneca's Appendix in Support of its Motion to Exclude the Expert Testimony of Thomas Dupont and Susan S. McDonald.

they fail to meet the threshold for expert evidence, and, in any event, whatever probative value they might have is far outweighed by their potential to prejudice the finder of fact. Moreover, to the extent TAP seeks to offer testimony of Dr. McDonald consisting of her personal opinions about the evidence, it should also be excluded because it invades the province of the finder of fact.

Summary of Argument

1.    Under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Court must ensure that expert testimony is both relevant and reliable.

2.    In addition, under Fed. R. Evid. 403, the Court has discretion to exclude evidence that is more prejudicial than probative.

3.    Whether under Fed. R. Evid. 702/*Daubert* or under Fed. R. Evid. 403, the two surveys conducted by Dr. Dupont are inadmissible.

4.    The Dupont TV Survey, offered to show that the "Better is Better" television commercial is implicitly communicating a message of superiority for Nexium in the relief of symptoms of acid reflux disease, is inadmissible because it fails to ask the question that TAP's own survey expert Susan McDonald identified as critical, that is, whether the commercial is communicating a superiority claim for Nexium for the relief of symptoms that the "typical" consumer "routinely experiences." In addition, the TV Survey failed to ask subjects who believed the commercial was communicating a superiority message for Nexium the reason for their belief, and thus failed to exclude possibilities that would indicate the subjects were not misled.

- 2 -

5.    Separately, Dr. Dupont ignores data in the TV Study that contradicts his conclusions and relies on other data that is highly suspect.

6.    Similarly, the testimony of Dr. Dupont and Dr. McDonald taken together indicates that the only data in the Internet Study that is not the product of guessing and thus wholly unreliable does not by itself support the conclusion that the internet advertisement is communicating a message of superior healing of all grades of erosive esophagitis ("EE"), as opposed to moderate to severe cases only.

7.    Finally, Dr. McDonald seeks to give an opinion concerning AstraZeneca's intent and whether AstraZeneca successfully effectuated its intent based on her review of certain documents produced in discovery.   Such testimony is inadmissible because it invades the province of the fact-finder and usurps the jury's role, and because there is no expert methodology underlying her conclusions.

<u>Facts</u>

In this action, TAP contends that AstraZeneca's Better is Better advertising is false because it communicates the message that AstraZeneca's Nexium is superior to TAP's competing PREVACID$^{®}$ (lansoprazole) product for treating the symptoms of acid reflux disease, such as heartburn, and for overall hearing of EE, even though the advertising expressly states only that Nexium is superior to Prevacid for healing moderate to severe erosive esophagitis ("EE").

REDACTED

On December 20, 2004, the Court denied TAP's motion for a preliminary injunction, holding that TAP failed to demonstrate that AstraZeneca's Better ads were literally false. (Exh. A) (D.I. 42). Accordingly, TAP now proffers the testimony of Dr. Thomas Dupont, who conducted the TV Survey to assess consumer takeaway from the Better is Better television commercial (Exh. B) and the Internet Survey to do likewise with respect to the internet advertisement that was part of the same campaign (Exh. C) in an effort to show that the advertising is communicating impliedly false claims. Specifically, the TV Survey purportedly shows that subjects took away an implied message of superior relief for symptoms of acid reflux disease. The Internet Survey allegedly demonstrates that the limitation of the superiority claim for Nexium in the internet advertising to moderate to severe EE, as opposed to all grades of EE, is not being effectively communicated.

A.    The TV Survey

In the TV Survey, two hundred forty interview subjects viewed the 45-second Better is Better television commercial (the "Test commercial"). Two hundred thirty nine subjects viewed an edited version of the commercial, designed to act as a control, that omitted the word "heartburn" and several references to "acid reflux disease" (the "Control commercial"). After the interview subjects viewed the commercial, they were asked a series of "open-ended" questions that allowed them to state in their own words what the commercial said Nexium was better at doing, followed by a "closed-ended" question asking the subjects to choose one of the following statements about the commercial:

1. It said Nexium heals damage to the esophagus better than the other leading prescription medicines, but did not say it was better than the other leading prescription medicines at relieving the symptoms of acid reflux disease, such as heartburn

2. It said Nexium relieves the symptoms of acid reflux disease, such as heartburn, better than the other leading prescription medicines, but did not say it was better than the other leading prescription medicines at healing damage to the esophagus

3. It said Nexium is better than the other leading prescription medicines both at healing damage to the esophagus and at relieving the symptoms of acid reflux disease, such as heartburn

4. None of the above describe what the commercial communicated to me

5. Don't know

To determine what messages were being taken away from the commercial by the subjects, Dr. Dupont had to "code" each open-ended response into categories such as "Comparative Responses" and "Non-comparative responses," which were further broken down into subcategories such as "Comparative — Relieves/treats/heals/cures acid reflux better/best" or "Non-comparative — Prevents acid reflux/heartburn." By contrast, the closed-ended questions required no subjective coding; the overall response rate for each of the closed-ended choices was stated as the percentage of subjects picking a particular closed-ended response out of the entire pool of subjects.

Dr. Dupont assumed that an interview subject who in response to the open-ended questions were coded in categories that Nexium was better at relieving, treating, healing or curing symptoms had been misled. Solely on the basis of the responses to these questions, Dr. Dupont concluded that 71.7% of the subjects who viewed the Test commercial took away a message that Nexium "Relieves/treats/heals/cures symptoms better/best" compared with 46.0%

- 5 -

of Control commercial subjects who received the same message. Subtracting the Test percentage
from the Control percentage, Dr. Dupont concluded that 25.7% of the subjects were misled into
thinking that Nexium is better at relieving, treating, healing or curing symptoms than Prevacid
because of the Better commercial. Dr. Dupont ignored the responses to the closed-ended
questions. As he testified during his deposition: "Given that it was a complex question, given
that it suggested possibilities that people might not have even thought of had they not been asked
the question, I felt that this was not a reliable question." (Dupont Tr. 68).[2]

B.     The Internet Survey

        In the Internet Survey, two hundred five subjects viewed the actual Nexium
internet advertisement, which reported the results of the studies that found that Nexium was
superior to Prevacid for healing moderate to severe EE (the "Test ad"), and two hundred six
consumers viewed an edited ad that removed all references limiting the claim to moderate to
severe cases of EE (the "Control ad"). Once again, interview subjects were asked several open-
ended questions in an attempt to elicit whether the ad said "that Nexium heals acid-related
damage better than the other leading medicine" and, if so, "what do you recall the ad saying
about that." The subjects were then asked a closed-ended question in which they were required
to choose for what group of people Nexium will heal acid-related damage better than the other
leading medicine:

                        Only people with moderate or severe damage to the
                        esophagus caused by acid reflux disease

                        All people with damage to the esophagus caused by

---

[2]     "Tr. __ " references the relevant portions of the deposition transcripts of Dr. Dupont and
        Dr. McDonald, attached to AstraZeneca's Appendix as Exhibits D and E, respectively.

acid reflux disease

Don't know or no opinion

As in the TV Survey, open-ended responses were coded into such categories as "Comparative — Heals/relieves acid damage/other damage better/best" and "Non-comparative — Heals esophagus/throat/damage to esophagus/throat." Closed-ended responses were tallied as a percentage of total responses.

On the basis of the open-ended responses, Dr. Dupont concluded that at least 11% of subjects took away a message from the Test ad that Nexium was superior to Prevacid for healing moderate to severe erosive esophagitis as against none from the Control ad. But Dr. Dupont acknowledged that the "open-ended questions don't help us a lot in understanding whether or not consumers understood the limitation on the claim being made in the ad." (Dupont Tr. 140-42). Dr. Dupont thus agreed that he could not draw conclusions solely on the basis of the open-ended responses:

> Q.  But you already told me the open ended only show you that you have a lower range of 11 percent and don't tell you how many more than 11 percent might have taken that message from the test ad; isn't that right?
>
> A.  I believe looking at both the open and the close-ended results, they both show that few people got the message.
>
> Q.  You need them both together, though, to reach that conclusion according to you; isn't that right?
>
> A.  That's what I said.

(Dupont Tr. 146-47). In response to the closed-ended question, 45.9% of Test ad subjects and 51% of Control ad subjects said that Nexium heals damage better in all people with esophageal damage, while 36.1% of Test ad and 29.1% of Control ad subjects perceived the claim as limited

- 7 -

to those with moderate to severe damage. Noting the similarity of these percentages for the Test and Control ads, Dr. Dupont concluded that "the specifics of the 'better' claim, in particular that Nexium heals moderate to severe acid-related damage to the esophagus better than does Prevacid, were not effectively communicated to consumers." (Exh. C at 5).

C.    The McDonald Reports

In addition to the surveys conducted by Dr. Dupont, TAP commissioned Dr. Susan McDonald to review Dr. Dupont's work. In her report, Dr. McDonald reached two conclusions that bear on this motion. First, with respect to the TV Survey, Dr. McDonald stated that the relevant issue to be addressed by survey experts in this case is "not whether Nexium is ever superior to Prevacid, but whether it is superior at doing *what the more typical consumer requires* and expects from a product to treat routine acid reflux." (Exh. F at 6) (emphasis in original). Dr. McDonald further stated that "the issues that a survey is required to address in this case are precisely these: Do a statistically meaningful percent of target consumers take away a message from the Nexium ads that they will gain greater benefit from Nexium than Prevacid for relief of the acid reflux *they routinely experience*; and is that erroneous message directly attributable to the words and images in the Nexium promotion?" (*Id.*).

With respect to the Internet Survey, Dr. McDonald concluded that because many respondents were guessing in response to the closed-ended question, the "closed-ended survey question cannot be trusted to provide meaningful data." (*Id.* at 18). Dr. McDonald discounted the closed-ended data entirely. (*Id.*).

Subsequently, Dr. McDonald also submitted a one-page Supplemental Report in which she offered the opinion, based on a review of documents produced in discovery, that

- 8 -

AstraZeneca was intending to communicate a broader message of superiority than set forth in the advertising and that it succeeded in doing so. Specifically, Dr. McDonald proposes to testify that AstraZeneca was seeking to utilize healing data to "evoke impressions of broadly superior performance for a wide range of patients on Prevacid and other competing products," that AstraZeneca "aimed to elevate the salience of 'healing' (and superior healing results) for the average patient," and that AstraZeneca succeeded in its efforts. (Exh. G at 2).

<u>Argument</u>

Point I

DR. DUPONT'S SURVEYS ARE BOTH FATALLY FLAWED
BECAUSE THEY FAIL TO ASK CRITICAL QUESTIONS AND
<u>REACH CONCLUSIONS NOT SUPPORTED BY THE DATA</u>

Under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), this Court has broad discretion to exclude expert testimony. Although the *Daubert* analysis was initially developed to examine "scientific" testimony, *Daubert* applies with equal force to all proffered expert testimony, including that of survey experts. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

As this Court has recognized: "Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Oxford Gene Technology Ltd. V. Mergen Ltd.*, 345 F. Supp. 2d 431, 434 (D. Del. 2004) (citing *Daubert*). This Court has also recognized that "Rule 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . . The party offering the

- 9 -

expert testimony has the burden of proving admissibility." *Id.* In addition, "[t]he subject of an expert's testimony must be grounded in the methods and procedures of science and based on more that a subjective belief or speculation." *Id.* And, "Rule 702 requires that expert testimony assist the trier of fact, in other words, it must 'fit' the issues in the case by having a valid scientific connection to the pertinent inquiry." *Id.*

This Court has also recognized that "[i]n determining whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact,' the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. As part of that inquiry, the court 'must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.'" *Id.* at 434-35 (citing *Daubert* and *Heller v. Shaw Indus., Inc.,* 167 F. 3d 146, 153 (3d Cir. 1999)).

As we show below, TAP cannot meet this burden with respect to the proposed testimony of Dr. Dupont.

A.    The TV Survey Fails to Address Critical Questions

1.    According to TAP's own expert, Dr. McDonald, the
TV Survey failed to address the relevant questions

TAP's own expert, Dr. Susan McDonald, opined that the relevant questions that must be addressed by the survey research in this case are (i) whether consumers take away a message from the Better ads that Nexium is superior to Prevacid for the requirements and expectations of a "typical consumer," and (ii) whether consumers take away a message that they will gain a greater benefit from Nexium than from Prevacid for the acid reflux they routinely

experience. That is because TAP's underlying theory is that the healing of moderate to severe
EE is irrelevant to most people, as distinguished from the relief of symptoms of acid reflux
disease. Because TAP retained Dr. McDonald as an expert witness in this litigation, her
statements are both admissible against and binding upon TAP, whether as adoptive admissions,
as statements by a person authorized by TAP to make statements on the subject, or as statements
by TAP's agent. *See* Fed. R. Evid. 801(d)(2); *see also Kreppel v. Guttman Breast Diagnostic
Inst., Inc.*, No. 95 CIV 10830 (SWK) (MHD), 1999 WL 1243891, at *1 (S.D.N.Y. Dec. 21,
1999) (retention of a trial expert who provided opinions in a Rule 26(a)(2)(B) report "cannot
reasonably be viewed as anything but adoption of or acquiescence in those opinions."); *Alvord-
Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1005 n.6 (3d Cir. 1994) (statements of agents
are adoptive admissions).

Not one question in the TV Survey addresses the experiences, requirements or
expectations of the supposed "typical consumer." Nor do any of the questions address the
"routine experiences" of survey respondents; the survey does not include *any* questions
concerning either product's effectiveness for the survey subjects. Instead, the questions only ask
generally about any superiority claims contained in the commercial. (*See* pp. 5-6, *supra*).

Indeed, Dr. Dupont conceded that the TV Survey was not designed to address the
question Dr. McDonald opined was the relevant one in this case:

> Q. But it did not in your survey seek to elicit any
> information as to whether any of these consumers
> believed that the message is addressed to a typical
> user of PPIs?
>
> A. It does not specifically address that issue.

- 11 -

(Dupont Tr. 29-30).  Dr. McDonald similarly acknowledged the point:

> Q.   What is it in that survey that allows you to reach any
> conclusion with respect to what people routinely
> experience, what people believe about the difference
> between these two products relative to the acid
> reflux they routinely experience?
>
> A.   Their responses to Question 5.
>
> Q.   What is it that in Question 5 tells you what they
> routinely experience?
>
> A.   Okay.   Question 5 doesn't speak to routine
> experience . . .

(McDonald Tr. 70).  The only explanation Dr. Dupont could give for the failure to obtain such

data, given TAP's theory, was that although "[t]he survey itself does not address [whether the

advertisement is making claims that relate to a typical user of these products], that's something

that's in the mind of the consumer."  (Dupont Tr. 29).

   The courts have held that "[i]f the expert has failed to consider the necessary

factors or if the analysis is premised upon a faulty assumption, his testimony may be excluded

for lack of probative value."  *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488

(S.D.N.Y. 2002).  *See also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert").  Dr. Dupont

constructed no questions and adduced no data that would support his belief that the experience of

the "typical user" is "in the mind of the consumer."  His opinion is thus nothing more than the

"*ipse dixit* of the expert," which the courts have rejected as a matter of course.  *See Gen'l

Electric*, 522 U.S. at 146.

057159.1005

2.    The TV Survey provides no information
as to the basis for the subjects' belief

Dr. Dupont has acknowledged that his TV Survey does not prove that subjects
took away a message that the clinical trials cited in the Better is Better television commercial
prove Nexium's superiority in relieving or treating the symptoms of acid reflux disease. (Dupont
Tr. 6-7). That admission is critical because a subject who provides a response to the open-ended
question that Nexium is superior for acid reflux disease may simply have believed that, all other
things being equal, if one drug heals moderate to severe EE better than another, it is therefore a
better drug. The TV Survey sheds no light on this issue because, as Dr. Dupont acknowledged,
he did not attempt to ascertain in either survey *why* subjects responded the way they did.
(Dupont Tr. 34-35). Indeed, he specifically told interviewers to follow up responses to open-
ended questions by probing only once with the question "anything else." (Exh. B at 6, 11).[3]

Just what Dr. Dupont might have found had he asked subjects the appropriate
questions is illustrated by responses offered by two subjects in the TV Survey who were
inadvertently asked questions beyond what the interviewers were instructed to probe in the
survey. One subject, No. 416, initially answered that Nexium is "better than other competitors."
The subject then responded to a probe of "in what way" by stating: "It heals damage caused by

---

[3]    By way of analogy, consider two baseball players who are equally good at hitting,
running, and fielding but Player A is a better bunter than Player B. One might well
conclude that Player A is the better overall player precisely because he is the better
bunter. That is, all other things being equal, Player A's superiority as a bunter might lead
some to consider him the better overall player. Dr. Dupont agreed that such a conclusion
would be reasonable. (Dupont Tr. 48-49). Concerning a similar analogy, Dr. McDonald
testified that a consumer who determined that a product was better overall than another
because, all other things being equal, the product was better in one attribute "may make a
faulty misjudgment, *but they may not be necessarily misled.*" (McDonald Tr. 62)
(emphasis added).

acid reflux." Another, No. 423, said Nexium "is better than all other competitors." When asked "why" he believed Nexium was better, he responded that "[i]t heals reflux damage." (Exh. H). Neither of these subjects can be said to have been misled. How many survey subjects were coded as being misled but would have given the same reason for their beliefs cannot be known because Dr. Dupont failed to ask.

Moreover, Dr. McDonald testified that because open-ended responses can sometimes be "unfocused," she did not believe that it was necessary for a consumer to say, 'erosive esophagitis' in order to be construed as receiving an appropriate message from the ad. Instead, she testified that "[i]t would have been sufficient to say, 'damage,' or it would have been sufficient to say, 'healing,' I believe, in terms of the way the codes were applied." (McDonald Tr. 109-10). Nevertheless, of the 172 Test group subjects in the TV Survey whom Dr. Dupont coded as "misled," 115 actually gave open-ended answers referring to healing, damage, or synonymous terms.[4]

Courts construing claims under the Lanham Act have refused to rely on survey evidence and testimony where, as here, critical issues have not been probed. For example, in *Sears, Roebuck & Co. v. Menard, Inc.*, No. 01 C 9843, 2003 WL 168642, at *3 (N.D. Ill. Jan. 24, 2003), the court rejected expert survey evidence where the survey failed to probe the reasons behind respondents' answers, stating that follow-up questions are necessary because "[o]ften, an examination of the respondents' verbatim responses to the 'why' question are the most illuminating and probative part of a survey, for they provide a window into consumer thought

---

[4]    In some instances, subjects who said things such as Nexium was "Better at healing" (No. 802) or that Nexium was "better at healing rather than just treating acid reflux disease" (No. 204) were nevertheless coded by Dr. Dupont as having received a message of superior symptom relief. (Exh. I).

processes in a way that mere statistical data cannot." (citing 5 *McCarthy on Trademarks* § 32:175 at 32-287) (4th ed. 2002). *See also ConAgra, Inc. v. Geo. A Hormel & Co.*, 784 F. Supp. 700, 725 (D. Neb. 1992) ("Well-designed studies typically employ the '[w]hat makes you say that?' question or some variation. Indeed, Professor McCarthy indicates that such a question is now a part of a standard survey format.").[5] Because Dr. Dupont's surveys failed to ask "Why do you say that?" or "What makes you say that?" they do not unambiguously demonstrate what messages survey respondents took away from the tested advertising. In short, Dr. Dupont failed in his task as a survey researcher, and his surveys should be excluded. *See Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 765 (E.D. Mich. 2003) (rejecting survey on *Daubert* grounds where it "failed to take into account obvious alternative explanations" for responses).

B.    Dr. Dupont's Analysis of the TV Survey Ignores
        Contradictory Data and Relies on Suspect Data

By his own admission, Dr. Dupont ignored the responses to the closed-ended questions in the TV Survey and drew his conclusions solely on the basis of open-ended responses. (Dupont Tr. 87-89). Thus, even when a subject answered the closed-ended question by choosing the "correct" answer that the commercial communicates that Nexium is superior for healing esophageal damage but not for relieving symptoms of acid reflux disease, Dupont counted that respondent as being misled by the commercial if his or her open-ended responses mentioned superior symptom relief. Dr. Dupont thus counted at least 27 subjects as "misled"

---

[5]    Dr. McDonald served as a consumer survey expert in *Edge Wireless, LLC v. US Cellular Corp.*, No. Civ. 03-1361-AA, 2004 WL 1661992 (D. Ore. 2004). Unlike Dr. Dupont in this case, Dr. McDonald's survey included as a final question the open-ended probe, "Why do you say that?"

- 15 -

even though their response to the closed-ended question showed that they received the "correct" message from the commercial.

Dr. Dupont's conclusions are further undermined by the inclusion of suspect data received in one of his survey sites. Of 24 subjects in Kansas City who viewed the Control commercial, only three said anything in their open-ended responses about symptom relief or healing of acid reflux. This 12% response is in contrast to the 75% of respondents in the nine other control group sites whose responses mentioned symptom relief and distorts — to TAP's advantage — the proportion of control group subjects who perceived a message of symptom relief. Dr. Dupont did nothing to assess why the Kansas City data was so markedly different from the data elsewhere.[6]

C.    There Is No Valid Data in the Internet
       Study Supporting Dr. Dupont's Conclusions

In his Internet Survey report, Dr. Dupont concluded that "the specifics of the 'better' claim, in particular that Nexium heals moderate to severe acid-related damage to the esophagus better than does Prevacid, were not effectively communicated to consumers." Essentially, Dr. Dupont compared the responses to the Test ad and the Control ad and, finding them to be similar, concluded that the repeated and express limitation of the claim to moderate to severe EE in the Test ad had little impact. As noted above, Dr. Dupont was able to reach this conclusion only by considering responses to both the closed-ended and open-ended questions together. (*See* pp. 7-8, *supra*). Because it is not reasonable to expect that many subjects would

---

[6]    TAP would obviously like the number of subjects perceiving a message of symptom relief from the Control commercial to be as low as possible, in contrast to the number of subjects perceiving such a message in the Test commercial, since the percentage of "misled" subjects is the difference between those who gave the relevant answers in the Test and Control arms of the study.

057159.1005

volunteer details such as "moderate to severe" in response to open-ended questions, Dr. Dupont agreed that "[y]ou need them both together . . ." (Dupont Tr. 146-47). As noted above (pp. 9-10), opinions such as these are binding on TAP.

The Control ad used in the Internet Survey removed *all* references to "moderate to severe" erosive esophagitis; the words "moderate to severe" are nowhere to be found. Nevertheless, almost as many respondents who saw the Control ad as saw the Test ad answered the closed-ended question by choosing the response that the ad communicated that Nexium heals damage better than the other leading medicine for people with moderate to severe damage. Because it is obvious that many subjects were guessing in response to this question, Dr. McDonald has acknowledged that the responses have no value and that she placed "no weight at all" on them. (McDonald Tr. 144). This, too, is binding on TAP. Coupled with Dr. Dupont's acknowledgment that he could not draw conclusions solely on the basis of the open-ended responses, this testimony constitutes an admission that the Internet Survey is unable to provide reliable evidence of consumers supporting the proposition that the limitation to moderate to severe EE was not effectively communicated in the internet advertisement.

Point II

## THE PROBATIVE VALUE OF THE SURVEYS ARE OUTWEIGHED BY THEIR PREJUDICIAL EFFECT

In addition to satisfying the standards of Fed. R. Evid 702 and *Daubert*, expert survey evidence must also satisfy Fed. R. Evid. 403, which allows for exclusion of evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See Citizens Financial Group, Inc. v. Citizens National Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004) (affirming exclusion of flawed

consumer survey). The failure to address relevant questions, failure to probe the responses received, and errors in data analysis render both surveys sufficiently flawed that whatever probative value they have is far outweighed by the danger of prejudice and potential to mislead the jury. *See Sears, Roebuck & Co.*, 2003 WL 168642 at *3 (rejecting survey that failed to ask respondents why they responded as they did under both *Daubert* and Rule 403); *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02 Civ. 3691, 03 Civ. 707, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) (rejecting flawed survey under Rules 702 and 403).

Point III

THE TESTIMONY OF DR. McDONALD BASED ON HER<br>SUPPLEMENTAL REPORT SHOULD BE EXCLUDED

As indicated in her Supplemental Report, TAP seeks to have Susan McDonald provide an opinion, based only on her review of market research documents, that AstraZeneca intended to communicate a broad superiority claim for Nexium and succeeded in doing so.[7] As she testified at deposition:

> Q. What you are, in essence, doing is looking at these documents and giving your opinion as to what AstraZeneca's intent was?
>
> A. Well, partly intent, but also results
>
> *    *    *
>
> Q. So you are giving an opinion based on your review of the documents that, A, AstraZeneca intended to communicate a message; and that, B, they did communicate the message. Is that right?
>
> A. That's right.

---

[7] The rest of Dr. McDonald's proposed testimony relates to Dr. Dupont's surveys and would obviously become irrelevant if the surveys themselves and Dr. Dupont's testimony about them were excluded.

- 18 -

(McDonald Tr. 158-59).

As this Court has recognized, "testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder." *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 588 (D. Del. 2004); *see also Oxford Gene Technology Ltd.*, 345 F. Supp. 2d at 435 (citing *McGowan v. Cooper Indus., Inc.*, 863 F. 2d 1266, 1273 (6th Cir. 1987) (expert on standard of care should not have been permitted to opine on breach of that standard because the jury was equally qualified to make that determination); *SEC v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.")). Nor is it appropriate for an expert to provide opinions as to the ultimate issue to be decided by the finder of fact. For example, in *Revlon Consumer Products Corp. v L'Oreal S.A.*, No. 96-192 MMS, 1997 WL 158281, at *3 (D. Del. Mar. 26, 1997), an expert proposed to testify as to whether there had been inequitable conduct. The testimony was excluded on the ground that "[t]he Court . . . cannot permit [the expert] to testify as an expert on inequitable conduct; to do otherwise would usurp the respective functions of the jury and the Court." *See also Pasteur v. Simon*, No. 98-727, 2005 WL 1993748, at *1 (E.D. Pa. Aug. 16, 2005).

Indeed, this Court has specifically precluded experts from offering opinions with respect to the purported intent of a third party as inappropriate under Rule 702. *Oxford Gene*, 345 F. Supp. at 473. *See also In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (barring expert testimony concerning "intent of authors of a drug study" as having "no basis in any relevant body of knowledge or expertise"). The testimony Dr.

- 19 -

McDonald promises to give in the McDonald Supplement consists of nothing more than her conclusions about AstraZeneca's intent and other factual matters based on her review of the evidence and should therefore be excluded.

Second, under *Daubert*, "the subject of an expert's testimony must be grounded in the methods and procedures of science and based on more that a subjective belief or speculation." *Oxford Gene Technology Ltd.*, 345 F. Supp. 2d at 434, citing *Daubert* at 589-590. In addition, "[i]n determining 'whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact,' the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue." *Oxford Gene Technology Ltd.*, 345 F. Supp. 2d at 434, citing *Daubert* at 592-93. Because there is no methodology or science underlying the proposed McDonald testimony, it should be excluded on that ground as well.

Conclusion

For these reasons, AstraZeneca respectfully requests that the Court exclude the testimony of Thomas Dupont and of Susan Schwartz McDonald.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
jingersoll@ycst.com

Attorneys for Plaintiff and Counterclaim Defendant
AstraZeneca LP

Of Counsel:

Harold P. Weinberger
Jonathan M. Wagner
Kerri Ann Law
Jeremy A. Cohen
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Dated: November 23, 2005

- 21 -

## CERTIFICATE OF SERVICE

I, Josy W. Ingersoll, hereby certify that on November 23, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Steven Balick, Esquire
> Ashby & Geddes
> 222 Delaware Avenue
> P.O. Box 1150
> Wilmington, DE 19899

I further certify that on November 23, 2005, I caused a copy of the foregoing document to be served by **hand delivery and e-mail** on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

### BY E-MAIL and FEDEX

> Thomas C. Morrison, Esquire
> Patterson, Belknap, Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (No. 1088)
*jingersoll@ycst.com*
John W. Shaw (No. 3362)
*jshaw@ycst.com*
Karen E. Keller (No. 4489)
*kkeller@ycst.com*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for AstraZeneca LP

DB01:1592472.1