# APPENDIX

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2004 DEC 20 PM 1:05

ASTRAZENECA LP, )
)
Plaintiff, )
)
v. ) Civil Action No. 04-1332-KAJ
)
TAP PHARMACEUTICAL PRODUCTS, INC., )
)
Defendant. )

**ORDER**

For the reasons stated in open court today, the Motion for Preliminary Injunction (D.I. 9) filed by Tap Pharmaceutical Products, Inc., is hereby DENIED.

UNITED STATES DISTRICT JUDGE

December 20, 2004
Wilmington, Delaware

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2004 DEC 20 PM 1:05

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ASTRAZENECA LP,

Plaintiff,

v.

TAP PHARMACEUTICAL PRODUCTS, INC.,

Defendant.

Civil Action No. 04-1332-KAJ

**ORDER**

For the reasons stated in open court today, the Motion for Preliminary Injunction (D.I. 9) filed by Tap Pharmaceutical Products, Inc., is hereby DENIED.

UNITED STATES DISTRICT JUDGE

December 20, 2004
Wilmington, Delaware

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

- - -

ASTRAZENECA L.P., : Civil Action
Plaintiff and :
Counter-defendant, :
v. :
TAP PHARMACEUTICAL PRODUCTS :
INC., :
Defendant and :
Counter-claimant. : No. 04-1332 (KAJ)

- - -

Wilmington, Delaware
Monday, December 20, 2004
10:00 a.m.

- - -

BEFORE: HONORABLE KENT A. JORDAN, U.S.D.C.J.

APPEARANCES:

JOHN W. SHAW, ESQ., and
KEVIN M. BAIRD, ESQ.
Young Conaway Stargatt & Taylor, LLP
-and-
HAROLD B. WEINBERGER, ESQ.,
JEREMY A. COHEN, ESQ., and
JONATHAN M. WAGNER, ESQ.
Kramer, Levin, Naftalis & Frankel, LLP
(New York, New York)

Counsel for Plaintiff

STEVEN J. BALICK, ESQ.
Ashby & Geddes
-and-
THOMAS C. MORRISON, ESQ., and
KARLA G. SANCHEZ, ESQ.
Patterson, Belknap, Webb & Tyler, LLP
(New York, New York)

Counsel for Defendant

THE COURT: Good morning. Please be seated.

All right. Let's begin with some introductions. We are here to handle two matters. First is the preliminary injunction hearing. Second is a scheduling hearing. We will go ahead and deal with the preliminary injunction piece of this first.

Mr. Shaw, do you want to go ahead and introduce the folks on your side of the courtroom. Then I will turn to Mr. Balick.

MR. SHAW: Good morning, Your Honor. Harold Weinberger, Jonathan Wagner and Jeremy Cohen from Kramer Levin, Stuart Fullerton from AstraZeneca, and Kevin Baird from my office, Young Conaway.

THE COURT: Who is going to be making the argument for AstraZeneca?

MR. SHAW: Mr. Weinberger will, Your Honor.

THE COURT: Mr. Balick.

MR. BALICK: Your Honor, good morning.

THE COURT: Good morning.

MR. BALICK: Your Honor, from the Patterson Belknap firm in New York we have Thomas Morrison and Karla Sanchez.

(Counsel respond "Good morning.")

MR. BALICK: Also, Kenneth Greisman from TAP Pharmaceutical.

Mr. Morrison will be making our presentation, Your Honor.

THE COURT: All right. Mr. Morrison, it's your motion. The podium is yours.

MR MORRISON: Thank you, Your Honor.

Your Honor, I think that the advertising in this case, particularly the TV commercial, is a primary example of how direct-to-consumer prescription drug advertising can be abused. If you think back to the initial days when companies began running direct-to-consumer advertising for Rx drugs, the ads barely did more than mention the name of the drug Then there came a second generation of ads when the companies began actually talking about the benefits of their drugs. And that's when they had to start disclosing the adverse reactions and so forth.

Those ads are very common today. For example, Prevacid has been advertising on television for several years, used John Elway as its spokesman this past year. And they basically talk about the benefits of Prevacid for relief of heartburn pain, just talking about your own drug and its benefits

AstraZeneca has really pioneered a new generation of direct-to-consumer advertising where for the first time companies are doing in consumer advertising what they have traditionally done in medical advertising, in the medical

profession. That is running directly comparative ads featuring their drug versus the competitive drug.

AstraZeneca has been extraordinarily aggressive in this manner. That's how they built the Nexium brand. They had comparative advertising, comparing Nexium to Prilosec, which had been their drug and had at one time been the best-selling drug in the world. But they used the comparative advertising to build the Nexium brand, and within three years of its introduction it had not only surpassed Prilosec, it had caught up with Prevacid, our drug, which was introduced in 1995. Their drug, Nexium, was only introduced in 2001.

So this kind of advertising can be extraordinarily effective.

Now, as I said, companies have long utilized comparative advertising directly to doctors. And, for example, some of the ads that they showed you in their answering papers were print ads that TAP utilizes to promote Prevacid to doctors, and those ads are comparative. But there is a huge difference when you are running a comparative ad campaign focused on doctors. Number one, doctors are trained to understand what clinical studies are all about. Number two, there is a day-to-day interaction. As the sales rep meets with the doctor or shows him or her the promotional piece and the study, there is a back-and-forth where the

doctor can probe what the study really shows, what it doesn't show. None of that happens when you have direct-to-consumer advertising, particularly a TV commercial, where you have a consumer sitting in front of his or her television station and seeing this ad.

THE COURT: Let me ask you a question, because I noted this theme in your papers, too, Mr. Morrison. A lot of the argument that TAP seems to be making to me is, if not directly, at least by implication, that this direct-to-consumer advertising is a dangerous game, a place where bad things can happen. An interesting point coming from a company that spent about 133 million on Prevacid ads, according to stuff you have given me yourself, and one that may well have a lot of merit to it.

Does it really bear on this case? Aren't I here today not to question generally the public policy wisdom of direct-to-consumer pharmaceutical ads, a point on which you spent, as I noted, some time in your papers and in the attachments you have provided, but to ask whether you have made a case specifically as to literal falsity? Because I don't have anything in the record before me about misleading, do I?

MR. MORRISON: Your Honor, everything that you have just said is absolutely correct. I don't mean to say the direct-to-consumer advertising is inherently bad. No

question, TAP does it, has done it historically for Prevacid. What I am saying is direct-to-consumer advertising has a potential to be abused, because when you begin running comparative advertising, comparing drug A to drug B, using technical terms, the audience that you target that ad to makes a huge difference. And that's my only point. I don't mean to say it is inherently bad. I do say it can be abused. And I think that's what this case is about.

THE COURT: But we are here, are we not, specifically on the question of literal falsity?

MR. MORRISON: Absolutely.

THE COURT: Because your opponent has said, and it looks like it's right to me -- you point out to me where they are wrong, if they are -- that you don't have evidence of actual confusion and misleading. What you have got is an assertion here that this "Better" campaign, the Nexium, quote, "Better," unquote, campaign, is literally false.

MR. MORRISON: That is our contention.

THE COURT: That is where I need you to take me to make your case.

MR. MORRISON: I think you have put your finger on it. In any false advertising case, there are obviously two key issues. A, what does the advertising communicate, and B, what does the science show about the truth or falsity of that message?

There is no question, we contend that this advertising expressly conveys and/or by necessary implication conveys two messages, A, message A, that Nexium is better than Prevacid overall for the relief of heartburn and the symptoms of acid reflux disease, and B, that it is better overall for the treatment of erosive esophagitis. And we believe those two messages are either literal or literal by necessary implication.

If I may, I would like to talk briefly about the science, because the science will tell us what could they have legitimately said about this drug. I think that would be a better context to get to the message.

As we said in our reply brief, I think there were three scientific questions that need to be addressed here. One is, question one, what do their studies show about the relief of acid reflux disease symptoms in general? What do they show about symptoms? Two, what do their studies show about healing of EE in general? And then number three, given what the studies show about EE, what if anything is the clinical significance of what those studies show?

As I say, we address these in our reply brief. And I would like to hand up at this time a, sort of really an oral argument, and I have given a copy to Mr. Weinberger, that will just help you follow I think the points that I would like to make.

So Page 1, Your Honor, addresses the first scientific question, what if anything do their studies show about the relief of symptoms of acid reflux disease.

Now, neither study, as is clear from reading the studies themselves, was primarily designed to measure symptom relief. They were primarily designed to measure healing of EE. They did, however, have secondary measurements in the study having to do with heartburn relief where the patients filled out diaries.

The Castell study, which is their bigger study -- Dr. Spilker in his initial declaration reviewed the Castell study. Now, Dr. Spilker is an expert and an author of several textbooks on the design and execution of clinical trials. He has worked for several different pharmaceutical companies during his career. He looked at the results in Castell regarding symptom relief, i.e., heartburn, and he found seven variables that were measured. Three had statistically significant differences. But those differences were in the neighborhood of one, two and three percent. And he found that none of those were clinically significant.

Dr. Robinson, who is our other expert, he is a gastroenterologist in Oklahoma, he looked at the same studies, reached the same conclusion. He actually found 16 heartburn symptom factors that were measured. Again, he found only three that had any statistical significance. None

of them had any clinical significance.

The most significant point here, Your Honor, is that even Dr. Castell, the author of the Castell study, and one of AstraZeneca's experts, he does not even claim in his declaration that his study shows superiority for acid reflux disease symptoms. If you look very carefully at Paragraph 16 and 17 of his declaration, it is very clear that the only claim he makes for his study is that there was superiority on EE healing.

Now, the only other study they have is Dr. Fennerty's study. At the time we filed our motion, all we had was the one-page abstract, so we couldn't really tell much. When we got their papers, AstraZeneca itself in house has written up the results of Dr. Fennerty's studies, so we now have his data. And again, Dr. Fennerty has not claimed any significance, any superiority significance for his heartburn symptom findings. Dr. Robinson, our expert, in his reply declaration, said again there were a couple of measurements that were statistically significant, none that were clinically significant.

Then we have all of these other studies that are mentioned on Page 1. There were a group of EE studies conducted by TAP, and again, heartburn was a secondary end point. There were no clinically significant differences.

And then the most important thing, on Page 1, in

my judgment is Item 4, the Chase study. That was a huge study commissioned by TAP. There were over 3,000 patients in that study. The primary end point, the focus of the study, was symptoms of acid reflux disease.

THE COURT: Let's stop there for a second. I am going to ask you to stay right there and ask Mr. Weinberger to get up, because two things I want to get Mr. Weinberger's reaction to right now are the assertion that there was nothing clinically significant in the Castell study and nothing clinically significant in the Fennerty study.

MR. WEINBERGER: Well, I think the problem is that Mr. Morrison is focusing on things that aren't being claimed in the advertisement. This is not a claim for GERD. Overall, it is a claim for moderate to severe EE. That is what the studies were investigating.

THE COURT: Let me be more precise. Is it AstraZeneca's position that as to healing in moderate to severe cases of EE that there are clinically significant findings in the Castell and the Fennerty studies?

MR. WEINBERGER: Absolutely.

THE COURT: Do you disagree that there are clinically significant findings in the Castell and Fennerty studies, Mr. Morrison, as to healing of EE in moderate to severe cases?

MR. MORRISON: I think we will, for purposes of

this motion, we will concede, and that's where I was going, we agree for purposes of this motion that they found some minor differences in healing of erosive esophagitis for Grade C and D. What I have been talking about until now was heartburn symptoms.

THE COURT: I am just trying to pin you down, because when you say no clinically significant findings, one might be led to think that the statement there was nothing clinically significant.

MR. MORRISON: I didn't mean to say that. That is why Item 1 here is symptom relief. That is all I was talking about. I have now exhausted that point. I don't think Mr. Weinberger would contend that either Castell or Fennerty claims that their studies show superiority for symptom relief.

Now, if we could turn to Page 2, Your Honor, now we go to the question of EE, what do the studies show about EE. Here, Your Honor, I don't think there is any real dispute among the experts about the data. I think the only dispute is to what conclusions can be drawn from that data.

First of all, if we look at Grades C and D, there is no question, Castell and Fennerty found differences. Castell found a 12.7-percent difference healing Grades C and D. Fennerty found a 4.9-percent difference in healing rates for Grades C and D.

Now, one thing that I would like to point out, they have been trumpeting Castell as saying the 12.7-advantage is huge. Dr. Fennerty's data shows less than half of that. And Dr. Fennerty's study was a large study. He had 999 people with Grade C and D. Castell had 1286.

So with respect to that category, we will concede for the purposes of this motion that their studies show a benefit for those patients in C and D.

But I don't want to stop there. I want to go back and look now at the whole EE population, because, after all, Castell looked at Grades A, B, C and D.

THE COURT: You can take it as a given that I have looked at your papers. I understand your assertion that this set, this Grade C and D set of sufferers is a minority population in the population of people who suffer from EE. I took your point. I understand your factual assertion for that and I don't understand from your opponent's papers that they disagree with that.

MR. MORRISON: That is fair enough. What I do want to point out in this regard, though, Your Honor, is I don't think we can disregard Castell's findings for the A and B group. Remember, that was 75 percent of the population of his study had either Grade A or Grade B. As to that 75 percent of people in his study, there was no difference. These weren't even statistically significant differences.

These were no differences at all.

You can combine A and B, as we did on this Page 2 of this chart, and you can see the combined difference isn't either statistically or clinically significant.

THE COURT: Let me drive you to whatever the end point is you want to take me to on this scientific information. And I will reemphasize that I have taken a look at what you have given me in your papers, because I want you to talk to me mostly about how this amounts to -- let me frame it for you this way.

I watched the ads. I watched them several times. I read the little subscript on the screen, which, interestingly, is called a super, I am not sure why.

MR. MORRISON: That's what they call it in advertising.

THE COURT: I guess that is the jargon.

I read the super as it was on the screen. I tried to get a sense of the time it was on the screen, the size of the super on the screen. I read the print ads, the brochures. I went back and read the super as it's reproduced in the exhibit to Mr. Spitalli's declaration, Docket Item 14 at Exhibit F. And I understand from what you have given me that you are saying, gee, a consumer would come away from this believing this is about acid reflux, and a consumer would come away from this, even if they were smart enough to

see it isn't about acid reflux generally, it is just about EE, thinking it was about EE generally, it isn't even that, it is about a subset.

What I want you to answer for me is the assertion that I take your opponents to be making that you are really talking about misleading. You are saying people will look at this and they won't get it because they will be misled into thinking this is about GERD or about EE generally. And you have staked your claim here, given the state of the record, on literal falsity.

So that puts you in the framework of having to say that what is in this ad is literally false, or as you put it, by necessary implication. That is where -- in the time you have got left, and I am dividing your time about evenly here, which means I am giving you both about a half-hour, you have got roughly between five and ten minutes left here -- where you are most productively going to be able to argue to me.

MR. MORRISON: That is fair enough, as long as we understand -- before I say that -- as long as we understand that among the entire population of acid reflux sufferers, we are talking about one percent of patients who might benefit from this alleged superiority among C and D patients. That's what we are talking about.

That being said, let me go to the ads. There is

no question, they point to the language in the middle of the ad that talks about the studies being about healing of EE. And they also point to the super, as it is called in the trade, that says among patients with moderate and severe damage. There is a problem with approaching it that way, Your Honor. That is that the courts have long said that you cannot just look at certain words in an ad out of context.

That concept goes back to FTC case law that was adopted by the Second Circuit in the Avis v. Hertz case in 1986, a famous quote that has been followed by courts ever since, the gist of which is that you must look at words in an advertisement in the context in which the whole ad appears. There is wonderful phrases the Court used, text must yield a context. The Court must consider the ad in its entirety and not engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately.

And when you look at the entire mosaic of these ads, I don't think there is any question but what these ads are talking about are two things, acid reflux disease in general and EE damage also in general.

Look at the very beginning of the ad, when James Naughton, the actor, walks out. We say in our papers that the word better and acid reflux disease are imposed across the entire screen. It is actually on the floor, he walks across the floor. And what they are talking about -- this is

the context of the ad. This is the entire mosaic. It is acid reflux disease. He is using the word better at the beginning. And at the end of the ad, he says, with Nexium, you don't just feel better.

Well, the evidence is undisputed, Your Honor, you don't feel good, bad, or indifferent because you have a damaged esophagus. You feel bad because you have heartburn and acid indigestion. That is the symptom. Their own experts basically concede that to the average consumer acid reflux disease means heartburn and its symptoms. Dr. Fennerty, one of their two study authors, in Paragraph 5 of his declaration, said, acid reflux disease is a disease, quote, known to most patients as acid indigestion, heartburn, or regurgitation of acid contents.

That is what consumers understand acid reflux disease to be.

And so my point, Your Honor, is the obvious one. Acid reflux disease, they knew when they drafted this commercial, and you can tell by looking at it, that's what Mr. Naughton is talking about. That is the overall context. The commercial begins with it. It has it on the screen. And it ends with the concept of feeling better.

Now, even this footnote, or the super, where they say, patients -- the study was in patients with moderate to severe damage --

THE COURT: Before you go to the super, you want me to pay attention to what he is saying. What am I to make of the language where he says, if I told you prescription Nexium heals acid-related damage in the esophagus better, you would want proof, and now your doctor has that proof. Recent medical studies prove Nexium heals that damage better than the other leading prescription medicine? What is your take on that?

MR. MORRISON: My answer is, they are positioning these studies about esophagus healing as the proof, as the proof that Nexium is better than Prevacid for acid reflux disease.

That whole thing you just quoted, Your Honor, is preceded by the words so if you suffer from acid reflux disease, frequent heartburn. It doesn't say if you suffer from an eroded esophagus you might want proof.

THE COURT: Let me ask you this: Scientifically, how does one get EE?

MR. MORRISON: One gets EE because you have constant heartburn.

THE COURT: Because you have acid reflux.

MR. MORRISON: Because you have the acid reflux and over time that can damage your esophagus. The treatment, though, isn't a pill that magically heals your esophagus. Neither Nexium or Prevacid heals the esophagus. All they do

is stop the acid from coming up through the esophagus, and by stopping that, then the esophagus heals naturally. That is an undisputed fact scientifically.

THE COURT: So it is the assertion of the statement about esophagus healing in the context of acid reflux that bothers you? I am trying to follow your argument. You are saying they start with acid reflux disease and then he says, if you have got damage to your esophagus, there is a study that shows Nexium heals that better.

MR. MORRISON: Yes.

THE COURT: It is the starting with the context of if you have acid reflux that is the nub of the problem as far as TAP is concerned.

MR. MORRISON: Yes. Your Honor, you are a consumer sitting in front of your television and you see this. You know what acid reflux disease is. You know you get heartburn and you feel bad. You see this ad, and all of a sudden they are talking about erosive esophagitis. What do you or I know about erosive esophagitis? A doctor might know. Again, that is why I put this in the context of the danger of this kind of advertisement. Well, the downfall of erosive esophagitis, a half of my patients, 20 percent of my patients with EE may have moderate to severe damage, and one percent of every patient I see notice acid reflux disease, you know, maybe a doctor would take that into account. But a

patient sitting in front of his television, his or her television, seeing this ad, knows nothing about erosive esophagitis. All they know is they have got heartburn, once a day, twice a day, five times a week. It hurts. They want to feel better. The proof that Nexium makes you feel better is these studies. That is the whole point about this commercial. These commercials are designed to posit the studies as the proof, the proof that Nexium is better overall.

And again, the message is better overall for the symptoms. But even if you want to go beyond that and say, well, it's not about symptoms, it's just about erosive esophagitis, even there, even there, the studies only pertain to a small percent of the people with erosive esophagitis.

The last thing I want to say about the ads is the language in the super studies versus Prevacid in patients with moderate to severe damage. Well, that's not true. This wasn't a study in patients with moderate to severe damage. This was a study in patients with all kinds of damages. A through D, 75 percent of those patients saw no difference.

So put it another way, Your Honor. You are a consumer, sitting in front of your commercial, and they say, hey, if you have acid reflux disease, maybe you have erosive esophagitis. 20 or 30 percent of you are going to have erosive esophagitis. Then they say, if you are in that 20 or

30 percent, five percent of you, according to Fennerty, may benefit from taking Nexium. That's one in 100. Now, do you think that average consumer is going to run out and say to their doctor, I think I am one of these -- this one person in 100, I think I have got moderate to severe EE, you better give me Nexium? That is not going to happen. And that's the vice of this advertising, is taking this tiny sliver of advantage, that again we would concede for purposes of this motion, and converting it into a broad message of superiority that just is not true. The Lanham Act doesn't allow you to do that.

If I may just briefly refer to two cases that I think are perfect bookends for this. One of the leading cases that established Lanham Act case law was American Home Products v. Johnson & Johnson. Anacin, the makers of Anacin, were running this advertising touting Anacin's anti-inflammatory benefits. Well, Anacin did have anti-inflammatory benefits, and Tylenol did not. Nevertheless, the Court found those benefits did not make Anacin a superior analgesic. And the Second Circuit was very careful in saying, if you want to craft advertising talking about, solely about the anti-inflammatory benefit of Anacin, you can, but you cannot convey a message about its overall superior pain relief.

The flip-side was promoting Tylenol as being you

can't buy a better pain reliever -- you can't find a more powerful pain reliever. That claim was only true for mild and moderate pain. It wasn't true for severe pain. Again, the Court said, you can't do that. You can't run an advertisement saying you can't buy a better pain reliever because that is false with respect to people with moderate to severe pain. So I think the Lanham Act case law is clear, you can't do that, and I think --

THE COURT: What was the context of those decisions? Were those preliminary injunction cases?

MR. MORRISON: The first case, the Anacin-Tylenol case, was following a trial on the merits. There had been a preliminary injunction motion. The motion was denied on the grounds that the plaintiff, which is our client, had not proven irreparable injury, not that they hadn't proven the ad. Now, Mr. Weinberger will point out rightly that in that case there was market research, because there was nothing in the Anacin ads that directly or by implication said superior pain relief. All it did was talk about inflammation. In that case the Court rightly required market research.

The second case was, I believe, a preliminary injunction case. And there was no market research. This was a print ad. And the Judge said, it's just not true that Tylenol is equipotent to the ibuprofen pain relievers.

THE COURT: Let me ask you a question

specifically about your assertion that it's just not true as to the super that the study was with patients with moderate to severe. I understand you to be saying the studies encompassed all categories of people with EE.

MR. MORRISON: Right.

THE COURT: So you would have me read with moderate to severe as saying in studies with patients limited to moderate to severe.

MR. MORRISON: Well, I could ask you to read it that way. What I really would say is to the extent that they want to point to that super and say that cures everything, my answer is it doesn't cure everything because it, itself, is not literally, it is not literally true.

THE COURT: You are right on the point I want to be on. How is it not literally true? These were studies that were on patients, and in that group of patients, there were people with moderate to severe. Right?

MR. MORRISON: Sure.

THE COURT: So I can read the word with to mean patients with this and nothing else, or I could read the word with to mean some group of people in the study had this. There are people in the group that had this. You tell me how I need to read that.

MR. MORRISON: Your Honor, if you were a doctor and AstraZeneca came to you with those words, you might go

through that process, and you might say as a doctor, well, gee, did the study only have people with moderate and severe? And the AstraZeneca rep would say well, no, we had 75 percent of them actually have the lower grades.

And the doctor would say, gee, what did you find there? The rep would say, well, we found they were really similar. But if you look at this top group, we found a difference.

The consumer watching the television in a 45-second ad isn't going to go through that process. Again, I keep coming back to this. That's the vice of this advertising. They are promoting consumers who aren't in a position to have this kind of discourse that they are having. A doctor might have it. But a consumer is just not going to have it. That is the vice of the advertising.

THE COURT: Okay. Thank you very much.

MR. MORRISON: Thank you very much, Your Honor.

THE COURT: I will give you a couple minutes at the end of Mr. Weinberger's presentation for rebuttal, if you would like.

THE COURT: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Weinberger.

MR. WEINBERGER: Thank you, Your Honor.

Given Mr. Morrison's statement at the beginning, his concession with respect to clinical significance, I am

going to focus on what we believe are the implied claims here. There are two of them that TAP has focused on. One, they say we are making a claim of superiority for healing all types of EE, not just moderate to severe. Second, that Nexium is superior to Prevacid for the treatment of acid reflux disease generally.

With the discourse we had here this morning, I think it illustrates precisely why the courts require survey evidence of this, because while Mr. Morrison's interpretation of what a consumer might take away from this might be plausible and Your Honor's interpretation, whatever it may be, might be plausible, that is not the issue.

The courts have basically said, we want to see evidence. If you are going to go beyond the literal words of what is in the advertisement or even if the advertisement is ambiguous, if it's ambiguous, we want to see evidence as to what it's communicating to a significant number of consumers before we find it to be actionable.

THE COURT: Talk to me about the necessarily implied line of cases and assertions that you saw in your opponent's papers and which you heard emphasized by Mr. Morrison here this morning.

MR. WEINBERGER: Let me first talk about the line of cases, Your Honor. I think the paradigm of the necessary implication case is Castrol v. Pennzoil in the Third

Page 25

Circuit. If I can describe that in shorthand, what Pennzoil says is if you say A equals B, and B equals C, then you necessarily imply that A equals C. So what happened in that case, they were making a claim that their engine oil was superior for viscosity. And they said that viscosity was related to engine wear. The better the viscosity, the less engine wear breakdown you were going to have. Therefore, the court said you were making a claim that your engine oil was better for engine wear. It was the only interpretation. There was no other interpretation. It necessarily followed.

The reason -- I will go through the other cases as well -- the reason you can't use the necessary implication as an excuse to avoid a survey in every case where you think a consumer might take away a message is because otherwise the exception will drive the rule out. The reason for the rule is critical because the First Amendment permits truthful commercial speech. If you are going to argue that it is not truthful or misleading, you have to have proof.

The second case that they cited was the Pharmacia -- I am sorry, was the Clorox case. I know that one because I was in it. First of all, the Clorox case was a dismissal motion. The judge sua sponte dismissed a motion that had been made on a preliminary injunction on a Lanham Act claim and they threw it out.

All the First Circuit held was necessary

Page 26

implication had been pleaded in the complaint, not that it had been proven. In that case, as I recall it, they showed a woman washing her clothes with detergent and bleach and then she used a product that was called abacon blonculor, it is a detergent with a bleach substitute built in.

It used the phrase whiter is not possible. And they said, the complaint adequately pleaded that the necessarily implication of the woman saying whiter is not possible when she wasn't using the bleach was that the second product got the clothes just as white or whiter than the bleach got it. Again, it was a pleading motion. Again, it was, in fact, arguably a necessary implication.

The third case was Pharmacia against GlaxoSmith. And there, Pharmacia said that its product was superior for -- Pharmacia said that the other product caused sleep disturbances and that its product was specially formulated to help consumers sleep. So the Court found that the necessary implication of that claim was that its product was better for avoiding sleep disturbances at night. This was a product for quitting smoking. Again, it is not what we have in this case.

The last one is Spalding. Spalding involved a golf ball which they tested in a laboratory the way in which the balls were balanced. And they said in the ad you could putt truer, something we would all like to do, you could putt

Page 27

truer with their golf ball. And the Court said the necessary implication of that was that you had proven it, because it was an establishment claim, you had proven it on a putting green, where it is the only place you putt, and not in a laboratory.

So those cases are all very, very different.

This is your classic case. Indeed, it is exactly like the case that Mr. Morrison cited, where the claim was made for a broader, I think it was the Anacin case that he cited, for a broader -- the argument was that the advertisement was conveying a message that the Anacin product was better than the Tylenol product on a broader basis. The proof and the express words of the commercial were limited to a specific benefit. I don't remember whether it was tougher headaches, something very specific.

The only reason that the J&J side of that case prevailed was because they had a survey which proved that they were communicating that. That's what's missing in this case.

The second case he cited, I think it was the American Home Products case, there was no issue as to what was being communicated in that case. The parties agreed that a broader benefit was being communicated, so no survey was required.

I have been involved in a case exactly like that

Page 28

as well between American Home Products and Procter & Gamble. Again, a survey was introduced to try and prove that a broader benefit was being communicated than the literal words of the commercial. In that case, the plaintiff was unsuccessful because the survey was rejected.

But that is precisely what is missing here. Your Honor, what they essentially are asking you to do is change a couple of decades worth of law in the Third Circuit and elsewhere that says you have to have this kind of proof.

I don't know why they didn't get it. Maybe they tried and didn't succeed, I don't know. But without it, they cannot make this claim.

Now, in terms of the EE overall claim, if Your Honor were to somehow to find that claim is being made, the proof is there in the Castell study. The Castell study had all grades of EE in it and the superiority shown in the Castell study was on an overall basis. The Fennerty study was specifically designed only to deal with moderate to severe.

THE COURT: Let me stop you for a second. Castell, Fennerty, they show a statistically significant difference in a subset, if I understand your opponents correctly, they say maybe one-quarter of folks who suffer from EE, and in the overall group of folks who suffer from acid reflux that amounts to one percent.

As to that subset, Mr. Morrison was pointing to the super that states, quote, Studies versus Prevacid -- I am not going to try to pronounce the chemical name -- in patients with moderate to severe damage, and says, that isn't right because the studies weren't in patients with moderate to severe EE. It was in all patients with EE. What is your response to that?

MR. WEINBERGER: Actually, one of them, the Fennerty study was only in patients with moderate to severe EE. What they did was, when they saw the results of the Castell study, which showed a greater benefit in C and D, they specifically designed a study with only those patients. So the statement is, no matter how you read it, is absolutely indisputably true with respect to the Fennerty study.

With respect to the Castell study, I think Your Honor made the point. Those are patients, patients in that study had moderate to severe EE. So the statement is absolutely correct. That is a study with patients who had moderate to severe EE.

So I think it's a true statement.

I don't know if Your Honor wants me to address this point about the one percent. I think it is an important point. First of all, I think the math is a little one-sided. I think if you were to use the highest number that the experts have testified, the highest percentage of

people with EE, and then you were to use the results of the Castell study and apply it to that, you would probably come up with a number like three to four percent rather than one percent.

But let's take the one percent. If we take the one percent and you take about a hundred -- about ten million GERD sufferers in the United States, you are talking about 100,000 people, 100,000 people who on their one percent would be healed after eight weeks using Nexium and not healed after eight weeks using Prevacid.

This isn't a case where you are talking about gradations, continuous variables -- my skin is a Grade 5.2 and this is a 5.3 and nobody can see the difference. We are talking about people. We are talking about bodies. People who are going to experience healing with one drug and not with another. And there is no case at all, no authority whatsoever for the proposition that we aren't entitled to tell people about it, people are not entitled to discuss it with their doctors. And after all --

THE COURT: I don't take them to be saying that. I take them to be saying you found something from which you could argue to the public that you could help 100,000 people out of ten million. But you tried to make it sound like you could help the ten million, and the ten million that are out there watching your ad would be fooled into thinking, gee, if

I can swallow this enormous pill that Mr. Naughton is standing next to, I will be better.

MR. WEINBERGER: First of all, if they think people are being misled that way, there is a way in which the cases say they can prove it. It is not enough for Mr. Morrison to get up here and say that is how I read it or that is how an ordinary consumer would read it. That is just not what the law is in the area.

Second of all, I might add that I can't go to the store and buy Nexium even if I am fooled by this. I have to go to my doctor. My doctor is going to have all of those ads and all of that information, and he will tell me, no, no, no, this reading, it doesn't apply to people who don't have moderate to severe.

The other point I should make is that, as the experts have all pretty much acknowledged, when you walk into your doctor's office with GERD, they do not put an instrument down your throat and do an endoscopy. So they don't know when you are being treated for GERD if you have EE or moderate to severe EE. It is treated symptomatically.

In terms of any given patient, it is really impossible to tell at the outset for the physician whether or not that person is in or is not in the category. And therefore, I think that's why you see Dr. Johnson, as well as Dr. Castell and Dr. Fennerty say, this is important to us

because of the way we treat patients. And if we have two drugs that cost the same, that have the same side effects, and I understand that one of those drugs may be more effective in this respect than the other, it is important to me and it is important to my patients. And I don't think there is any reason in the world why we should be prohibited from telling people that unless the appropriate proof is in the record -- and, frankly, TAP had every opportunity to generate that proof and made the judgment not to do that.

You know, I think, Your Honor, that as it was initially framed, TAP was claiming that we were advertising to a subgroup and the percentage change wasn't that great, it was only ten percent or whatever in the Castell and three point something percent in Fennerty. I think they walk away from that in their reply brief because I think we have shown that the law permits that and permitted it in both respects in a case in which we cited, the SmithKline case, and there is just nothing wrong with that.

To sum up, Your Honor, I think that AstraZeneca has done studies, studies that show a benefit. The benefit is a meaningful benefit to gastroenterologists. Dr. Spilker, with all due respect, is not a gastroenterologist, his 20-percent rule, there is no foundation for that rule whatsoever. The notion that human variability is 20 percent and therefore there should be a 20-percent rule is

Page 33

preposterous, among other reasons, when you do a randomized clinical trial, you have people randomized into the treatments and that 20-percent variability is going to equal out. The FDA has approved drugs on far less than 20 percent. The 30 percent he is citing as the FDA criteria is actually against placebos, not between two active products, and isn't even the rule. There is just no support for it whatsoever.

The last thing I will say is just to reiterate again, the law is clear, TAP had the ability to put in the kind of proof that might have entitled it to relief if it could have proved it. It didn't do it, for whatever reason. And I don't think that our own interpretations of this advertising are going to solve that problem.

THE COURT: All right. Mr. Morrison.

MR. MORRISON: I want to cover two brief points if I may, Your Honor. On the false by necessary implication, the one case Mr. Weinberger did not talk about is the Novartis v. J&J case, Third Circuit 2002. I think that is instructive, because the Court accepted one necessary implication, rejected the other. The product was a new line extension to Mylanta called Nighttime Strength Mylanta. The plaintiff argued that that necessarily implied two messages. One, that it was stronger and more effective than other medications, such as Extra Strength Maalox, Super Strength

Page 34

Maalox, Maximum Strength Maalox. The Court rejected that and said, no, there is nothing in the commercial to necessarily imply that. But on the other hand, the Court accepted the argument that it did necessarily imply that Nighttime Strength Mylanta had been spatially formulated for nighttime use, and there was something about that product that was unique for nighttime use. Otherwise, why refer to it as Nighttime Strength?

I think that's a very instructive case.

On the clinical significance point, I want to say just two things, Your Honor.

First of all, I would cite to you Dr. Castell's own conclusion in his declaration, Paragraph 17, where he says, quote, Clinically, the results of this study, i.e., his own study, confirm that Nexium and Prevacid, like all available medications in this class, are highly effective in healing esophagitis.

This is the author of the study saying that both medications have been proven to be, quote, highly effective in healing esophagitis. The only thing his study shows is for this tiny subset of patients Nexium might be a little better. Now, what's the clinical significance of that? We are conceding that there is a difference among that subset. But is that a clinically significant difference that would make a doctor or a patient ask for Nexium over Prevacid?

Page 35

THE COURT: The ad says that there are studies that show it's better for people with those -- well, I am sorry. I interrupted you. I take your point.

MR. MORRISON: Obviously, if you conclude that that is all the ad says, there is nothing I am going to be able to do to convince you to the contrary. I think the ad says a whole lot more.

My point is, Your Honor, what does all of this mean? They have these studies that they are touting, they are spending hundreds of millions of dollars to tout them. What does it mean? Even Dr. Fennerty and Dr. Johnson, their third expert, say we don't like Dr. Spilker's 20-percent rule. We don't see where that comes from. But the measurement of clinical significance is how would it affect what they call the number needed to treat analysis. In other words, how many patients would a doctor have to see before he or she said, oh, I am going to switch that patient from drug A to drug B. And if you do that analysis, and you limit it, if you limit it to patients with moderate to severe EE, that number is only somewhere between 4.9 percent, Fennerty's number, and 12.7, Castell's number. If you extend it to all EE patients, that number becomes very, very small. And if you extend it to the entire population of GERD patients, that's where you get the one percent. And we are not asking you to take our math for that. That is their own experts,

Page 36

using their intent to treat analysis. That was the whole point of points 1, 2 and 3 of our reply brief, using their numbers and their data, one in 100 patients seeing this commercial might benefit from taking this drug. And I don't think -- if you just think about it, Your Honor, is a company going to spend hundreds of millions of dollars in consumer advertising to tell the American public that one in 100 patients is going to get a benefit if they take this drug? I think the clear answer to that question is no, and that's why this advertising is false and should be enjoined.

THE COURT: All right.

MR. MORRISON: Thank you.

THE COURT: Thanks.

Well, I am going to give you a ruling right now, and then we will turn to schedule.

I am denying the preliminary injunction. The standard here is very clear. You have four things you are supposed to meet. You have got to show a likelihood of success on the merits. You have got to show irreparable harm in the absence of an injunction. You have to show as the proponent of the injunction that you win on the balance of equities. And you have to show that the public interest swings in your favor.

You have to show all those things.

I have looked at the evidence that has been given

to me, and I have seen the arguments in the papers and heard it here today, and find that this heavy burden -- and it is a heavy burden, for extraordinary relief at the preliminary stage -- has not been met by TAP in this case.

The assertion is that there is a false claim of overall superiority. That's what the complaint asserts -- I should say the counterclaim. But having viewed the ad and watched it several times, read the things over in print, you could definitely argue, and Mr. Morrison has done that effectively here today, that this is artfully presented and that it could well mislead consumers. But you haven't shown me that it is literally false.

Without evidence of literal falsity, I am left to say, where is your evidence that it is misleading? And you don't have it. You don't have consumer proof. You don't have a study to show consumer confusion. All the argument has been around the notion of misleading, that if you looked at this you would think that this is what that meant. That is the language of misleading. In trying to press to show me where it is false, how is it literally false, I get the generalities of you have to take it in context, you have to see it in context.

The bottom line is, you haven't demonstrated a likelihood of success on literal falsity. At least on this record it is not there. And there is not evidence of

misleading, which isn't to say it may not be out there. There may well be tremendous success in a consumer survey that shows that people, doing just what Mr. Morrison said, sitting in front of their television set, watching the news while they are eating dinner, think, acid reflux, big letters on the screen, Nexium is better for acid reflux is the conclusion that they draw, that could be the case, but you don't have proof of it. And I need proof in order to give relief of the sort you are looking for here. So at this stage I have to say you haven't demonstrated that.

I want to point out that I think it's noteworthy that in addressing its claim to the FDA, it appeared that TAP was couching it in terms of misleading as well, not in terms of literal falsity but in terms of misleading. When I read in Mr. Spitalli's declaration the copy of the September 27, 2004 letter that TAP sent to the FDA, I noted that it spoke of misleading. And I will quote from the first page at the bottom of the page: "Until studies demonstrating superiority are completed against the 20-milligram approved dose as well as the 40-milligram approved dose we believe this commercial misleads the consumer."

Going over to the next page, it says, quote, "The tiny 'super' referring to studies against Prevacid in moderate to severe disease is not sufficient to correct this overwhelming impression of superiority in all cases..."

That doesn't complete the sentence. That's where I was quoting.

In short, TAP was saying, and it makes sense for it to say, people are going to be misled by this. Again, that is not the claim of literal falsity.

The necessary implication cases cited don't help because I believe Mr. Weinberger had it right, and my interpretation of those cases was in line that it has to be an unbroken logical chain, an unavoidable -- that's what it means. It's necessary by implication. And you haven't drawn that kind of implication here. All you have said on the TAP side is "acid reflux" in big letters across the screen sets a context in which people will be confused. It doesn't lay out the logical chain you have to have. And the literal words of the ad, coming out of the actor's mouth and the super, in combination, I am looking at that context to say what they say, which is, we are talking about esophageal damage, super, moderate to severe cases, maybe that is not enough to avoid confusion, but it's also not literally false by implication or otherwise.

I should also point out that I think when the FDA responded in the way it did -- and there is an affidavit in the papers by TAP -- that the FDA said, and again I quote, "We have considered your complaint and have concluded that it appears to have merit and will be carefully evaluated for

further action," that they were saying that in the context of the assertion that these ads are misleading. And they did the prudent thing, which is to say, you know, you know what? This really could be misleading. We are going to look at it. If it is misleading, we are going to do something about it.

I will tell you roughly the same thing, which is if you give me evidence of actual confusion to show the ad is misleading, I will carefully evaluate it, and at an appropriate time maybe we will be in a position to talk about relief. But we are not there now.

So the long and short of it is that you haven't shown likelihood of success on the merits on the record you have given me.

As to the irreparable harm, in the absence of an injunction, I note again you failed to show that. Indeed, you are asking me to presume harm because of the whole context you have raised, which is, this is likely to confuse ordinary folks out there who will now go to their doctor and say give me something they don't really need and that that must hurt you. But you don't address the AstraZeneca argument in your reply brief on irreparable harm, and I am not in a position to presume it.

By all appearances, I should know TAP is a sophisticated, thoroughly capable, well-financed

pharmaceutical company, which itself, by the record it itself has given me, has spent on the order of 133 million dollars to promote Prevacid. The implication that it can't defend itself in the market just doesn't persuade me much at all, particularly on this truncated record.

Balance of hardships, again, TAP doesn't address this in the reply brief. It leaves AstraZeneca's argument unanswered. I can't leave it unanswered. It is one of the four factors I have to consider. AstraZeneca asserts that, hey, we have spent millions on this ad campaign. If you make us pull it right now, we are going to suffer real damage here. With nothing but speculation to counter that, it is a credible assertion. Even on the balance of hardship, here I am talking about the hardship to TAP, not the hardship to the public, because the argument thrown at me by TAP -- thrown is the wrong word. It implies it wasn't well-crafted. It was well-crafted. The argument presented to me by TAP focuses strongly, as is appropriate in one respect, on the public, it is the public suffering here.

But when it comes to the balance of the hardships, I am looking at the hardships between the parties. And on that balance, AstraZeneca said, we are going to be hurt, and TAP has said nothing to show me how it's being hurt, how it's being hurt would be more than AstraZeneca would be hurt.

So on the balance of hardship, TAP has to come up short on that one as well.

Finally, the public interest -- and this is a fascinating case, because it does point out a very interesting social problem, and it invites me as a judge to step in and say, well, this is bad public policy. We have got consumers out there who are going to be sucked in by direct-to-consumer advertising by pharmaceutical ads artfully drawn, good production values, and superscripts notwithstanding, consumers will be fooled into thinking that other drugs that are good, adequate, and in some cases, if I take the Prilosec example which was pushed at me in the papers and mentioned here today again, indeed, would be cheaper, that the consumers are going to be fooled into thinking that is not good, that this Nexium pill is better, when really all it's better for is AstraZeneca's bottom line.

That is the argument I am getting from the folks at TAP. It certainly generates some interest in the press. They have what appears to be, I don't know if it is front page, but they have big-page press in the New York Times that they cite to and other kind of attention in the media to this issue. But you know what? Definitely not at this stage, and I question whether at any stage, am I in a position to say the public policy here that I might think is right has got to

override the legal standards and what is being permitted by regulatory authorities.

So while I think I was held up more on the public interest point than any other, in the final analysis, I have to defer to and believe that the public interest is being adequately protected by those regulatory authorities who are specifically empowered to look to and make sure that direct-to-consumer advertising, which is permitted under law, is properly being handled.

You made your pitch to the FDA on this point. By all means, push it, if you think you have got a point to win there. But I am not going to turn myself into a super FDA or legislator on this point, and certainly not on this record.

All right. So for all of those reasons, the preliminary injunction motion is denied. The order you will get out of me will say nothing but Denied for the reasons stated in open court.

Now let's turn to the matter of scheduling.

When we met in November, I specifically asked the parties to meet and confer on a schedule. And then the order that I put out following that meeting, this was the 19th of November, said, quote, the Court will hold a Rule 16 scheduling conference on December 20th. That would be today. Counsel shall file their proposed joint scheduling order with the Court three business days prior to the

scheduling conference. We might have missed it, but I don't think we got it.

Mr. Morrison.

MR. MORRISON: Your Honor, Ms. Sanchez is going to be prepared to discuss the scheduling order in general. One of the problems is we weren't able to work out an agreement because there is a dispute about when we want to have a trial. We obviously want to do it sooner than they do.

One thing I would like to ask Your Honor, in view of your ruling, because I think the schedule would depend on your answer to this question, we would respectfully request that either you award us an expedited trial on the merits or, alternatively, an opportunity to renew our motion for a PI.

We in fact did do a consumer survey. It wasn't completed until right before their papers were due. We knew if we interjected it in the case at that point, we would lose the ability to come before you in December and have a hearing on the motion.

So we would like to request -- I think everything flows in terms of scheduling from whether we can either have a renewed hearing date on a motion or an expedited trial on the merits.

THE COURT: Mr. Weinberger.

MR. WEINBERGER: It just seems to me, Your Honor,

you have one shot to make a preliminary injunction motion. As I said in my argument, it is not as if they came running in here the day after this declaratory judgment action was filed with a PI motion. It took six weeks from the time the case was filed until they made the motion. In my experience, you can do a survey in two or three. So it just seems to me they have had their opportunity to make a preliminary injunction motion. They have made whatever tactical decision they made.

While Your Honor may want to provide them with a trial date somewhat sooner than necessary, I don't see renewing the preliminary injunction motion as an appropriate thing to do.

THE COURT: Well, you are not getting another bite at the apple for a preliminary injunction. It is what it is. You have made your record. You argued. We have done that. That chapter is closed. Now the question is, when is trial going to be and what do you need to get there.

I have a scheduling order right here. I am ready to hand it to you, because you guys didn't give me what I asked you for. Very specifically, I said, give me your positions three days in advance. The fact you couldn't agree doesn't mean you couldn't give me something. Every day I get scheduling orders where parties disagree and one side says this is what I want and the other side says this is what I

want, and we talk about it. But at least then I have had the chance to look at my calendar, to think about your alternative proposals. We don't waste our time, which we are going to do now -- you put me in a posture where you have to do one of two things. I hand you the schedule I prepared because you guys wouldn't prepare one, chose not to, or I hear what you have to say today, I make you do what I asked you to do before, which is give it to me on paper and we reconvene this, either by teleconference, or I choose something and hand it to you anyway.

The reason I want you involved in the process is it's more beneficial for all of us. In other words, I would rather not say, well, I have come up with this order, here it is. I am interested in what you want to know.

So that is enough whining by me. I am disappointed you didn't give me what we needed so we could be done with it today. I am not going to jam an order down on you without hearing from you. So if you want to talk to me about it, we will do it on a teleconference later.

Here is what you guys need to do. Do what I asked you to do in November, speak to each other, then give me a form of order. If you have a disagreement, your local counsel have been through this process with me dozens of times, put down the alternatives -- plaintiff wants this, defendant wants this. We will get on the phone and we will

talk about it then, after I have had a chance to see what you want, look at my own calendar and make some judgments about what seems fair and what will fit.

All right? Now, hold with me just a second here. I am going to give you a date and time if I can for the scheduling teleconference.

(Pause.)

We will have a scheduling conference at 4:30 p.m. on Monday, January 10th. And I will ask AstraZeneca as the plaintiff in the case to set up the call. I will expect to have that scheduling order to me in advance. I will see it on the 4th at the latest, the 4th of January.

All right. Mr. Morrison, anything else from your side of the courtroom, sir?

MR. MORRISON: No, Your Honor.

THE COURT: Mr. Weinberger?

MR. WEINBERGER: No, Your Honor.

THE COURT: All right. We stand in recess. Thanks for your time.

(Hearing concluded at 11:17 a.m.)

- - -

Reporter: Kevin Maurer

'super' [1] 38:23
-and [2] 1:16 1:22
00 [1] 1:11
04-1332 [1] 1:9
1 [4] 9:22 9:25 11:11 36:2
10 [1] 1:11
100 [4] 20:2 20:5 36:3 36:7
100,000 [3] 30:8 30:8 30:22
10th [1] 47:9
11 [1] 47:20
12.7 [1] 35:21
12.7-advantage [1] 12:3
12.7-percent [1] 11:23
1286 [1] 12:5
133 [2] 5:12 41:2
14 [1] 13:21
16 [2] 8:23 9:6
17 [3] 9:7 34:13 47:20
1986 [1] 15:10
1995 [1] 4:11
19th [1] 43:21
2 [3] 11:16 13:2 36:2
20 [6] 1:11 18:22 19:24 19:25 32:24 33:4
20-milligram [1] 38:19
20-percent [4] 32:23 32:25 33:3 35:12
2001 [1] 4:12
2002 [1] 33:19
2004 [2] 1:11 38:16
20th [1] 43:23
27 [1] 38:15
3 [1] 36:2
3,000 [1] 10:2
30 [3] 19:24 33:5 47:8
4 [1] 47:8
4.9 [1] 35:20
4.9-percent [1] 11:24
40-milligram [1] 38:20
45-second [1] 23:10
4th [2] 47:12 47:12
5 [1] 16:11
5.2 [1] 30:12
5.3 [1] 30:13
75 [4] 12:22 12:23 19:20 23:3
999 [1] 12:5
a.m [2] 1:11 47:20
abacon [1] 26:4
ability [2] 33:10 44:18
able [3] 14:17 35:6 44:6
absence [2] 36:20 40:15
absolutely [5] 5:24 6:11 10:20 29:13 29:18
abstract [1] 9:12
abused [3] 3:9 6:3 6:7
accepted [2] 33:20 34:3
according [1] 5:13
account [1] 18:25
acid [32] 7:5 7:16 8:3 9:5 10:4 13:24 14:21 15:19 15:23 16:2 16:8 16:9 16:12 16:13 16:14 16:15 16:18 17:11 17:14 17:21 17:22 18:5 18:7 18:12 18:16 18:24 19:23 24:5 28:25 38:5 38:6 39:12
acid-related [1] 17:4
acknowledged [1] 31:16
Act [4] 20:10 20:14 21:7 25:24
action [2] 1:3 45:3
actionable [1] 24:18
active [1] 33:6
actor [1] 15:22
actor's [1] 39:15
actual [2] 6:15 40:8
ad [23] 4:21 5:5 6:5 14:12 15:2 15:7 15:12 15:14 15:21 16:3 18:17 19:2 21:16 21:23 23:10 26:24 30:25 35:5 35:6 37:7 39:15 40:8 41:10
add [1] 31:9
address [4] 7:21 29:21 40:21 41:6
addressed [1] 7:14
addressing [1] 38:12
adequate [1] 42:11
adequately [2] 26:7 43:6
adopted [1] 15:9
ads [18] 3:11 3:12 3:16 4:17 4:18 4:19 5:12 5:17 13:11 13:19 14:25 15:18 15:18 19:15 21:18 31:11 40:2 42:8
advance [2] 45:22 47:11
advantage [1] 20:8
adverse [1] 3:14
advertisement [7] 10:13 15:12 18:21 21:5 24:15 24:15 27:11
advertising [31] 3:6 3:8 3:10 3:17 3:23 3:24 3:25 4:5 4:8 4:13 4:16 5:3 5:10 5:25 6:2 6:4 6:22 6:23 7:2 13:15 20:7 20:16 20:21 23:12 23:15 32:11 33:14 36:7 36:10 42:8 43:8
affect [1] 35:14
affidavit [1] 39:22
again [19] 8:24 9:15 9:18 9:23 18:20 19:10 20:8 21:3 23:10 26:11 26:11 26:20 28:2 33:10 39:4 39:23 40:16 41:6 42:13
against [4] 26:13 33:6 38:19 38:23
aggressive [1] 4:3
agree [2] 11:2 45:22
agreed [1] 27:22
agreement [1] 44:7
ahead [3] 2:5 2:7 23:22
alleged [1] 14:23
allow [1] 20:10
alternative [1] 46:3
alternatively [1] 44:14
alternatives [1] 46:24
ambiguous [2] 24:16 24:16
Amendment [1] 25:16
American [3] 20:14 27:21 36:7
among [5] 11:19 14:21 14:23 15:4 34:23
amounts [2] 13:9 28:25
Anacin [8] 20:15 20:15 20:17 20:20 20:22 21:18 27:9 27:11
Anacin's [1] 20:16
Anacin-Tylenol [1] 21:11
analgesic [1] 20:20
analysis [3] 35:15 35:18 43:4
answer [5] 14:4 17:9 22:12 36:9 44:12
answering [1] 4:18
anti-inflammatory [3] 20:17 20:18 20:22
anyway [1] 46:10
appearances [2] 1:14 40:24
appeared [1] 38:12
apple [1] 45:15
apply [2] 30:2 31:13
approaching [1] 15:5
appropriate [4] 32:7 40:10 41:18 45:12
approved [3] 33:4 38:19 38:20
area [1] 31:8
arguably [1] 26:12
argue [4] 14:17 25:17 30:22 37:9
argued [2] 33:23 45:16
argument [13] 2:15 5:8 7:23 18:7 27:10 34:4 37:16 40:22 41:7 41:15 41:17 42:18 45:2
artfully [2] 37:10 42:8
Ashby [1] 1:21
assertion [9] 6:16 10:8 12:13 12:16 14:4 18:4 37:5 40:2 41:13
assertions [1] 24:20
asserts [2] 37:6 41:9
AstraZeneca [14] 1:3 2:12 2:15 3:22 4:3 9:13 22:25 23:3 32:19 40:21 41:9 41:22 41:25 47:9
AstraZeneca's [4] 9:4 10:17 41:7 42:16
attachments [1] 5:19
attention [2] 17:2 42:22
audience [1] 6:5
author [3] 8:12 9:3 34:18
authorities [2] 43:2 43:6
authority [1] 30:16
authors [1] 16:11
available [1] 34:16
average [2] 16:9 20:3
Avis [1] 15:9
avoid [2] 25:13 39:18
avoiding [1] 26:19
award [1] 44:13
away [5] 13:23 13:25 24:10 25:14 32:14
B [11] 1:17 6:4 6:24 7:5 12:11 12:22 12:23 13:2 25:2 25:2 35:18
back-and-forth [1] 4:25
bad [7] 5:11 5:25 6:7 16:6 16:7 18:17 42:6
Baird [2] 1:15 2:12
balance [5] 36:21 41:6 41:13 41:20 41:22
balanced [1] 26:24
Balick [6] 1:21 2:9 2:17 2:18 2:20 2:24
ball [1] 26:23
balls [1] 26:24
barely [1] 3:11
basis [2] 27:12 28:17
bear [1] 5:15
becomes [1] 35:22
began [2] 3:10 3:13
begin [2] 2:2 6:3
beginning [3] 15:21 16:3 23:24
begins [1] 16:21
believing [1] 13:24
Belknap [2] 1:23 2:21
beneficial [1] 46:12
benefit [13] 12:8 14:22 20:2 20:22 27:14 27:23 28:3 29:11 32:20 32:20 32:21 36:4 36:8
benefits [6] 3:13 3:19 3:21 20:17 20:18 20:19
best-selling [1] 4:7
better [29] 6:16 6:17 7:3 7:5 7:12 15:23 16:2 16:4 16:22 17:4 17:6 17:11 18:9 19:5 19:5 19:8 19:10 20:5 21:5 25:6 25:9 26:18 27:12 31:2 34:22 35:2 38:6 42:15 42:16
between [4] 14:16 33:6 35:20 41:21
beyond [2] 19:11 24:14
big [2] 38:5 39:12
big-page [1] 42:21
bigger [1] 8:10
bite [1] 45:15
bleach [4] 26:3 26:5 26:9 26:11
blonculor [1] 26:4
bodies [1] 30:14
bookends [1] 20:13
bothers [1] 18:6

bottom [3] 37:23 38:18 42:16
brand [2] 4:4 4:8
breakdown [1] 25:7
brief [7] 7:13 7:21 32:15 33:16 36:2 40:22 41:7
briefly [2] 7:9 20:12
broad [1] 20:9
broader [5] 27:9 27:10 27:12 27:23 28:3
brochures [1] 13:20
build [1] 4:8
built [2] 4:4 26:5
burden [2] 37:2 37:3
business [1] 43:25
buy [2] 21:5 31:10
C [13] 1:22 11:4 11:21 11:23 11:25 12:5 12:8 12:11 12:14 14:23 25:2 25:3 29:11
calendar [2] 46:2 47:2
campaign [4] 4:21 6:16 6:17 41:10
cannot [3] 15:7 20:23 28:12
capable [1] 40:25
career [1] 8:15
careful [1] 20:21
carefully [3] 9:6 39:25 40:9
case [48] 3:7 5:15 5:20 6:8 6:20 6:22 15:8 15:9 20:14 21:7 21:11 21:12 21:17 21:20 21:21 21:22 24:25 25:4 25:13 25:19 25:20 25:21 26:2 26:13 26:21 27:7 27:8 27:9 27:16 27:19 27:20 27:21 27:22 27:25 28:4 30:11 30:16 32:17 32:17 33:18 33:19 34:9 37:4 38:7 42:4 44:17 45:5 47:10
cases [15] 10:18 10:24 20:12 20:14 21:10 24:20 24:24 25:11 27:6 31:5 38:25 39:6 39:8 39:18 42:11
Castell [23] 8:10 8:11 8:16 9:3 9:3 10:9 10:19 10:22 11:13 11:22 11:23 12:2 12:5 12:11 28:15 28:15 28:17 28:21 29:11 29:15 30:2 31:25 32:13
Castell's [3] 12:21 34:12 35:21
Castrol [1] 24:25
categories [1] 22:4
category [2] 12:6 31:23
caught [1] 4:10
caused [1] 26:15
certain [1] 15:7
certainly [2] 42:19 43:13
chain [2] 39:9 39:14
chance [1] 46:2
change [2] 28:7 32:12
chapter [1] 45:17
chart [1] 13:3
cheaper [1] 42:14
chemical [1] 29:3
choose [1] 46:9
chose [1] 46:6
Circuit [5] 15:9 20:20 25:25 28:8 33:19
cite [2] 34:12 42:22
cited [6] 25:19 27:8 27:10 27:20 32:17 39:6
citing [1] 33:5
Civil [1] 1:3
claim [19] 9:4 9:8 10:13 10:14 14:9 21:2 24:3 25:4 25:8 25:24 26:18 27:3 27:8 28:12 28:13 28:14 37:5 38:12 39:5
claimed [2] 9:15 10:13
claiming [1] 32:11
claims [1] 11:14
class [1] 34:16
classic [1] 27:7
clear [6] 8:4 9:7 21:7 33:10 36:9 36:17
client [1] 21:14
clinical [8] 4:22 7:20 8:13 23:25 33:2 34:10 34:22 35:14
clinically [12] 8:20 9:20 9:24 10:9 10:10 10:18 10:22 11:7 11:9 13:4 34:14 34:24
Clorox [2] 25:20 25:21
closed [1] 45:17
clothes [2] 26:3 26:10
Cohen [2] 1:17 2:11
combination [1] 39:16
combine [1] 13:2
combined [1] 13:3
coming [3] 5:11 23:11 39:15
commercial [12] 3:7 5:3 16:19 16:21 19:7 19:22 25:17 27:13 28:4 34:2 36:4 38:20
commercials [1] 19:7
commissioned [1] 10:2
common [1] 3:16
communicate [1] 6:23
communicated [3] 27:22 27:23 28:3
communicating [2] 24:17 27:18
companies [5] 3:9 3:12 3:24 4:15 8:15
company [2] 5:12 36:5
comparative [6] 4:5 4:8 4:16 4:19 4:20 6:4
comparing [2] 4:5 6:4
competitive [1] 4:2
complaint [3] 26:7 37:6 39:24
completed [2] 38:19 44:16
Conaway [2] 1:16 2:13
concede [3] 12:6 16:9 20:8
conceding [1] 34:23
concept [2] 15:8 16:22
concerned [1] 18:13
concession [1] 23:25
conclude [1] 35:4
concluded [2] 39:24 47:20
conclusion [3] 8:23 34:13 38:7
conclusions [1] 11:20
conducted [1] 9:23
confer [1] 43:20
conference [2] 43:23 47:8
confirm [1] 34:15
confuse [1] 40:18
confused [1] 39:13
confusion [4] 6:15 37:16 39:19 40:8
consider [2] 15:14 41:9
considered [1] 39:24
constant [1] 17:20
consumer [19] 3:24 5:4 13:23 13:24 16:9 18:15 19:22 20:3 23:9 23:14 24:10 25:14 31:7 36:6 37:15 37:16 38:2 38:21 44:15
consumers [8] 16:15 23:12 24:17 26:17 37:11 42:7 42:10 42:14
contend [1] 11:13
contention [1] 6:18
contents [1] 16:14
context [14] 7:12 15:7 15:12 15:14 16:20 18:5 18:11 18:20 21:9 37:21 37:22 39:13 39:16 40:18
continuous [1] 30:12
contrary [1] 35:6
converting [1] 20:9
convey [1] 20:23
conveying [1] 27:11
conveys [2] 7:2 7:3
convince [1] 35:6
copy [2] 7:23 38:15
correct [3] 5:24 29:18 38:24
correctly [1] 28:23
cost [1] 32:2
couching [1] 38:13
counsel [5] 1:20 1:25 2:23 43:24 46:23
counter [1] 41:12
Counter-claimant [1] 1:9
Counter-defendant [1] 1:5
counterclaim [1] 37:7
couple [3] 9:18 23:18 28:8
court [50] 2:14 2:17 2:19 3:3 5:6 6:9 6:12 6:19 10:5 10:16 10:21 11:6 12:12 13:5 13:16 15:13 15:14 17:17 17:21 18:4 18:11 20:19 21:4 21:9 21:20 21:25 22:6 22:14 22:19 23:16 23:18 23:21 23:22 24:19 25:8 26:17 28:20 30:20 33:15 33:20 34:3 36:11 36:13 43:17 43:22 43:25 44:24 45:14 47:16 47:18
courtroom [2] 2:8 47:14
courts [4] 15:6 15:10 24:8 24:13
cover [1] 33:16
craft [1] 20:21
credible [1] 41:13
criteria [1] 33:5
critical [1] 25:16
cure [1] 22:12
cures [1] 22:11
D [11] 11:4 11:21 11:24 11:25 12:5 12:8 12:11 12:14 14:23 19:20 29:11
damage [13] 15:5 15:20 16:25 17:4 17:6 17:23 18:8 18:23 19:17 19:18 29:4 39:17 41:11
damaged [1] 16:7
damages [1] 19:19
danger [1] 18:21
dangerous [1] 5:10
data [5] 9:15 11:19 11:20 12:3 36:3
date [3] 44:22 45:11 47:5
day-to-day [1] 4:23
days [3] 3:9 43:25 45:22
deal [2] 2:5 28:18
decades [1] 28:8
December [3] 1:11 43:23 44:18
decision [1] 45:8
decisions [1] 21:10
declaration [8] 8:11 9:5 9:7 9:18 13:21 16:12 34:13 38:15
declaratory [1] 45:3
defend [1] 41:3
defendant [3] 1:8 1:25 46:25
defer [1] 43:5
definitely [2] 37:9 42:23
Delaware [2] 1:1 1:10
demonstrated [2] 37:23 38:10
demonstrating [1] 38:18
denied [3] 21:13 43:15 43:16
denying [1] 36:16
depend [1] 44:11
design [1] 8:13
designed [5] 8:5 8:6 19:7 28:18 29:12
detergent [2] 26:3 26:5
diaries [1] 8:9
difference [12] 4:20 6:6 11:23 11:24

measurement [1] 35:14
measurements [2] 8:7 9:19
media [1] 42:22
medical [3] 3:25 3:25 17:6
medications [3] 33:25 34:16 34:19
medicine [1] 17:7
meet [2] 36:18 43:20
meeting [1] 43:21
meets [1] 4:24
mention [1] 3:11
mentioned [2] 9:22 42:13
merit [2] 5:14 39:25
merits [5] 21:12 36:19 40:13 44:13 44:23
message [8] 6:25 7:3 7:12 19:10 20:9 20:23 25:14 27:11
messages [3] 7:3 7:7 33:23
met [2] 37:4 43:19
might [15] 11:8 14:22 17:16 18:19 22:25 23:14 24:10 24:10 24:12 25:14 31:9 33:11 34:21 36:4 42:25
mild [1] 21:2
million [6] 5:12 30:6 30:23 30:24 30:24 41:2
millions [3] 35:10 36:6 41:10
minor [1] 11:3
minority [1] 12:14
minutes [2] 14:16 23:18
mislead [1] 37:11
misleading [14] 5:21 6:15 14:6 25:18 37:14 37:17 37:19 38:13 38:14 38:17 40:2 40:4 40:5 40:9
misleads [1] 38:21
misled [3] 14:7 31:4 39:4
missing [2] 27:18 28:6
moderate [28] 10:14 10:17 10:23 15:4 16:24 18:23 19:17 19:18 20:5 21:3 21:6 22:2 22:7 22:8 22:17 23:2 24:4 28:18 29:4 29:5 29:9 29:17 29:19 31:14 31:20 35:19 38:24 39:18
Monday [2] 1:11 47:9
morning [6] 2:10 2:18 2:19 2:23 24:7 24:22
Morrison [40] 1:22 2:21 3:3 3:5 5:7 5:23 6:11 6:18 6:21 10:12 10:23 10:25 11:10 12:19 13:14 14:19 17:9 17:19 17:22 18:10 18:14 21:11 22:5 22:9 22:18 22:24 23:17 24:22 27:8 31:6 33:15 33:16 35:4 36:12 37:9 38:3 44:3 44:4 47:13 47:15
Morrison's [2] 23:24 24:9
mosaic [2] 15:15 15:17
most [4] 9:2 9:25 14:17 16:13
mostly [1] 13:9
motion [18] 3:4 9:11 11:2 12:7 20:9 21:13 21:13 25:22 25:22 26:11 43:15 44:14 44:19 44:22 45:4 45:5 45:8 45:12
mouth [1] 39:15
Ms [1] 44:4
must [4] 15:11 15:13 15:14 40:21
Mylanta [3] 33:22 33:22 34:5
Naftalis [1] 1:18
name [2] 3:11 29:3
naturally [1] 18:2
Naughton [2] 15:22 16:20
necessarily [7] 24:19 25:3 25:10 26:8 33:23 34:2 34:4
necessary [13] 7:2 7:8 14:13 24:24 25:12 25:25 26:12 26:17 33:17 33:20 39:6 39:10 45:11
need [7] 6:19 7:14 22:23 38:8 40:20 45:18 46:20
needed [2] 35:15 46:16
neighborhood [1] 8:19
neither [2] 8:4 17:25
Nevertheless [1] 20:19
new [8] 1:19 1:19 1:24 1:24 2:21 3:22 33:21 42:21
news [1] 38:4
Nexium [24] 4:4 4:5 4:8 4:11 6:16 7:3 16:3 17:4 17:6 17:11 17:25 18:9 19:5 19:8 20:2 20:6 24:5 30:9 31:10 34:15 34:21 34:25 38:6 42:15
next [2] 31:2 38:22
night [1] 26:19
nighttime [5] 33:22 34:4 34:5 34:7 34:8
nobody [1] 30:13
none [4] 5:2 8:20 8:25 9:19
note [1] 40:16
noted [3] 5:7 5:18 38:16
noteworthy [1] 38:11
nothing [12] 10:9 10:10 11:8 19:2 21:17 22:20 32:18 34:2 35:5 41:12 41:23 43:16
notice [1] 18:24
notion [2] 32:24 37:17
notwithstanding [1] 42:10
Novartis [1] 33:19
November [3] 43:19 43:22 46:21
now [25] 4:15 8:4 8:12 9:10 9:15 10:8 11:4 11:12 11:16 11:16 12:10 16:23 17:5 20:2 21:16 28:13 34:22 36:14 40:11 40:19 41:11 43:18 45:17 46:4 47:4
nub [1] 18:12
number [11] 4:21 4:23 7:18 24:17 29:24 30:3 35:15 35:20 35:21 35:21 35:22
numbers [1] 36:3
obvious [1] 16:17
obviously [3] 6:22 35:4 44:8
office [2] 2:13 31:17
oil [2] 25:4 25:8
Oklahoma [1] 8:22
once [1] 19:3
one [44] 4:6 4:21 5:13 7:15 7:15 8:19 9:4 11:7 14:22 16:11 16:17 17:18 17:19 18:23 20:2 20:4 20:4 20:13 24:2 25:21 26:22 28:25 29:8 29:22 30:3 30:5 30:6 30:8 30:15 32:3 33:18 33:20 33:24 35:24 36:3 36:7 41:8 41:18 42:2 44:6 44:10 45:24 46:5 46:6
one-page [1] 9:12
one-quarter [1] 28:23
one-sided [1] 29:24
open [1] 43:17
opponent [1] 6:12
opponent's [2] 12:17 24:21
opponents [2] 14:5 28:22
opportunity [3] 32:8 44:14 45:7
oral [1] 7:23
order [11] 38:8 41:2 43:15 43:20 43:25 44:5 45:19 46:13 46:17 46:22 47:11
orders [1] 45:24
ordinary [2] 31:7 40:19
otherwise [3] 25:14 34:7 39:20
outset [1] 31:22
overall [11] 7:4 7:6 10:14 16:20 19:9 19:10 20:23 28:13 28:17 28:24 37:6
overwhelming [1] 38:25
own [7] 3:20 16:8 33:13 34:13 34:15 35:25 47:2
p.m [1] 47:8
page [8] 9:22 9:25 11:16 13:2 38:17 38:18 38:22 42:21
pain [9] 3:20 20:24 21:2 21:3 21:3 21:5 21:7 21:19 21:24
paper [1] 46:8
papers [12] 4:18 5:7 5:18 9:13 12:13 12:17 13:8 15:22 24:21 39:23 42:13 44:16
paradigm [1] 24:24
Paragraph [3] 9:6 16:11 34:13
particularly [3] 3:7 5:3 41:5
parties [4] 27:22 41:22 43:20 45:24
past [1] 3:18
patient [4] 18:24 31:21 34:25 35:17
patients [36] 8:8 10:2 12:8 14:22 14:23 15:4 16:13 16:24 16:24 18:22 18:23 19:16 19:18 19:19 19:20 22:2 22:7 22:16 22:16 22:20 29:4 29:5 29:6 29:9 29:12 29:16 29:16 29:18 32:5 34:21 35:16 35:19 35:22 35:23 36:3 36:8
Patterson [2] 1:23 2:20
Pause [1] 47:7
pay [1] 17:2
Pennzoil [1] 24:25
people [26] 12:5 12:15 12:24 14:6 19:14 21:6 22:4 22:17 22:21 22:22 23:2 30:8 30:8 30:14 30:14 30:18 30:18 30:22 31:4 31:13 32:7 33:2 35:2 38:3 39:4 39:13
percent [24] 8:19 12:22 12:24 14:22 18:22 18:24 19:14 19:20 19:24 23:3 28:25 29:22 30:3 30:4 30:5 30:6 30:8 32:13 32:14 32:24 33:5 33:5 35:20 35:24
percentage [2] 29:25 32:12
perfect [1] 20:13
permits [2] 25:16 32:16
permitted [2] 32:16 43:8
person [2] 20:4 31:23
persuade [1] 41:4
pertain [1] 19:13
pharmaceutical [5] 1:7 2:25 5:17 8:14 42:8
Pharmacia [4] 25:20 26:13 26:14 26:15
phone [1] 46:25
phrase [1] 26:6
phrases [1] 15:13
physician [1] 31:22
PI [2] 44:14 45:4
piece [2] 2:5 4:25
pill [2] 17:24 42:15
pin [1] 11:6
pioneered [1] 3:22
pitch [1] 43:10
place [2] 5:10 27:4
placebos [1] 33:6
plaintiff [7] 1:4 1:20 21:14 28:4 33:23 46:24 47:10
plausible [2] 24:11 24:12
pleaded [1] 26:7
pleading [1] 26:11
podium [1] 3:4
point [34] 5:11

5:17 6:6 6:13 9:2 9:24 10:3 11:12 12:16 12:20 13:6 15:3 16:17 19:6 21:16 22:11 22:14 29:16 29:22 29:23 31:15 32:14 34:10 35:3 35:8 36:2 38:11 39:21 42:4 43:4 43:10 43:11 43:13 44:17
points [3] 7:24 33:16 36:2
policy [3] 5:16 42:6 42:25
population [6] 12:10 12:15 12:15 12:22 14:21 35:23
posit [1] 19:7
position [5] 10:17 23:13 40:10 40:23 42:24
positioning [1] 17:9
positions [1] 45:22
possible [2] 26:6 26:9
posture [1] 46:4
potential [1] 6:3
powerful [1] 21:2
preceded [1] 17:14
precise [1] 10:16
precisely [2] 24:8 28:6
preliminary [12] 2:3 2:5 21:10 21:13 21:21 25:23 36:16 37:3 43:15 45:7 45:12 45:15
prepare [1] 46:6
prepared [2] 44:5 46:5
prescription [3] 3:8 17:3 17:7
presentation [1] 23:19
presented [2] 37:10 41:17
press [3] 37:19 42:19 42:21
presume [2] 40:17 40:23
pretty [1] 31:16
Prevacid [17] 3:17 3:19 4:10 4:19 5:12 6:2 7:4 17:11 17:25 19:16 24:5 29:2 30:10 34:15 34:25 38:23 41:3
prevailed [1] 27:17
Prilosec [3] 4:6 4:10 42:12
primarily [2] 8:5 8:6
primary [2] 3:7 10:3
print [4] 4:18 13:19
21:23 37:8
problem [5] 10:11 15:5 18:12 33:14 42:5
problems [1] 44:6
process [3] 23:10 46:11 46:23
product [11] 26:4 26:10 26:14 26:15 26:16 26:18 26:19 27:11 27:12 33:21 34:6
production [1] 42:9
productively [1] 14:17
products [4] 1:7 20:15 27:21 33:6
prohibited [1] 32:6
promote [2] 4:18 41:3
promoting [2] 20:25 23:12
promotional [1] 4:24
pronounce [1] 29:3
proof [18] 17:5 17:5 17:10 17:11 17:16 19:5 19:8 19:8 25:18 27:13 28:9 28:15 32:7 32:9 33:11 37:15 38:8 38:8
properly [1] 43:9
proponent [1] 36:21
proposals [1] 46:3
proposed [1] 43:24
proposition [1] 30:17
protected [1] 43:6
prove [3] 17:6 28:2 31:5
proved [2] 27:17 33:12
proven [6] 21:15 21:15 26:2 27:2 27:3 34:19
provide [1] 45:10
provided [1] 5:19
prudent [1] 40:3
public [12] 5:16 30:22 36:7 36:22 41:15 41:18 41:19 42:3 42:6 42:25 43:3 43:5
pull [1] 41:11
purposes [4] 10:25 11:2 12:7 20:8
push [1] 43:11
pushed [1] 42:12
put [9] 6:21 14:12 18:20 19:21 31:17 33:10 43:21 46:4 46:24
puts [1] 14:11
putt [3] 26:25 26:25 27:4
putting [1] 27:3
questions [1] 7:14
quitting [1] 26:20
quote [10] 6:17 15:10 16:13 29:2 34:14 34:19 38:17 38:22 39:23 43:22
quoted [1] 17:13
quoting [1] 39:2
raised [1] 40:18
randomized [1] 33:2
rates [1] 11:24
rather [3] 15:16 30:3 46:13
reached [1] 8:23
reaction [1] 10:8
reactions [1] 3:15
read [14] 13:12 13:17 13:19 13:20 22:6 22:9 22:19 22:20 22:23 29:13 31:6 31:7 37:8 38:14
reading [2] 8:4 31:13
ready [1] 45:19
real [2] 11:18 41:11
really [11] 3:22 5:15 7:22 9:12 14:5 22:10 23:6 31:21 40:4 40:20 42:16
reason [7] 25:11 25:12 25:15 27:16 32:6 33:12 46:11
reasons [2] 43:14 43:16
rebuttal [1] 23:19
Recent [1] 17:5
recess [1] 47:18
reconvene [1] 46:9
record [8] 5:21 14:9 32:8 37:25 40:13 41:5 43:13 45:16
reemphasize [1] 13:7
refer [2] 20:12 34:7
referring [1] 38:23
reflux [29] 7:5 7:16 8:3 9:5 10:4 13:24 14:21 15:19 15:23 16:2 16:10 16:12 16:15 16:18 17:11 17:14 17:21 17:22 18:6 18:7 18:12 18:16 18:24 19:23 24:6 28:25 38:5 38:6 39:12
regard [1] 12:20
regarding [1] 8:16
regulatory [2] 43:2 43:6
regurgitation [1] 16:14
reiterate [1] 33:9
rejected [2] 28:5 33:21
related [1] 25:6
relief [15] 3:19 7:4 7:16 8:3 8:6 8:8 8:16 11:11 11:15 20:24 21:19 33:11 37:3 38:9 40:11
reliever [2] 21:2 21:5
relievers [1] 21:24
remember [2] 12:22 27:14
renew [1] 44:14
renewed [1] 44:22
renewing [1] 45:12
rep [3] 4:24 23:3 23:6
reply [7] 7:13 7:21 9:18 32:15 36:2 40:22 41:7
Reporter [1] 47:22
reproduced [1] 13:20
request [2] 44:12 44:20
require [1] 24:8
required [2] 21:20 27:24
research [3] 21:17 21:20 21:22
respect [8] 12:6 21:6 23:25 29:14 29:15 32:4 32:22 41:18
respectfully [1] 44:12
respects [1] 32:16
respond [1] 2:23
responded [1] 39:22
response [1] 29:7
results [4] 8:15 9:14 29:10 34:14
reviewed [1] 8:11
right [21] 2:2 3:3 6:13 10:6 10:8 22:5 22:14 22:17 29:5 33:15 36:11 36:14 39:7 41:11 42:25 43:14 44:16 45:19 47:4 47:13 47:18
rightly [2] 21:16 21:20
Robinson [2] 8:21 9:17
roughly [2] 14:16 40:7
rule [8] 25:15 25:15 32:23 32:23 32:25 33:7 35:13 43:22
ruling [2] 36:14 44:11
run [2] 20:3 21:4
running [5] 3:10 4:20 6:3 20:16 45:2
Rx [1] 3:10
sales [1] 4:23
Sanchez [3] 1:23 2:22 44:4
saw [3] 19:20 24:20 29:10
says [13] 15:4 16:3 17:3 18:8 25:2 28:9 29:4 34:14 35:5 35:7 38:22 45:24 45:25
schedule [4] 36:15 43:20 44:11 46:5
scheduling [11] 2:4 43:18 43:23 43:24 44:5 44:21 45:19 45:24 47:6 47:8 47:11
science [3] 6:24 7:10 7:10
scientific [3] 7:14 8:2 13:6
scientifically [2] 17:17 18:3
screen [8] 13:12 13:17 13:18 13:19 15:24 16:21 38:6 39:12
second [13] 2:4 3:12 10:5 15:9 20:20 21:21 24:4 25:19 26:9 27:20 28:20 31:9 47:4
secondary [2] 8:7 9:23
see [13] 13:3 18:15 18:17 18:24 24:13 24:16 30:13 31:24 35:13 35:16 37:22 45:11 47:11
seeing [3] 5:5 19:2 36:3
sense [2] 13:18 39:3
sent [1] 38:16
separately [1] 15:16
September [1] 38:15
set [4] 12:14 12:14 38:4 47:10
sets [1] 39:12
seven [1] 8:17
several [5] 3:17 8:13 8:14 13:11 37:8
severe [28] 10:14 10:18 10:24 15:4 16:25 18:23 19:17 19:18 20:5 21:3 21:7 22:3 22:7 22:8 22:17 23:2 24:4 28:19 29:4 29:6 29:9 29:17 29:19 31:14 31:20 35:19 38:24 39:18
shall [1] 43:24
Shaw [4] 1:15 2:7 2:10 2:16

short [3] 39:3 40:12 42:2
show [24] 5:2 6:24 7:15 7:17 7:17 7:19 7:20 8:2 11:14 11:17 12:7 28:21 32:20 35:2 36:18 36:19 36:20 36:22 36:24 37:16 37:19 40:8 40:16 41:23
showed [3] 4:17 26:2 29:11
shown [4] 28:16 32:15 37:11 40:13
shows [6] 4:24 9:5 12:3 18:9 34:20 38:3
side [7] 2:8 27:16 32:2 39:12 45:24 45:25 47:14
significance [8] 7:20 8:25 9:16 9:16 23:25 34:10 34:22 35:14
significant [17] 8:18 8:20 9:2 9:19 9:20 9:24 10:9 10:10 10:18 10:22 11:7 11:9 12:25 13:4 24:17 28:21 34:24
similar [1] 23:7
sitting [4] 5:4 18:15 19:22 38:4
six [1] 45:4
size [1] 13:19
skin [1] 30:12
sleep [3] 26:15 26:17 26:19
sliver [1] 20:7
small [2] 19:14 35:22
smart [1] 13:25
SmithKline [1] 32:17
smoking [1] 26:20
social [1] 42:5
solely [1] 20:22
solve [1] 33:14
somewhat [1] 45:11
somewhere [1] 35:20
sooner [2] 44:8 45:11
sophisticated [1] 40:25
sorry [2] 25:20 35:3
sort [2] 7:22 38:9
sound [1] 30:23
Spalding [2] 26:22 26:22
spatially [1] 34:5
speak [1] 46:21
specially [1] 26:16
specific [2] 27:14 27:15
specifically [7] 5:20 6:10 28:18 29:12 43:7 43:19 45:21
speculation [1] 41:12
speech [1] 25:17
spend [1] 36:6
spending [1] 35:10
spent [4] 5:12 5:18 41:2 41:10
Spilker [3] 8:11 8:12 32:21
Spilker's [1] 35:12
Spitalli's [2] 13:21 38:15
spoke [1] 38:16
spokesman [1] 3:18
sponte [1] 25:22
stage [4] 37:4 38:10 42:23 42:24
staked [1] 14:9
stand [1] 47:18
standard [1] 36:17
standing [1] 31:2
Stargatt [1] 1:16
start [2] 3:14 18:7
starting [1] 18:11
state [1] 14:9
statement [6] 11:8 18:5 23:24 29:13 29:17 29:20
states [2] 29:2 30:7
station [1] 5:4
statistical [1] 8:25
statistically [5] 8:18 9:19 12:25 13:4 28:21
stay [1] 10:6
step [1] 42:6
STEVEN [1] 1:21
stop [3] 10:5 12:9 28:20
stopping [1] 18:2
store [1] 31:10
Strength [5] 33:22 33:25 33:25 34:5 34:8
stronger [1] 33:24
strongly [1] 41:18
Stuart [1] 2:12
studies [34] 4:22 7:15 7:17 7:19 7:20 8:2 8:5 8:23 9:14 9:21 9:22 10:15 10:19 10:23 11:14 11:17 12:7 15:2 17:6 17:10 19:6 19:8 19:13 19:16 22:3 22:7 22:15 29:2 29:5 32:20 32:20 35:9 38:18 38:23
study [45] 4:25 8:4 8:8 8:10 8:10 8:12 9:3 9:5 9:8 9:10 9:11 10:2 10:3 10:3 10:9 10:10 12:4 12:4 12:23 12:24 16:11 16:24 18:9 19:18 19:19 22:2 22:21 23:2 28:15 28:15 28:17 28:17 29:9 29:11 29:12 29:14 29:15 29:17 29:18 30:2 34:14 34:15 34:18 34:20 37:16
stuff [1] 5:13
sua [1] 25:22
subgroup [1] 32:12
subscript [1] 13:12
subset [4] 14:3 28:22 34:21 34:23
substitute [1] 26:5
succeed [1] 28:11
success [4] 36:19 37:24 38:2 40:13
such [1] 33:25
sucked [1] 42:7
sudden [1] 18:18
suffer [6] 12:15 17:14 17:15 28:23 28:24 41:11
sufferers [3] 12:14 14:21 30:7
suffering [1] 41:19
sufficient [1] 38:24
sum [1] 32:19
super [14] 13:13 13:17 13:19 13:20 15:3 16:23 19:16 22:2 22:11 29:2 33:25 39:15 39:17 43:12
superior [6] 20:20 20:24 21:18 24:5 25:5 26:14
superiority [11] 9:5 9:8 9:16 11:14 14:23 20:9 24:3 28:16 37:6 38:18 38:25
superscripts [1] 42:9
support [1] 33:7
supposed [1] 36:18
surpassed [1] 4:9
survey [9] 24:8 25:13 27:17 27:23 28:2 28:5 38:2 44:15 45:6
swings [1] 36:23
switch [1] 35:17
symptom [7] 8:5 8:16 8:24 9:17 11:11 11:15 16:8
symptomatically [1] 31:20
symptoms [10] 7:5 7:16 7:17 8:3 9:6 10:4 11:5 16:10 19:11 19:12
tactical [1] 45:8
taking [3] 20:2 20:7 36:4
talks [1] 15:2
TAP [24] 1:7 2:24 4:18 5:8 9:23 10:2 18:13 24:2 32:8 32:11 33:10 37:4 38:12 38:16 39:3 39:11 39:23 40:24 41:6 41:14 41:15 41:17 41:23 42:19
target [1] 6:5
Taylor [1] 1:16
technical [1] 6:5
teleconference [3] 46:9 46:19 47:6
television [6] 3:17 5:4 18:15 19:2 23:9 38:4
telling [1] 32:7
ten [6] 14:16 30:6 30:23 30:24 30:24 32:13
terms [7] 6:5 28:13 31:21 38:13 38:13 38:14 44:21
tested [1] 26:23
testified [1] 29:25
text [1] 15:13
textbooks [1] 8:13
Thank [6] 3:5 23:16 23:17 23:21 23:23 36:12
Thanks [2] 36:13 47:19
theme [1] 5:7
themselves [1] 8:5
therefore [3] 25:7 31:24 32:25
thinking [5] 14:2 14:8 30:25 42:10 42:15
third [5] 24:25 26:13 28:8 33:19 35:12
Thomas [2] 1:22 2:21
thoroughly [1] 40:25
three [11] 4:9 7:14 7:18 8:17 8:19 8:25 30:3 32:13 43:25 45:6 45:22
threw [1] 25:24
throat [1] 31:18
through [4] 19:20 23:10 25:11 46:23
thrown [2] 41:15 41:15
tile [1] 15:16
times [5] 13:12 19:4 37:8 42:21 46:24
tiny [3] 20:7 34:21 38:23
today [8] 3:16 5:16 37:2 37:10 42:13 43:24 46:7 46:17
too [1] 5:7
took [2] 12:16 45:4
top [1] 23:7
tougher [1] 27:14
tout [1] 35:10
touting [2] 20:16 35:9
trade [1] 15:4
traditionally [1] 3:25
trained [1] 4:22
treat [1] 35:15
treated [2] 31:19 31:20
treatment [3] 7:6 17:23 24:5
treatments [1] 33:3
tremendous [1] 38:2
trial [7] 21:12 33:2 44:8 44:13 44:22 45:11 45:18
trials [1] 8:14
tried [3] 13:18 28:11 30:23
true [9] 19:17 20:10 21:2 21:3 21:23 22:13 22:15 29:14 29:20
truer [1] 26:25
trumpeting [1] 12:2
truncated [1] 41:5
truth [1] 6:24
truthful [2] 25:16 25:18
try [2] 28:2 29:3
trying [3] 11:6 18:6 37:19
turn [5] 2:8 11:16 36:15 43:12 43:18
TV [2] 3:7 5:3
twice [1] 19:4
two [18] 2:3 4:23 6:23 7:3 7:7 7:17 8:19 10:7 15:19 16:11 20:12 24:2 33:6 33:16 33:23 34:11 45:6 46:5
Tylenol [4] 20:18 20:25 21:24 27:12
Tyler [1] 1:23
types [1] 24:4
U.S.D.C.J [1] 1:13
unanswered [2] 41:8 41:8
unavoidable [1] 39:9
unbroken [1] 39:9
under [1] 43:8

understand [11] 4:22
12:13    12:16    12:17
13:22    14:20    14:20
16:15    22:3    28:22
32:3
undisputed [2]    16:5
18:3
unique [1]        34:7
United [1]        30:7
unless [1]        32:7
unquote [1]      6:17
unsuccessful [1]
28:5
up [10]    4:10    7:22
9:14    10:7    30:3
31:6    32:19    43:3
46:13    47:10
used [5] 3:18    4:7
15:13    26:4    26:6
using [6]          6:4
16:2    26:9    30:9
30:10    36:2
utilized [1]      4:15
utilizes [1]      4:18
v [5]      1:6    15:9
20:15    24:25    33:19
values [1]       42:9
variability [2] 32:24
33:3
variables [2]    8:17
30:12
versus [3]         4:2
19:16    29:2
vice [3]  20:7    23:11
23:15
view [1] 44:10
viewed [2]       15:16
37:7
viscosity [3]    25:5
25:5    25:6
W [2]      1:15    1:18
Wagner [2]       1:18
2:11
walk [2] 31:16    32:14
walks [2]        15:22
15:24
wants [3]        29:21
46:24    46:25
washing [1]      26:3
waste [1]        46:3
watched [3]      13:11
13:11    37:8
watching [3]     23:9
30:25    38:4
wear [3] 25:6    25:7
25:9
Webb [1]         1:23
week [1] 19:4
weeks [3]        30:9
30:10    45:4
Weinberger [20]
1:17    2:11    2:16
7:23    10:6    10:11
10:20    11:13    21:16
23:22    23:23    24:23

29:8    31:3    33:18
39:7    44:24    44:25
47:16    47:17
Weinberger's [2]
10:7    23:19
well-crafted [2]
41:16    41:17
well-financed [1]
40:25
whatsoever [3] 30:17
32:24    33:8
whining [1]      46:15
white [1]        26:10
whiter [3]       26:6
26:8    26:10
whole [6]        12:10
15:12    17:13    19:6
35:7    40:17
Wilmington [1] 1:10
win [2]  36:21    43:11
wisdom [1]       5:16
within [1]        4:8
without [3]      28:11
37:13    46:18
woman [2]        26:3
26:8
wonderful [1]    15:13
word [5] 15:23    16:2
22:19    22:20    41:16
words [10]        15:7
15:11    17:14    22:25
24:14    27:13    28:3
35:16    39:14    46:12
worked [1]       8:14
world [2]          4:7
32:6
worth [1]        28:8
written [1]      9:14
wrong [3]        6:14
32:18    41:16
year [1] 3:18
years [2] 3:18    4:9
yield [1] 15:13
York [6] 1:19    1:19
1:24    1:24    2:21
42:21
Young [2]        1:16
2:13
yourself [1]     5:13

12:24 13:3 19:20 23:8 28:22 30:13 34:23 34:24
differences [6] 8:18 8:18 9:24 11:3 11:22 12:25
different [2] 8:14 27:6
dinner [1] 38:5
direct-to-consumer [10] 3:8 3:10 3:23 5:2 5:10 5:17 5:25 6:2 42:8 43:8
directly [3] 4:16 5:9 21:18
disagree [3] 10:21 12:18 45:24
disagreement [1] 46:22
disappointed [1] 46:16
disclosing [1] 3:14
discourse [2] 23:13 24:7
discuss [2] 30:18 44:5
disease [21] 7:5 7:16 8:3 9:6 10:4 15:19 15:23 16:2 16:10 16:12 16:12 16:16 16:18 17:12 17:15 18:7 18:16 18:24 19:23 24:6 38:24
dismissal [1] 25:22
dismissed [1] 25:22
disputatious [1] 15:15
dispute [3] 11:19 11:20 44:7
disregard [1] 12:21
dissection [1] 15:15
DISTRICT [1] 1:1
disturbances [2] 26:16 26:19
dividing [1] 14:14
Docket [1] 13:21
doctor [13] 4:24 17:5 18:19 18:25 20:4 22:24 23:5 23:14 31:11 31:11 34:25 35:16 40:19
doctor's [1] 31:17
doctors [5] 4:16 4:19 4:21 4:21 30:19
doesn't [8] 17:15 20:10 22:12 31:13 39:13 41:4 41:6 45:23
dollars [3] 35:10 36:6 41:2
done [5] 3:25 32:20 37:9 45:16 46:17
dose [2] 38:19 38:20
down [4] 11:6 31:18 46:17 46:24
downfall [1] 18:21
dozens [1] 46:23
Dr [19] 8:11 8:12 8:21 9:3 9:10 9:14 9:15 9:17 12:3 12:4 16:10 31:24 31:25 31:25 32:21 34:12 35:11 35:11 35:12
drafted [1] 16:18
draw [1] 38:7
drawn [3] 11:20 39:10 42:9
drive [2] 13:5 25:15
drug [17] 3:8 3:11 3:20 4:2 4:2 4:6 4:7 4:10 4:11 6:4 6:4 7:11 30:15 35:17 35:18 36:4 36:8
drugs [6] 3:10 3:13 32:2 32:3 33:4 42:11
due [2] 32:22 44:16
during [1] 8:15
eating [1] 38:5
EE [35] 7:18 7:19 8:7 9:9 9:22 10:14 10:18 10:23 11:17 11:18 12:10 12:15 14:2 14:2 14:8 15:2 15:20 17:18 17:19 18:23 20:5 22:4 24:4 28:13 28:16 28:24 29:6 29:6 29:10 29:17 29:19 31:19 31:20 35:19 35:22
effective [5] 4:14 32:4 33:24 34:16 34:19
effectively [1] 37:10
effects [1] 32:2
eight [2] 30:9 30:10
either [7] 7:7 11:13 12:23 13:4 44:13 44:21 46:9
elsewhere [1] 28:9
Elway [1] 3:18
emphasized [1] 24:21
empowered [1] 43:7
encompassed [1] 22:4
end [5] 9:23 10:3 13:5 16:3 23:19
endoscopy [1] 31:18
ends [1] 16:22
engage [1] 15:15
engine [5] 25:4 25:6 25:7 25:8 25:9
enjoined [1] 36:10
entire [5] 14:21 15:15 15:17 15:24 35:23
entirety [1] 15:14
entitled [3] 30:17 30:18 33:11
equal [1] 33:3
equals [3] 25:2 25:2 25:3
equipotent [1] 21:24
equities [1] 36:22
eroded [1] 17:16
erosive [10] 7:6 11:3 18:18 18:19 18:22 19:2 19:12 19:14 19:23 19:25
esophageal [1] 39:17
esophagitis [12] 7:6 11:3 18:18 18:19 18:22 19:3 19:13 19:14 19:24 19:25 34:17 34:20
esophagus [10] 16:7 17:4 17:10 17:16 17:23 17:24 17:25 18:2 18:5 18:8
ESQ [8] 1:15 1:15 1:17 1:17 1:18 1:21 1:22 1:23
essentially [1] 28:7
established [1] 20:14
establishment [1] 27:3
evaluate [1] 40:9
evaluated [1] 39:25
evenly [1] 14:14
evidence [10] 6:14 16:5 24:9 24:14 24:16 36:25 37:13 37:14 37:25 40:8
exactly [2] 27:7 27:25
example [4] 3:7 3:16 4:17 42:12
exception [1] 25:15
excuse [1] 25:13
execution [1] 8:13
exhausted [1] 11:12
exhibit [2] 13:21 13:22
expect [1] 47:10
expedited [2] 44:13 44:22
experience [2] 30:15 45:5
expert [4] 8:12 8:21 9:17 35:12
experts [6] 9:4 11:19 16:9 29:25 31:16 35:25
express [1] 27:13
expressly [1] 7:2
extend [2] 35:21 35:23
extension [1] 33:22
extent [1] 22:10
Extra [1] 33:25
extraordinarily [2] 4:3 4:14
extraordinary [1] 37:3
F [1] 13:22
fact [4] 18:3 26:12 44:15 45:22
factors [2] 8:24 41:9
factual [1] 12:16
failed [1] 40:16
fair [3] 12:19 14:19 47:3
false [11] 6:17 6:22 14:12 21:6 33:17 36:10 37:5 37:12 37:20 37:20 39:19
falsity [8] 5:20 6:10 6:24 14:10 37:13 37:24 38:14 39:5
famous [1] 15:10
far [2] 18:13 33:4
fascinating [1] 42:4
favor [1] 36:23
FDA [8] 33:4 33:5 38:12 38:16 39:21 39:23 43:10 43:12
featuring [1] 4:2
feeling [1] 16:22
Fennerty [15] 9:15 10:10 10:19 10:22 11:14 11:22 11:24 16:11 28:17 28:21 29:9 29:14 31:25 32:14 35:11
Fennerty's [5] 9:11 9:14 12:3 12:4 35:20
file [1] 43:24
filed [3] 9:11 45:4 45:5
filled [1] 8:9
final [1] 43:4
Finally [1] 42:3
findings [5] 9:17 10:19 10:22 11:7 12:21
finger [1] 6:21
firm [1] 2:21
first [13] 2:3 2:6 3:23 11:21 21:11 24:23 25:16 25:21 25:25 29:23 31:3 34:12 38:17
fit [1] 47:3
five [2] 14:16 19:4
flip-side [1] 20:25
floor [2] 15:24 15:25
flows [1] 44:21
focus [1] 10:3
focused [2] 4:21 24:2
focuses [1] 41:17
focusing [1] 10:12
folks [5] 2:8 28:23 28:24 40:19 42:18
follow [2] 7:24 18:6
followed [2] 15:10 25:10
following [2] 21:12 43:21
fooled [4] 30:25 31:10 42:10 42:14
footnote [1] 16:23
form [1] 46:22
formulated [2] 26:16 34:5
forth [1] 3:15
found [13] 8:17 8:20 8:23 8:25 11:2 11:22 11:23 11:24 20:19 23:6 23:7 26:17 30:21
foundation [1] 32:23
four [3] 30:3 36:17 41:9
frame [1] 13:10
framed [1] 32:11
framework [1] 14:11
Frankel [1] 1:18
frankly [1] 32:8
frequent [1] 17:15
front [5] 5:4 18:15 19:22 38:4 42:20
FTC [1] 15:8
Fullerton [1] 2:12
G [1] 1:23
game [1] 5:10
gastroenterologist [2] 8:22 32:22
gastroenterologists [1] 32:21
Geddes [1] 1:21
gee [4] 13:23 23:2 23:5 30:25
general [5] 7:16 7:18 15:20 15:20 44:5
generalities [1] 37:21
generally [4] 5:16 14:2 14:8 24:6
generate [1] 32:9
generates [1] 42:19
generation [2] 3:12 3:22
GERD [6] 10:13 14:8 30:7 31:17 31:19 35:23
gist [1] 15:11
given [12] 5:13 7:18 7:23 12:12 13:8 13:22 14:9 23:24 31:21 36:25 40:14 41:2
giving [1] 14:15
GlaxoSmith [1] 26:13

goes [1] 15:8
golf [1] 26:23
good [8] 2:10 2:18 2:19 2:23 16:6 42:9 42:11 42:15
gradations [1] 30:12
Grade [6] 11:3 12:5 12:14 12:23 12:23 30:12
grades [6] 11:21 11:23 11:25 12:11 23:4 28:16
great [1] 32:12
greater [1] 29:11
green [1] 27:4
Greisman [1] 2:24
grounds [1] 21:14
group [7] 9:22 12:22 22:16 22:21 22:22 23:7 28:24
guess [1] 13:16
guys [3] 45:20 46:6 46:20
half [2] 12:4 18:22
half-hour [1] 14:15
hand [5] 7:22 34:3 45:20 46:5 46:10
handle [1] 2:3
handled [1] 43:9
hardship [3] 41:13 41:14 41:14
hardships [3] 41:6 41:21 41:21
harm [4] 36:19 40:15 40:17 40:22
Harold [2] 1:17 2:10
headaches [1] 27:15
healed [2] 30:9 30:9
healing [15] 7:18 8:6 9:9 10:17 10:23 11:3 11:23 11:24 15:2 17:10 18:5 24:3 30:15 34:17 34:20
heals [6] 17:4 17:6 17:24 17:25 18:2 18:9
hear [1] 46:7
heard [1] 24:21
hearing [6] 2:4 2:4 44:18 44:22 46:18 47:20
heartburn [15] 3:20 7:4 8:8 8:16 8:24 9:17 9:23 11:5 16:7 16:10 16:13 17:15 17:20 18:17 19:3
heavy [2] 37:2 37:3
held [2] 25:25 43:3
help [5] 7:24 26:17 30:22 30:24 39:6
Hertz [1] 15:9
hey [2] 19:23 41:10
highest [2] 29:24 29:25
highly [2] 34:16 34:19
hold [2] 43:22 47:4
Home [2] 20:14 27:21
Honor [39] 2:10 2:16 2:18 2:20 3:2 3:5 3:6 5:23 9:2 11:16 11:18 12:20 15:6 16:5 16:17 17:13 18:14 19:21 22:24 23:17 23:21 23:23 24:24 28:7 28:14 29:16 29:21 32:10 32:19 33:17 34:11 35:8 36:5 44:4 44:10 44:25 45:10 47:15 47:17
Honor's [1] 24:11
HONORABLE [1] 1:13
house [1] 9:13
huge [3] 4:20 6:6 12:3
human [1] 32:24
hundred [1] 30:6
hundreds [2] 35:10 36:6
hurt [5] 40:21 41:23 41:24 41:24 41:25
hurts [1] 19:4
i.e [2] 8:16 34:14
ibuprofen [1] 21:24
illustrates [1] 24:8
implication [18] 5:9 7:2 7:8 14:13 21:18 24:25 25:12 26:8 26:12 26:18 27:2 33:17 33:21 39:6 39:10 39:11 39:19 41:3
implied [2] 24:20 33:23
implies [1] 41:16
imply [3] 25:3 34:3 34:4
important [5] 9:25 29:22 31:25 32:4 32:5
imposed [1] 15:23
impossible [1] 31:22
impression [1] 38:25
INC [1] 1:7
indeed [3] 27:7 40:16 42:13
indifferent [1] 16:6
indigestion [2] 16:8 16:13
indisputably [1] 29:14
inflammation [1] 21:19
information [2] 13:7 31:12
inherently [2] 5:25 6:7
initial [2] 3:9 8:11
injunction [14] 2:4 2:5 21:10 21:13 21:22 25:23 36:16 36:20 36:21 40:16 43:15 45:8 45:12 45:15
injury [1] 21:15
instructive [2] 33:20 34:9
instrument [1] 31:17
interaction [1] 4:23
interest [5] 36:22 42:3 42:19 43:4 43:5
interested [1] 46:14
interesting [2] 5:11 42:5
interestingly [1] 13:13
interjected [1] 44:17
interpretation [5] 24:9 24:11 25:9 25:10 39:8
interpretations [1] 33:13
interrupted [1] 35:3
introduce [1] 2:7
introduced [3] 4:11 4:11 28:2
introduction [1] 4:9
introductions [1] 2:2
investigating [1] 10:15
invites [1] 42:5
involved [3] 26:22 27:25 46:11
irreparable [4] 21:15 36:19 40:15 40:22
issue [3] 24:12 27:21 42:23
issues [1] 6:23
Item [2] 11:11 13:21
itself [3] 9:13 22:12 41:4
J [1] 1:21
J&J [2] 27:16 33:19
jam [1] 46:17
James [1] 15:21
January [2] 47:9 47:12
jargon [1] 13:16
Jeremy [2] 1:17 2:11
John [2] 1:15 3:18
Johnson [4] 20:15 20:15 31:24 35:11 37:24 40:13
joint [1] 43:24
Jonathan [2] 1:18 2:11
JORDAN [1] 1:13
judge [3] 21:23 25:22 42:5
judgment [2] 32:9 45:3
judgments [1] 47:2
KAJ [1] 1:9
Karla [2] 1:23 2:21
keep [1] 23:11
Kenneth [1] 2:24
KENT [1] 1:13
Kevin [3] 1:15 2:12 47:22
key [1] 6:23
kind [7] 4:13 18:21 23:13 28:9 33:11 39:11 42:22
kinds [1] 19:19
knew [2] 16:18 44:16
known [1] 16:13
knows [1] 19:2
Kramer [2] 1:18 2:11
L.P [1] 1:3
16 [1] 43:22
laboratory [2] 26:23 27:5
language [3] 17:3 19:16 37:19
Lanham [4] 20:10 20:14 21:7 25:23
large [1] 12:4
last [3] 19:15 26:22 33:9
latest [1] 47:12
law [8] 15:8 20:14 21:7 28:8 31:8 32:16 33:10 43:8
lay [1] 39:13
leading [2] 17:7 20:13
least [2] 5:9 37:24
leave [1] 41:8
leaves [1] 41:7
led [1] 11:8
left [3] 14:14 14:16 37:13
legislator [1] 43:13
legitimately [1] 7:11
less [3] 12:3 25:6 33:4
letter [1] 38:16
letters [2] 38:5 39:12
Levin [2] 1:18 2:12
likelihood [3] 36:18 37:24 40:13
likely [1] 40:18
limit [2] 35:18 35:19
limited [2] 22:7 27:13
line [6] 24:20 24:23 33:21 37:23 39:8 42:17
literal [12] 5:20 6:10 7:7 7:7 14:10 24:14 28:3 37:13 37:24 38:14 39:5 39:14
literally [8] 6:17 14:12 22:13 22:13 22:15 37:12 37:20 39:19
LLP [3] 1:16 1:18 1:23
local [1] 46:22
logical [2] 39:9 39:14
look [14] 9:6 11:21 12:10 13:7 14:6 15:7 15:11 15:17 15:21 23:7 40:4 43:7 46:2 47:2
looked [6] 8:15 8:22 12:11 12:13 36:25 37:17
looking [4] 16:19 38:9 39:16 41:21
looks [1] 6:13
lose [1] 44:17
lower [1] 23:4
M [1] 1:15
Maalox [1] 33:25
magically [1] 17:24
makers [1] 20:15
makes [4] 6:6 9:8 19:5 39:3
manner [1] 4:4
market [4] 21:17 21:20 21:22 41:4
math [2] 29:23 35:25
matter [2] 29:13 43:18
matters [1] 2:3
Maurer [1] 47:22
may [9] 5:14 7:9 18:23 20:12 24:11 32:3 33:17 38:2 45:10
mean [8] 5:24 6:7 11:10 22:19 22:21 35:9 35:11 45:23
meaningful [1] 32:21
means [4] 14:15 16:10 39:10 43:11
meant [1] 37:18
measure [2] 8:5 8:6
measured [2] 8:17 8:24

# APPENDIX EXHIBITS

# D & E

# REDACTED

# IN

# FULL

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on December 9, 2005, copies of the foregoing document were served upon the following counsel of record in the manner indicated:

**BY HAND DELIVERY**

Steven Balick, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

**BY FEDERAL EXPRESS**

Thomas C. Morrison, Esquire
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600