IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ASTRAZENECA LP, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1332-KAJ |
| | ) | |
| - vs - | ) | **REDACTED – PUBLIC VERSION** |
| | ) | |
| TAP PHARMACEUTICAL PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | x | |

**PLAINTIFF ASTRAZENECA LP'S APPENDIX IN
SUPPORT OF ITS MOTION TO EXCLUDE THE
EXPERT TESTIMONY OF CREIGHTON HOFFMAN**

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY STARGATT
   & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware  19899-0391
(302) 571-6600
kkeller@ycst.com

Attorneys for Plaintiff AstraZeneca LP

Of Counsel:

Harold P. Weinberger
Jonathan M. Wagner
Kerri Ann Law
Jeremy A. Cohen
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Dated:  December 9, 2005

**Plaintiff AstraZeneca LP's Appendix in Support of Its
Motion To Exclude the Expert Testimony of Creighton Hoffman**

## Table of Contents

Description      Tab

Expert Report of Creighton G. Hoffman, dated October 6, 2005 .................................................A

Declaration of Paul Villa, dated December 7, 2005 ....................................................................B

Declaration of Christian Keller, dated December 8, 2005 ..........................................................C

Deposition Testimony of Creighton Hoffman, dated November 22, 2005 .................................D

Deposition Testimony of Paul Villa, dated September 9, 2005 ...................................................E

Deposition Testimony of Christian Keller, dated September 7, 2005..........................................F

Deposition Testimony of Antoine Pompe, dated October 18, 2005.............................................G

Transcript from the Preliminary Injunction Hearing, dated December 20, 2004.........................H

Print Advertisement from the "Better is Better" Advertising Campaign ....................................I

# EXHIBITS A – G

# REDACTED
# IN
# FULL

Exhibit H

CondenseIt™                                                    December 20, 2004

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF DELAWARE
 2
                        - - -
 3
    ASTRAZENECA L.P.,        :    Civil Action
 4
            Plaintiff and    :
 5          Counter-defendant,:
 6      v.                   :
 7   TAP PHARMACEUTICAL PRODUCTS :
     INC.,                   :
 8
            Defendant and    :
 9          Counter-claimant. :    No. 04-1332 (KAJ)
10                      - - -
              Wilmington, Delaware
11            Monday, December 20, 2004
                 10:00 a.m.
12                      - - -
13   BEFORE: HONORABLE KENT A. JORDAN, U.S.D.C.J.
14   APPEARANCES:
15          JOHN W. SHAW, ESQ., and
            KEVIN M. BAIRD, ESQ.
16          Young Conaway Stargatt & Taylor, LLP
                  -and-
17          HAROLD B. WEINBERGER, ESQ., and
            JEREMY A. COHEN, ESQ., and
18          JONATHAN M. WAGNER, ESQ.
            Kramer, Levin, Naftalis & Frankel, LLP
19          (New York, New York)
20              Counsel for Plaintiff
21          STEVEN J. BALICK, ESQ.
            Ashby & Geddes
22                -and-
            THOMAS C. MORRISON, ESQ., and
23          KARLA G. SANCHEZ, ESQ.
            Patterson, Belknap, Webb & Tyler, LLP
24          (New York, New York)
25              Counsel for Defendant
```

Page 2

```
 1          THE COURT: Good morning. Please be seated.
 2          All right. Let's begin with some introductions.
 3   We are here to handle two matters. First is the preliminary
 4   injunction hearing. Second is a scheduling hearing. We will
 5   go ahead and deal with the preliminary injunction piece of
 6   this first.
 7          Mr. Shaw, do you want to go ahead and introduce
 8   the folks on your side of the courtroom. Then I will turn to
 9   Mr. Balick.
10          MR. SHAW: Good morning, Your Honor. Harold
11   Weinberger, Jonathan Wagner and Jeremy Cohen from Kramer
12   Levin, Stuart Fullerton from AstraZeneca, and Kevin Baird
13   from my office, Young Conaway.
14          THE COURT: Who is going to be making the
15   argument for AstraZeneca?
16          MR. SHAW: Mr. Weinberger will, Your Honor.
17          THE COURT: Mr. Balick.
18          MR. BALICK: Your Honor, good morning.
19          THE COURT: Good morning.
20          MR. BALICK: Your Honor, from the Patterson
21   Belknap firm in New York we have Thomas Morrison and Karla
22   Sanchez.
23          (Counsel respond "Good morning.")
24          MR. BALICK: Also, Kenneth Graisman from TAP
25   Pharmaceutical.
```

Page 3

```
 1          Mr. Morrison will be making our presentation,
 2   Your Honor.
 3          THE COURT: All right. Mr. Morrison, it's your
 4   motion. The podium is yours.
 5          MR MORRISON: Thank you, Your Honor.
 6          Your Honor, I think that the advertising in this
 7   case, particularly the TV commercial, is a primary example of
 8   how direct-to-consumer prescription drug advertising can be
 9   abused. If you think back to the initial days when companies
10   began running direct-to-consumer advertising for Rx drugs,
11   the ads barely did more than mention the name of the drug.
12   Then there came a second generation of ads when the companies
13   began actually talking about the benefits of their drugs.
14   And that's when they had to start disclosing the adverse
15   reactions and so forth.
16          Those ads are very common today. For example,
17   Prevacid has been advertising on television for several
18   years, used John Elway as its spokesman this past year. And
19   they basically talk about the benefits of Prevacid for relief
20   of heartburn pain, just talking about your own drug and its
21   benefits.
22          AstraZeneca has really pioneered a new generation
23   of direct-to-consumer advertising where for the first time
24   companies are doing in consumer advertising what they have
25   traditionally done in medical advertising, in the medical
```

Page 4

```
 1   profession. That is running directly comparative ads
 2   featuring their drug versus the competitive drug.
 3          AstraZeneca has been extraordinarily aggressive
 4   in this manner. That's how they built the Nexium brand.
 5   They had comparative advertising, comparing Nexium to
 6   Prilosec, which had been their drug and had at one time been
 7   the best-selling drug in the world. But they used the
 8   comparative advertising to build the Nexium brand, and within
 9   three years of its introduction it had not only surpassed
10   Prilosec, it had caught up with Prevacid, our drug, which was
11   introduced in 1995. Their drug, Nexium, was only introduced
12   in 2001.
13          So this kind of advertising can be
14   extraordinarily effective.
15          Now, as I said, companies have long utilized
16   comparative advertising directly to doctors. And, for
17   example, some of the ads that they showed you in their
18   answering papers were print ads that TAP utilizes to promote
19   Prevacid to doctors, and those ads are comparative. But
20   there is a huge difference when you are running a comparative
21   ad campaign focused on doctors. Number one, doctors are
22   trained to understand what clinical studies are all about.
23   Number two, there is a day-to-day interaction. As the sales
24   rep meets with the doctor or shows him or her the promotional
25   piece and the study, there is a back-and-forth where the
```

Page 5

1  doctor can probe what the study really shows, what it doesn't
2  show. None of that happens when you have direct-to-consumer
3  advertising, particularly a TV commercial, where you have a
4  consumer sitting in front of his or her television station
5  and seeing this ad.
6        THE COURT: Let me ask you a question, because I
7  noted this theme in your papers, too, Mr. Morrison. A lot of
8  the argument that TAP seems to be making to me is, if not
9  directly, at least by implication, that this
10 direct-to-consumer advertising is a dangerous game, a place
11 where bad things can happen. An interesting point coming
12 from a company that spent about 133 million on Prevacid ads,
13 according to stuff you have given me yourself, and one that
14 may well have a lot of merit to it.
15       Does it really bear on this case? Aren't I here
16 today not to question generally the public policy wisdom of
17 direct-to-consumer pharmaceutical ads, a point on which you
18 spent, as I noted, some time in your papers and in the
19 attachments you have provided, but to ask whether you have
20 made a case specifically as to literal falsity? Because I
21 don't have anything in the record before me about misleading,
22 do I?
23       MR. MORRISON: Your Honor, everything that you
24 have just said is absolutely correct. I don't mean to say
25 the direct-to-consumer advertising is inherently bad. No

Page 6

1  question, TAP does it, has done it historically for
2  Prevacid. What I am saying is direct-to-consumer advertising
3  has a potential to be abused, because when you begin running
4  comparative advertising, comparing drug A to drug B, using
5  technical terms, the audience that you target that ad to
6  makes a huge difference. And that's my only point. I don't
7  mean to say it is inherently bad. I do say it can be abused.
8  And I think that's what this case is about.
9        THE COURT: But we are here, are we not,
10 specifically on the question of literal falsity?
11       MR. MORRISON: Absolutely.
12       THE COURT: Because your opponent has said, and
13 it looks like it's right to me -- you point out to me where
14 they are wrong, if they are -- that you don't have evidence
15 of actual confusion and misleading. What you have got is an
16 assertion here that this "Better" campaign, the Nexium,
17 quote, "Better," unquote, campaign, is literally false.
18       MR. MORRISON: That is our contention.
19       THE COURT: That is where I need you to take me
20 to make your case.
21       MR. MORRISON: I think you have put your finger
22 on it. In any false advertising case, there are obviously
23 two key issues. A, what does the advertising communicate,
24 and B, what does the science show about the truth or falsity
25 of that message?

Page 7

1        There is no question, we contend that this
2  advertising expressly conveys and/or by necessary implication
3  conveys two messages, A, message A, that Nexium is better
4  than Prevacid overall for the relief of heartburn and the
5  symptoms of acid reflux disease, and B, that it is better
6  overall for the treatment of erosive esophagitis. And we
7  believe those two messages are either literal or literal by
8  necessary implication.
9        If I may, I would like to talk briefly about the
10 science, because the science will tell us what could they
11 have legitimately said about this drug. I think that would
12 be a better context to get to the message.
13       As we said in our reply brief, I think there were
14 three scientific questions that need to be addressed here.
15 One is, question one, what do their studies show about the
16 relief of acid reflux disease symptoms in general? What do
17 they show about symptoms? Two, what do their studies show
18 about healing of EE in general? And then number three, given
19 what the studies show about EE, what if anything is the
20 clinical significance of what those studies show?
21       As I say, we address these in our reply brief.
22 And I would like to hand up at this time a, sort of really an
23 oral argument, and I have given a copy to Mr. Weinberger,
24 that will just help you follow I think the points that I
25 would like to make.

Page 8

1        So Page 1, Your Honor, addresses the first
2  scientific question, what if anything do their studies show
3  about the relief of symptoms of acid reflux disease.
4        Now, neither study, as is clear from reading the
5  studies themselves, was primarily designed to measure symptom
6  relief. They were primarily designed to measure healing of
7  EE. They did, however, have secondary measurements in the
8  study having to do with heartburn relief where the patients
9  filled out diaries.
10       The Castell study, which is their bigger study --
11 Dr. Spilker in his initial declaration reviewed the Castell
12 study. Now, Dr. Spilker is an expert and an author of
13 several textbooks on the design and execution of clinical
14 trials. He has worked for several different pharmaceutical
15 companies during his career. He looked at the results in
16 Castell regarding symptom relief, i.e., heartburn, and he
17 found seven variables that were measured. Three had
18 statistically significant differences. But those differences
19 were in the neighborhood of one, two and three percent. And
20 he found that none of those were clinically significant.
21       Dr. Robinson, who is our other expert, he is a
22 gastroenterologist in Oklahoma, he looked at the same
23 studies, reached the same conclusion. He actually found 16
24 heartburn symptom factors that were measured. Again, he
25 found only three that had any statistical significance. None

**Page 9**

1  of them had any clinical significance.

2  　　　The most significant point here, Your Honor, is

3  that even Dr. Castell, the author of the Castell study, and

4  one of AstraZeneca's experts, he does not even claim in his

5  declaration that his study shows superiority for acid reflux

6  disease symptoms. If you look very carefully at Paragraph 16

7  and 17 of his declaration, it is very clear that the only

8  claim he makes for his study is that there was superiority on

9  EE healing.

10  　　　Now, the only other study they have is Dr.

11  Fennerty's study. At the time we filed our motion, all we

12  had was the one-page abstract, so we couldn't really tell

13  much. When we got their papers, AstraZeneca itself in house

14  has written up the results of Dr. Fennerty's studies, so we

15  now have his data. And again, Dr. Fennerty has not claimed

16  any significance, any superiority significance for his

17  heartburn symptom findings. Dr. Robinson, our expert, in his

18  reply declaration, said again there were a couple of

19  measurements that were statistically significant, none that

20  were clinically significant.

21  　　　Then we have all of these other studies that are

22  mentioned on Page 1. There were a group of EE studies

23  conducted by TAP, and again, heartburn was a secondary end

24  point. There were no clinically significant differences.

25  　　　And then the most important thing, on Page 1, in

**Page 10**

1  my judgment is Item 4, the Chase study. That was a huge

2  study commissioned by TAP. There were over 3,000 patients in

3  that study. The primary end point, the focus of the study,

4  was symptoms of acid reflux disease.

5  　　　THE COURT: Let's stop there for a second. I am

6  going to ask you to stay right there and ask Mr. Weinberger's

7  to get up, because two things I want to get Mr. Weinberger's

8  reaction to right now are the assertion that there was

9  nothing clinically significant in the Castell study and

10  nothing clinically significant in the Fennerty study.

11  　　　MR. WEINBERGER: Well, I think the problem is

12  that Mr. Morrison is focusing on things that aren't being

13  claimed in the advertisement. This is not a claim for GERD.

14  Overall, it is a claim for moderate to severe EE. That is

15  what the studies were investigating.

16  　　　THE COURT: Let me be more precise. Is it

17  AstraZeneca's position that as to healing in moderate to

18  severe cases of EE that there are clinically significant

19  findings in the Castell and the Fennerty studies?

20  　　　MR. WEINBERGER: Absolutely.

21  　　　THE COURT: Do you disagree that there are

22  clinically significant findings in the Castell and Fennerty

23  studies, Mr. Morrison, as to healing of EE in moderate to

24  severe cases?

25  　　　MR. MORRISON: I think we will, for purposes of

**Page 11**

1  this motion, we will concede, and that's where I was going,

2  we agree for purposes of this motion that they found some

3  minor differences in healing of erosive esophagitis for Grade

4  C and D. What I have been talking about until now was

5  heartburn symptoms.

6  　　　THE COURT: I am just trying to pin you down,

7  because when you say no clinically significant findings, one

8  might be led to think that the statement there was nothing

9  clinically significant.

10  　　　MR. MORRISON: I didn't mean to say that. That

11  is why Item 1 here is symptom relief. That is all I was

12  talking about. I have now exhausted that point. I don't

13  think Mr. Weinberger would contend that either Castell or

14  Fennerty claims that their studies show superiority for

15  symptom relief.

16  　　　Now, if we could turn to Page 2, Your Honor, now

17  we go to the question of EE, what do the studies show about

18  EE. Here, Your Honor, I don't think there is any real

19  dispute among the experts about the data. I think the only

20  dispute is to what conclusions can be drawn from that data.

21  　　　First of all, if we look at Grades C and D, there

22  is no question, Castell and Fennerty found differences.

23  Castell found a 12.7-percent difference healing Grades C and

24  D. Fennerty found a 4.9-percent difference in healing rates

25  for Grades C and D.

**Page 12**

1  　　　Now, one thing that I would like to point out,

2  they have been trumpeting Castell as saying the

3  12.7-advantage is huge. Dr. Fennerty's data shows less than

4  half of that. And Dr. Fennerty's study was a large study.

5  He had 999 people with Grade C and D. Castell had 1286.

6  　　　So with respect to that category, we will concede

7  for the purposes of this motion that their studies show a

8  benefit for those patients in C and D.

9  　　　But I don't want to stop there. I want to go

10  back and look now at the whole EE population, because, after

11  all, Castell looked at Grades A, B, C and D.

12  　　　THE COURT: You can take it as a given that I

13  have looked at your papers. I understand your assertion that

14  this set, this Grade C and D set of sufferers is a minority

15  population in the population of people who suffer from EE. I

16  took your point. I understand your factual assertion for

17  that and I don't understand from your opponent's papers that

18  they disagree with that.

19  　　　MR. MORRISON: That is fair enough. What I do

20  want to point out in this regard, though, Your Honor, is I

21  don't think we can disregard Castell's findings for the A and

22  B group. Remember, that was 75 percent of the population of

23  his study had either Grade A or Grade B. As to that 75

24  percent of people in his study, there was no difference.

25  These weren't even statistically significant differences.

**Page 13**

1 These were no differences at all.
2       You can combine A and B, as we did on this Page 2
3 of this chart, and you can see the combined difference isn't
4 either statistically or clinically significant.
5       THE COURT: Let me drive you to whatever the end
6 point is you want to take me to on this scientific
7 information. And I will reemphasize that I have taken a look
8 at what you have given me in your papers, because I want you
9 to talk to me mostly about how this amounts to — let me
10 frame it for you this way.
11       I watched the ads. I watched them several
12 times. I read the little subscript on the screen, which,
13 interestingly, is called a super, I am not sure why.
14       MR. MORRISON: That's what they call it in
15 advertising.
16       THE COURT: I guess that is the jargon.
17       I read the super as it was on the screen. I
18 tried to get a sense of the time it was on the screen, the
19 size of the super on the screen. I read the print ads, the
20 brochures. I went back and read the super as it's reproduced
21 in the exhibit to Mr. Spitalli's declaration, Docket Item 14
22 at Exhibit F. And I understand from what you have given me
23 that you are saying, gee, a consumer would come away from
24 this believing this is about acid reflux, and a consumer
25 would come away from this, even if they were smart enough to

**Page 14**

1 see it isn't about acid reflux generally, it is just about
2 EE, thinking it was about EE generally, it isn't even that,
3 it is about a subset.
4       What I want you to answer for me is the assertion
5 that I take your opponents to be making that you are really
6 talking about misleading. You are saying people will look at
7 this and they won't get it because they will be misled into
8 thinking this is about GERD or about EE generally. And you
9 have staked your claim here, given the state of the record,
10 on literal falsity.
11       So that puts you in the framework of having to
12 say that what is in this ad is literally false, or as you put
13 it, by necessary implication. That is where — in the time
14 you have got left, and I am dividing your time about evenly
15 here, which means I am giving you both about a half-hour, you
16 have got roughly between five and ten minutes left here —
17 where you are most productively going to be able to argue to
18 me.
19       MR. MORRISON: That is fair enough, as long as we
20 understand — before I say that — as long as we understand
21 that among the entire population of acid reflux sufferers, we
22 are talking about one percent of patients who might benefit
23 from this alleged superiority among C and D patients. That's
24 what we are talking about.
25       That being said, let me go to the ads. There is

**Page 15**

1 no question, they point to the language in the middle of the
2 ad that talks about the studies being about healing of EE.
3 And they also point to the super, as it is called in the
4 trade, that says among patients with moderate and severe
5 damage. There is a problem with approaching it that way,
6 Your Honor. That is that the courts have long said that you
7 cannot just look at certain words in an ad out of context.
8       That concept goes back to FTC case law that was
9 adopted by the Second Circuit in the Avis v. Hertz case in
10 1986, a famous quote that has been followed by courts ever
11 since, the gist of which is that you must look at words in an
12 advertisement in the context in which the whole ad appears.
13 There is wonderful phrases the Court used, text must yield a
14 context. The Court must consider the ad in its entirety and
15 not engage in disputatious dissection. The entire mosaic
16 should be viewed rather than each tile separately.
17       And when you look at the entire mosaic of these
18 ads, I don't think there is any question but what these ads
19 are talking about are two things, acid reflux disease in
20 general and EE damage also in general.
21       Look at the very beginning of the ad, when James
22 Naughton, the actor, walks out. We say in our papers that
23 the word better and acid reflux disease are imposed across
24 the entire screen. It is actually on the floor, he walks
25 across the floor. And what they are talking about — this is

**Page 16**

1 the context of the ad. This is the entire mosaic. It is
2 acid reflux disease. He is using the word better at the
3 beginning. And at the end of the ad, he says, with Nexium,
4 you don't just feel better.
5       Well, the evidence is undisputed, Your Honor, you
6 don't feel good, bad, or indifferent because you have a
7 damaged esophagus. You feel bad because you have heartburn
8 and acid indigestion. That is the symptom. Their own
9 experts basically concede that to the average consumer acid
10 reflux disease means heartburn and its symptoms. Dr.
11 Fennerty, one of their two study authors, in Paragraph 5 of
12 his declaration, said, acid reflux disease is a disease,
13 quote, known to most patients as acid indigestion, heartburn,
14 or regurgitation of acid contents.
15       That is what consumers understand acid reflux
16 disease to be.
17       And so my point, Your Honor, is the obvious one.
18 Acid reflux disease, they knew when they drafted this
19 commercial, and you can tell by looking at it, that's what
20 Mr. Naughton is talking about. That is the overall context.
21 The commercial begins with it. It has it on the screen. And
22 it ends with the concept of feeling better.
23       Now, even this footnote, or the super, where they
24 say, patients — the study was in patients with moderate to
25 severe damage —

Page 17

1  THE COURT: Before you go to the super, you want
2  me to pay attention to what he is saying. What am I to make
3  of the language where he says, if I told you prescription
4  Nexium heals acid-related damage in the esophagus better, you
5  would want proof, and now your doctor has that proof. Recent
6  medical studies prove Nexium heals that damage better than
7  the other leading prescription medicine? What is your take
8  on that?
9      MR. MORRISON: My answer is, they are positioning
10  these studies about esophagus healing as the proof, as the
11  proof that Nexium is better than Prevacid for acid reflux
12  disease.
13      That whole thing you just quoted, Your Honor, is
14  preceded by the words so if you suffer from acid reflux
15  disease, frequent heartburn. It doesn't say if you suffer
16  from an eroded esophagus you might want proof.
17      THE COURT: Let me ask you this: Scientifically,
18  how does one get EE?
19      MR. MORRISON: One gets EE because you have
20  constant heartburn.
21      THE COURT: Because you have acid reflux.
22      MR. MORRISON: Because you have the acid reflux
23  and over time that can damage your esophagus. The treatment,
24  though, isn't a pill that magically heals your esophagus.
25  Neither Nexium or Prevacid heals the esophagus. All they do

Page 18

1  is stop the acid from coming up through the esophagus, and by
2  stopping that, then the esophagus heals naturally. That is
3  an undisputed fact scientifically.
4      THE COURT: So it is the assertion of the
5  statement about esophagus healing in the context of acid
6  reflux that bothers you? I am trying to follow your
7  argument. You are saying they start with acid reflux disease
8  and then he says, if you have got damage to your esophagus,
9  there is a study that shows Nexium heals that better.
10      MR. MORRISON: Yes.
11      THE COURT: It is the starting with the context
12  of if you have acid reflux that is the nub of the problem as
13  far as TAP is concerned.
14      MR. MORRISON: Yes. Your Honor, you are a
15  consumer sitting in front of your television and you see
16  this. You know what acid reflux disease is. You know you
17  get heartburn and you feel bad. You see this ad, and all of
18  a sudden they are talking about erosive esophagitis. What do
19  you or I know about erosive esophagitis? A doctor might
20  know. Again, that is why I put this in the context of the
21  danger of this kind of advertisement. Well, the downfall of
22  erosive esophagitis, a half of my patients, 20 percent of my
23  patients with EE may have moderate to severe damage, and one
24  percent of every patient I see notice acid reflux disease,
25  you know, maybe a doctor would take that into account. But a

Page 19

1  patient sitting in front of his television, his or her
2  television, seeing this ad, knows nothing about erosive
3  esophagitis. All they know is they have got heartburn, once
4  a day, twice a day, five times a week. It hurts: They want
5  to feel better. The proof that Nexium makes you feel better
6  is these studies. That is the whole point about this
7  commercial. These commercials are designed to posit the
8  studies as the proof, the proof that Nexium is better
9  overall.
10      And again, the message is better overall for the
11  symptoms. But even if you want to go beyond that and say,
12  well, it's not about symptoms, it's just about erosive
13  esophagitis, even there, even there, the studies only pertain
14  to a small percent of the people with erosive esophagitis.
15      The last thing I want to say about the ads is the
16  language in the super studies versus Prevacid in patients
17  with moderate to severe damage. Well, that's not true. This
18  wasn't a study in patients with moderate to severe damage.
19  This was a study in patients with all kinds of damages. A
20  through D, 75 percent of those patients saw no difference.
21      So put it another way, Your Honor. You are a
22  consumer, sitting in front of your commercial, and they say,
23  hey, if you have acid reflux disease, maybe you have erosive
24  esophagitis. 20 or 30 percent of you are going to have
25  erosive esophagitis. Then they say, if you are in that 20 or

Page 20

1  30 percent, five percent of you, according to Fennerty, may
2  benefit from taking Nexium. That's one in 100. Now, do you
3  think that average consumer is going to run out and say to
4  their doctor, I think I am one of these -- this one person in
5  100, I think I have got moderate to severe EE, you better
6  give me Nexium? That is not going to happen. And that's the
7  vice of this advertising, is taking this tiny sliver of
8  advantage, that again we would concede for purposes of this
9  motion, and converting it into a broad message of superiority
10  that just is not true. The Lanham Act doesn't allow you to
11  do that.
12      If I may just briefly refer to two cases that I
13  think are perfect bookends for this. One of the leading
14  cases that established Lanham Act case law was American Home
15  Products v. Johnson & Johnson. Anacin, the makers of Anacin,
16  were running this advertising touting Anacin's
17  anti-inflammatory benefits. Well, Anacin did have
18  anti-inflammatory benefits, and Tylenol did not.
19  Nevertheless, the Court found those benefits did not make
20  Anacin a superior analgesic. And the Second Circuit was very
21  careful in saying, if you want to craft advertising talking
22  about, solely about the anti-inflammatory benefit of Anacin,
23  you can, but you cannot convey a message about its overall
24  superior pain relief.
25      The flip-side was promoting Tylenol as being you

## Page 21

1  can't buy a better pain reliever -- you can't find a more
2  powerful pain reliever. That claim was only true for mild
3  and moderate pain. It wasn't true for severe pain. Again,
4  the Court said, you can't do that. You can't run an
5  advertisement saying you can't buy a better pain reliever
6  because that is false with respect to people with moderate to
7  severe pain. So I think the Lanham Act case law is clear,
8  you can't do that, and I think --
9      THE COURT: What was the context of those
10  decisions? Were those preliminary injunction cases?
11      MR. MORRISON: The first case, the Anacin-Tylenol
12  case, was following a trial on the merits. There had been a
13  preliminary injunction motion. The motion was denied on the
14  grounds that the plaintiff, which is our client, had not
15  proven irreparable injury, not that they hadn't proven the
16  ad. Now, Mr. Weinberger will point out rightly that in that
17  case there was market research, because there was nothing in
18  the Anacin ads that directly or by implication said superior
19  pain relief. All it did was talk about inflammation. In
20  that case the Court rightly required market research.
21      The second case was, I believe, a preliminary
22  injunction case. And there was no market research. This was
23  a print ad. And the Judge said, it's just not true that
24  Tylenol is equipotent to the ibuprofen pain relievers.
25      THE COURT: Let me ask you a question

## Page 22

1  specifically about your assertion that it's just not true as
2  to the super that the study was with patients with moderate
3  to severe. I understand you to be saying the studies
4  encompassed all categories of people with EE.
5      MR. MORRISON: Right.
6      THE COURT: So you would have me read with
7  moderate to severe as saying in studies with patients limited
8  to moderate to severe.
9      MR. MORRISON: Well, I could ask you to read it
10  that way. What I really would say is to the extent that they
11  want to point to that super and say that cures everything, my
12  answer is it doesn't cure everything because it, itself, is
13  not literally, it is not literally true.
14      THE COURT: You are right on the point I want to
15  be on. How is it not literally true? These were studies
16  that were on patients, and in that group of patients, there
17  were people with moderate to severe. Right?
18      MR. MORRISON: Sure.
19      THE COURT: So I can read the word with to mean
20  patients with this and nothing else, or I could read the word
21  with to mean some group of people in the study had this.
22  There are people in the group that had this. You tell me how
23  I need to read that.
24      MR. MORRISON: Your Honor, if you were a doctor
25  and AstraZeneca came to you with those words, you might go

## Page 23

1  through that process, and you might say as a doctor, well,
2  gee, did the study only have people with moderate and severe?
3  And the AstraZeneca rep would say well, no, we had 75 percent
4  of them actually have the lower grades.
5      And the doctor would say, gee, what did you find
6  there? The rep would say, well, we found they were really
7  similar. But if you look at this top group, we found a
8  difference.
9      The consumer watching the television in a
10  45-second ad isn't going to go through that process. Again,
11  I keep coming back to this. That's the vice of this
12  advertising. They are promoting consumers who aren't in a
13  position to have this kind of discourse that they are
14  having. A doctor might have it. But a consumer is just not
15  going to have it. That is the vice of the advertising.
16      THE COURT: Okay. Thank you very much.
17      MR. MORRISON: Thank you very much, Your Honor.
18      THE COURT: I will give you a couple minutes at
19  the end of Mr. Weinberger's presentation for rebuttal, if you
20  would like.
21      THE COURT: Thank you, Your Honor.
22      THE COURT: Go ahead, Mr. Weinberger.
23      MR. WEINBERGER: Thank you, Your Honor.
24      Given Mr. Morrison's statement at the beginning,
25  his concession with respect to clinical significance, I am

## Page 24

1  going to focus on what we believe are the implied claims
2  here. There are two of them that TAP has focused on. One,
3  they say we are making a claim of superiority for healing all
4  types of EE, not just moderate to severe. Second, that
5  Nexium is superior to Prevacid for the treatment of acid
6  reflux disease generally.
7      With the discourse we had here this morning, I
8  think it illustrates precisely why the courts require survey
9  evidence of this, because while Mr. Morrison's interpretation
10  of what a consumer might take away from this might be
11  plausible and Your Honor's interpretation, whatever it may
12  be, might be plausible, that is not the issue.
13      The courts have basically said, we want to see
14  evidence. If you are going to go beyond the literal words of
15  what is in the advertisement or even if the advertisement is
16  ambiguous, if it's ambiguous, we want to see evidence as to
17  what it's communicating to a significant number of consumers
18  before we find it to be actionable.
19      THE COURT: Talk to me about the necessarily
20  implied line of cases and assertions that you saw in your
21  opponent's papers and which you heard emphasized by Mr.
22  Morrison here this morning.
23      MR. WEINBERGER: Let me first talk about the line
24  of cases, Your Honor. I think the paradigm of the necessary
25  implication case is Castrol v. Pennzoil in the Third

Page 25

1  Circuit. If I can describe that in shorthand, what Pennzoil
2  says is if you say A equals B, and B equals C, then you
3  necessarily imply that A equals C. So what happened in that
4  case, they were making a claim that their engine oil was
5  superior for viscosity. And they said that viscosity was
6  related to engine wear. The better the viscosity, the less
7  engine wear breakdown you were going to have. Therefore, the
8  court said you were making a claim that your engine oil was
9  better for engine wear. It was the only interpretation.
10  There was no other interpretation. It necessarily followed.
11      The reason -- I will go through the other cases
12  as well -- the reason you can't use the necessary implication
13  as an excuse to avoid a survey in every case where you think
14  a consumer might take away a message is because otherwise the
15  exception will drive the rule out. The reason for the rule
16  is critical because the First Amendment permits truthful
17  commercial speech. If you are going to argue that it is not
18  truthful or misleading, you have to have proof.
19      The second case that they cited was the
20  Pharmacia -- I am sorry, was the Clorox case. I know that
21  one because I was in it. First of all, the Clorox case was a
22  dismissal motion. The judge sua sponte dismissed a motion
23  that had been made on a preliminary injunction on a Lanham
24  Act claim and they threw it out.
25      All the First Circuit held was necessary

Page 26

1  implication had been pleaded in the complaint, not that it
2  had been proven. In that case, as I recall it, they showed a
3  woman washing her clothes with detergent and bleach and then
4  she used a product that was called abacon bionculor, it is a
5  detergent with a bleach substitute built in.
6      It used the phrase whiter is not possible. And
7  they said, the complaint adequately pleaded that the
8  necessarily implication of the woman saying whiter is not
9  possible when she wasn't using the bleach was that the second
10  product got the clothes just as white or whiter than the
11  bleach got it. Again, it was a pleading motion. Again, it
12  was, in fact, arguably a necessary implication.
13      The third case was Pharmacia against GlaxoSmith.
14  And there, Pharmacia said that its product was superior
15  for -- Pharmacia said that the other product caused sleep
16  disturbances and that its product was specially formulated to
17  help consumers sleep. So the Court found that the necessary
18  implication of that claim was that its product was better for
19  avoiding sleep disturbances at night. This was a product for
20  quitting smoking. Again, it is not what we have in this
21  case.
22      The last one is Spalding. Spalding involved a
23  golf ball which they tested in a laboratory the way in which
24  the balls were balanced. And they said in the ad you could
25  putt truer, something we would all like to do, you could putt

Page 27

1  truer with their golf ball. And the Court said the necessary
2  implication of that was that you had proven it, because it
3  was an establishment claim, you had proven it on a putting
4  green, where it is the only place you putt, and not in a
5  laboratory.
6      So those cases are all very, very different.
7      This is your classic case. Indeed, it is exactly
8  like the case that Mr. Morrison cited, where the claim was
9  made for a broader, I think it was the Anacin case that he
10  cited, for a broader -- the argument was that the
11  advertisement was conveying a message that the Anacin product
12  was better than the Tylenol product on a broader basis. The
13  proof and the express words of the commercial were limited to
14  a specific benefit. I don't remember whether it was tougher
15  headaches, something very specific.
16      The only reason that the J&J side of that case
17  prevailed was because they had a survey which proved that
18  they were communicating that. That's what's missing in this
19  case.
20      The second case he cited, I think it was the
21  American Home Products case, there was no issue as to what
22  was being communicated in that case. The parties agreed that
23  a broader benefit was being communicated, so no survey was
24  required.
25      I have been involved in a case exactly like that

Page 28

1  as well between American Home Products and Procter & Gamble.
2  Again, a survey was introduced to try and prove that a
3  broader benefit was being communicated than the literal words
4  of the commercial. In that case, the plaintiff was
5  unsuccessful because the survey was rejected.
6      But that is precisely what is missing here. Your
7  Honor, what they essentially are asking you to do is change a
8  couple of decades worth of law in the Third Circuit and
9  elsewhere that says you have to have this kind of proof.
10      I don't know why they didn't get it. Maybe they
11  tried and didn't succeed, I don't know. But without it, they
12  cannot make this claim.
13      Now, in terms of the EE overall claim, if Your
14  Honor were to somehow to find that claim is being made, the
15  proof is there in the Castell study. The Castell study had
16  all grades of EE in it and the superiority shown in the
17  Castell study was on an overall basis. The Fennerty study
18  was specifically designed only to deal with moderate to
19  severe.
20      THE COURT: Let me stop you for a second.
21  Castell, Fennerty, they show a statistically significant
22  difference in a subset, if I understand your opponents
23  correctly, they say maybe one-quarter of folks who suffer
24  from EE, and in the overall group of folks who suffer from
25  acid reflux that amounts to one percent.

Page 29

1    As to that subset, Mr. Morrison was pointing to
2  the super that states, quote, Studies versus Prevacid -- I am
3  not going to try to pronounce the chemical name -- in
4  patients with moderate to severe damage, and says, that isn't
5  right because the studies weren't in patients with moderate
6  to severe EE. It was in all patients with EE. What is your
7  response to that?
8    MR. WEINBERGER: Actually, one of them, the
9  Fennerty study was only in patients with moderate to severe
10 EE. What they did was, when they saw the results of the
11 Castell study, which showed a greater benefit in C and D,
12 they specifically designed a study with only those patients.
13 So the statement is, no matter how you read it, is absolutely
14 indisputably true with respect to the Fennerty study.
15    With respect to the Castell study, I think Your
16 Honor made the point. Those are patients, patients in that
17 study had moderate to severe EE. So the statement is
18 absolutely correct. That is a study with patients who had
19 moderate to severe EE.
20    So I think it's a true statement.
21    I don't know if Your Honor wants me to address
22 this point about the one percent. I think it is an important
23 point. First of all, I think the math is a little
24 one-sided. I think if you were to use the highest number
25 that the experts have testified, the highest percentage of

Page 30

1  people with EE, and then you were to use the results of the
2  Castell study and apply it to that, you would probably come
3  up with a number like three to four percent rather than one
4  percent.
5    But let's take the one percent. If we take the
6  one percent and you take about a hundred -- about ten million
7  GERD sufferers in the United States, you are talking about
8  100,000 people. 100,000 people who on their one percent would
9  be healed after eight weeks using Nexium and not healed after
10 eight weeks using Prevacid.
11    This isn't a case where you are talking about
12 gradations, continuous variables -- my skin is a Grade 5.2
13 and this is a 5.3 and nobody can see the difference. We are
14 talking about people. We are talking about bodies. People
15 who are going to experience healing with one drug and not
16 with another. And there is no case at all, no authority
17 whatsoever for the proposition that we aren't entitled to
18 tell people about it, people are not entitled to discuss it
19 with their doctors. And after all --
20    THE COURT: I don't take them to be saying that.
21 I take them to be saying you found something from which you
22 could argue to the public that you could help 100,000 people
23 out of ten million. But you tried to make it sound like you
24 could help the ten million, and the ten million that are out
25 there watching your ad would be fooled into thinking, gee, if

Page 31

1  I can swallow this enormous pill that Mr. Naughton is
2  standing next to, I will be better.
3    MR. WEINBERGER: First of all, if they think
4  people are being misled that way, there is a way in which the
5  cases say they can prove it. It is not enough for Mr.
6  Morrison to get up here and say that is how I read it or that
7  is how an ordinary consumer would read it. That is just not
8  what the law is in the area.
9    Second of all, I might add that I can't go to the
10 store and buy Nexium even if I am fooled by this. I have to
11 go to my doctor. My doctor is going to have all of those ads
12 and all of that information, and he will tell me, no, no, no,
13 this reading, it doesn't apply to people who don't have
14 moderate to severe.
15    The other point I should make is that, as the
16 experts have all pretty much acknowledged, when you walk into
17 your doctor's office with GERD, they do not put an instrument
18 down your throat and do an endoscopy. So they don't know
19 when you are being treated for GERD if you have EE or
20 moderate to severe EE. It is treated symptomatically.
21    In terms of any given patient, it is really
22 impossible to tell at the outset for the physician whether or
23 not that person is in or is not in the category. And
24 therefore, I think that's why you see Dr. Johnson, as well as
25 Dr. Castell and Dr. Fennerty say, this is important to us

Page 32

1  because of the way we treat patients. And if we have two
2  drugs that cost the same, that have the same side effects,
3  and I understand that one of those drugs may be more
4  effective in this respect than the other, it is important to
5  me and it is important to my patients. And I don't think
6  there is any reason in the world why we should be prohibited
7  from telling people that unless the appropriate proof is in
8  the record -- and, frankly, TAP had every opportunity to
9  generate that proof and made the judgment not to do that.
10    You know, I think, Your Honor, that as it was
11 initially framed, TAP was claiming that we were advertising
12 to a subgroup and the percentage change wasn't that great, it
13 was only ten percent or whatever in the Castell and three
14 point something percent in Fennerty. I think they walk away
15 from that in their reply brief because I think we have shown
16 that the law permits that and permitted it in both respects
17 in a case in which we cited, the SmithKline case, and there
18 is just nothing wrong with that.
19    To sum up, Your Honor, I think that AstraZeneca
20 has done studies, studies that show a benefit. The benefit
21 is a meaningful benefit to gastroenterologists. Dr. Spilker,
22 with all due respect, is not a gastroenterologist, his
23 20-percent rule, there is no foundation for that rule
24 whatsoever. The notion that human variability is 20 percent
25 and therefore there should be a 20-percent rule is

**Page 33**

1  preposterous, among other reasons, when you do a randomized
2  clinical trial, you have people randomized into the
3  treatments and that 20-percent variability is going to equal
4  out. The FDA has approved drugs on far less than 20
5  percent. The 30 percent he is citing as the FDA criteria is
6  actually against placebos, not between two active products,
7  and isn't even the rule. There is just no support for it
8  whatsoever.
9        The last thing I will say is just to reiterate
10  again, the law is clear, TAP had the ability to put in the
11  kind of proof that might have entitled it to relief if it
12  could have proved it. It didn't do it, for whatever reason.
13  And I don't think that our own interpretations of this
14  advertising are going to solve that problem.
15        THE COURT: All right. Mr. Morrison.
16        MR. MORRISON: I want to cover two brief points
17  if I may, Your Honor. On the false by necessary implication,
18  the one case Mr. Weinberger did not talk about is the
19  Novartis v. J&J case, Third Circuit 2002. I think that is
20  instructive, because the Court accepted one necessary
21  implication, rejected the other. The product was a new line
22  extension to Mylanta called Nighttime Strength Mylanta. The
23  plaintiff argued that that necessarily implied two messages.
24  One, that it was stronger and more effective than other
25  medications, such as Extra Strength Maalox, Super Strength

**Page 34**

1  Maalox, Maximum Strength Maalox. The Court rejected that and
2  said, no, there is nothing in the commercial to necessarily
3  imply that. But on the other hand, the Court accepted the
4  argument that it did necessarily imply that Nighttime
5  Strength Mylanta had been specially formulated for nighttime
6  use, because something about that product was
7  unique for nighttime use. Otherwise, why refer to it as
8  Nighttime Strength?
9        I think that's a very instructive case.
10        On the clinical significance point, I want to say
11  just two things, Your Honor.
12        First of all, I would cite to you Dr. Castell's
13  own conclusion in his declaration, Paragraph 17, where he
14  says, quote, Clinically, the results of this study, i.e., his
15  own study, confirm that Nexium and Prevacid, like all
16  available medications in this class, are highly effective in
17  healing esophagitis.
18        This is the author of the study saying that both
19  medications have been proven to be, quote, highly effective
20  in healing esophagitis. The only thing his study shows is
21  for this tiny subset of patients Nexium might be a little
22  better. Now, what's the clinical significance of that? We
23  are conceding that there is a difference among that subset.
24  But is that a clinically significant difference that would
25  make a doctor or a patient ask for Nexium over Prevacid?

**Page 35**

1        THE COURT: The ad says that there are studies
2  that show it's better for people with those -- well, I am
3  sorry. I interrupted you. I take your point.
4        MR. MORRISON: Obviously, if you conclude that
5  that is all the ad says, there is nothing I am going to be
6  able to do to convince you to the contrary. I think the ad
7  says a whole lot more.
8        My point is, Your Honor, what does all of this
9  mean? They have these studies that they are touting, they
10  are spending hundreds of millions of dollars to tout them.
11  What does it mean? Even Dr. Fennerty and Dr. Johnson, their
12  third expert, say we don't like Dr. Spilker's 20-percent
13  rule. We don't see where that comes from. But the
14  measurement of clinical significance is how would it affect
15  what they call the number needed to treat analysis. In other
16  words, how many patients would a doctor have to see before he
17  or she said, oh, I am going to switch that patient from drug
18  A to drug B. And if you do that analysis, and you limit it,
19  if you limit it to patients with moderate to severe EE, that
20  number is only somewhere between 4.9 percent, Fennerty's
21  number, and 12.7, Castell's number. If you extend it to all
22  EE patients, that number becomes very, very small. And if
23  you extend it to the entire population of GERD patients,
24  that's where you get the one percent. And we are not asking
25  you to take our math for that. That is their own experts,

**Page 36**

1  using their intent to treat analysis. That was the whole
2  point of points 1, 2 and 3 of our reply brief, using their
3  numbers and their data, one in 100 patients seeing this
4  commercial might benefit from taking this drug. And I don't
5  think -- if you just think about it, Your Honor, is a company
6  going to spend hundreds of millions of dollars in consumer
7  advertising to tell the American public that one in 100
8  patients is going to get a benefit if they take this drug? I
9  think the clear answer to that question is no, and that's why
10  this advertising is false and should be enjoined.
11        THE COURT: All right.
12        MR. MORRISON: Thank you.
13        THE COURT: Thanks.
14        Well, I am going to give you a ruling right now,
15  and then we will turn to schedule.
16        I am denying the preliminary injunction. The
17  standard here is very clear. You have four things you are
18  supposed to meet. You have got to show a likelihood of
19  success on the merits. You have got to show irreparable harm
20  in the absence of an injunction. You have to show as the
21  proponent of the injunction that you win on the balance of
22  equities. And you have to show that the public interest
23  swings in your favor.
24        You have to show all those things.
25        I have looked at the evidence that has been given

## Page 37

1  to me, and I have seen the arguments in the papers and heard
2  it here today, and find that this heavy burden -- and it is a
3  heavy burden, for extraordinary relief at the preliminary
4  stage -- has not been met by TAP in this case.
5        The assertion is that there is a false claim of
6  overall superiority. That's what the complaint asserts -- I
7  should say the counterclaim. But having viewed the ad and
8  watched it several times, read the things over in print, you
9  could definitely argue, and Mr. Morrison has done that
10  effectively here today, that this is artfully presented and
11  that it could well mislead consumers. But you haven't shown
12  me that it is literally false.
13        Without evidence of literal falsity, I am left to
14  say, where is your evidence that it is misleading? And you
15  don't have it. You don't have consumer proof. You don't
16  have a study to show consumer confusion. All the argument
17  has been around the notion of misleading, that if you looked
18  at this you would think that this is what that meant. That
19  is the language of misleading. In trying to press to show me
20  where it is false, how is it literally false, I get the
21  generalities of you have to take it in context, you have to
22  see it in context.
23        The bottom line is, you haven't demonstrated a
24  likelihood of success on literal falsity. At least on this
25  record it is not there. And there is not evidence of

## Page 38

1  misleading, which isn't to say it may not be out there.
2  There may well be tremendous success in a consumer survey
3  that shows that people, doing just what Mr. Morrison said,
4  sitting in front of their television set, watching the news
5  while they are eating dinner, think, acid reflux, big letters
6  on the screen, Nexium is better for acid reflux is the
7  conclusion that they draw, that could be the case, but you
8  don't have proof of it. And I need proof in order to give
9  relief of the sort you are looking for here. So at this
10  stage I have to say you haven't demonstrated that.
11        I want to point out that I think it's noteworthy
12  that in addressing its claim to the FDA, it appeared that TAP
13  was couching it in terms of misleading as well, not in terms
14  of literal falsity but in terms of misleading. When I read
15  in Mr. Spitalli's declaration the copy of the September 27,
16  2004 letter that TAP sent to the FDA, I noted that it spoke
17  of misleading. And I will quote from the first page at the
18  bottom of the page: "Until studies demonstrating superiority
19  are completed against the 20-milligram approved dose as well
20  as the 40-milligram approved dose we believe this commercial
21  misleads the consumer."
22        Going over to the next page, it says, quote, "The
23  tiny 'super' referring to studies against Prevacid in
24  moderate to severe disease is not sufficient to correct this
25  overwhelming impression of superiority in all cases..."

## Page 39

1        That doesn't complete the sentence. That's where
2  I was quoting.
3        In short, TAP was saying, and it makes sense for
4  it to say, people are going to be misled by this. Again,
5  that is not the claim of literal falsity.
6        The necessary implication cases cited don't help
7  because I believe Mr. Weinberger had it right, and my
8  interpretation of those cases was in line that it has to be
9  an unbroken logical chain, an unavoidable -- that's what it
10  means. It's necessary by implication. And you haven't drawn
11  that kind of implication here. All you have said on the TAP
12  side is "acid reflux" in big letters across the screen sets a
13  context in which people will be confused. It doesn't lay out
14  the logical chain you have to have. And the literal words of
15  the ad, coming out of the actor's mouth and the super, in
16  combination, I am looking at that context to say what they
17  say, which is, we are talking about esophageal damage, super,
18  moderate to severe cases, maybe that is not enough to avoid
19  confusion, but it's also not literally false by implication
20  or otherwise.
21        I should also point out that I think when the FDA
22  responded in the way it did -- and there is an affidavit in
23  the papers by TAP -- that the FDA said, and again I quote,
24  "We have considered your complaint and have concluded that
25  it appears to have merit and will be carefully evaluated for

## Page 40

1  further action," that they were saying that in the context of
2  the assertion that these ads are misleading. And they did
3  the prudent thing, which is to say, you know, you know what?
4  This really could be misleading. We are going to look at
5  it. If it is misleading, we are going to do something about
6  it.
7        I will tell you roughly the same thing, which is
8  if you give me evidence of actual confusion to show the ad is
9  misleading, I will carefully evaluate it, and at an
10  appropriate time maybe we will be in a position to talk about
11  relief. But we are not there now.
12        So the long and short of it is that you haven't
13  shown likelihood of success on the merits on the record you
14  have given me.
15        As to the irreparable harm, in the absence of an
16  injunction, I note again you failed to show that. Indeed,
17  you are asking me to presume harm because of the whole
18  context you have raised, which is, this is likely to confuse
19  ordinary folks out there who will now go to their doctor and
20  say give me something they don't really need and that that
21  must hurt you. But you don't address the AstraZeneca
22  argument in your reply brief on irreparable harm, and I am
23  not in a position to presume it.
24        By all appearances, I should know TAP is a
25  sophisticated, thoroughly capable, well-financed

## Page 41

1  pharmaceutical company, which itself, by the record it itself
2  has given me, has spent on the order of 133 million dollars
3  to promote Prevacid. The implication that it can't defend
4  itself in the market just doesn't persuade me much at all,
5  particularly on this truncated record.
6        Balance of hardships, again, TAP doesn't address
7  this in the reply brief. It leaves AstraZeneca's argument
8  unanswered. I can't leave it unanswered. It is one of the
9  four factors I have to consider. AstraZeneca asserts that,
10 hey, we have spent millions on this ad campaign. If you make
11 us pull it right now, we are going to suffer real damage
12 here. With nothing but speculation to counter that, it is a
13 credible assertion. Even on the balance of hardship, here I
14 am talking about the hardship to TAP, not the hardship to the
15 public, because the argument thrown at me by TAP – thrown is
16 the wrong word. It implies it wasn't well-crafted. It was
17 well-crafted. The argument presented to me by TAP focuses
18 strongly, as is appropriate in one respect, on the public, it
19 is the public suffering here.
20       But when it comes to the balance of the
21 hardships, I am looking at the hardships between the
22 parties. And on that balance, AstraZeneca said, we are going
23 to be hurt, and TAP has said nothing to show me how it's
24 being hurt, how it's being hurt would be more than
25 AstraZeneca would be hurt.

## Page 42

1        So on the balance of hardship, TAP has to come up
2  short on that one as well.
3        Finally, the public interest – and this is a
4  fascinating case, because it does point out a very
5  interesting social problem, and it invites me as a judge to
6  step in and say, well, this is bad public policy. We have
7  got consumers out there who are going to be sucked in by
8  direct-to-consumer advertising by pharmaceutical ads artfully
9  drawn, good production values, and superscripts
10 notwithstanding, consumers will be fooled into thinking that
11 other drugs that are good, adequate, and in some cases, if I
12 take the Prilosec example which was pushed at me in the
13 papers and mentioned here today again, indeed, would be
14 cheaper, that the consumers are going to be fooled into
15 thinking that is not good, that this Nexium pill is better,
16 when really all it's better for is AstraZeneca's bottom
17 line.
18       That is the argument I am getting from the folks
19 at TAP. It certainly generates some interest in the press.
20 They have what appears to be, I don't know if it is front
21 page, but they have big-page press in the New York Times that
22 they cite to and other kind of attention in the media to this
23 issue. But you know what? Definitely not at this stage, and
24 I question whether at any stage, am I in a position to say
25 the public policy here that I might think is right has got to

## Page 43

1  override the legal standards and what is being permitted by
2  regulatory authorities.
3        So while I think I was held up more on the public
4  interest point than any other, in the final analysis, I have
5  to defer to and believe that the public interest is being
6  adequately protected by those regulatory authorities who are
7  specifically empowered to look to and make sure that
8  direct-to-consumer advertising, which is permitted under law,
9  is properly being handled.
10       You made your pitch to the FDA on this point. By
11 all means, push it, if you think you have got a point to win
12 there. But I am not going to turn myself into a super FDA or
13 legislator on this point, and certainly not on this record.
14       All right. So for all of those reasons, the
15 preliminary injunction motion is denied. The order you will
16 get out of me will say nothing but Denied for the reasons
17 stated in open court.
18       Now let's turn to the matter of scheduling.
19       When we met in November, I specifically asked the
20 parties to meet and confer on a schedule. And then the order
21 that I put out following that meeting, this was the 19th of
22 November, said, quote, the Court will hold a Rule 16
23 scheduling conference on December 20th. That would be
24 today. Counsel shall file their proposed joint scheduling
25 order with the Court three business days prior to the

## Page 44

1  scheduling conference. We might have missed it, but I don't
2  think we got it.
3        Mr. Morrison.
4        MR. MORRISON: Your Honor, Ms. Sanchez is going
5  to be prepared to discuss the scheduling order in general.
6  One of the problems is we weren't able to work out an
7  agreement because there is a dispute about when we want to
8  have a trial. We obviously want to do it sooner than they
9  do.
10       One thing I would like to ask Your Honor, in view
11 of your ruling, because I think the schedule would depend on
12 your answer to this question, we would respectfully request
13 that either you award us an expedited trial on the merits or,
14 alternatively, an opportunity to renew our motion for a PI.
15       We in fact did do a consumer survey. It wasn't
16 completed until right before their papers were due. We knew
17 if we interjected it in the case at that point, we would lose
18 the ability to come before you in December and have a hearing
19 on the motion.
20       So we would like to request – I think everything
21 flows in terms of scheduling from whether we can either have
22 a renewed hearing date on a motion or an expedited trial on
23 the merits.
24       THE COURT: Mr. Weinberger.
25       MR. WEINBERGER: It just seems to me, Your Honor,

CondenseIt™                                                    December 20, 2004

**Page 45**

1  you have one shot to make a preliminary injunction motion.
2  As I said in my argument, it is not as if they came running
3  in here the day after this declaratory judgment action was
4  filed with a PI motion. It took six weeks from the time the
5  case was filed until they made the motion. In my experience,
6  you can do a survey in two or three. So it just seems to me
7  they have had their opportunity to make a preliminary
8  injunction motion. They have made whatever tactical decision
9  they made.
10        While Your Honor may want to provide them with a
11 trial date somewhat sooner than necessary, I don't see
12 renewing the preliminary injunction motion as an appropriate
13 thing to do.
14        THE COURT: Well, you are not getting another
15 bite at the apple for a preliminary injunction. It is what
16 it is. You have made your record. You argued. We have done
17 that. That chapter is closed. Now the question is, when is
18 trial going to be and what do you need to get there.
19        I have a scheduling order right here. I am ready
20 to hand it to you, because you guys didn't give me what I
21 asked you for. Very specifically, I said, give me your
22 positions three days in advance. The fact you couldn't agree
23 doesn't mean you couldn't give me something. Every day I get
24 scheduling orders where parties disagree and one side says
25 this is what I want and the other side says this is what I

**Page 46**

1  want, and we talk about it. But at least then I have had the
2  chance to look at my calendar, to think about your
3  alternative proposals. We don't waste our time, which we are
4  going to do now -- you put me in a posture where you have to
5  do one of two things. I hand you the schedule I prepared
6  because you guys wouldn't prepare one, chose not to, or I
7  hear what you have to say today, I make you do what I asked
8  you to do before, which is give it to me on paper and we
9  reconvene this, either by teleconference, or I choose
10 something and hand it to you anyway.
11        The reason I want you involved in the process is
12 it's more beneficial for all of us. In other words, I would
13 rather not say, well, I have come up with this order, here it
14 is. I am interested in what you want to know.
15        So that is enough whining by me. I am
16 disappointed you didn't give me what we needed so we could be
17 done with it today. I am not going to jam an order down on
18 you without hearing from you. So if you want to talk to me
19 about it, we will do it on a teleconference later.
20        Here is what you guys need to do. Do what I
21 asked you to do in November, speak to each other, then give
22 me a form of order. If you have a disagreement, your local
23 counsel have been through this process with me dozens of
24 times, put down the alternatives -- plaintiff wants this,
25 defendant wants this. We will get on the phone and we will

**Page 47**

1  talk about it then, after I have had a chance to see what you
2  want, look at my own calendar and make some judgments about
3  what seems fair and what will fit.
4        All right? Now, hold with me just a second
5  here. I am going to give you a date and time if I can for
6  the scheduling teleconference.
7        (Pause.)
8        We will have a scheduling conference at 4:30 p.m.
9  on Monday, January 10th. And I will ask AstraZeneca as the
10 plaintiff in the case to set up the call. I will expect to
11 have that scheduling order to me in advance. I will see it
12 on the 4th at the latest, the 4th of January.
13        All right. Mr. Morrison, anything else from your
14 side of the courtroom, sir?
15        MR. MORRISON: No, Your Honor.
16        THE COURT: Mr. Weinberger?
17        MR. WEINBERGER: No, Your Honor.
18        THE COURT: All right. We stand in recess.
19 Thanks for your time.
20        (Hearing concluded at 11:17 a.m.)
21             - - -
22 Reporter: Kevin Maurer
23
24
25

Exhibit I



# The healing purple pill has some very healing news.

**Nexium**
(esomeprazole magnesium)

## NEXIUM® heals acid related damage better than the other leading medicine.*

*Studies vs Prevacid® (lansoprazole) in patients with moderate to severe damage.†

Here's big news for people suffering from acid reflux disease.

If you've treated your symptoms and changed your diet, but persistent heartburn still comes back two or more days a week, it could be acid reflux disease. Over time, this could lead to erosions in your esophagus, a condition called erosive esophagitis.

Only a doctor can determine if you have this damage. If you do, ask about recent medical studies that prove NEXIUM heals moderate to severe acid related damage in the esophagus better than the other leading prescription medicine. That's right, two major medical studies prove prescription NEXIUM–the healing

purple pill–heals moderate to severe acid related damage to the esophagus better. Now that's news you can feel good about.

For many, one NEXIUM pill a day can mean 24-hour heartburn relief and can heal acid related damage in the esophagus. Most erosions heal in 4 to 8 weeks. Your results may vary. The most common side effects of NEXIUM are headache, diarrhea, and abdominal pain. Symptom relief does not rule out other serious stomach conditions.

Take advantage of our Free Trial Offer today and ask your doctor if NEXIUM is right for you. With NEXIUM, you don't just feel better, you are better. And better is better.

**For more information, visit us at purplepill.com or call 1-800-4-NEXIUM**
Please read the Important Product Information about NEXIUM on the reverse side and discuss it with your doctor. Ask your doctor for information about how well NEXIUM heals.


AstraZeneca

†Sources: *American Journal of Gastroenterology;* Data on file.
NEXIUM and the color purple as applied to the capsule are registered trademarks of the AstraZeneca group of companies.
Prevacid is a registered trademark of TAP Pharmaceuticals.

© 2004 AstraZeneca LP. All rights reserved. 222581 9/04



**Nexium®**
(esomeprazole magnesium)

Please read this summary carefully and then ask your doctor about NEXIUM. No advertisement can provide all the information needed to prescribe a drug. This advertisement does not take the place of careful discussions with your doctor. Only your doctor has the training to weigh the risks and benefits of a prescription drug for you.



# Nexium®
## (esomeprazole magnesium)

**20-MG, 40-MG Delayed-Release Capsules**

**BRIEF SUMMARY**
Before prescribing NEXIUM, please see full Prescribing Information.

**INDICATIONS AND USAGE**

**CONTRAINDICATIONS**

**PRECAUTIONS**

*Information for Patients*

*Drug Interactions*

*Carcinogenesis, Mutagenesis, Impairment of Fertility*

*Pregnancy*

*Therapeutic Effects. Pregnancy Category B*

*Nursing Mothers*

*Pediatric Use*

*Geriatric Use*

**ADVERSE REACTIONS**

**OVERDOSAGE**

**References**

NEXIUM is a registered trademark of the AstraZeneca group of companies
©AstraZeneca 2004. All rights reserved.

Distributed by: AstraZeneca LP, Wilmington, DE 19850

Product of France

622514-06
Rev. 01/04    218068

AstraZeneca



**This certificate is part of AstraZeneca's Free 7-Day Trial Program for NEXIUM® (esomeprazole magnesium).**

**To the Physician:**
- To use this certificate, your patient needs one prescription for 7 capsules of NEXIUM (20 or 40 mg).
- You will need to provide a second prescription based on your recommended therapy if you want to keep your patient on NEXIUM beyond the 7-day free trial period.
- Refills are not authorized with the certificate.

**To the Pharmacist:**
- This certificate must be accompanied by a valid prescription and is valid for 7 capsules of NEXIUM (20 or 40 mg). No substitutions permitted.
- Please dispense 7 capsules of NEXIUM (20 or 40 mg) to the patient at no charge and transmit the claim to AdvancePCS.
- This certificate is for one time use only. For all other prescriptions, please use the patient's primary method of payment with a new Rx number.
- For audit purposes, this certificate must be attached to the original prescription and retained by you for the greater of 3 years or the usual period for which your pharmacy records are kept.
- Call the PerformanceScript Help Desk at 1-800-345-5413 for assistance in filing this claim.

**I certify that:**
- I have received this certificate from an eligible patient and I have dispensed the NEXIUM product in accordance with this certificate.

- I have not received and will not accept any payment from the patient.
- Other than to AdvancePCS, I have not submitted, and will not submit, a claim for reimbursement to any third-party payor, including Medicaid, Medicare, or similar federal or state programs.
- My participation in this program is consistent with all applicable laws and any other obligation, contractual or otherwise, that I have.

_____
*Pharmacist's Signature*

This certificate is valid through December 31, 2004

**Patient Eligibility:**
Offer is good for qualified customers for NEXIUM and may not be used for any other product. This offer may not be combined with any other offer, including any coupon, discount, or prescription savings card program. This offer is void where prohibited by law, taxed, or restricted. Offer valid only in the United States. AstraZeneca reserves the right to amend or discontinue this offer at any time without notice.

NEXIUM and the color purple as applied to the capsule are registered trademarks of the AstraZeneca group of companies.

© 2004 AstraZeneca LP. All rights reserved.    214614    7/03

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on December 9, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Steven Balick, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

I further certify that on December 9, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participant in the manner indicated:

### BY FEDERAL EXPRESS

Thomas C. Morrison, Esquire
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Karen E. Keller (#4489)
*kkeller@ycst.com*
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600

## Other Documents
<u>1:04-cv-01332-KAJ AstraZeneca LP v. Tap Pharmaceutical</u>

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Shaw, John entered on 12/9/2005 at 4:18 PM EST and
filed on 12/9/2005

**Case Name:**       AstraZeneca LP v. Tap Pharmaceutical
**Case Number:**     <u>1:04-cv-1332</u>
**Filer:**           AstraZeneca LP
**Document Number:** <u>102</u>

**Docket Text:**
SEALED APPENDIX re [100] MOTION Exclude Expert Testimony of Creighton Hoffman, [101]
Opening Brief in Support by AstraZeneca LP. (Shaw, John)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=12/9/2005] [FileNumber=137825-0]
[3183183cb91cc7aebd094942da09e6ffd41fce38cc95e37a0c8f05d70066b9118c99
171cb945cce5ea2868cd1a613752baa59d84d04368c8b58f62843a5e0b31]]

**1:04-cv-1332 Notice will be electronically mailed to:**

Steven J. Balick    sbalick@ashby-geddes.com, jday@ashby-geddes.com; mkipp@ashby-geddes.com;
dfioravanti@ashby-geddes.com; nlopez@ashby-geddes.com; tlydon@ashby-geddes.com;
lmaguire@ashby-geddes.com

John G. Day    jday@ashby-geddes.com, sbalick@ashby-geddes.com; mkipp@ashby-geddes.com;
dfioravanti@ashby-geddes.com; nlopez@ashby-geddes.com

Josy W. Ingersoll    jingersoll@ycst.com, corporate@ycst.com; cglover@ycst.com; corpcal@ycst.com

Lauren E. Maguire    lmaguire@ashby-geddes.com, tenglish@ashby-geddes.com

John W. Shaw    jshaw@ycst.com, corporate@ycst.com; ptorterotot@ycst.com; corpcal@ycst.com

**1:04-cv-1332 Notice will be delivered by other means to:**