**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ASTRAZENECA LP, | ) | **PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. No. 04-1332 - KAJ |
| TAP PHARMACEUTICAL PRODUCTS INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PUBLIC VERSION OF TAP PHARMACEUTICAL PRODUCTS INC.'S BRIEF IN**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant-Counterclaimant*
*TAP Pharmaceutical Products Inc.*

*Of Counsel:*

Thomas C. Morrison
Karla G. Sanchez
Deborah Steinberger
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710

George C. Kokkines
TAP Pharmaceutical Products Inc.

Dated: December 21, 2005

**TABLE OF CONTENTS**

Page

Table of Authorities ..........................................................................................................iii

Introduction and Summary ...............................................................................................1

Summary of the Facts ........................................................................................................3

    A.    PREVACID, NEXIUM and Acid Reflux Disease..............................................3

    B.    AstraZeneca's Promotion of NEXIUM to Consumers.....................................4

    C.    The NEXIUM TV Ad ..........................................................................................5

    D.    The NEXIUM Website Ad ..................................................................................6

    E.    AstraZeneca Has No Evidence That NEXIUM Provides Superior Symptom Relief..................................................................................................................6

    F.    The AstraZeneca Studies Do Not Show That NEXIUM Is Superior to PREVACID for the Overall Healing of EE .......................................................7

    G.    NEXIUM's Alleged Superior Healing Rate Is Not Clinically Significant Among Any Group of Patients ..........................................................................10

        1.    Clinical Significance For Grades C and D Patients ...............................11

        2.    Clinical Significance for All EE Patients.................................................12

        3.    Clinical Significance for all GERD Patients...........................................14

            (1)    Dr. Fennerty ....................................................................................15

            (2)    Dr. Castell .........................................................................................15

            (3)    Dr. Johnson ......................................................................................16

            (4)    Recapitulation ..................................................................................16

Summary Judgment Standards.........................................................................................18

I      The NEXIUM TV Commercial Conveys a Message of Superior Symptom Relief..........19

    A.    The Implied Message of Superior Symptom Relief .......................................19

    B.    The Express Message of Superior Symptom Relief .......................................22

II     The NEXIUM Advertising Conveys a Message of Superior Healing Among All Patients Suffering From EE........................................................................................................26

    A.    The Website Ad ..................................................................................................26

    B.    The TV Ad ...........................................................................................................29

III    Because the Difference in Healing Rates Shown by the Castell and Fennerty Studies is not Clinically Significant, The NEXIUM Ads are Literally False .....................................32

A.    Superiority Claims Based on Statistical But Not Clinical Significance Are False......32

B.    FDA Regulations Prohibit the Exploitation of Statistical Significance in the Absence of Clinical Relevance ......................................................................35

C.    The Cases Cited By AstraZeneca Are Inapposite..........................................36

Conclusion ......................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Abbott Laboratories</u> v. <u>Mead Johnson & Co.</u>,
   971 F.2d 6 (7th Cir. 1992) ............................................................... 33

<u>Abbott</u> v. <u>Mead Johnson</u>,
   1991 U.S. Dist. LEXIS 21010 (S.D. Ind. 1991) ......................................... 34

<u>American Home Products</u>,
   654 F. Supp. at 590 ..................................................................... 31

<u>American Home Products Corp.</u> v. <u>Procter & Gamble Co.</u>,
   871 F. Supp. 739 (D.N.J. 1994) ......................................................... 21

<u>American Home Products</u> v. <u>Johnson & Johnson</u>,
   436 F. Supp. 785 (S.D.N.Y. 1978) ....................................................... 34

<u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>,
   477 U.S. at 247 ......................................................................... 18

<u>Castrol, Inc.</u> v. <u>Pennzoil Co.</u>,
   987 F.2d 939 (3d Cir. 1993) .......................................................... 22, 24

<u>Castrol, Inc.</u> v. <u>Quaker State Corp.</u>,
   1992 WL 47981 (S.D.N.Y.), <u>aff'd</u>, 977 F.2d 57 (2d Cir. 1992) ......................... 33

<u>Celotex Corp.</u> v. <u>Catrett</u>,
   477 U.S. 317 (1986) ..................................................................... 18

<u>Charles of the Ritz Group Ltd.</u> v. <u>Quality King Distributing, Inc.</u>,
   832 F.2d 1317 (2d Cir. 1987) ............................................................ 30

<u>Ciba-Geigy Corp.</u> v. <u>Thompson Medical Co., Inc.</u>,
   672 F. Supp. 679 (S.D.N.Y. 1985) ....................................................... 35

<u>DeMarini Sports, Inc.</u> v. <u>Worth, Inc.</u>,
   239 F.3d 1314 (Fed. Cir. 2001) ......................................................... 18

Genderm Corp. v. Biozone Laboratories,
   1992 WL 220638 (N.D. Ill. 1992) ..............................................................35, 36

Gillette Co. v. Norelco Consumer Products Co.,
   69 F. Supp. 2d 246 (D. Mass. 1999) .............................................................21

Grove Fresh, Inc. v. Flavor Fresh Foods, Inc.,
   720 F. Supp. 714 (N.D. Ill. 1989) .................................................................35

Hertz Corp. v. Avis, Inc.,
   867 F. Supp. 208 (S.D.N.Y. 1994).................................................................21

Home Box Office, Inc. v. Showtime/The Movie Channel Inc.,
   832 F.2d 1311 (2d Cir. 1987).........................................................................30

Johnson & Johnson-Merck Consumer Pharm.,Co. v. Rhone-Poulenc Rorer
   Pharm., Inc.,
   19 F.3d 125 (3d Cir. 1994).............................................................................20

Johnson & Johnson.Merck Consumer Pharm. Co. v. SmithKline Beecham Corp.,
   960 F.2d 294 (2d Cir. 1992)...........................................................................20

Matsushita Electric Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986).......................................................................................18

Mead Johnson & Co. v. Abbott Lab.,
   201 F.3d 883 (7th Cir. 2000) .........................................................................36

Nikkal Industries Ltd. v. Salton, Inc.,
   735 F. Supp. 1227 (S.D.N.Y. 1990)...............................................................37

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
   Pharmaceuticals Co.,
   290 F.3d 578 (3d Cir. 2002)...............................................................22, 23, 30

Novartis Consumer Health, Inc. v. Johnson Johnson-Merck Consumer Pharms.
   Co.,
   129 F. Supp. 2d 351 (D.N.J. 2000), aff'd, 290 F.3d 578 (3d Cir. 2002) ......................32

Pharmacia Corp. v. Glaxosmithkline Consumer Healthcare, L.P.,
   292 F. Supp. 2d 611 (D.N.J. 2003) ...............................................................25

Procter & Gamble Co. v. Chesebrough-Pond's Inc.,
   588 F. Supp. 1082 (S.D.N.Y. 1984)...............................................................37

SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
    Consumer Pharmaceuticals Co.,
    2001 U.S. Dist. LEXIS 7061 (S.D.N.Y. 2001) ...............................................23

SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
    Consumer Pharms. Co., Inc.,
    906 F. Supp. 178 (S.D.N.Y. 1995).................................................................30

Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
    Consumer Pharmaceuticals Co.,
    2001 WL 588846 (S.D.N.Y.), aff'd, 2001 WL 1168026 (2d Cir. 2001).....................37

The Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.,
    228 F.3d 24 (1st Cir. 2000).........................................................................23

**STATUTES**

21 C.F.R. § 202.1(e)(7)...............................................................................35

Fed. R. Civ. P. 56(c) ................................................................................18

## INTRODUCTION AND SUMMARY

AstraZeneca's motion for summary judgment is inappropriate. The question is not whether AstraZeneca can pull together selected facts in order to present a defense of its "Better Is Better" advertising campaign. Rather, the question is whether, viewing all the evidence and all reasonable references from that evidence in the light most favorable to TAP, there is no genuine issue of fact to be tried. AstraZeneca cannot conceivably satisfy this test.

AstraZeneca's motion is particularly misplaced in light of the fact that this Court denied TAP's motion for a preliminary injunction largely due to the absence of a consumer survey. Now, TAP has such a survey; in fact, it has two surveys, one of the "Better Is Better" television commercial and one of the NEXIUM website ad. Moreover, TAP has submitted a report from a second expert vouching for these surveys in response to criticisms lodged by AstraZeneca's survey expert. As shown in our brief in opposition to AstraZeneca's motion to strike the surveys, AstraZeneca is attempting to elevate a garden variety dispute regarding survey design into a scheme to eliminate the surveys altogether, thereby providing a plausible basis for summary judgment. Just as there is no basis for striking the surveys, there is also no basis for summary judgment.

As we show herein, there are triable questions of fact with respect to the following issues:

1. Whether the NEXIUM TV commercial is false because it conveys the message that NEXIUM is superior to PREVACID *for relief of the symptoms of acid reflux disease such as heartburn*. While AstraZeneca concedes it has no evidence to support such a claim, it denies that any such claim is made. AstraZeneca's denial is, in turn, based on its expert's criticism of TAP's survey and its argument that the survey should be stricken.

2.    Whether AstraZeneca's advertising is false because it communicates the message that NEXIUM is superior to PREVACID *for esophageal healing on an across-the-board basis* rather than among only the small subset of patients with moderate to severe damage. AstraZeneca contends that this limitation on NEXIUM's alleged superiority is fully disclosed in its advertising. That contention is disproven by TAP's second survey as well as by the TV commercial viewed in its entirety.

3.    Whether AstraZeneca's advertising is false because the small difference in EE healing rates among the subset of patients with moderate to severe EE *is not clinically significant*, whether viewed in terms of (i) all patients with acid reflux disease, (ii) all patients with EE or (iii) only those patients with moderate to severe EE. The parties' medical experts disagree on this issue.

These are garden variety issues that arise routinely in false advertising cases. We do not begrudge AstraZeneca arguing its side of these issues at trial. We do begrudge its attempt to avoid a trial on the ground that there are no issues to try.

## SUMMARY OF THE FACTS

Most of the evidence cited below comes from the following witnesses and experts:

- Michael Spitalli, a TAP marketing executive (Exh. C);

- Dr. Malcolm Robinson, a gastroenterologist at the University of Oklahoma Medical School (Exhs. D, E and F);

- Dr. Bert Spilker, a pharmaceutical industry veteran who specializes in the design and analysis of clinical studies (Exhs. G and H);

- Dr. Thomas Dupont, an expert in market research who conducted two consumer surveys for TAP (Exhs. I and J) and responded to AstraZeneca's criticisms of the surveys (Exh. K);

- Dr. Susan McDonald, President of National Analysts, one of the nation's premier market research firms, who has vouched for the propriety of the Dupont surveys (Exh. L);

- Creighton Hoffman, an accountant with Hoffman Alvary & Company who conducted a damages analysis for TAP. [Redacted]

- Drs. Castell, Fennerty and Johnson, medical experts who submitted declarations on behalf of AstraZeneca for the preliminary injunction motion (Exhs. N, O and P).

## A.    PREVACID, NEXIUM and Acid Reflux Disease

PREVACID and NEXIUM are proton pump inhibitors ("PPIs"). PPIs inhibit the secretion of gastric acid in the stomach (Robinson, Exh. D at ¶ 15). PREVACID and NEXIUM are the leading PPI prescription drugs used to treat acid reflux disease, the main symptom of which is heartburn, a burning sensation in the chest that occurs when stomach acid backs up or "refluxes" into the esophagus (Id. at ¶ 3).

A small minority – no more than 20% to 30% – of acid reflux patients have erosive esophagitis ("EE"), a condition where excessive exposure of the esophagus to stomach acid wears away the lining of the esophagus (Id. at ¶¶ 4, 18, 28). EE is not treated with medication. Rather, the body heals EE naturally once stomach acid ceases to irritate the esophagus (Id. at ¶¶ 9, 15). Most patients with EE are unaware that they have EE; they normally notice only the discomfort from heartburn that is experienced to some degree by most acid reflux patients (Id. at ¶¶ 3, 4).

**B.    AstraZeneca's Promotion of NEXIUM to Consumers**

Since it launched NEXIUM in 2001, AstraZeneca has relied heavily on direct-to-consumer advertising as a principal means of promoting the drug. This extensive advertising has been highly successful. Today, NEXIUM is the fifth best-selling drug in the country and the third best-selling drug in the world (Spitalli, Exh. C at ¶ 9).

AstraZeneca launched its "Better is Better" campaign in September 2004 and saturated the media with consumer advertising, primarily a TV commercial. The commercial has been seen over 2 *billion* times by adult U.S. consumers (Id. at ¶ 21). The "Better is Better" campaign also included a print ad, a website ad, and a consumer pamphlet (Id. at ¶¶ 12, 19, 34-38). An article in The New York Times about this campaign reports that direct-to-consumer advertising is highly effective, and often results in patients asking their doctor for, and receiving, a prescription for the advertised drug (Id. at ¶¶ 13-15). Unfortunately, consumers lack the knowledge and experience needed to understand and interpret advertising claims based on pharmaceutical studies (Robinson, Exh. F at 10).

## C.    The NEXIUM TV Ad

The centerpiece of AstraZeneca's campaign is the TV commercial, which exists in both a 45-second version and a 60-second version (Exh. A).  The central message of the commercial is that recent medical studies "prove" that NEXIUM is "better" than "the other leading prescription medicine" for acid reflux disease.  The superiority claim is explicit:  the word "better" is displayed in large letters across the very first frame of the commercial and is repeated by the announcer *eight times* (Id.).

The commercial conveys the message that NEXIUM is better than PREVACID *for all patients suffering from acid reflux disease* – not just the minority of patients who have esophageal damage.  This can be seen from the fact that the words "acid reflux disease" are vividly displayed across the screen at the beginning of the commercial (Exh. A).  In addition, the spokesman (actor James Naughton) tells viewers (Id.):

> "So if you suffer from acid reflux disease, frequent
> heartburn. . . ."

This theme is brought home at the close of the commercial, when Mr. Naughton concludes (Id.):

> "Hey, with NEXIUM, you don't just feel better, you are
> better."

In December 2004, the Court rejected TAP's motion for a preliminary injunction regarding this commercial largely because of the absence of a consumer survey.  TAP now has a survey and that survey confirms that the commercial is communicating a message of superiority for symptom relief, not merely superiority for EE healing (see Point I below).

AstraZeneca ran this commercial until late April 2005, when it was replaced with a new, non-comparative commercial that is not at issue.  The commercial was enormously successful. Redacted

Redacted

## D.    **The NEXIUM Website Ad**

At the time the lawsuit was filed, AstraZeneca's website contained an ad that, like the TV ad, touted NEXIUM's general superiority over PREVACID for the treatment of acid reflux disease. In January of this year, we discovered that AstraZeneca had changed its website ad. The new ad (Exh. B) continues to tout the results of the Castell and Fennerty studies but ***only in the context of EE damage***; thus the ad eliminated virtually all references to acid reflux disease and symptoms such as heartburn. This ad is significant because AstraZeneca recognizes that it cannot support a claim of superior ***symptom*** relief; thus its next best strategy is to tout NEXIUM as offering across-the-board superiority for the treatment of EE, regardless of the severity of the EE. While the ad has several references to patients with "moderate to severe EE", TAP's second survey shows that this limitation is not effectively communicated to consumers. To the contrary, the survey shows that consumers believe that the EE superiority claim applies to ***all patients with EE*** (see Point II below).

## E.    **AstraZeneca Has No Evidence That NEXIUM Provides Superior Symptom Relief**

The NEXIUM ads are based on the results of two clinical studies: Castell and Fennerty. Neither study has any data on the much larger patient population of those with GERD (but not EE).

Redacted

Redacted



Further, neither the Castell nor Fennerty study proves that NEXIUM is superior to PREVACID for symptom relief for those patients who have EE (Robinson, Exh. D at ¶¶ 17, 18; Spilker, Exh. G at ¶¶ 11-13, 18).  AstraZeneca's experts do not contend otherwise.  While Drs. Castell and Fennerty collected data regarding heartburn, *neither of them argues that this data demonstrates NEXIUM's superiority for the treatment of heartburn*; to the contrary, both limit their conclusion to NEXIUM's alleged superiority for the *healing* of EE (Castell, Exh. N at ¶¶ 13-17; Fennerty, Exh. O at ¶¶ 9-10 and 12-14).

Moreover, the data collected by Castell shows that there were no clinically meaningful differences in the symptom relief experienced by NEXIUM users as compared to PREVACID users (    Redacted    Spilker, Exh. G ¶¶ 10-14, 18, 19).  This is consistent with the findings of several other studies that have concluded that PREVACID and NEXIUM are equally effective in relieving the everyday symptoms of acid reflux disease (Spilker, Exh. G ¶¶ 20-24; Robinson, Exh. D at ¶¶ 24, 25).     Redacted

Redacted

**F.    The AstraZeneca Studies Do Not Show That NEXIUM Is Superior to PREVACID for the Overall Healing of EE**

In its opposition to TAP's preliminary injunction motion, AstraZeneca denied that its advertising makes any "overall" superiority claim for NEXIUM with respect to EE healing (see Plaintiff AstraZeneca's Answering Brief, December 8, 2004 (D.I. 29) at p. 32).  According

to AstraZeneca, its advertising only claims that NEXIUM is superior to PREVACID for moderate to severe EE (Id. at pp. 2, 33).

In its summary judgment brief (D.I. 29 at p. 9), AstraZeneca argues that, even if it were making a claim of overall EE superiority, that claim would be true. But AstraZeneca's studies show no such thing. First, Dr. Fennerty's study does not even address all grades of EE; his study *only* examined patients with "the more severe esophagitis", i.e., those suffering from Grades C and D esophagitis (Fennerty, Exh. O at ¶¶ 4, 6). Thus, his study is not supportive of an overall claim.

Second, although Dr. Castell did study EE patients across all grades, the majority of them – more than 75% – had virtually identical rates of healing (Robinson, Exh. E at ¶ 2):

Grade A Healing Rates:                    Grade B Healing Rates:

NEXIUM        ┌ - - - - - - - - ┐        NEXIUM        ┌ - - - - - - - - ┐
PREVACID      │   Redacted      │        PREVACID      │   Redacted      │
              └ - - - - - - - - ┘                      └ - - - - - - - - ┘

The difference in these results, as well as in the aggregated A and B scores, is neither statistically nor clinically significant ┌ - - - - - - - Redacted - - - - - - - ┐ Marks Rpt., Exh. BB at 2).

How, then, can AstraZeneca claim that Castell shows that NEXIUM is superior for treatment of EE for all patients? It does so by aggregating the data for *all* patients in the Castell study, i.e., those with any grade of EE. Dr. Castell reports the aggregated data as follows (Castell, Exh. N ¶ 13):

Overall Healing Rates:

NEXIUM          92.6%
PREVACID        88.8%

This difference, although *statistically* significant, is not *clinically* significant (Robinson, Exh. E at ¶¶ 9-14; Spilker, Exh. H at ¶¶ 5-15).

AstraZeneca's experts may once again agree. Dr. Johnson, for example, approaches this issue on the basis of an NNT ("number needed to treat") analysis, i.e., the number of patients a doctor will need to treat before finding one for whom the drug in question offers an advantage. Dr. Johnson opines that an NNT "of less than fifteen to twenty patients is a very strong weighted support for a switch in therapy based on efficacy considerations" (Johnson, Exh. P at ¶ 41). Yet, the NNT for the overall results from Castell is 26 – higher than the 15 to 20 suggested by Dr. Johnson. Other sources confirm that such a marginal difference in overall EE healing rates is not meaningful:

- FDA found that "a superiority claim of NEXIUM over omeprazole is NOT SUPPORTED" by AstraZeneca studies, which found differences of 6.2%, 9%, 9.7% and even 12%. (Exh. CC at 5). FDA concluded that "There are no studies which demonstrate that [Nexium] is superior to [omeprazole], clinically or even statistically" (Exh. CC at 161).



Redacted

Moreover, it is obvious that the small margin of difference in overall healing rates reported by Castell is driven by the Grade C and D patients ⸤ Redacted ⸥ ⸤ Redacted ⸥ While this arguably means that patients with moderate or severe EE might be better off taking NEXIUM, it does not mean that the vast majority of EE patients – at least 75% – who have milder forms of EE are better off taking NEXIUM ⸤ Redacted ⸥

Dr. Robinson explains that EE is not a progressive disease that migrates from Grade A to more severe levels.  To the contrary (Exh. D at ¶ 8):

> "[P]atients with low grades of esophageal injury seldom if ever progress to severe esophagitis grades."

Thus, for the vast majority of EE patients, there is simply no advantage – statistical or clinical – in taking NEXIUM rather than PREVACID.  Dr. Castell essentially conceded this point in his conclusion about his own study (Castell, Exh. N, ¶ 17):

> "Clinically, the results of this study confirm that esomeprazole [NEXIUM] and lansoprazole [PREVACID], like all available medications in this class, are highly effective in healing esophagitis."

In sum, while AstraZeneca can create a ***statistically*** significant difference in overall healing rates by aggregating the data from all four groups, the only arguable ***clinically*** meaningful difference is among those patients suffering from moderate and severe damage.


G.    **NEXIUM's Alleged Superior Healing Rate Is Not Clinically Significant Among Any Group of Patients**

The experts disagree as to whether the relatively small difference in healing rates for EE patients is clinically meaningful.  As shown in Point III below, a difference in the performance of two drugs can be statistically significant but not clinically significant; this is because, with a large enough study, virtually any difference in performance can be proven

statistically significant. But unless the *magnitude* of that difference is sufficient to affect the clinical outcome, the drug with the statistically significant advantage cannot be said to be a superior drug. This is precisely the case with respect to the data from the Castell and Fennerty studies.

1.      **Clinical Significance For**
        **Grades C and D Patients**

Even among the small subset of patients suffering from moderate and severe EE, the experts disagree as to whether the difference in healing rates is clinically meaningful. Dr. Robinson believes that it is not. As he explains (Exh. E at ¶ 11):

> "[E]sophageal erosions almost always heal naturally once the production of stomach acid has been controlled. Because both Nexium and Prevacid are quite effective at inhibiting the production of stomach acid and limiting the exposure of the esophagus to acid, patients on both drugs will experience esophageal healing. Any marginal differences in the degree of healing or the time to healing are clinically meaningless. In fact, no scientific proof exists that *completely* healing the esophagus provides any definite benefit to the patient. And despite allusions by the plaintiff's experts to the grave risks associated with nonhealing, there is no data to suggest that any patients continuing to receive any PPI therapy who are not *completely* healed ever progress to Barrett's esophagus, cancer, or stricture."

Robinson also explained that those patients who were not completely healed at eight weeks cannot be viewed as "treatment failures." As he states (Id., ¶ 12):

> "[P]laintiff's experts repeated reference to patients on Prevacid who were not healed as "treatment failures" is a misnomer (and, under this logic, patients taking Nexium who were not healed were also treatment failures). There is absolutely no evidence that the small percentage of patients taking Prevacid who were not completely healed were "treatment failures." In fact, based on my extensive experience with the treatment of EE patients and their use of Prevacid, the patients who were "not healed" are simply not *completely* healed. In fact, they are likely to have a very few small erosions remaining, would be "upgraded" to Grades A or B, which

in my opinion is a treatment success, and would continue to heal with Prevacid treatment.  The AstraZeneca studies artificially truncate what would have been continued therapy in any normal clinical milieu."



Robinson concluded that this miniscule difference in healing is not clinically meaningful because continued treatment will result in complete healing.  As he states (Id. at p. 4):

"[T]he natural course of events for virtually all such patients would be continued PPI treatment.  With such treatment, complete or nearly complete healing is virtually certain to occur in essentially all patients, regardless of the PPI utilized.  Overall, the proportion of patients not healed with either drug is not clinical[ly] significant; neither is the difference between the patients not healed on Prevacid and those not healed on Nexium."

## 2.    Clinical Significance for All EE Patients

The difference in healing rates is even less meaningful when viewed in the context of *all* EE patients.  According to Castell – the only AstraZeneca study that measured

healing rates among patients with all grades of EE – the overall difference in healing rates was 3.8%: 92.6% for NEXIUM vs. 88.8% for PREVACID. AstraZeneca contends that this statistical difference is *clinically* meaningful to doctors treating *all* acid reflux patients, not just those with moderate and severe EE. But the weight of the medical evidence is that this statistical difference is of no clinical consequence for patients.

For example, the Oregon Health Resources Commission has established groups of experts to review all available data regarding prescription drugs in various therapeutic classes. The purpose is to provide published reports that third-party payors, such as HMOs and State Medicaid authorities, can utilize in setting up prescription drug formularies and reimbursement plans. The panel that examined PPIs issued the following finding (Exh. DD at 10):

> "The PPI subcommittee agrees by consensus that there is no overall clinically significant difference between proton pump inhibitors for esophagitis healing, relief of symptoms or prevention of relapse in adult patients with GERD."

The panel subsequently reviewed the studies comparing NEXIUM and PREVACID healing rates. Once again it found no meaningful difference between the two drugs (Id. at 7) (emphasis added):

> "Twenty-six patients would be needed to treat (NNT) with esomeprazole as compared to lansoprazole to make a difference in esophagitis healing in all groups. **However, it was the consensus of the update subcommittee that these differences were so small (albeit "statistically significant") as to be clinically irrelevant.**"

Dr. Spilker testified that clinical significance requires that the difference between two drugs "must be of such magnitude that it is obvious to the physician that it should influence his or her prescribing behavior" (Exh. G at ¶8). He further testified that a 20% difference would satisfy this requirement and that, in its own studies, AstraZeneca looked for at least a 10% difference (Id.).

AstraZeneca's experts argue that there is no standard "20% rule." Instead, they analyze the significance of Castell's 3.8% difference in terms of the "number-needed-to-treat analysis"[1] (Fennerty, Exh. O, ¶ 10; Johnson, Exh. P, ¶¶ 41-42). Fennerty explained this concept as follows (Id.):

> "These data mean that the number of patients with moderate to severe esophagitis needing to be treated with esomeprazole [NEXIUM] vs. lansoprazole [PREVACID] to achieve an additional patient healed of his or her disease is approximately [20]."[2]

Accepting Fennerty's statement that one patient in 20 with moderate to severe EE will benefit from NEXIUM, this means that only 5% of all patients with those severe grades of EE will receive a clinically significant benefit from NEXIUM vs. PREVACID. But moderate and severe EE only accounts for roughly 25% of all patients with EE; this means that only 1.25% of all patients with EE (i.e., 5% of 25%=1.25%) would benefit from NEXIUM over PREVACID. This could not possibly constitute a clinically meaningful basis for switching all EE patients from PREVACID to NEXIUM.

### 3. Clinical Significance for all GERD Patients

The significance is even lower when you apply this analysis to the overall population to whom AstraZeneca's advertising is directed, i.e., the universe of all patients suffering from acid reflux disease. To explore this question, we will utilize the data generated by AstraZeneca's own experts.

---

[1]     Dr. Spilker's 20% and AstraZeneca's 10% are simply a reciprocal of the NNT number. Thus, a 20% difference is the same as stating an NNT of 5 and a 10% difference is the same as stating an NNT of 10.

[2]     Although in his declaration Dr. Fennerty opined that the NNT was 25, at his deposition he stated he had erred and that the NNT was 20.

### (1)  Dr. Fennerty

Fennerty states (Exh. O, ¶ 17) that he participated in a separate study to determine the prevalence of moderate to severe esophagitis in patients suffering from acid reflux disease. He found that 1,035 out of 4,015 patients in that study, or 25.8%, had Grade C or D EE.  We accept this as Dr. Fennerty's estimate of the universe of patients who suffer from moderate or severe EE.  Turning to Fennerty's NEXIUM study, he found that 1 in 20, or 5% of all C and D patients, would benefit from NEXIUM's faster healing rate.  Accordingly, the percentage of GERD patients who, according to Fennerty's own numbers, would benefit from using NEXIUM rather than PREVACID is as follows:  25.8% (C and D patients in total reflux disease universe) x 5% (those who benefit from NEXIUM) = 1.29%.

### (2)  Dr. Castell

Castell does not opine on the percentage of overall GERD patients who have EE or a particular grade of EE.  Accordingly, we will use Dr. Robinson's estimate, which is that the percentage of GERD patients who have any grade of EE is no higher than 20% (Exh. D, ¶ 10).  In Castell's study, 25% of the patients had Grades C or D EE.  Thus the percent of the total GERD population with Grades C or D EE is 25% of 20%, or 5%. Castell found that, among this 5%, 12.7% of the NEXIUM users had higher healing rates than those who used PREVACID.  Accordingly, the percentage of acid reflux patients who, according to Castell's own numbers, would benefit from using NEXIUM is as follows:  5% (C and D patients) x 12.7% (those who benefit from NEXIUM) = .6%.

    (3)     **Dr. Johnson**

According to Johnson, 15% of all acid reflux disease patients have Grade C or D

EE (Exh. P, ¶ 20).  Inasmuch as Johnson endorses both the Castell and Fennerty studies, we will

apply each of their findings to this 15% patient group.

> Castell:  Using Castell's 12.7% finding, the percentage of
> GERD patients who would benefit from using NEXIUM
> rather than PREVACID is:  15% (C and D
> patients) x 12.7% (those who benefit from
> NEXIUM) = 1.9%.

> Fennerty:  Using Fennerty's 5% finding, the percentage of
> GERD patients who would benefit from NEXIUM rather
> than PREVACID is:  15% (C and D patients) x 5% (those
> who benefit from NEXIUM) = .75%.

    (4)     **Recapitulation**

Relying solely on data in AstraZeneca's own declarations, the percentage of

patients with acid reflux disease who would benefit from NEXIUM's allegedly "proven"

superiority is as follows:

| | |
|---|---|
| Fennerty Calculation | 1.29% |
| Castell Calculation | .6% |
| Johnson Calculation | 1.9% or .75% |

The average of these numbers is 1.12%.  This means that, among all patients with acid reflux

disease, *a physician would have to treat almost 90 patients before finding one for whom*

*NEXIUM would offer a benefit over PREVACID.*

    None of AstraZeneca's experts suggest that this is such a meaningful number that

physicians would likely switch their PREVACID users to NEXIUM.  In fact, Johnson states that

only a "needed to treat" number of "*less* than fifteen to twenty patients" would offer support for a

switch in medication (Exh. P, ¶ 41). But one patient in every 15 or 20 (Johnson's criteria) is a far

cry from one patient in every 90 (the situation here). Despite this marginal benefit for NEXIUM,

AstraZeneca spent more than $73 million to broadcast a TV commercial claiming that studies

prove that NEXIUM is a "better" acid reflux disease drug than PREVACID.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is not appropriate if there are disputed issues of material fact. Fed. R. Civ. P. 56(c); <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). It is AstraZeneca's burden to identify the basis for its motion and demonstrate that no evidence supports TAP's case. <u>See</u> <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 323 (1986).

Summary judgment is only appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law". Fed. R. Civ. P. 56(c). In evaluating AstraZeneca's motion, the Court must view the evidence and all reasonable inferences therefrom in the light most favorable to TAP. <u>Matsushita Elec. Indus. Co.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>DeMarini Sports, Inc.</u> v. <u>Worth, Inc.</u>, 239 F.3d 1314, 1322 (Fed. Cir. 2001). Moreover, the Court must resolve any doubt as to the existence of a genuine issue of material fact against AstraZeneca. <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. at 247.

Under these well-recognized standards, summary judgment is clearly inappropriate and AstraZeneca's motion must be denied.

# I

## THE NEXIUM TV COMMERCIAL CONVEYS A MESSAGE OF SUPERIOR SYMPTOM RELIEF

AstraZeneca has never contended that the Castell and Fennerty studies prove that NEXIUM provides superior relief for heartburn and other symptoms. Instead, it contends that its TV ad conveys no such message. As shown below, there is a triable issue of fact as to whether such a message is conveyed either (i) impliedly or (ii) expressly by necessary implication.

### A.    The Implied Message of Superior Symptom Relief

This Court ruled that it could not preliminarily enjoin the TV commercial without the benefit of a consumer survey. TAP now has such a survey: it was conducted by Dr. Thomas Dupont, a well-known expert in market research whose surveys have been routinely admitted in advertising and trademark cases. The survey (Exh. I) is described in detail in our brief in opposition to AstraZeneca's Daubert motion. In the survey, 204 acid reflux disease patients in ten cities were shown the NEXIUM commercial twice; they were then asked a series of questions about the commercial. The key data is as follows.

**Q 1/Q 2:** The respondents were asked two open-ended questions: "What, if anything, did the commercial communicate to you about NEXIUM?" and "What else, if anything, did the commercial communicate to you about NEXIUM?" More than twice as many respondents (69.6% vs. 31.7%) said it communicated a message about *symptoms* as opposed to *healing* (Exh. I, Table 6, p. 12).

**Q 5:** All respondents who said, in response to a "filter" question, that the commercial said that NEXIUM is "better", were asked another open-ended question: "What did

the commercial tell you NEXIUM was better at doing?" Once again, more than twice as many respondents (67.9% vs. 28.8%) stated that the commercial said that NEXIUM is better at relieving/treating *symptoms* as opposed to healing/relieving *esophageal damage* (Exh. I, Table 9, p. 19).

  **Combined Open-Ends:** Combining the responses from all three open-ended questions, the net unduplicated take-away of a message regarding symptom relief was more than twice that of a message regarding healing (70.8% vs. 32.1%) (Exh. I, Table 10, p. 21).

  Both Dr. Dupont (Exh. J, p. 5) and Dr. McDonald (Exh. L, pp. 19-22) conclude that this data demonstrates that the commercial is conveying a message of superior symptom relief, and that this message is far stronger than the secondary message of superior healing. Furthermore, Dupont (Exh. K) and McDonald (Exh. L) disagree with the criticism lodged against the survey by AstraZeneca's survey expert Michael Rappeport, including his contention that the responses to a subsequent closed-ended question undercut the responses to the open-ended questions. Dr. McDonald (Exh. L, pp. 14, 20) and Dr. Dupont (Exh. U, Dep. at 60-61) believe that the data from the closed-ended question is largely meaningless because the alternative answers posed in the question (Q 6) were, in hindsight, confusing and led to considerable guessing.

  The testimony by Dupont and McDonald that the data from the open-ended questions is of primary importance is consistent with Lanham Act case law which universally recognizes that responses to open-ended questions provide the most significant data in any advertising communication survey. E.g., Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 19 F.3d 125, 133-35 (3d Cir. 1994); Johnson & Johnson Merck Consumer Pharmaceuticals Co. v. SmithKline Beecham Corp., 960 F.2d 294,

299-300 (2d Cir. 1992); <u>Gillette Co.</u> v. <u>Norelco Consumer Products Co.</u>, 69 F. Supp.2d 246, 259

(D. Mass. 1999); <u>American Home Prods. Corp.</u> v. <u>Procter & Gamble Co.</u>, 871 F. Supp. 739, 761

(D.N.J. 1994); <u>Hertz Corp.</u> v. <u>Avis, Inc.</u>, 867 F. Supp. 208, 213 (S.D.N.Y. 1994).

Further evidence that the commercial conveys a broad message of overall

superiority comes from documents produced by AstraZeneca and its advertising agency, Saatchi

& Saatchi, during discovery.



Redacted



Redacted

In sum, there is clearly a triable issue of fact regarding the commercial's communication of an implied message of superior symptom relief.

**B.     The Express Message of
        Superior Symptom Relief**

In the context of the preliminary injunction motion, the Court rejected TAP's argument that the commercial is literally false by necessary implication (see AstraZeneca Exh. A, Tr. of 12/20/04 at pp. 37-40). While we respect the Court's refusal to apply that doctrine at the preliminary injunction stage, that should not foreclose consideration of this argument in the context of a trial on the merits.

Under this doctrine, an advertisement may be literally false as a result of the "necessary implication" of the ad as a whole. Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 290 F.3d 578, 586 (3d Cir. 2002); Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 943 (3d Cir. 1993). As the Third Circuit explained in Novartis:

> "A 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its

> entirety, the audience would recognize the claim as readily as if it
> had been explicitly stated.'"

<u>Novartis</u>, 290 F.3d at 586-87, <u>quoting</u> <u>Clorox Co.</u> v. <u>Proctor & Gamble Commercial Co.</u>, 228

F.3d 24, 35 (1st Cir. 2000).  Similarly, in <u>SmithKline Beecham Consumer Healthcare, L.P.</u> v.

<u>Johnson & Johnson-Merck Consumer Pharmaceuticals Co.</u>, 2001 U.S. Dist. LEXIS 7061, at

*24-25 (S.D.N.Y. 2001), the court pointed out that:

> "Courts may also consider any claims the advertisement conveys
> by 'necessary implication' through visual images or visual images
> combined with an audio message."

The Third Circuit's decision in <u>Novartis</u> demonstrates the applicability of this

doctrine.  That case involved a challenge to the packaging and advertising for defendant's new

MYLANTA Night Time Strength ("MNTS"), an OTC heartburn product.  The Third Circuit

rejected the District Court's finding that the packaging and advertising – which focused solely on

the product's suitability for overnight heartburn relief – necessarily conveyed a message that the

product provided relief that was *superior* to other heartburn medications.  As the Court explained

(290 F.3d at 588):

> "In this case, consumers will only receive a message of superior
> relief from the MNTS name and advertising if they assume that a
> product that provides 'Night Time' relief is more effective than a
> product that provides 'Extra Strength' or 'Maximum' relief.  The
> MNTS name and advertising alone do not require that this
> inference will be made.  The District Court therefore clearly erred
> in finding that a message of superior efficacy is necessarily implied
> from the MNTS name and advertising."

On the other hand, the court affirmed the finding that the Night Time Strength

name necessarily implied that the product was **specially formulated** for nighttime relief.  As the

Third Circuit explained (<u>id</u>. at 589):

> "Although the District Court erred in finding that a message of
> superior efficacy is necessarily implied from the MNTS name and
> advertising, it did not err when it found that the MNTS name is

literally false by necessary implication because it conveys the unambiguous message that the product is specially formulated to relieve nighttime heartburn. The Court found that 'the product name Mylanta "Night Time Strength" necessarily implies a false message . . . that it possesses a quality that is particularly efficacious for those suffering from heartburn at night.'"

\*　\*　\*

"We agree with the District Court that the term 'nighttime' conveys a different meaning than the terms 'regular,' 'extra,' and 'maximum.'. . . .

The phrase 'nighttime strength' therefore necessarily conveys a message that the MNTS product is specially made to work at night."

Here, TAP ***does not*** argue that the NEXIUM advertising conveys a message that requires consumers to "assume" a fact that does not appear in the advertising (such as the contention in <u>Novartis</u> that "Night Time Strength" means ***superior*** strength or efficacy). Rather, TAP contends that the NEXIUM advertising conveys a message that appears throughout the advertising, and is thus analogous to the <u>Novartis</u> ruling that "Night Time Strength" means that the product was **specially formulated** for nighttime use.

Other leading "necessary implication" cases confirm the applicability of the doctrine to this case:

- <u>The Clorox Co. Puerto Rico</u> v. <u>Procter & Gamble Commercial Co.</u>, 228 F.3d 24 (1st Cir. 2000): The ad depicted a housewife who traditionally did her laundry using both detergent and chlorine. It then depicted the same housewife using only ACE con BLANQUEADOR and proclaiming "whiter is not possible". Therefore the ad necessarily implied that bleach is unnecessary if clothes are washed with ACE.

- <u>Castrol, Inc.</u> v. <u>Pennzoil Co.</u>, 987 F.2d 939, 947 (3d Cir. 1993): The ad stated that Pennzoil motor oil outperformed other leading motor oils against viscosity breakdown. It also stated that viscosity breakdown causes engine failure. Therefore the ad necessarily implied that Pennzoil is superior to other motor oils in preventing engine failure.

- <u>Pharmacia Corp.</u> v. <u>Glaxosmithkline Consumer Healthcare, L.P.,</u> 292 F. Supp.2d 611, 618 (D.N.J. 2003): The ad claimed that if you are trying to quit smoking and are experiencing sleep disturbances, you are probably using NicoDerm. It then stated that Nicotrol was designed to help you sleep. Therefore the ad necessarily implied that Nicotrol helps you sleep better than NicoDerm.

The NEXIUM ads are consistent with these cases. The commercial states that "if you suffer from frequent heartburn" and "if I told you" that NEXIUM was better for acid reflux disease, you'd want proof. The ad then goes on to say that such proof exists in the form of studies showing that NEXIUM is more effective for EE than PREVACID. The necessary implication is that NEXIUM is better than PREVACID for the frequent heartburn of acid reflux disease. Because this message is false, AstraZeneca's advertising is literally false.

## II

### THE NEXIUM ADVERTISING CONVEYS A MESSAGE OF SUPERIOR HEALING AMONG ALL PATIENTS SUFFERING FROM EE

The most that the Castell and Fennerty studies show is a difference in healing rates in favor of NEXIUM among the small subset of patients suffering from moderate to severe EE. Even if a jury were to find that this difference is clinically meaningful for that subset of patients, AstraZeneca has no evidence that NEXIUM provides superior healing for the 75% of patients with lesser grades of EE. Accordingly, the issue is whether, as TAP contends, AstraZeneca's advertising conveys a message of superior healing for all EE patients. As shown below, such a message is conveyed by both the website ad and the TV ad.

### A.     The Website Ad

The ad that appeared on the NEXIUM website at the time the lawsuit was filed (Exh. T) cited the results of the Castell and Fennerty studies; like the TV commercial, it touted the results as news "for people suffering from acid reflux disease". Following the preliminary injunction hearing, AstraZeneca changed this ad by deleting the "acid reflux" disease headline and eliminating most of the references to "heartburn". The new ad (Exh. B) is obviously designed to limit the NEXIUM superiority message to EE healing.

The problem, however, is that this ad – like all of NEXIUM's advertising touting the Castell and Fennerty studies – conveys an unqualified message of across-the-board superiority for all patients suffering from EE, not just those with moderate and severe EE. This is so despite the fact that the ad discloses *several times* that the studies were among patients with moderate to severe erosions.

-26-

This is readily demonstrated by the second Dupont survey (Exh. J). The key to this survey is Dupont's use of a "control cell", *i.e.*, a separate group of respondents who were shown an "edited" version of the ad. Dupont created an edited version of the ad that is indisputably false: *he eliminated from the ad all seven references to "moderate to severe erosions"* so that the modified ad contained *no* language limiting NEXIUM's superiority to patients with moderate to severe EE. That enabled Dupont to observe whether the numerous references to "moderate to severe erosions" in the real ad changed the message conveyed by the patently false edited ad which had no such references (Exh. J, pp. 3,4; McDonald, Exh. L, p. 15). The data shows quite clearly that the insertion of the seven references to "moderate to severe damage" were insufficient to correct the false message of overall superiority for healing.

**Q 1/Q 2:** Each ad was shown to approximately 200 consumers in six cities. Both groups were asked identical questions, the first two of which were typical open-ended questions: "First, please tell me what that ad communicates to you about NEXIUM?" and "What else, if anything, did the ad communicate to you about NEXIUM?" Both groups of respondents played back a message relating to healing, with some playing back a comparative message about healing and some playing back a non-comparative message (Exh. J, p. 7). Not surprisingly, no one who viewed the edited ad mentioned the "moderate to severe" limitation (Id.). Yet among those who viewed the actual ad – *with seven explicit references to "moderate to severe damage"* – only 8.3% mentioned the limitation (Id.).[3] This shows that only a tiny portion of the audience understands that the claim is limited to this subgroup (Dupont, Exh. J at 6-10; McDonald, Exh. L at 15, 16).

---

[3]     The 8.3% consists of 2.9% who perceived a comparative message re healing plus 5.4% who perceived a non-comparative message re healing.

**Q 4:**  The respondents were then asked whether they recalled the ad saying that "NEXIUM heals acid-related damage better than the other leading medicine?" (Exh. J, p. 9). Those who answered "yes" (roughly 90% in each group) were then asked: "Specifically, what do you recall the ad saying about that?" (Id.). Once again, almost no one who viewed the edited ad (.5%, or one person) mentioned the "moderate to severe" limitation and only 4.4% who viewed the actual ad – containing seven mentions of "moderate to severe" – mentioned the limitation (Id., p. 11).[4]

**Q 5:**  This question was designed to determine whether the ad was *material* to consumers. It asked (id., p. 14): "Would the information in the ad make you more likely to try NEXIUM, less likely to try NEXIUM, or would it not affect your decision one way or the other?"  A majority of people in both groups (58.5% who saw the actual ad and 54.9% who saw the edited ad) said the ad made it "more likely" that they would try NEXIUM (Id.).

Dr. Dupont (Exh. J, p. 5 and Exh. K, p. 16) and Dr. McDonald (Exh. L, p. 22) conclude that this survey shows that consumers do not understand that NEXIUM's alleged superiority is limited to patients with moderate to severe EE.  This is not surprising in light of the ad's repeated statement that NEXIUM is "better" at healing esophageal damage and that this superiority is proven by two clinical studies.

Dr. Dupont and Dr. McDonald also disagree with the criticisms lodged by AstraZeneca's expert, Dr. Rappeport, including his argument that the responses to a closed-ended question (which demonstrates that many respondents were "guessing" at the correct multiple-choice answer) undercuts the survey (Dupont, Exh. K, p. 15; McDonald, Exh. L, p. 19).  Dupont explained in his deposition that he included a closed-ended question in both surveys because you

---

[4]    The 4.4% consists of 3.9% who perceived a comparative message re healing plus .5% who perceived a non-comparative message.

generally do not know whether the open-ended questions will yield information that is germane to the issue in the case; because it would be improper to conduct a second survey with multiple-choice questions if the first survey turned out to be inconclusive, it is generally necessary to include a closed-ended question (Exh. U, pp. 58-60). But, as demonstrated in Point I, the courts have routinely held that the most probative data in an advertising survey is data elicited in response to open-ended questions. That is precisely the data that Dupont and McDonald rely on in this case.

**B.     The TV Ad**

James Naughton, the spokesman in the NEXIUM commercial, tells viewers the following (Exh. A):

> "Let's talk about better.
>
> When someone says something's better, it's usually just their opinion. So if you suffer from acid reflux disease, frequent heartburn and I told you prescription Nexium heals acid related damage in the esophagus better, you'd want proof.
>
> And now your doctor has that proof.
>
> Recent medical studies prove Nexium heals that damage better than the other leading prescription medicine."

This is an explicit, unambiguous claim that NEXIUM is superior to PREVACID for the healing of damage to the esophagus caused by acid reflux disease. The claim is in no way limited to the subset of EE patients – 25% according to Castell – who have the two highest grades of erosion.

It is only in a "super" – a disclaimer statement that appears briefly and in small type at the bottom of the TV screen – that any mention is made of patients with moderate to severe EE. That information appears as part of a series of small-type supers that read as follows (Id.):

> "Persistent Heartburn, 2 Or More Days A Week, Despite
> Treatment And Diet Change May Be Acid Reflux Disease.
>
> Over Time Acid Can Cause Damage Your Doctor Would
> Diagnose As Erosive Esophagitis.
>
> Studies Vs. Prevacid (lansoprazole) In Patients With Moderate To
> Severe Damage."

It is common knowledge within the advertising industry, and common experience

among consumers, that information contained in supers is scarcely seen by consumers, much less

understood. That is precisely why the courts do not allow advertisers to "cure" a false claim by

hiding behind lawyer-driven footnotes, supers and disclaimers. As the Third Circuit said about

supers:

> "[W]e are skeptical whether disclaimers can cure false advertising
> claims (made literally or by necessary implication)."

Novartis, 290 F.3d at 599, citing Charles of the Ritz Group Ltd. v. Quality King Distrib., Inc.,

832 F.2d 1317, 1324 (2d Cir. 1987) and Home Box Office, Inc. v. Showtime/The Movie Channel

Inc., 832 F.2d 1311, 1316 (2d Cir. 1987). In Novartis, the Third Circuit affirmed an injunction

where the disclaimer would not adequately protect consumers, holding that the burden is on the

proponent of the advertising to prove that a disclaimer is sufficient to correct an otherwise false

message.

The adequacy of a super or disclaimer must be viewed in the context of the

overall message of the ad, rather than as an isolated element. For example, in SmithKline

Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co., Inc.,

906 F. Supp. 178, 185-86 (S.D.N.Y. 1995), the ad suggested that doctors endorsed TAGAMET

by prescribing it more often; the ad featured a chart showing that physicians had written

237 million prescriptions for TAGAMET compared to only 36 million for PEPCID. A footnote

at the bottom of the ad disclosed the reason for this difference:  the TAGAMET prescriptions had

been written over a much longer period of time than the PEPCID prescriptions, because PEPCID was a newer drug. Notwithstanding the footnote, the Court concluded that the ad conveyed the false message that doctors prescribed TAGAMET more than they prescribed PEPCID *over an equal period of time*; it enjoined the ad because the footnote was "inconspicuously located or in such fine print that readers tend to overlook it." Id. at 185-86, quoting American Home Prods., 654 F. Supp. at 590.

Finally, AstraZeneca's super regarding the EE studies is itself misleading. It states:

"Studies versus PREVACID (lansoprazole) in patients with moderate to severe damage."

This is not true. The Castell study was not simply a study "in patients with moderate to severe damage". In fact, only about 25% of Castell's patients had moderate to severe damage; the other 75% had only Grade A or Grade B damage – *and among that group the study showed no difference in healing*. Thus, not only does the super not correct the false message communicated by the overall ad, it exacerbates it.

This is confirmed by Dupont's survey of the website ad. Whereas the TV commercial has only a single mention in small type of "moderate to severe" damage, the website ad mentions moderate to severe *seven times* in the *text* of the ad. Yet, even there, only a handful of people who viewed the ad understood that the studies pertained to only those patients with moderate to severe damage. It is inconceivable that consumers viewing the commercial would be any more likely to observe and understand the disclaimer provided in the super. As the Third Circuit pointed out in Novartis, the burden is on AstraZeneca to prove that the super is sufficient to correct the false message contained in the body of the commercial.

III

**BECAUSE THE DIFFERENCE IN HEALING RATES
SHOWN BY THE CASTELL AND FENNERTY STUDIES
IS NOT CLINICALLY SIGNIFICANT, THE NEXIUM
ADS ARE LITERALLY FALSE**

AstraZeneca contends (Br. 18) that since TAP concedes that Castell and Fennerty found a *statistically* significant difference in healing rates in favor of NEXIUM, it cannot establish literal falsity under the Lanham Act. AstraZeneca is mistaken. The courts have frequently enjoined ads that make superiority claims based on differences that have no therapeutic relevance. Moreover, FDA's advertising regulations (which are relevant, although not controlling, in a Lanham Act case) prohibit claims based on statistical significance when no clinical relevance has been established. Finally, the cases cited by AstraZeneca are inapposite to the matter at issue here.

A.     **Superiority Claims Based on Statistical
       But Not Clinical Significance Are False**

In false advertising cases involving establishment claims, a plaintiff may prevail by demonstrating that, although the test in question may be technically reliable, its results have no relevance in practical application. For example, in Novartis Consumer Health, Inc. v. Johnson Johnson-Merck Consumer Pharms. Co., 129 F. Supp. 2d 351 (D.N.J. 2000), aff'd, 290 F.3d 578 (3d Cir. 2002), the court evaluated advertising for MYLANTA NIGHT TIME STRENGTH. The advertising claimed that the product offered superior relief in treating the moderate to severe symptoms of night time heartburn, based on its greater acid neutralization capacity ("ANC"); ANC is measured by a product's ability to neutralize acid in a beaker over a 15-minute period. The court concluded that, while defendant's product did have a higher ANC

-32-

rating, the claim that this provided greater relief was false because a product's ANC rating does not measure its ability to neutralize acid in the stomach; the court pointed out that defendant's own expert conceded that "slight differences in ANC do not have clinical significance" (129 F. Supp.2d at 360-61).

The concept of clinical significance is also applicable to non-medical products where the product's performance is at issue. For example, in Castrol, Inc. v. Quaker State Corp., 1992 WL 47981 (S.D.N.Y.), aff'd, 977 F.2d 57 (2d Cir. 1992), a commercial claimed that tests prove that Quaker State oil flows faster to engine parts and therefore is superior in protecting against engine start-up wear. Even though the tests in question demonstrated a "statistically significant difference in oiling time" (1992 WL 47981 at *4), the Second Circuit held that the speedier flow of Quaker State oil was irrelevant to start-up wear because residual oil protects against such wear until the new oil begins to flow (977 F.2d at 61-64). Because the alleged benefit was negligible, the court concluded that the claim of superior protection was literally false (Id. at 63-64).

AstraZeneca's contention (Br. 18) that TAP has "invented" an advertising standard regarding clinical significance is erroneous. Clinical or therapeutic relevance has long been central to a court's assessment of superiority claims involving product performance. In Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6 (7th Cir. 1992), the Seventh Circuit reversed the district court's denial of a preliminary injunction on claims involving the efficacy of oral electrolyte maintenance solutions used to treat infant dehydration. One of the claims that was found to be false was Mead Johnson's claim that its product RICELYTE had a "lower osmolality" than Abbott's PEDIALYTE. The Seventh Circuit pointed out that (971 F.2d at 15):

> "Mead's statement that Ricelyte has a lower osmolality than
> Pedialyte, while literally true, is misleading because the difference
> in osmolality has no therapeutic significance."

In other words, even though RICELYTE did have lower osmolality, it was misleading to tout the

osmolality when that quality had no therapeutic significance.

Although it denied the injunction on other grounds, the district court had

specifically required that the lower osmolality claim have clinical significance:

> "It is true that RICELYTE has a lower osmolality than either
> PEDIALYTE or REHYDRALYTE.  However, this slightly lower
> osmolality is clinically insignificant, and results in no therapeutic
> advantage to the user.  It is misleading for an advertiser to tout an
> 'advantage' for a product if that advantage is not significant to the
> product's performance...."

Abbott v. Mead Johnson, 1991 U.S. Dist. LEXIS 21010, at *104 (S.D. Ind. 1991).  The district

court imposed a similar requirement with respect to RICELYTE's claim of superior fluid

absorption (Id. at *105):

> "Defendant's fluid absorption claim is deceptive because
> clinically, the percent weight gain by the infant studies by
> Dr. Pizarro – a far more clinically meaningful measurement that
> fluid absorption – was the same for RICELYTE and
> REHYDRALYTE."

Similarly, in American Home Products v. Johnson & Johnson, 436 F.Supp. 785

(S.D.N.Y. 1978), the court examined the clinical significance of a claim touting ANACIN's

superiority to TYLENOL in reducing inflammation that accompanies pain.  The court

emphasized the importance of clinical significance in comparing the products (id. at 799, n.9):

> "A claim concerning a drug's effect made in lay advertising to
> consumers must be understood as representing that the effect will
> be experienced in humans and thus that it has some significance in
> a clinical context."

The court concluded that "there is no reliable evidence showing that ASA reduces inflammation

to a clinically significant extent in the conditions listed in the advertisements at OTC dosages",

and granted a permanent injunction prohibiting the touting of ANACIN's alleged analgesic superiority for conditions associated with inflammation (Id. at 801-804).  Accord:  Ciba-Geigy Corp. v. Thompson Medical Co., Inc., 672 F. Supp. 679, 690-91 (S.D.N.Y. 1985) (enjoining a claim regarding superior blood level duration for an OTC appetite suppressant where there was no proof that longer duration provided any therapeutic advantage and consumers perceived the advertisement as setting forth therapeutic superiority).

**B.     FDA Regulations Prohibit the Exploitation of
Statistical Significance in the Absence of Clinical Relevance**

While a private litigant does not have standing to sue for a competitor's violation of the Food, Drug & Cosmetic Act, FDA regulations are nevertheless relevant to a Lanham Act case.  These regulations frequently show the "standard" or "duty" that the defendant has failed to meet in its advertising.  Genderm Corp. v. Biozone Laboratories, 1992 WL 220638 (N.D. Ill. 1992); Grove Fresh, Inc. v. Flavor Fresh Foods, Inc., 720 F. Supp. 714, 716 (N.D. Ill. 1989).  As stated in Genderm (1992 WL at 10-11):

> "A private litigant does, however, have a private right of action under the Lanham Act for misrepresentation and false description of any goods, including goods which are governed by the FDCA such as pharmaceuticals and foods.
>
> \*   \*   \*
>
> The FDCA or FDA regulations may be utilized in a Lanham Act action to 'establish the standard or duty which defendants allegedly failed to meet.'"

In this case, FDA's regulations governing prescription drug advertising explicitly prohibit ads that exploit statistical significance in the absence of clinical relevance.  The regulation in question, 21 C.F.R. § 202.1(e)(7)(ii), states that an advertisement may violate Section 502(n) of the Federal Food, Drug, and Cosmetic Act if it:

"Uses the concept of 'statistical significance' to support a claim that
has not been demonstrated to have clinical significance or
validity."

AstraZeneca's advertising, which touts NEXIUM's superiority over PREVACID
based on statistical differences found in the Castell and Fennerty studies, falls squarely within
this regulation. While not binding on a Lanham Act court, this regulation is evidence of "the
standard or duty which defendant allegedly failed to meet." Genderm, 1992 WL at 11.

AstraZeneca was well aware that FDA did not consider statistically significant
differences, such as those found in the Castell (3.8%) and Fennerty (4.9%) studies, to form the
basis of a superiority claim. In his review of the NEXIUM NDA, wherein AstraZeneca sought a
superiority claim over another PPI (omeprazole), the FDA Medical Officer found that "a
superiority claim of NEXIUM over omeprazole is NOT SUPPORTED by either the comparison
of [Nexium]20 vs [omeprazole]20 or the comparison of [Nexium]40 vs [omeprazole]20"
(Exh. CC at 5). The statistical differences found in the studies submitted to FDA were 6.2%,
9%, 9.7% and 12%, all of which are *higher* than the differences in the Castell and Fennerty
studies (id.). Thus, as a result of its own dealings with the FDA, AstraZeneca is well aware that
the Agency would not view the differences cited in the Castell and Fennerty studies as clinically
meaningful.

C.     **The Cases Cited By AstraZeneca Are Inapposite**

The cases cited by AstraZeneca in support of its argument that only statistical
significance is required do not support its contention. For example, Mead Johnson & Co. v.
Abbott Laboratories, 201 F.3d 883 (7th Cir. 2000), did not involve a claim of comparative
product performance; rather, it involved a claim of *doctor preference based on surveys of
doctors*. The Seventh Circuit reversed the District Court's issuance of a preliminary injunction

-36-

enjoining defendant's claim that its product was the "1ˢᵗ Choice of Doctors." The Court based its decision on the fact that the lower court erroneously assumed that the term "first" was a cardinal, rather than ordinal, number (id. at 884). Holding that the designation "first" simply denotes rank in a series, and that absolute and relative preferences for defendant's formula were substantial, the court held that the claim "1ˢᵗ Choice" was literally true. This decision is irrelevant because the claim "1ˢᵗ Choice of Doctors" had nothing to do with whether defendant's product was superior to plaintiff's *in terms of product benefits*; the only issue was whether the product was *preferred* by more doctors than plaintiff's.

AstraZeneca also mischaracterizes the court's decision in Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 2001 WL 588846 (S.D.N.Y.), aff'd, 2001 WL 1168026 (2d Cir. 2001). AstraZeneca suggests (Br. 19) that the Court refused to enjoin comparative advertising for defendant's PEPCID COMPLETE because the claim was supported by studies showing statistical but not clinical significance. AstraZeneca fails to point out that several other factors led to the Court's conclusion, such as the fact that both parties' experts agreed that studies showed that PEPCID COMPLETE is *"clinically significantly better"* than other antacids in providing long-lasting relief (2001 WL 588846 at *3) (emphasis added).

The other two cases cited by AstraZeneca are equally inapposite. Nikkal Industries Ltd. v. Salton, Inc., 735 F. Supp. 1227 (S.D.N.Y. 1990), did not involve an establishment claim and did not involve studies or tests demonstrating statistical significance. Likewise, in Procter & Gamble Co. v. Chesebrough-Pond's Inc., 588 F. Supp. 1082 (S.D.N.Y. 1984), the court denied both parties' requests for injunctions since consumer preference tests upon which each party's advertising was based had no certifiable standards and rested on

subjective evaluations of skin conditions, thus making any resulting statistical or clinical analysis unreliable.

In sum, the fact that Castell and Fennerty found statistically significant differences in EE healing rates does not mean that AstraZeneca's superiority claims are truthful. Unless the differences in question are clinically meaningful, AstraZeneca may not tout those differences in advertising claiming that NEXIUM has been proven superior to PREVACID. There is plainly a triable issue as to whether NEXIUM's statistical superiority is clinically meaningful with respect to (i) all acid reflux disease patients, (ii) all acid reflux patients with EE, or (iii) only those EE patients with moderate to severe damage.

## CONCLUSION

AstraZeneca's motion for summary judgment is without merit and should be denied.

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant-Counterclaimant*
*TAP Pharmaceutical Products Inc.*

*Of Counsel:*

Thomas C. Morrison
Karla G. Sanchez
Deborah Steinberger
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710

George C. Kokkines
TAP Pharmaceutical Products Inc.

Dated: December 14, 2005
164636.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December, 2005, the attached **TAP**

**PHARMACEUTICAL PRODUCTS INC.'S BRIEF IN OPPOSITION TO PLAINTIFF'S**

**MOTION FOR SUMMARY JUDGMENT** was served upon the below-named counsel of

record at the address and in the manner indicated:

Josy W. Ingersoll, Esquire                          <u>HAND DELIVERY</u>
Young Conaway Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE  19801

Harold P. Weinberger, Esquire                       <u>VIA FEDERAL EXPRESS</u>
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY  10036


                                        */s/ Lauren E. Maguire*
                                        _____
                                        Lauren E. Maguire

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2005, the attached **PUBLIC**

**VERSION OF TAP PHARMACEUTICAL PRODUCTS INC.'S BRIEF IN OPPOSITION**

**TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** was served upon the below-

named counsel of record at the address and in the manner indicated:


Josy W. Ingersoll, Esquire                          HAND DELIVERY
Young Conaway Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE  19801

Harold P. Weinberger, Esquire                       VIA FEDERAL EXPRESS
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY  10036



                              */s/ Lauren E. Maguire*
                              _____
                              Lauren E. Maguire