Exhibit E

RECYCLED

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE.

2004 DEC 15 PM 4: 22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ASTRAZENECA LP,                          )
                                         )
            Plaintiff,                   )       **CONFIDENTIAL:**
                                         )       **FILED UNDER SEAL**
        v.                               )
                                         )       C.A. No. 04-1332-KAJ
TAP PHARMACEUTICAL PRODUCTS INC.,        )
                                         )
            Defendant.                   )

A0407-1590

| SERIAL NO. | 30 | |
| SERVED | | |
| RECEIVED | | |
| FILED | | |

## DECLARATION OF MALCOLM ROBINSON, M.D., FACP, FACG

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899

*Attorneys for Defendant Tap
Pharmaceutical Products Inc.*

*Of Counsel:*

Thomas C. Morrison
Karla G. Sanchez
Blair Axel
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Kenneth D. Greisman
Vice President and Chief Legal Counsel
TAP Pharmaceutical Products Inc.

Karen L. Hale
Senior Counsel
Abbott Laboratories

Dated: December 15, 2004

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

———————————————— x

ASTRAZENECA LP,                                   :

                          Plaintiff,             :

                                                 :    Civil Action No. 04-1332 - KAJ
          - against -                            :

                                                 :
TAP PHARMACEUTICAL PRODUCTS INC.                 :

                          Defendant.             :

                                                 :
———————————————— x

## DECLARATION OF MALCOLM ROBINSON, M.D., FACP, FACG

Malcolm Robinson, under penalty of perjury, declares as follows:

1.     I have reviewed the declarations of Drs. Castell, Fennerty, Levine and

Johnson (the "plaintiff's experts") and submit this declaration in response to those declarations

and in further support of TAP's motion for preliminary injunction.

### Nexium is Not Superior to Prevacid Across All Grades of EE

2.     The plaintiff's experts argue that the Castell study demonstrated that

Nexium is superior to Prevacid across all Grades of EE. Although in the Castell study the

combined healing rate for patients with all four grades of EE was statistically significant, that

significance is attributable to the results for the patients with Grades C and D. Patients with

Grades A and B had virtually identical rates of healing with no clinical or statistical difference between recipients of the respective drugs:

*Grade A Healing Rates:*
NEXIUM
PREVACID

Redacted

A difference of Redacted

*Grade B Healing Rates:*
NEXIUM
PREVACID

Redacted

A difference of Redacted

3.    Under the circumstances here, differences as small as Redacted are no differences at all.  Given that patients with Grades A and B made up more than 75% of the patients enrolled in the study, the overall differences demonstrable for Nexium vs. Prevacid in the great majority of their patients are clinically irrelevant.

4.    Even when the results from Grades A and B are combined, there is still no significant difference in the results for Nexium versus Prevacid:

*Grade A and B Healing Rates Combined:*
NEXIUM
PREVACID

Redacted

A difference of Redacted

**The Castell and Fennerty Studies Do Not Show Superior Symptom Relief**

2

5.    The plaintiff's experts, in a number of different iterations, claim that Nexium is faster or better at making people feel better.  Yet, none of the doctors address the lack of statistical and clinical significance in most of the patient-recorded symptom relief measures from the Castell and Fennerty studies.[1]  In the Fennerty study, none of the patient-recorded measures were ANY different:

| Measure | Nexium (days) | Prevacid (days) |
|---------|---------------|-----------------|
| Diary-recorded, median days to first resolution (of heartburn) | 2 | 2 |
| Diary-recorded, median days to sustained resolution (of heartburn) | 6 | 6 |

And in the Castell, only three of the sixteen patient-recorded measures were statistically significant, and of those, the differences were not clinically significant:



Redacted

---

[1]    I consider patient-recorded results far more significant than the investigator's opinion of the relief the patient is feeling.

3

1129487v1



Redacted

6.      Moreover, none of the Plaintiff's experts addressed the equal use of "rescue medication" (up to six antacid tablets per day), which is one of the surrogates used to analyze the efficacy of symptom relief.  In the Castell study, both the Nexium and Prevacid patients used an average of Redacted at weeks 4 and 8.  In Fennerty, the Nexium patients used Redacted and the Prevacid patients used Redacted  If patients felt so much better with Nexium, the Nexium patients would need no rescue medication as opposed to a lot of antacids for the Prevacid patients.

7.      Finally, Dr. Johnson relies on the AGA manual, Improving the Management of GERD:  Evidence-based Therapeutic strategies to make the point that "[f]or time-to-healing, esomeprazole (40 mg/day) was found to be superior to omeprazole (20 mg/day) or lansoprazole (30 mg/day) for healing erosive esophagitis with 8 weeks."  Yet, he leaves out the next clause – "*but only in some of the comparative trials; these results were not consistently*

4

*found.*" The bottom line of the guidelines is that they do not recommend one drug over another for making patients feel better.

8.      Similarly, in the review article co-authored by Dr. Fennerty and relied on by both Drs. Fennerty and Johnson, Dr. Fennerty concluded that "no agent or dose can be recommended as being superior for all indications for which proton pump inhibitors are used based on the currently available data." In fact, the article found that:

> "For GERD symptom relief, all five proton pump inhibitors demonstrate similar efficacy after 1-2 weeks, but lansoprazole and esomeprazole are the only agents to demonstrate a hastening of the speed of symptom relief in head-to-head studies with other proton pump inhibitors."

## The Castell and Fennerty Study Results Are Not Clinically Significant

9.      The plaintiff's experts state, without any support or citations, that the results of Castell and Fennerty are clinically significant. In an attempt to demonstrate clinical significance of healing rates, the plaintiff's experts focus on many of the more distressing conditions suffered by those with GERD. However, this focus fails to acknowledge some basic facts about the existence of EE and its treatment and thus do not support a conclusion that the healing rates are clinically significant.

10.     First, as I pointed out in my initial declaration with substantial citation of other papers, the number of people who suffer the demonstrable effects of severe EE is quite small compared to the overall population that suffers from GERD. Moreover, most of the data gathered for papers that describe GERD are from trials conducted at secondary or tertiary centers, or from a subset of patients who were referred for endoscopies. Thus, the data represents those patients who are most likely to have severe symptoms and GERD complications and are not representative of the larger GERD population. In my opinion, the number of people

5

who have EE is even more limited than the cited numbers of 20%, and among that group an even tinier number would be found to have severe EE.

11.    Second, esophageal erosions almost always heal naturally once the production of stomach acid has been controlled.  Because both Nexium and Prevacid are quite effective at inhibiting the production of stomach acid and limiting the exposure of the esophagus to acid, patients on both drugs will experience esophageal healing.  Any marginal differences in the degree of healing or the time to healing are clinically meaningless.  In fact, no scientific proof exists that *completely* healing the esophagus provides any definite benefit to the patient. And despite allusions by the plaintiff's experts to the grave risks associated with nonhealing, there is no data to suggest that any patients continuing to receive <u>any</u> PPI therapy who are not *completely* healed ever progress to Barrett's esophagus, cancer, or stricture.

12.    In fact, the plaintiff's experts repeated reference to patients on Prevacid who were not healed as "treatment failures" is a misnomer (and, under this logic, patients taking Nexium who were not healed were also treatment failures).  There is absolutely no evidence that the small percentage of patients taking Prevacid who were not completely healed were "treatment failures."  In fact, based on my extensive experience with the treatment of EE patients and their use of Prevacid, the patients who were "not healed" are simply not *completely* healed. In fact, they are likely to have a very few small erosions remaining, would be "upgraded" to Grades A or B, which in my opinion is a treatment success, and would continue to heal with Prevacid treatment.  The AstraZeneca studies artificially truncate what would have been continued therapy in any normal clinical milieu.  Indeed, the majority of the patients not healed in the Howden study, at a minimum, improved one grade from baseline.  Only one patient taking

6

Prevacid remained in Grade 3, and one patient each for Prevacid and Nexium remained in Grade 4 at study conclusion.

13.     Moreover, there is affirmative support that the results of the Castell and Fennerty studies are not clinically significant. The Plaintiff's experts address the "number needed to treat" or NNT. This measure indicates to a doctor how many patients he or she would need to treat before any of his or her patients received a benefit. Although I disagree, Dr. Johnson opines that an NNT of anywhere from 15 to 20 would be sufficient for a doctor to change his or her prescribing practice. Applying that opinion, the overall results of both the Castell and Fennerty studies would not cause doctors to change their practice. Thus, this further demonstrates the clinical insignificance of the findings.

14.     As Dr. Fennerty points out, his study had an NNT of 25; and Dr. Castell's study, over all four grades of EE, had an NNT of 26, both numbers exceed Dr. Johnson's selection of 15-20 as the cutoff for clinical relevance. [Redacted] [Redacted] this was a post hoc conclusion, and as I set out in my initial report, it is highly unusual for most physicians prescribing PPIs, which includes primary care physicians as well as gastroenterologists, to ever see a [Redacted] patients with Grades C or D in their entire career. Thus, under the circumstances, even Dr. Johnson's NNT figure is irrelevant. Even so, based on the NNT figures in the Castell and Fennerty studies, as viewed through with Dr. Johnson's guidelines, most physicians would not change their practice, which provides further evidence of the clinical irrelevance of the results.

## All Patients Should Not Receive Nexium

15.     One of the plaintiff's experts' other arguments is that because Nexium was proven superior for an extreme minority of patients and that that minority cannot be easily

7

identified, physicians should prescribe Nexium for all GERD patients. Dr. Johnson makes this conclusory statement even though he also recognizes that the "consensus of both gastroenterology and primary care experts" is that the treatment of patients with Grades C and D of EE warrant a "different management strategy" than those with mild EE.

16.    In reality, the view that all patients should be treated with what is arguably the most potent drug is a shortsighted and narrow view that is not held by most physicians. This method of treatment is akin to using the most powerful available broad-spectrum antibiotic against streptococcal pharyngitis ("strep throat") instead of plain old penicillin (a practice widely condemned by experts). Moreover, as Dr. Fennerty agreed in his declaration, other issues such as side effects, potency and cost must be considered.

17.    In real clinical practice, physicians treat patients with a wide variety of therapeutic interventions (H2RAs, antacids, lifestyle modifications, and all of the available prescription and OTC PPIs). Many physicians start with a less powerful drug and only if that drug is not successful do they try another drug or increase the dose. If patients have resolution of their complaints/symptoms, and in the absence of alarm symptoms, physicians exercise due clinical diligence and follow these patients. Very occasionally, there is a need to modify or upgrade such therapy. This continues to be the expressed position of all major gastroenterology-related organizations.

Executed in Sarasota, Florida, on December 14, 2004.

_Malcolm Robinson MD_

Malcolm Robinson MD, FACP, FACG

1129487v1

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2004, the attached DECLARATION

OF MALCOLM ROBINSON, M.D., FACP, FACG was served upon the below-named

counsel of record at the address and in the manner indicated:

Josy W. Ingersoll, Esquire                        **HAND DELIVERY**
Young Conaway Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE  19801

Harold P. Weinberger, Esquire                  **VIA FEDERAL EXPRESS**
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY  10022

John G. Day

149881.1

Exhibit F



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

———————————————————— x

ASTRAZENECA LP,

                Plaintiff,

       - against -               Civil Action No. 04-1332 - KAJ

TAP PHARMACEUTICAL PRODUCTS INC.

                Defendant.

———————————————————— x

## REBUTTAL EXPERT REPORT OF MALCOLM ROBINSON, M.D., FACP, FACG

Malcolm Robinson, under penalty of perjury, declares as follows:

I have reviewed the supplemental report of Dr. David Johnson and have formulated the following responses regarding his statements.

### Intragastric Acid Suppression Studies

Dr. Johnson asserts a number of opinions regarding the significances and findings of intragastric acid suppression studies. However, his opinions on the importance of gastric acid inhibition miss the point. AstraZeneca was not relying on intragastric acid studies to support its "Better" advertising, and such gastric acid inhibition studies are not designed to prove that Nexium is clinically superior to Prevacid. Furthermore, the gastric acid suppression studies cited by Dr. Johnson measure acid in the stomach, not in the esophagus. Even if one were to postulate a potential correlation between acid and heartburn relief and healing, it would be the acid in the esophagus that would best correlate with healing or with GERD symptom relief. On the other hand, acid suppression in the stomach may or may not correlate with GERD symptom relief

and/or erosive esophagitis healing. If desired, AstraZeneca could easily and inexpensively have undertaken concomitant evaluation of esophageal acid exposure in all of their acid-related investigations to determine that point. They chose not to do so.

Moreover, studies of acid suppression alone miss a very critical aspect of the underlying principles of GERD as an illness. People who suffer from erosive GERD in particular seldom, if ever, have this disorder because they make too much acid, but because the protective mechanisms of the esophagus are not equipped to properly deal with the amount of acid they do make that happens to reach the esophagus. A patient might produce very little acid but because of issues related to the length and weakness and/or inappropriate relaxations of the lower esophageal sphincter, and/or the ineffectiveness of esophageal contractions, whatever gastric acid is present could reach the esophagus, remain there for prolonged periods, and lead to damage and symptoms. Studies designed only to test the level of acid suppression in the stomach cannot account for most of the critical variability of GERD-related pathophysiology. In sum, gastric acid suppression study results do not and cannot substantiate Dr. Johnson's claim that Nexium is better than Prevacid.



Redacted

As I stated in my expert report, a key question in determining the clinical significance of these studies is whether the majority of "unhealed" patients were upgraded to Grades 1 or 2 or A and B (i.e., substantially healed to minimal erosions of no further clinical importance).



2.





Grade 2 esophagitis is quite mild, and patients with this degree of mucosal damage are not thought to be at risk for complications of GERD or for any other long term clinical problems. There is a very little difference across all of the available studies in the proportion of patients that fail to improve their esophagitis when on PPI therapy. Moreover, as has also been presented in my expert report, the natural course of events for virtually all such patients would be continued PPI treatment. With such treatment, complete or nearly complete healing is virtually certain to occur in essentially all patients, regardless of the PPI utilized. Overall, the proportion of patients not healed with either drug is not clinical significant; neither is the difference between the patients not healed on Prevacid and those not healed on Nexium.



4



Redacted

Taken together, this information shows how Nexium's consumer advertising is doing a disservice to the public. The subtle differences in the pharmacology of Nexium and Prevacid may be of interest to clinical researchers or to specialists who treat only patients with extremely severe HH, but they should be of no concern to the typical practitioner who treats patients with acid reflux disease and they are entirely misleading to consumers. By taking a minuscule difference that is not even clinically meaningful and touting it to consumers as proof that Nexium is better than Prevacid, AstraZeneca is doing a disservice to the public and abusing its privilege to engage in DTC advertising.

Executed in Sarasota, Florida, on October 21, 2005.

Malcolm Robinson, M.D., FACP, FACG

1219333v1

Exhibit G



A0407-1590
10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

———————————————— x
:
ASTRAZENECA LP,                          :
:
Plaintiff,              :
:
- against -               :      Civil Action No. 04-1332
:
TAP PHARMACEUTICAL PRODUCTS INC.          :
:
Defendant.              :
:
———————————————— x

## DECLARATION OF BERT SPILKER, PH.D., M.D.

Bert Spilker, under penalty of perjury, declares as follows:

### THE CHARGE

1.      I was contacted by Ms. Karla Sanchez of Patterson, Belknap, Webb &
Tyler LLP on October 28, 2004 to evaluate a number of scientific papers and abstracts to
determine if they supported statements about clinical symptoms and healing rates made in
television and in print advertisements for Nexium.  The list of materials that I used in my
evaluation is provided at the end of this declaration.

### MY QUALIFICATIONS

2.      I am currently an independent consultant and was most recently the Senior
Vice President for Scientific and Regulatory Affairs for PhRMA (Pharmaceutical Research and
Manufacturers of America), the research industry's trade association.  Prior to that, for over 20
years, I worked at four large pharmaceutical companies – Pfizer, Philips-Duphar, Sterling-

Winthrop Research Institute, and Burroughs Wellcome. I also co-founded a pharmaceutical company, Orphan Medical, where I served as president for five years. I have lectured widely at both academic and industry-oriented conferences on the relationship between statistical significance, clinical significance and relevance of clinical trial data for medical practice. One of the 15 textbooks on clinical trial methods and drug development that I have authored – "Guide to Clinical Trials" – deals with these issues extensively. I currently hold several faculty positions as an adjunct professor of medicine, pharmacy and pharmacology. My curriculum vitae provides details on these and other activities, including numerous honors that I have received, and is attached hereto as Exhibit A.

## THE QUESTION ADDRESSED

3.    The pertinent question I will address in this declaration is: What is the most scientifically and medically correct interpretation of the clinical data on heartburn, other clinical symptoms of GERD (gastroesophageal reflux disease) and healing rates of erosive esophagitis ("EE") that are presented in the various clinical papers and abstracts I reviewed? Specifically, I will look at two studies cited by AstraZeneca as supporting its recent advertising campaign and other available data that directly compares Lansoprazole (Prevacid) and Esomeprazole (Nexium) in treating subjects with either EE, a subset of GERD, or GERD itself. Both of these indications will be discussed separately for the two products being compared -- Lansoprazole and Esomeprazole.

### A.  Statistical Significance, Clinical Significance and Relevance for Medical Practice

4.    To evaluate the studies, one must grasp the differences between statistical significance and clinical significance and understand the importance of both to relevance for medical practice. The term statistical significance is widely used in the medical and other scientific fields, and is defined in the dictionary as denoting a finding that is probably not the

2

result of chance: the probability that the finding may be due to chance is generally less than 5 percent (Stedman's Medical Dictionary, 22nd Edition, 1972). However, an effect that is statistically significant does not necessarily suggest that the effect is also clinically significant. Clinical significance of a new product is the minimal amount of change in an important parameter that will encourage a physician to alter his or her practice of medicine and to use a drug or medical product in his or her patients. Thus, it is important to determine the magnitude and overall quality of the data or effect, or in this particular situation, the magnitude of the difference in the effect of the two drugs that would be substantial enough to lead a large number of physicians to use the drug.

     5.     In many situations, an effect will be both statistically and clinically significant. However, it is possible to have one without the other. If only one measure is present (i.e. positive), it is usually statistical significance without clinical significance. "This is an extremely common occurrence in clinical trials that happens, for example, when (1) a vital sign changes by a small amount that is statistically significant because of the large number of measurements made, (2) the change in an efficacy parameter's amplitude is small, but statistically significant, often because of minimal variability, (3) the efficacy parameter changes at one or a few of many time points, but results are not consistent." See Guide to Clinical Trials at 511. Indeed, the larger the sample size that is being compared, the smaller the difference in a measured parameter that can be found statistically significant. Thus, when evaluating clinical and statistical significance one should consider the number of patients in the study to determine whether a small difference in a parameter is likely to be statistically significant. This in turn influences the determination of clinical significance.

1118346v6

6.    The concept of data being relevant for medical practice addresses the implications of the data for treating other patients. This concept allows the extrapolation of data from a clinical trial of one group of patients to a new group of patients or set of conditions. The relevance of data from one clinical situation to another clinical situation is based on how narrow or broad the specific group of patients was who were treated in the initial clinical situation. Extrapolation of data involves the determination of what the data means in terms of treatment (or prevention) of disease for different: (1) patients in terms of concurrent diseases or other therapies etc., (2) physicians, (3) settings, (4) times, or (5) levels of interpretation (see comments later in this section).

7.    Some of the factors that affect the relevance of clinical trial data for medical practice are: (a) the availability of alternative therapy; (b) the suitability of alternative therapy; (c) the capability of data to be extrapolated to a new situation; and (d) various other factors such as price, convenience, or adverse reactions of the medicine.

8.    In the case of two similar drugs, for the difference between them on an important parameter to be medically relevant, the difference must be of such magnitude that it is obvious to the physician that it should influence his or her prescribing behavior. Given that the magnitude of normal biological and clinical variability is considered to be about 20%, physicians should seek a difference between drugs of approximately that magnitude for most clinical endpoints. For an endpoint that is extremely significant such as death, then a smaller difference between drugs would be clinically significant. However, for an endpoint such as heartburn, the variability in severity from time to time within a single patient is large and the severity between patients varies from a minor annoyance to a major influence on quality of life. Therefore, it is

difficult to imagine that a difference much less than 20% is enough for the two drugs to be clinically significant.

9.    Statistical and clinical significance as well as the concept of medical relevance are interrelated. In other words, unless an effect is statistically significant it will almost never be clinically significant. Similarly, if an effect is not clinically significant the data will not be relevant for influencing medical practice. Because biological variability between patients is often described as accounting for a 20% difference around the mean values in biological and clinical sciences, differences below that number should not be considered clinically significant.

**B.  The Studies Cited by AstraZeneca**

10.    Studies conducted in this area primarily analyze either the healing rates for those who suffer from erosive esophagitis (EE) or the symptoms of those who suffer from GERD, which includes EE. Most of the studies that look at healing rates as a primary endpoint also analyze symptoms of EE. AstraZeneca indicated in its legal complaint that it relies on two studies to support the scientific and medical basis in its advertisements -- Castell et al. and Fennerty et al., attached hereto as Exhibits B-C respectively.

1.    The Castell Study

11.    Castell's study enrolled 5241 adult patients with erosive esophagitis of Los Angeles Grades A to D. Table 4 of the paper presents the data on heartburn, which was measured after four weeks of treatment. There are seven variables that were compared between the two drugs, four of which showed statistically significant differences between the two groups of patients, each in favor of esomeprazole (Nexium) versus lansoprazole (Prevacid). As discussed above, the greater the number of patients in a clinical trial, the smaller a difference between treatment groups is likely to be statistically significant. For each of the measures in

Castell, the number of patients who participated in the study was so large that even small differences were found to be statistically significant. I examined each of these seven variables to see if the data were clinically significant.

    a.      **Complete resolution of heartburn at week 4 as assessed by the investigator.** The values were 62.9 percent of all patients on esomeprazole and 60.2 percent of all patients on lansoprazole. This difference was statistically significant (p value less than 0.05), but the difference of 2.7 percent of patients is not clinically significant as it is much less than a 20 percent difference.

    b.      **Heartburn-free days.** The values of 72.5 for esomeprazole and 70.9 for lansoprazole were neither statistically significant nor clinically significant.

    c.      **Heartburn-free nights.** The difference in the values of 87.1 for esomeprazole and 85.8 for lansoprazole was in fact statistically significant, even though the difference was only 1.3 percent. This difference is not clinically significant.

    d.      **Time to first resolution of diary-recorded heartburn in days.** This value was the same (2 days) for both drugs, and thus neither statistically nor clinically significant.

    e.      **Time to sustained resolution of diary-recorded heartburn.** This value was 7 days for esomeprazole and 8 days for lansoprazole. Again, these data were statistically significant but not clinically significant.

    f.      **Time to first resolution of diary-recorded nocturnal heartburn.** This value was one day for each group, and thus neither statistically nor clinically significant

    g.      **Time to sustained resolution of diary-recorded nocturnal heartburn.** This value was 1 day for esomeprazole and 2 days for lansoprazole. This result was statistically significant but not clinically significant.

12.      In addition to the lack of clinical significance, the methodology should be viewed skeptically. The data were taken from observations made and recorded in patient diaries.

Patient diaries are well known to be a poor source of reliable information and are subject to major biases and confounding factors. In fact, the data that show statistically significant differences are so close in value for the two groups that careful questioning of patients, particularly on the specific day when the symptoms of heartburn disappeared, may have readily shown that the small differences reported by patients were not real differences.

13.      Given the small differences in values of esomeprazole and lansoprazole for improving heartburn, and the lack of any clinically significant differences between the two drugs, it is clear that these particular data are not relevant for influencing medical practice in favor of using one drug over another. These data support the conclusion that there are no real clinical differences between these drugs for the treatment of heartburn.

14.      Similarly, the data is not clinically significant for the healing rates of EE. Using endoscopies, Castell measured the healing rates at two time points – 4 weeks and 8 weeks. At 4 weeks, esomeprazole (Nexium) healed 79.4% versus lansoprazole (Prevacid) at 75.1%, for a statistically significant difference, but at 4.3% not a clinically significant difference. Similarly at 8 weeks, the healing rate for esomeprazole was 92.6% versus 88.8% for lansoprazole, again a statistically significant difference but at less than 4%, not a clinical significant difference. Again, given the large number of patients involved in the study, although the two sets of values of healing rates are statistically significant, the differences are so small they have no clinical Significance or relevance for medical practice.

2.      The Fennerty Study

15.      The clinical publication by Fennerty et al. is far more difficult to assess, as it is only an abstract. Abstracts are well known to have serious limitations as to their validity and reliability in terms of accuracy and overall credibility. While it is possible that a full publication of the clinical study and data presented in the abstract may be issued at some point, one's ability

7

to draw any conclusions from abstracts is extremely limited. As a result, until the final and much more complete data (i.e., the results) and methodological details are published, one must be highly skeptical of any data or interpretations made in an abstract.

16.     There are a number of reasons why abstracts are unreliable. First, abstracts are often published before their clinical study is completed, allowing the author to have a "placeholder" at a professional meeting so that they can present the "real" or "complete" results when they get to the meeting itself. Second, many abstracts are never published as full publications because the final data turn out differently than the more limited data set originally reported in the abstract. Third, because of space limitations, most of the methodological and other important details of a clinical study are not presented. Thus, sometimes major problems or questions about a study that are withheld in a short abstract, become obvious in a full publication.

17.     As a result, most scientists and physicians wait for a full publication, where all the details are presented, before accepting or judging the value and validity of the results and interpretation of data presented in an abstract. In sum, one should be skeptical about abstracts until the full results of a study are available.

18.     The only data on heartburn reported in the Fennerty abstract is on the resolution of heartburn at week four in 999 patients with Los Angeles Grade C or D of esophageal erosions. In the study, the amount of resolution of heartburn was 72.0% with esomeprazole (Nexium) and 63.6% with lansoprazole (Prevacid). These data were statistically significant. However, the small difference between the two drugs for heartburn relief is not clinically significant, and thus not relevant for medical practice. The other limitations in interpreting the data of the Castell study apply equally to this study.

19.     Similarly, for the data reported on healing rates, Fennerty finds statistical but not clinical significance. Like Castell, Fennerty reported healing rates at two time points – 4 and 8 weeks. At 4 weeks, esomeprazole (Nexium) healed 58.6% patients compared with 49.4% for lansoprazole (Prevacid), for a 9.2% difference. And at 8 weeks, esomeprazole healed 82.4% versus 77.5% for lansoprazole, a 4.9% difference. For the reasons outlined above, although these differences are statistically significant, they are too small to be clinically significant.

3.     Other Studies Evaluating Symptom Relief and Healing Rates in Patients Suffering From Erosive Esophagitis Do Not Support A Superiority Claim

20.     A number of additional studies who's primary endpoint s were EE healing rates also measure the effects of Lansoprazole and Esomeprazole in relieving symptoms, including heartburn. A publication by Lauritsen et al. compared the two drugs as maintenance therapy (using a smaller dose of each drug) (Exh. D hereto). The study evaluated 1391 patients with Los Angeles Grade A to D esophagitis, over a 6-month period after the esophagitis erosions of subjects were healed. Two evaluations were made of clinical symptoms, one for heartburn and another for epigastric pain. Figure 4 of the paper shows that the percent of patients who were free of heartburn at six months was 78% for esomeprazole (Nexium) and 71% for lansoprazole (Prevacid). This result was statistically significant, but not clinically significant. The results for epigastric pain relief was 80% for esomeprazole and 75% for lansoprazole. Again, these data were statistically significant but are not clinically significant.

21.     The results from Castell, Fennerty and Lauritsen were similar to two clinical studies sponsored by TAP (see "Synopses" in the Materials Reviewed for identification of the studies). Both studies used similar protocols as in Castell – double blind, randomized and well controlled. The TAP studies were conducted over a 12-week period. All subjects had a baseline endoscopy to confirm the diagnosis of esophageal erosions of Grade 2 or more, which

9

diagnosis was repeated at 12 weeks or at the final clinic visit. One study enrolled 496 subjects at 43 sites in the United States and the other study enrolled 482 subjects at 42 sites in the United States. Heartburn was recorded by patients in a daily diary, just as was done in the Castell, Fennerty and Lauritsen studies reviewed above.

       22.    Heartburn was assessed after one day, three days and one week, using the same two treatment groups (esomeprazole and lansoprazole) and the same doses (40 and 30 mg respectively) as in Castell and Fennerty. Both of the TAP trials observed no statistically significant differences between esomeprazole and lansoprazole for any of the several variables measured for heartburn, and the authors of each report concluded that there were no clinically significant differences between the two treatments in this parameter.

       23.    Finally, I reviewed a clinical trial conducted by Howden et al., which used a well designed and controlled clinical trial protocol that was very similar to those mentioned above (Exh. E hereto). Two hundred eighty-four subjects with at least a Grade 2 severity of esophageal erosions were enrolled in the study. The doses of esomeprazole and lansoprazole were the same as those previously used in the above 12-week studies and Castell. In this study, heartburn was again measured after one day, three days and one week of treatment. In this trial a higher percent of patients were heartburn free after one day on lansoprazole (41.5%) than they were on esomeprazole (34.5%), however, this difference had a p value of 0.2 and was therefore not statistically significant or clinically significant (Table 4). The trend for improved values on lansoprazole versus esomeprazole (Nexium) was also observed in all heartburn variables on Day 3; and the average severity score was less (i.e., was better) for all variables in the lansoprazole (Prevacid) group compared with esomeprazole (Nexium) group on Day 3, but again these

10

differences did not reach statistical or clinical significant levels. At one week of treatment the same profile was observed and the data did not show a statistical or clinical significance.

24.    Taking all these studies together, there are no clinically significant differences between these two drugs in terms of their relief of heartburn. Thus, there is no basis to say that any of the statistical differences observed regarding heartburn are relevant for medical practice. The most correct interpretation of the data on clinical symptoms is that there are no differences between the two drugs.

25.    The same is true for the data reported on healing rates. Taking into account the two AstraZeneca studies (Castell and Fennerty), the two TAP studies, and the Lauritsen and Howden studies, it cannot be said Nexium is superior to Prevacid in healing EE for the vast majority of EE patients.

26.    The most that can be said in favor of Nexium is that several of the studies show a somewhat higher rate of healing for the minority of EE patients who experience moderate or severe EE. While these differences may be statistically significant, they are not clinically significant. In sum, these studies do not support a conclusion that one of the drugs is superior to the other.

## C.  A Review of Studies Designed to Measure Relief of Symptoms of GERD

27.    In comparing esomeprazole (Nexium) and lansoprazole (Prevacid) for the treatment of the symptoms of GERD as a clinical endpoint, there is a large well-designed double blind study that compared the two drugs, Chey et al. (Exh. F hereto). Chey et al. used the same doses that were used in the above studies. A total of 3034 subjects were randomized to one of the two treatments, and as above, both daytime and nighttime heartburn frequency and severity were assessed over a two-week period. Although heartburn is the most common symptom in

11

GERD, other symptoms of GERD were also studied, including acid regurgitation, dysphagia, belching and epigastric pain.

28.     There were no statistically significant differences between the two groups of subjects on days one or three of treatment in daytime or nighttime relief of heartburn symptoms or in the severity of symptoms (daytime or nighttime). After one week of therapy there was one statistically significant difference observed. The severity of daytime heartburn was statistically significantly less (i.e., better) in subjects receiving lansoprazole than in those receiving esomeprazole. The values for severity were 0.59 for lansoprazole and 0.63 for esomeprazole, but this difference is not clinically significant. The percent of both days and nights without heartburn was greater for lansoprazole than for esomeprazole at every time point of assessment through two weeks (Figure 3). But again, none of these differences was clinically significant.

29.     Investigator assessments of regurgitation, dysphagia, belching and epigastric pain were comparable between the two groups. Moreover, the level of patient satisfaction as assessed and shown in Table 6 were very positive and almost identical for the two groups of subjects.

30.     The conclusion of this direct comparison in patients with GERD is clear – there were no clinically significant differences between the two treatments in any of the clinical symptoms assessed.

## CONCLUSION

31.     The preponderance of data I reviewed, and the clinical interpretation of the data on heartburn and healing rates leads me to conclude that there were no clinically significant

12

differences between esomeprazole (Nexium , 40 mg) and lansoprazole (Prevacid, 30 mg) for acute or chronic therapy in patients with esophageal erosions.

32.     In terms of GERD, the heartburn data demonstrate the same conclusion, i.e.,  that there are no clinically significant differences between the two drugs in treating symptoms of GERD.

Executed in Bethesda, Maryland, on November 10, 2004.

_____

Bert Spilker, Ph.D., M.D.

**13**

## MATERIALS REVIEWED

1. Castell, DO. Esomeprazole (40 mg) compared with lansoprazole (30 mg) in the treatment of erosive esophagitis. Am J Gastroenterol, 2002, 97: 575-583.

2. Chey, W. et al. Lansoprazole and esomeprazole in symptomatic GERD. Clin Drug Invest, 2003, 23: 69-84.

3. Dohmen, W. Onset and duration of pain relief in gastro-esophageal reflux disease (GERD). A clinical comparison of lansoprazole, omeprazole MUPS and esomeprazole. Gastroenterology (abstract), 2002, 122 (Suppl 1): A-201.

4. Fennerty, MB et al. Esomeprazole 40 mg versus lansoprazole 30 mg in healing and symptom relief in patients with moderate to severe erosive oesophagitis (Los Angeles grade C&D). Gut, 2004, 53: (Suppl. 6) A111.

5. Howden, CW et al. Evidence for therapeutic equivalence of lansoprazole 30mg and esomeprazole 40mg in the treatment of erosive oesophagitis. Clin Drug Invest, 2002, 22: 99-109.

6. Lauritsen, K et al. Esomeprazole 20 mg and lansoprazole 15 mg in maintaining healed reflux oesophagitis: Metropole study results. Aliment Pharmacol Ther, 2003, 17: 333-341.

7. Synopsis of a TAP sponsored trial in 496 patients titled: A study to evaluate the effect of lansoprazole 30mg qd versus esomeprazole 40 mg qd on healing and symptom relief in subjects with erosive esophagitis.

8. Synopsis of a TAP sponsored trial in 482 patients with the same title as above.

9. Vakil, N. Review article: esomeprazole, 40 mg once daily, compared with lansoprazole, 30 mg once daily, in healing and symptom resolution of erosive oesophagitis. Aliment Pharmacol Ther, 2003, 17 Suppl. 1: 21-23.

10. Vakil, N and Fennerty, MB. Systematic review: direct comparative trials of the efficacy of proton pump inhibitors in the management of gastro-oesophageal reflux disease and peptic ulcer disease. Aliment Pharmacol Ther, 2003, 18: 559-568.

11. Galmiche, JP and des Varannes, SB. Endoscopy-negative reflux disease. Curr Gastroenterol Reports, 2001, 3: 206-214.

12. Text of 45 second and 60 second Television advertisements on the campaign "better."

13. Two print advertisements on Nexium.

14. Copy of AstraZeneca's complaint in the above noted case.

15. Copy of the package insert for Nexium.

14

16. Spilker, B. 1991, "Guide to Clinical Trials" Lippincott, Williams and Wilkins,
    Philadelphia.

Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 DEC 15  PM 4: 21

ASTRAZENECA LP,                     )
                                    )
            Plaintiff,              )       **CONFIDENTIAL:**
                                    )       **FILED UNDER SEAL**
                                    )                                A 0407-1590
        v.                          )
                                    )       C.A. No. 04-1332-KA

| SERIAL NO. 31 | | |
| --- | --- | --- |
| SERVED | | |
| RECEIVED | | |
| FILED | | |

TAP PHARMACEUTICAL PRODUCTS INC.,   )
                                    )
            Defendant.              )

## DECLARATION OF BERT SPILKER, PH.D., M.D.

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17[h] Floor
P.O. Box 1150
Wilmington, Delaware 19899

*Attorneys for Defendant Tap
Pharmaceutical Products Inc.*

*Of Counsel:*

Thomas C. Morrison
Karla G. Sanchez
Blair Axel
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Kenneth D. Greisman
Vice President and Chief Legal Counsel
TAP Pharmaceutical Products Inc.

Karen L. Hale
Senior Counsel
Abbott Laboratories

Dated:  December 15, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

———————————————————— x

ASTRAZENECA LP,                              :

                    Plaintiff,               :

                                             :   Civil Action No. 04-1332-KAJ
         - against -                         :

                                             :
TAP PHARMACEUTICAL PRODUCTS INC.             :

                    Defendant.               :

                                             :
———————————————————— x

## <u>DECLARATION OF BERT SPILKER, PH.D., M.D.</u>

Bert Spilker, under penalty of perjury, declares as follows:

      1.     I have reviewed the declarations of Drs. Castell, Fennerty and Johnson (the "plaintiff's experts"). My conclusions and statements in my original declaration do not have to be modified in light of the plaintiff's experts' comments, who presented incomplete versions of my statements or misstated them in some way. I submit this declaration in response to those declarations and in further support of TAP's motion for a preliminary injunction.

### Determining Clinical Significance

      2.     The three plaintiff's expert declarations address a central issue – whether the results of the Castell and Fennerty studies are clinically significant. In my initial declaration, I set out a definition of clinical significance and my opinion that under the facts of this case a 20% difference between the effects of the two drugs on healing esophageal erosions or eliminating clinical symptoms would be needed to demonstrate

1129640v1

clinical significance. As I explained in my declaration, my opinion is based on the now uncontroverted view that, in general, an approximately 20% variation exists in individual patient responses and measurements between patients, often referred to as "noise." In other words, in general, the results from the same patient taking the same drug can vary by as much as 20%; similarly the results between patients taking the same drug can vary by as much as 20%. These variations may be due to, and the magnitude of the variations influenced by, such factors as environment, personal mood, emotional state, time of day, and degree of the symptom at the time the drug is taken, among other factors. Therefore, these variations may be less or more than 20%, and in a clinical trial, when clinically significant differences between drug effects are expected to be less than 20% it would be necessary to describe in detail, and in advance of initiating the clinical trial (not in hindsight), why a smaller difference should be considered clinically significant.

3.    None of the plaintiff's experts provided any opinion or justification for why a difference of less than 20% should be considered clinically significant. Nor did they provide an alternate percentage or any references to support their conclusory opinions.

4.    In fact, there is no rule or fixed percent for establishing clinical significance, but there are procedures for determining this value for any trial, which I mentioned in my original declaration. And, because of the large number of variables that influence clinical significance, neither the FDA nor any well-respected groups have established guidelines of the magnitude of difference between two drugs that is clinically significant. But, when developing new drugs the FDA usually requires a difference between the test drug and placebo or between the test drug and "no treatment" to be at

2

least 30%, and considers smaller differences to be clinically insignificant. One of the major reasons for the 30% or greater value chosen by companies and the FDA is because of the "noise" mentioned in paragraph 2 above.

### Clinical Significance in AstraZeneca's Studies

5.    I evaluated the final medical reports of four clinical trials that AstraZeneca conducted of esomeprazole (Nexium) versus lansoprazole (Prevacid) (coded by AstraZeneca as study numbers 267, 322, 325 and Metropole). Study 267 was eventually published as the Castell paper (referred to herein as the "Castell trial"), Study 322 corresponds to the Fennerty abstract (referred to herein as the "Fennerty trial") and Study 325 and Metropole are two studies comparing Nexium and Prevacid over longer periods of time. Although the clinical professionals at AstraZeneca who wrote the protocols and final medical reports offer no clear percentage that they define as being clinically significant in these clinical trials, an analysis of the methodology used by AstraZeneca to calculate the number of patients that were needed to be enrolled in these studies is highly relevant and allows us to determine the level of difference that they considered in fact to be clinically significant.

6.    In any well controlled trial comparing the efficacy of two drugs, the statistician determining the number of patients to be enrolled in the study needs to know how great a difference between the two drugs is expected, and what difference would be clinically significant. The statistician would need to know the SMALLEST DIFFERENCE between the two groups of patients being tested that will be clinically meaningful (i.e., significant) to the people conducting the clinical trial and to those in the medical community or to any regulatory agency that will evaluate the results of the trial.

3

7.    In advance of the study, the statistician would also need to know how sure the clinician(s) wants to be that the response will be observed if it is truly present. This is referred to as the "power" of the trial.  Usually, in studies sponsored by the pharmaceutical industry, the power of a trial chosen is between 70% and 85%.

8.    The power of the four AstraZeneca studies was 85% for trial 325, 90% for the Fennerty trial, and 95% for both the Castell trial and the METROPOLE trial. A 95% power is highly unusual in the pharmaceutical industry (or in academia) because it requires a company (or medical school in a university) to enroll substantially more patients than would be needed for the usual 80% or 85% power.

9.    The value of the difference sought in the Fennerty, METROPOLE and 325 trials was 10%, i.e., the studies were designed to find a 10% difference between the healing rates of the two drugs.  Although the difference sought between the two drugs in the Castell trial was only 3%, in my opinion the 3% was not chosen because the planners of the trial believed that the extremely low number of 3% would be clinically significant, but because they were looking to see if there was ANY difference between the two drugs that could be shown to exist.

10.    This supposition is confirmed by AstraZeneca's commission of the Fennerty trial.  Had AstraZeneca considered the 3.8% result that was obtained in the Castell trial to be clinically significant then there would not have been a reason to increase the level of difference between the two groups that was sought in the follow-up Fennerty trial to 10%.

11.    The importance of this point can be well illustrated with an example.  If a clinical trial was designed to show a difference of two drugs in preventing

4

death, then one might consider and discuss whether a 3% difference between two drugs

would be clinically significant. However, if one is looking at a less catastrophic event,

such as reducing seizures, reducing blood pressure, or reducing gastrointestinal problems,

then a 3% difference between two drugs is almost trivial, regardless of whether the data

are statistically significant. If the level of clinical significance defined in advance of a

trial is to be less than 20% (level of background noise within or between patients) then

one needs to present a strong rationale why a lower level has been chosen. This was not

done by the plaintiff's experts, who merely assert (without evidence) that the data are

clinically significant. This was also not done by AstraZeneca in its protocols or in its

final medical reports, where some gave assertions without evidence that the data were

clinically significant; but it is noteworthy that no such statement of clinical significance

appears in the Discussion or Conclusions of the Castell trial's final medical report.

   12. Thus, it is very probable and reasonable to assume that

AstraZeneca believed a 10% difference in healing between the two groups in these trials

to be the magnitude of difference that is clinically significant. However, neither the

METROPOLE, the 325, nor the Fennerty trials demonstrated the 10% difference sought.

The Fennerty trial showed a 4.9% difference, which is less than half the amount that

AstraZeneca evidently considers is needed to show clinical significance. The

METROPOLE study showed a 7% difference, the 325 study showed an 8% difference

and the Castell trial showed that across all grades of esophageal erosions there was a

3.8% difference, all of which are below the level of demonstrating a clinically significant

difference.

13.     Although the Castell trial showed a difference above 10% for the subsets of C and D patients (but not the A and B patients, where there was almost no difference), this was determined in a **post hoc analysis**, that was thought about and conducted after the trial was completed. These types of statistical, or post hoc, analysis that professionals conduct after a trial are universally agreed not to be valid and cannot be relied on for drawing important or meaningful conclusions. The reasons for this statement include the fact that this type of evaluation, often referred to as "data dredging," can turn up all sorts of spurious findings, some of which may appear to be highly important. AstraZeneca is very upfront in admitting that the analysis of C and D patients was post-hoc (see for example Johnson Decl. ¶ 25; Castell Decl. ¶ 15).

14.     But, the results found in a post hoc analysis can be, and often are used as the basis for a new hypothesis, which must then be tested in a new clinical study. Therefore, the result in the Castell trial that Nexium was more effective than Prevacid in healing esophageal erosions in patients classified as Grades C & D would not be considered as a valid conclusion, but could be evaluated in a new trial specifically designed to test this hypothesis. This appears to be at least one of the major reasons why AstraZeneca set up and conducted the Fennerty trial (see Fennerty Decl. ¶ 4).

15.     Having then conducted a clinical trial to seek a clinically significant difference of 10% in the Fennerty trial, AstraZeneca was unsuccessful because Fennerty only resulted in a 4.9% difference. Thus, as I previously stated, I conclude that the differences between Nexium and Prevacid in healing any grade or grades of esophageal erosions and in treating symptoms of GERD are clinically non-significant.

6

Executed in Bethesda, Maryland, on December 14, 2004.

Bert Spilker

7

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2004, the attached **DECLARATION OF BERT SPILKER, PH.D., M.D.** was served upon the below-named counsel of record at the address and in the manner indicated:

Josy W. Ingersoll, Esquire                                    HAND DELIVERY
Young Conaway Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE 19801

Harold P. Weinberger, Esquire                              VIA FEDERAL EXPRESS
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022

John G. Day

149881.1