# EXHIBIT K

Case 1:04-cv-01332-KAJ   Document 128-2   Filed 12/21/2005   Page 1 of 20

# Rebuttal Expert Report of Thomas D. Dupont, Ph.D.

# RE: TAP Pharmaceuticals v. AstraZeneca

Submitted To:

Patterson, Belknap, Webb & Tyler, LLP

June, 2005

$D^2$ Research
71 South Glen Road
Kinnelon, NJ 07405
(973) 492-0100

#100-5-04

# TABLE OF CONTENTS

| | Page |
|---|---|
| **Preface** | 1 |
| **Rebuttal Overview** | 2 |
| **Detailed Rebuttal** | 4 |
|     **Rappeport Chapter II: The Underlying Issues** | 4 |
|     **Rappeport Chapter III: Interpreting Dupont's TV Survey** | 6 |
|     **Rappeport Chapter IV: Dupont's TV Survey Qua Survey** | 7 |
|     **Rappeport Chapter V: Dupont's Internet Survey** | 11 |
|     **Rappeport Chapter VI: Dupont's Internet Survey Qua Survey** | 12 |

$D^2$ Research

# PREFACE

I, Thomas D. Dupont, Ph.D., designed and conducted two surveys on behalf of TAP Pharmaceuticals in connection with TAP's lawsuit vs. AstraZeneca, related to AstraZenaca's advertising for Nexium.

At the request of AstraZeneca's counsel, Dr. Michael Rappeport of RL Associates prepared a critique of those surveys, dated May 12, 2005. This report is my rebuttal to Dr. Rappeport's critique.

The two surveys I conducted are:

1. <u>Consumer Perception Test Of Nexium "Man Talks About Better" :45</u>, dated January 20, 2005. This survey of Nexium's TV commercial is referred to by Rappeport as "Dupont's TV Survey."

2. <u>Consumer Perception Test of Nexium Internet Ad</u>, dated March 14, 2005. This survey of an advertisement appearing on Nexium's website is referred to by Rappeport as "Dupont's Internet Survey."

My background and other information in compliance with Rule 26 (a)(2)(B) is contained in each of my two survey reports. My compensation for preparing this rebuttal will be approximately $10,000. In preparing this rebuttal I have relied on no materials other than my experience, my two surveys, and Rappeport's critique.

Dated this 28th day of June, 2005

_____
Thomas D. Dupont, Ph.D.

$D^2$ Research

# REBUTTAL OVERVIEW

A.   The Dupont Surveys

The two surveys that are the object of the Rappeport critique are these:

1.   <u>TV Survey</u>

In this survey, conducted among current and prospective users of Rx heartburn/acid reflux drugs, 240 persons viewed the 45 second version of the Nexium "Man Talks About Better" TV commercial. The survey results showed that over 70% of respondents perceived the commercial to communicate that Nexium is better than other brands at relieving acid reflux disease and/or its symptoms, whereas only 32% got a message of superiority vis-à-vis damage to the esophagus. Moreover, fewer than 1% of respondents volunteered that the superior healing of damage message applied only to moderate or severe cases (as was disclosed in the commercial via a "super").

This survey included a control group who viewed a version of the commercial edited to eliminate all references to heartburn and most references to acid reflux disease. (However, because of the extremely high frequency with which the Nexium advertising has run, it is likely that most control group members had been exposed to the original, unedited, Nexium commercial). Still, among this control group 46% (vs. 72% in the Test Group) perceived that the commercial was communicating that Nexium is better than other brands at relieving acid reflux disease and/or its symptoms.

2.   <u>Internet Survey</u>

In this survey, also conducted among current and prospective users of Rx heartburn/acid reflux drugs, 205 persons viewed[1] an ad that appears on the Nexium website. That ad was a more detailed version of a print ad that has run in consumer magazines. The Internet ad talks about how Nexium heals acid-related damage better than Prevacid in patients with moderate to severe damage, and shows supporting bar charts (the charts are absent in the print ad). In order to test the efficacy of the

---

[1] Respondents were interviewed at shopping malls and viewed the ad on computers at the malls. The survey was not conducted over the Internet.

-2-

D²|Research

disclosure about superiority being limited to moderate/severe damage, the survey included a comparison group exposed to an ad in which those disclosures were deleted. The survey results showed that the responses to the two ads were virtually identical; the disclosure about moderate/severe damage was ineffective. Among those exposed to the Test (unedited) ad, only 11% said anything about moderate/severe damage, and when asked directly whether the better healing claim applied to all people or just those with moderate/severe damage, more respondents replied "all people" than replied "only those with moderate to severe damage."

### B.   Overview Of Rappeport Critique

The issues that my two surveys set out to test were relatively simple:

- Does the TV commercial communicate to consumers that Nexium is superior at relieving acid reflux disease or its symptoms (as opposed to just communicating that it is better at healing moderate to severe damage to the esophagus)?
- Does the Internet ad communicate to consumers that the "better healing" claim applies only to moderate to severe damage (as opposed to all damage)?

Dr. Rappeport, in his critique, tries to make these straightforward issues complex by insisting, without any data or other basis, that consumers interpreted the ads in a way that is at variance with what the survey data showed to be the case. It is important to note that Rappeport could find very little fault with the design, execution or analysis of either survey. Instead, he constructed far-fetched theories about how consumers interpreted the ads, and faulted my surveys for not testing his theories. If he really believed his theories had any validity, he had the opportunity to test them himself, but apparently chose not to.

In the remainder of this report I will expand on the above and, for the reader's convenience, follow the chapter-by-chapter structure of Rappeport's critique.

$D^2$ Research

# DETAILED REBUTTAL

## A. Rappeport Chapter II: The Underlying Issues

In this chapter Rappeport defines acid reflux, heartburn, erosive esophagitis and acid reflux disease, and concludes that many consumers (indeed the overwhelming majority) are unaware of the distinctions among them and ignorant of the implications of those distinctions. I agree, and the data from my surveys supports this. The question is, if consumers don't understand those distinctions, is it legal for an advertiser to exploit that ignorance in order to plant the impression that his product is better for all those conditions? If the Lanham Act says NO, then my surveys show that AstraZeneca is in violation.

Rappeport then goes on to describe what he calls the "real issue" in the case,

> "If a typical consumer knew and understood the four definitions given above [acid reflux, heartburn, erosive esophagitis, acid reflux disease],
>
> And if they also knew that one medicine did a better job than another medicine at healing the complication of acid reflux called erosive esophagitis,
>
> And if they also knew that because of the complexity of the scientific measurements involved, there was at this point simply no evidence as to which product, if either, actually did a better job of reducing the amount of acid refluxed into the esophagus,
>
> Would they believe that Nexium is better than Prevacid for "acid reflux disease"?
>
> That is, regardless of the lack of specific test evidence, is doing a better job at healing one of the principal complications arising from acid reflux disease TANTAMOUNT IN THE MIND OF THE CONSUMER to doing a better job in some sense at treating acid reflux disease? In other words, are consumers who see this commercial, and interpret it to have something to say about relative efficacy with regard to acid reflux disease, doing so
>
> a) because they are being misled by the commercial, or
>
> b) because the commercial is presenting an abridged account of facts, which if they were known in their entirety would still lead them (the consumer not the experts) to the same conclusion?"

D² Research

In effect, Rappeport is taking the position that consumers will perceive that comparative superiority, on any product dimension, will lead to consumer perception that the product is better "overall" and, moreover, that if that happens consumers are not being misled. That is contrary to my understanding of the Lanham Act, which is that the law does not allow an advertiser to communicate a message of overall superiority when that superiority exists only in certain limited circumstances. No better example can be found than in the landmark case, American Home Products v. Johnson & Johnson (1978),[2] in which the court enjoined Anacin advertising that said, "Anacin can reduce the inflammation that comes with pain, Tylenol cannot." While Anacin had evidence of superior reduction of inflammation in certain circumstances, it could not prove superior pain relief, and consumer surveys showed that consumers interpreted the advertising to be saying that Anacin was a superior analgesic generally. The decision in that case is consistent with my understanding of advertising law as applied by the courts, the NAD (before whom I have appeared and lectured) and the TV networks.

Returning to Rappeport's analysis, one only has to think of some other examples to realize how erroneously ludicrous his position is. If an SUV maker advertises that his SUV goes through deeper snow than a competitor, will a consumer living in Florida conclude that the advertised SUV is "better overall?" If a credit card issuer advertises a lower interest rate than the competition, will a consumer who always pays his monthly bills in full conclude that the advertised card is "better overall?"

In addition, Rappeport's hypothetical syllogism is incomplete. Indeed, two key facts are omitted. A more accurate version of Rappeport's syllogism would be:

> *"If a typical consumer knew and understood the four definitions given above [acid reflux, heartburn, erosive esophagitis, acid reflux disease],*
>
> *And if they also knew that one medicine did a better job than another medicine at healing the complication of acid reflux called erosive esophagitis,*

---

[2] American Home Products Corp. v. Johnson & Johnson, 577 F.2d 160

-5-

D²|Research

> *And if they also knew that most acid reflux/heartburn sufferers don't have erosive esophagitis,*
>
> *And if they also knew that Nexium's superiority applied only to moderate or severe cases of erosive esophagitis (which are the minority of total cases)*
>
> *And if they also knew that because of the complexity of the scientific measurements involved, there was at this point simply no evidence as to which product, if either, actually did a better job of reducing the amount of acid refluxed into the esophagus,*
>
> *Would they believe that Nexium is better than Prevacid for "acid reflux disease"?*

It is my opinion that any reasonable person, knowing all these facts, would conclude that, for the vast majority of potential users, Nexium is no better than Prevacid for "acid reflux disease."

Rappeport's entire criticism of what my surveys set out to do hinges on hypothetical scenarios of what consumers <u>might have meant</u> by their answers to the survey questions, and he even goes so far as to speculate that his hypothetical interpretations of meaning are more accurate reflections of what consumers meant than what they actually said. If he really believes that, he had three months to test his theory, at least in the case of my survey of the TV commercial. That survey took five weeks to complete, and the report was turned over to AstraZeneca on January 31, 2005 – 3 ½ months prior to the issue date of Dr. Rappeport's rebuttal.

### B.   Rappeport Chapter III: Interpreting Dupont's TV Survey

This chapter is essentially a repetition of Chapter II, and Rappeport again asserts (without data) that consumers perceive being better at healing erosive esophagitis to be equivalent to being better at treating acid reflux disease. Rappeport then faults my survey for not testing this proposition, and my control for not being appropriate to test that proposition. At the risk of being repetitive myself, I would say that if Rappeport really believes his interpretation has merit, he had ample opportunity to conduct a survey to prove it.

D²Research

My survey was meant to test a different proposition – whether consumers perceive the commercial to be communicating superiority at treating the symptoms of acid reflux, and whether they understood that the message of healing acid-related damage better applied only to cases of moderate/severe damage. I believe the survey did test that proposition, and that the proposition so tested was the appropriate one to test.

C.   **Rappeport Chapter IV: Dupont's TV Survey Qua Survey**

In this chapter Rappeport points out alleged flaws in the design, implementation and analysis of my TV survey. I will address each in turn.

1. Survey Design

The survey was a mall intercept survey, and Rappeport agrees that such was appropriate. However, he found fault with the geographic distribution of the malls, a point which I believe he greatly exaggerated. The truth is, the U.S. Census divides the country into nine regions. The survey was conducted in 20 locations, 10 in the Test Group and 10 in the Control Group. The Test survey was conducted in all nine regions (one region had two locations). The Control survey was conducted in eight out of the nine regions. The TV survey was not a political poll (for which one might expect substantial differences by region); it was a perception survey of a commercial which aired nationally. There is no reason to expect that geography, per se, would have any influence on the results. The important thing was to conduct the survey in a number of locations, and for those locations to be dispersed around the country. That goal was accomplished.

Rappeport also criticized several aspects of the screening procedure. First, he found fault with the fact that persons employed in health care were excluded. It is a standard practice in consumer surveys to exclude persons with "specialized knowledge," and one will find that most such surveys exclude persons employed in the industry covered by the survey. I concede, however, that the survey results apply only to people not employed in the health care field.

He also faulted the fact that in the screening consumers were asked whether they had taken, or intended to take, Rx medicines to treat heartburn or acid reflux disease. This was necessary, of course, since that was the relevant universe for the survey (and Rappeport agrees it was the relevant universe). Rappeport posits that the mention of heartburn and acid reflux in the screening caused consumers to mention heartburn and/or acid reflux in reply to the questions subsequently asked after they had twice viewed the commercial. This criticism overlooks a number of key facts:

A. The screening questions diverted attention from heartburn and acid reflux by also asking about "headaches or body aches" and "allergies or hay fever."

B. The screening was conducted in accordance with the way screening is usually conducted in consumer perception surveys. If one is looking for sufferers of a specific ailment, there simply is no substitute for asking people whether they suffer from that ailment.

C. There is no denying that Nexium is for sufferers of heartburn or acid reflux, and that consumers use the terms "heartburn" and "acid reflux" to describe what they suffer.

D. A time lag (probably about five minutes or so) occurred between the screening questions and the survey questions, during which the respondent traveled from the main concourse of the mall to the interviewing service office, provided his or her name and phone number, and viewed the commercial twice.

E. Even if the screening questions somehow induced respondents to mention heartburn or acid reflux in response to the survey questions, they could respond with either comparative or non-comparative statements about those things. The vast majority of such responses, at least until the survey focused specifically on the "better" message, were non-comparative.

Furthermore, Rappeport seemed to feel that the screening questions should have included some references to erosive esophagitis. It is difficult to understand what that would accomplish, since most heartburn/acid reflux sufferers don't have esophageal damage, and many or most of those who do don't realize it, as it can only be diagnosed by a physician.

## 2. Survey Implementation

This entire section was devoted to criticism of the interviewing-in-one Control Group city, Kansas City (24 of the 239 Control Group respondents). Rappeport's problem

- 8 -

D² Research

with Kansas City appears to be that in that city fewer respondents (compared to the total) gave replies dealing with symptom relief and more of them gave replies dealing with erosive esophagitis. For AstraZeneca, those are "bad" results (whereas had Kansas City been in the Test Group, AstraZeneca no doubt would have been happy with the results). My view is this:

- When you have ten cities in a survey and samples of around 24-25 in a city, there are going to be differences, if only due to the small sample sizes. That's why you have multiple locations and add them all together to reach your conclusion.
- I have examined detailed verbatim responses from Kansas City. It seems apparent to me that, for whatever reason, on average the Kansas City respondents understood the commercial better (more accurately) than the average respondent overall. The difference is not great, but it is there.
- That does not mean there is anything "wrong" with the Kansas City results, any more than that there is something "wrong" with results in some other city where comprehension was below average. Both are part of the whole and must be so treated.

### 3. Interpretation of the Data

This section of Rappeport's report is an exercise in creative data manipulation designed to drive down the percentage of respondents who perceived a false message. As shown in Table 7 of my survey report, 71.7% of Test Group respondents said the commercial communicated that Nexium relieves heartburn/acid reflux symptoms better, versus 46.0% in the Control Group (a difference of 26 percentage points).[3] It is true, as Rappeport points out, that most of the responses concerning superiority on symptom relief came in response to survey question #5, which asked those respondents who had previously acknowledged that the commercial said Nexium was better, "What did the commercial tell you Nexium was better at doing?" That is a perfectly fair and acceptable question, properly filtered to exclude those who got no message regarding superiority, and Rappeport does not suggest otherwise.

---

[3] For reasons unknown, in his critique Rappeport changed the 46% in the Control Group to 47%.

What he does do is suggest that there is a vast difference between Test and Control groups in the percentage of respondents saying the commercial said Nexium is better (and therefore in the percentage who were asked survey question #5). That is not true; the actual percentages saying that the commercial said Nexium was superior are 86% in the Test Group and 71% in the Control group. Rappeport posits that this small difference is caused by the fact that the word "better" was mentioned eight times in the Test commercial and three times in the Control commercial. First of all, the Control commercial mentioned "better" four times, not three. Second, four times is a lot of times in a 45 second commercial; it does not necessarily follow that eight times has to be significantly more effective at communicating better than four times. Finally, he ignores another plausible explanation for why that 15 percentage point difference occurred — maybe some of the people who viewed the Control commercial and understood the limited circumstances in which Nexium was better chose to express that view by responding that the commercial did not say Nexium was better. I cannot say with confidence that is what happened, and neither can Rappeport say with any confidence that the difference in the number of "better" mentions led to the difference in perceived superiority.

Rappeport continues his analysis (shown in his Table III) by recalculating percentages to eliminate from the base any people who did not perceive the commercial to say Nexium was superior, and further, by eliminating Kansas City respondents. There is no reasonable basis for either of those two steps, except that it enables him to take the 26 percentage point difference between test and control groups in perceptions that the commercial communicated superior symptom relief and cut it in half.

D²|Research

Rappeport also takes issue with the fact that I relied heavily on the open ended results in my analysis. I did rely more heavily on the open-ended results, for several very good reasons.

- The open ended questions are completely unbiased and free of any suggestion as to what the commercial might have communicated.
- The results from the open-ended questions are clear and unambiguous.
- The closed ended multiple-choice question, on the other hand, is both complex and suggestive. That is undesirable, but unavoidable, given the nature of the message in the commercial. I made it as simple as I could, but it still is complex and it takes careful reading to distinguish between the various choices.

Notably, there are a number of elements of my analysis of survey results with which Rappeport does not take issue:

- He did not challenge the conclusion that takeaway of superior symptom relief was more than twice as high as takeaway of superior healing of damage.
- He did not challenge the conclusion that virtually no one noticed that the superiority in healing damage was limited to moderate/severe damage.
- He did not challenge the view that the control group probably "overcontrols" because the likelihood is high that control group respondents had previously been exposed to the Test commercial. Indeed, he acknowledged (Rappeport report, p. 22) that this "is completely feasible."

**D. Rappeport Chapter V: Dupont's Internet Survey**

The Internet Survey which is the topic of this chapter was a mall intercept survey using Nexium's Internet ad. The Internet ad is a longer, more detailed version of a print ad that has run in consumer magazines; if consumers are misled by the Internet ad, they would surely also be misled by the print ad, which includes fewer references to erosive esophagitis. The purpose of the survey was to find out whether consumers understood that the superiority message in the Internet ad was limited to cases of moderate or severe esophageal damage (as opposed to believing that Nexium was better at healing all damage – even mild damage). Rappeport begins by misconstruing the survey as being a survey to find out whether consumers considered the ad to be false. That was in no way the purpose; no questions were asked respecting per-

D² Research

ceived veracity or falsity. The survey did include an edited version of the ad which was clearly false legally, as it did not qualify the "superior healing" claim by saying it applied only to moderate or severe damage. That edited ad was included only to test whether the real ad was any better than the clearly false ad at communicating the limitation on the claim.

Rappeport then took the position, similar to the one he took with respect to the TV survey, that consumers who believe Nexium is better at healing moderate/severe damage will conclude that it is better overall at treating damage, even if the consumer himself does not have moderate or severe damage. As was the case with the analogous position he took with respect to the TV survey, Rappeport has no support for this hypothesis. The only reason for his broaching that hypothesis seems to be to deflect attention from what my Internet survey sought to measure, and to suggest that it should have measured something different.

### E. Rappeport Chapter VI: Dupont's Internet Survey Qua Survey

In this chapter Rappeport points out alleged flaws in the questions and analysis of my Internet survey. I will address each in turn.

#### 1. Correction To Table 4

Rappeport is correct in pointing out that Table 4 in my Internet report was incorrect. I apologize for the mistake. However, Rappeport's "correction" is also incorrect. The following table presents the correct results, along with his and my previously reported incorrect results. The principal difference between the corrected data and my previously reported (incorrect) data is in the group which saw the edited ad. In that group the correct number who believed Nexium's "better healing" applied only to moderate/severe damage was 29%, instead of the previously reported 38%.

D² Research

Internet Survey Table 4

For What Group Of People Will Nexium Heal Acid Related
Damage Better Than The Other Leading Medicine?
(Closed Ended)

| | Correct Data | | Originally Reported Data (Incorrect) | | Rappeport Data (Incorrect) | |
|---|---|---|---|---|---|---|
| | Test Ad % | Edited Ad % | Test Ad % | Edited Ad % | Test Ad % | Edited Ad % |
| All people with damage to the esophagus caused by acid reflux disease | 46 | 51 | 47 | 52 | 43 | 42 |
| Only people with moderate or severe damage to the esophagus caused by acid reflux disease. | 36 | 29 | 38 | 38 | 39 | 38 |
| Don't Know/No Opinion | 9 | 10 | 9 | 10 | 9 | 10 |
| Not Asked (Do not recall seeing claim) | 9 | 10 | 9 | 10 | 9 | 10 |

## 2. Open Ended and Closed Ended Questions

Dr. Rappeport claims I "played down" the results of the open-ended questions. That is untrue. My survey had seven questions; four open ended and three closed-ended. My report had six tables; three reporting results from open-ended questions and three reporting results from closed ended questions. (One table combined the results from two open-ended questions). The "Conclusions" section of the report begins with conclusions drawn from the open-ended questions. However, it is undeniable that one of the closed ended questions (specifically, question #7, reported above) provided the most unambiguous data respecting whether or not consumers understood the "better healing" claim to be limited to moderate/severe damage. As the data show, more respondents replied that the claim applied to "all people" than replied that it applied only to people with moderate/severe damage.

- 13 -

D² Research

### 3. Data Analysis – Open Ended Questions

There is a grain of truth in Dr. Rappeport's observation (Rappeport report, p. 20) that responses to open ended questions "will generally be limited in their scope and frequently will also be quite imprecise," but he overstates the case – as he does in the subsequent paragraph when he speculates that "experience shows" (what experience?) that this is particularly likely to be the case in this survey. The truth is that in answering open-ended questions, survey respondents will often leave out information that they do not feel is important (but that may be very important to those interpreting the survey results). However, it is difficult to predict when this will and will not occur. The fact of the matter is that in this survey most respondents played back messages that Nexium is better, and about 40% played back that it is better than Prevacid. Relatively few (until they were asked directly), volunteered how or in what circumstances it is better. So, the open ended questions don't help us a lot in understanding whether or not consumers understood the limitation on the claim being made in the ad. Rappeport speculates, based on the open ended results, that a lower bound estimate of the number who understood that Nexium was superior only for moderate/severe damage is 11%. That is consistent with the data and I am content to assume it is a reasonable estimate. The critical question is, what is the upper bound estimate? That is an issue I'll take up in the following section.

### 4. Data Analysis – Closed End Question

As shown on page 12, in response to a closed ended question asking for whom Nexium will heal acid related damage better, respondents exposed to the Test Ad were more likely to say "all people with damage" (46%) than to say "only people with moderate/severe damage" (36%). By that measurement, 36% could be the upper bound estimate (i.e., at most, only 1/3 of consumers understood the limitation on the claim in the ad. However, among those who saw the Edited Ad, 29% said "only people with moderate/severe damage." Remember, the Edited Ad did not limit the claim to moderate/severe damage, so some or all of that 29% must be guessing. If we look

D²|Research

at the difference between the Test Ad data and the Edited Ad data on that measure we get a difference of 7%, which can properly be interpreted as:

> *Truly, the Edited Ad could not have communicated the limitation on the claim to anyone, since the ad did not include a limitation on the claim.*
>
> *The data show the Test Ad was successful in communicating the limitation on the claim to 7% more consumers than the Edited Ad did.*
>
> *Therefore, the true number of persons exposed to the Test Ad who understood the limitation on the claim must be 7%.*

Previously, we have seen another measure suggesting that 11% understood the limitation, and there is no reason to suspect that that is incorrect. Given the survey sample size (205), there is no statistically significant difference between the 7% and the 11%. Therefore, one must conclude that, at most, no more than about 11% of consumers understood the limitation on the claim in the Test Ad.

The above is a far more plausible interpretation of the data than Rappeport gave, which was that either:

- Notwithstanding the wording of the question, which was very specific, respondents were somehow "biased by a mind set created by the wording of the previous open-ended question(s)."
- Some of the people who thought the Edited Ad talked about moderate/severe damage were playing back preconceptions caused by prior exposure to Nexium ads.[4]

Not only are the above two "interpretations" gross speculation, but Rappeport does not explain how they might have led to the survey findings which exist. He seems satisfied to just throw them out there in hopes the reader will be so confused he will conclude there might be something wrong with the survey.

Finally, Rappeport concludes that "the open-ended questions demonstrate that a significant proportion of consumers will perceive the website as conveying as a primary message that Nexium is better than Prevacid at healing moderate to severe dam-

---

[4] It is not clear what ads he is referring to. The TV commercials mentioned moderate/severe damage only in a briefly appearing, barely readable "super."

D²|Research

age." Apparently, 11% is his criterion for what "significant" is, since that's the number who perceived that Nexium is better at healing moderate to severe damage. I sincerely doubt that any advertiser would be happy if told that only 11% of the people who saw his ad knew what it was talking about. The relevant measure is the reciprocal of that 11% -- the 89% who did not understand the claim to be limited to moderate/severe damage.

The important finding to keep in mind – one that Rappeport did not challenge – is that more consumers thought Nexium's "better healing" message applied to all people (46%) than thought it applied only to people with moderate/severe damage (36%).

D² Research

# Timesheet for Wolff, Bruce L. (0398) for Friday 06/24/2005
## Printed 06/30/2005 at 10:59 am  Page 1

| | | |
|---|---|---|
| Client : | Z9999 | PATTERSON, BELKNAP, WEBB & TYLER LLP |
| Matter : | 006999 | PBW&T OFFICE GENERAL-VACATION |
| Operator : | TEMP_SEC_GEN | TEMP_SEC_GEN |
| Hours : | 7.00 N | |

Vacation Day.

---

| | | | |
|---|---|---|---|
| Billable : | 0 Entries. | Hours : | 0.00 |
| Non-Billable : | 1 Entries. | Hours : | 7.00 |
| Total : | 1 Entries. | Hours : | 7.00 |

Timekeeper : _____        Date : _____