EXHIBIT L

# RESPONSE TO CRITICISMS BY
# DR. MICHAEL RAPPEPORT OF TWO SURVEYS
# CONDUCTED TO DETERMINE WHETHER
# A PAIR OF NEXIUM ADS ARE FALSE AND MISLEADING

Prepared for

## Patterson, Belknap, Webb & Tyler LLP

On Behalf of

### Tap Pharmaceutical Products, Inc.

Prepared by

Susan Schwartz McDonald, Ph.D.

**JUNE 2005**



EXHIBIT

McDonald-1

NW   11-6-05



# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................... 1

II.  RESPONSE TO DR. RAPPEPORT'S CRITICISM THAT
     NEITHER SURVEY ADDRESSES THE RELEVANT ISSUES...... 4

III. RESPONSE TO DR. RAPPEPORT'S CRITICISMS OF
     DR. DUPONT'S TV COMMERCIAL SURVEY *QUA* SURVEY... 7

IV.  RESPONSE TO CRITICISMS OF DR. DUPONT'S
     INTERNET AD SURVEY *QUA* SURVEY................................. 15

V.   MY OWN ANALYSIS AND CONCLUSIONS .............................. 19

APPENDIX:
    CV of Susan Schwartz McDonald, Ph.D.

# I. INTRODUCTION

- <u>Nature of the Assignment</u>

I have been retained by Patterson, Belknap, Webb & Tyler LLP on behalf of Defendant in AstraZeneca LP v. TAP Pharmaceutical Products, Inc. to respond to criticisms of two surveys that were conducted Dr. Thomas Dupont for the purpose of determining whether AstraZeneca's direct-to-consumer advertising of Nexium is false and misleading under the Lanham Act. Specifically, TAP contends that the Nexium ads leave current or potential users with the impression that Nexium is better than competing prescription drugs in its class at relieving symptoms of acid reflux and heartburn, even though the clinical data suggest that Nexium is superior only in healing esophageal damage. Secondarily, TAP is also concerned that consumers exposed to Nexium ads fail to recognize that Nexium's claims of superiority with respect to healing of esophageal damage apply only to *moderate-to-severe* damage, despite a qualifying statement to that effect in the ads.

Dr. Dupont conducted two surveys over a period of three months. The first one (January 2005) addressed a Nexium television commercial that has been widely aired nationally, and the second (March 2005) addressed an Internet ad. Dr. Rappeport has concluded that both studies fail to address what *he* believes to be the relevant issue: Whether consumers who knew the underlying facts about Nexium would conclude that it is better than competing products, in which case (he argues) they could *not* be misled by the ads in the way that TAP contends. He raises further objections to the design and implementation of both surveys on their face, contending that, as a result of those methodological shortcomings, neither survey has any evidentiary value whatsoever in the case.

*I respectfully disagree with Dr. Rappeport on both counts.* I believe that each survey addresses what I understand to be the relevant issues under the Lanham Act using approaches that are methodologically valid. I further believe that a proper interpretation of Dr. Dupont's results justifies the conclusion that both Nexium ads are misleading to a significant

proportion of consumers in this market with respect to how and for whom Nexium may be better.

- ## Professional Background and Qualifications

I am CEO of National Analysts, a marketing research and consulting organization that conducts hundreds of surveys with consumers and professionals each year. As CEO, I have responsibility for the design and implementation of many of these surveys, including assignments commissioned for litigation purposes to examine the interpretation of potentially false or misleading advertising, and gauge secondary meaning or trademark confusion under the Lanham Act.

I am an expert in both survey research and marketing, and each year, I oversee dozens of surveys designed to illuminate the purchase decision-making process for new and existing products. In that context, I am frequently called upon by companies to help them assess the interpretation and motivational impact of their advertising and promotion. I have also lectured on research methodology at major universities (e.g., University of Pennsylvania and Princeton) and at industry training seminars sponsored by major professional organizations (e.g., Council of American Survey Research Organizations [CASRO], Pharmaceutical Marketing Research Group, HMC Council, etc.). In addition to serving as a member of the Board of Directors of CASRO, I co-chair its Guidelines and Standards Committee and its Pharmaceutical Marketing Research Taskforce.

I received a BA degree from Smith College, and Masters and Doctoral degrees from the University of Pennsylvania's Annenberg School for Communication, where my studies were concentrated in the field of social psychology and communications theory. I am the author of a text on market research and numerous publications and speeches on marketing and market research methodology. A complete copy of my vitae along

3.

with a list of publications authored in the past ten years and testimony and depositions taken in the past five years is presented in the Appendix.

In arriving at my opinions and conclusions, I have reviewed the following materials:

- AstraZeneca's Complaint
- TAP's Answer
- Preliminary Injunction Oral Argument Transcript
- Storyboard for the "Better" TV commercial
- Tom Dupont's Questionnaire for the first survey
- Tom Dupont's Report on the first survey
- Tom Dupont's Questionnaire for the second survey
- Tom Dupont's Report on the second survey
- Current Print Ad for NEXIUM

I am being compensated for my work in connection with this litigation at my standard billing rate of $500 per hour.

\*    \*    \*    \*    \*

The discussion that follows is organized into three principal sections. The first (Section II) addresses Dr. Rappeport's assertion that neither survey addresses the relevant issues in this case. Section III responds specifically to his methodological criticisms of the television commercial survey, and Section IV responds to his methodological criticisms of the Internet ad survey.

Section V presents my own interpretation of the surveys, drawing on the questions I perceive to be most pertinent and most valid for these purposes.

4.

## II.  RESPONSE TO DR. RAPPEPORT'S CRITICISM THAT NEITHER SURVEY ADDRESSES THE RELEVANT ISSUES

In critiquing Dr. Dupont's surveys, Dr. Rappeport makes the *a priori* argument that the Nexium ads are not necessarily misleading because, if consumers knew what Dr. Rappeport describes as "all the facts" they might, themselves, conclude that Nexium is better.*  In that case, he contends, the Nexium ads would *not* be misleading because they would be consonant with consumers' own interpretation of the facts based on an ingoing logic or worldview about the definition of "better."  Continuing from this syllogistic premise, Dr. Rappeport argues that Dr. Dupont should have set about the business of determining the veracity of the ad using consumers' own assumptions about what is a legitimate inference to draw about Nexium's superiority.

I believe that Dr. Rappeport is very much mistaken in his view that consumers should be made the arbiters of an ad's truthfulness or be assigned responsibility for what can *legally* be communicated about this product given a particular set of facts.  The goal of surveys like these should be to determine how consumers interpret a specific promotional message and which elements of the promotion give rise to, or encourage, that interpretation – not to invite consumers to weigh in on whether that interpretation is justified, given the facts.

I begin with the premise that Nexium has *not* been shown to be better than Prevacid at relieving acid reflux or "heartburn," and that it is improper for AstraZeneca to state, or even imply, superiority in that regard.  I contend further that it would be improper to do so, even if consumers who were given Dr. Rappeport's assertions about acid reflux disease were ultimately to conclude that a general claim of "superiority" is justified.  I will cede primary responsibility to the attorneys for substantiating my ingoing premise about how "truth" is properly defined in Lanham Act cases, but it is important to

---

*His facts, in sum, are as follows:  Erosive esophagitis can be one of the sequelae of acid reflux disease, and Nexium has been proven more effective at healing cases that are moderate-to-severe; ergo, Nexium could legitimately be judged better.

note that Dr. Rappeport's view of things does not square with my understanding of federal regulatory guidelines regarding promotion based on clinical data, and that his own inference about the superiority of Nexium for most people with acid reflux is, in fact, unjustified.

Ironically, it appears that Dr. Rappeport has, himself, fallen prey to precisely the kind of misapprehension that the law aims to avert. He concludes that if a product provides superior results under a narrow set of circumstances (i.e. for a subpopulation or a specific set of symptoms), those benefits will be experienced by all users under all conditions – or, at the very least, that it would be reasonable for them to assume so. I disagree. *The notion of "better" is not a broad abstraction but a statement about performance under specific circumstances or particular applications. To generalize broadly without regard to those contingencies is to create expectations that will not be met.*

*By way of analogy,* it might be true that a prescription remedy formally indicated for migraine headaches would provide superior relief of a *migraine* than, say, ordinary Tylenol, but it cannot be assumed that a migraine drug would necessarily provide superior benefit to someone with an ordinary headache. To that extent, it would be misleading to suggest to a consumer that a prescription drug is "better" for an ordinary headache than Tylenol, even though they might tend to assume that to be the case.

Similarly, if we imagine two waterproof watches – one capable of withstanding immersion in the bath or shower, and another capable of withstanding the pressure of deep-sea diving – it would not be fair to assume that the diver's watch was "better" for the purposes to which ordinary consumers would want to put it, even though some consumers might assume so unless told otherwise.

While both of these analogies substantially overstate the magnitude of difference between Nexium and Prevacid (which, by all accounts, are very similar drugs), overstatement helps to make the point even more clearly. *The issue is not whether Nexium is ever superior to Prevacid, but whether it is superior at doing what the more typical consumer requires and expects from*

*a product to treat routine acid reflux.* If the answer to that is no, then consumers are misled insofar as the advertising leads them to extrapolate from severe esophageal damage to ordinary acid reflux. Thus, Dr. Rappeport's depiction of "all the facts" is not, as it happens, "all the facts." When he attempts to make the case that Nexium can legitimately be judged "better," he is selecting and positioning information in such a way as to perpetuate or promote the very misapprehensions that the Lanham Act is meant to prevent.

From my perspective, the issues that a survey is required to address in this case are precisely these: Do a statistically meaningful percent of target consumers take away a message from the Nexium ads that they will gain greater benefit from Nexium than Prevacid for relief of the acid reflux they routinely experience; and is that erroneous message directly attributable to the words and images in the Nexium promotion? Since those are the questions that Dr. Dupont's surveys were designed to answer, it remains only to decide whether: (1) he chose appropriate methodologies; (2) he properly executed and analyzed the studies, and finally, (3) he drew the correct conclusions from the data.

## III. RESPONSE TO DR. RAPPEPORT'S CRITICISMS OF DR. DUPONT'S TV COMMERCIAL SURVEY *QUA* SURVEY

- **Criticism Regarding Choice of Malls for the Control Condition**

  Dr. Rappeport objects to the fact that the control sample did not include a New England location while the test cell sample did, arguing that this lack of complete parallelism "reduces to some unknown degree the evidentiary value of the survey" (Rappeport, p.17). Although he concedes that "it is hard to know just how much difference not matching the two samples makes," he thinks enough of the issue to raise it at all. This strikes me as a petty quibble – particularly in light of the fact that mall intercept surveys are never "national samples" in the literal sense of the term, and that use of six or eight malls to represent the entire country (which is customary in Lanham Act surveys) is really a ceremonial nod to geographic dispersion rather than a guarantee of true national representation.

  Researchers know well that variations in time of day or day of the week – as well as use of two different central locations in the same region – can produce a greater disparity in "matched" samples than Dr. Dupont's omission of New England in his control arm. Regardless, experience suggests there is rarely significant, systematic regional variation in responses to Lanham Act surveys; if we found that to be the case, we would be obligated to conduct these surveys in many more locations than we customarily do, using more rigorous sampling designs. In effect, this issue is purely cosmetic and, as such, unworthy of the attention Dr. Rappeport gives it. Moreover, it is ultimately *moot* with respect to my own analysis of the data since I believe that the control arm in this survey was unnecessary.

- **Criticisms Regarding Universe and Sample**

  Dr. Rappeport objects to the fact that Dr. Dupont screened out respondents "employed in the healthcare field," arguing that

healthcare workers constitute a substantial portion of the relevant market. I infer that Dr. Dupont's rationale for doing so was the concern that healthcare workers might not be "typical" consumers in the sense that they are more knowledgeable than the average person about certain topics, and less easily misled by advertisements that are misleading to others. While we suspect that this screening criterion excluded people from the survey who knew no more about these drugs than the rest of the population, it is rather difficult to draw fine lines between occupational subsets in a way that separates respondents who have unusual knowledge from those who do not. Thus, it is routine to frame screening questions of this type in a way that may be broadly exclusionary in order to avoid any risk that professionally knowledgeable respondents might skew the results.

If Dr. Rappeport believes that health care workers were improperly excluded from the survey, and that their inclusion would, in fact, have produced a different outcome, one might reasonably ask: how and why? Had they given responses that were systematically *different* from other survey participants, Dr. Dupont would have been, *ipso facto*, correct in assuming that their professional experience rendered them somehow different – *but that* would, in turn, have been confirmation that they *deserved* to be excluded. Had their responses been the *same* as those of the people actually surveyed, then we could confidently say that the participants Dr. Dupont chose to include did a good job of representing the entire population. Either way, there can be no creditable argument for including healthcare industry workers – or for criticizing the survey because they were not included.

- ## Criticisms That the Screening Questions Sensitized Respondents

Dr. Rappeport goes on to complain that the screener sensitized respondents to the topic at hand by asking them about heartburn or acid reflux disease between two and four times. For the record, the maximum number of times was three, by my quick calculation, but regardless, I see nothing amiss with the screening procedure. The population of interest is people who rely on prescription drugs to treat

heartburn and acid reflux. Presumably, those individuals approach the
Nexium ads with that orientation – not from the vantage point of
erosive esophagitis (which, arguably, most have never heard of and are
thus, not specifically listening for, or attuned to). What Dr. Rappeport
would clearly have preferred is a survey design that actually sensitized
respondents to esophageal damage. Dr. Dupont chose not to do that,
and I believe he made the proper decision.

- **Criticisms Regarding Analysis of the Control Data**

Although Dr. Rappeport is clearly in favor of a controlled survey
design, he takes direct aim at the way in which the data from the
control arm of this study were analyzed, and presents a re-analysis of
the data to suggest that the difference between the test and control
arms is nominal. *Like Dr. Dupont, I believe that a control was
unnecessary in this particular case,* given the nature of the Nexium ad,
and I would argue that the relevant point is better made – *and more*
appropriately made – *by an analysis of the test cell data per se.*
Regardless, the control does lend support to Dr. Dupont's conclusions *if
the data are properly analyzed.* Dr. Rappeport's re-analysis is, in my
estimation, improper and should not be used as the metric of how
many consumers derive a false and misleading message from the
commercial.

Before speaking more directly to that point, I want to address the
general issue of controls and the role they may play in experimental
survey design. Social science research has borrowed many precepts
and techniques from "the scientific method" in order to enhance the
validity of research outcomes. Nonetheless, social science research –
especially survey research – cannot perfectly replicate the
methodologies of the physical sciences. The social sciences deal with
people rather than substances or natural phenomenon, and the metrics
we use to measure attitudes, beliefs, or impressions rely on language
and meaning, which we cannot completely rid of subjectivity and
imprecision.

The notion of a controlled survey design is one such borrowed technique, used frequently to partial out the effect of environmental noise or survey design artifact. Not every research scenario that arises under the Lanham Act necessarily warrants a controlled survey, however, and under some circumstances, the process of designing a control risks introducing as much research artifact and distortion as it is meant to remedy or preclude. Controls do not always present themselves naturally in a given situation, and even in the case of scientific experiments, there are sometimes challenges associated with the design of a perfect control.

In this case, however, I would concur with Dr. Dupont that the control arm he designed in an "abundance of caution" was actually gratuitous, and that the data it generated, though supportive of the general conclusions to be drawn from the test arm, do not constitute an optimal test of how many consumers were misled by the original ad. My reasons are as follows.

The Nexium commercial, as Dr. Rappeport fully concedes, is frankly comparative. In fact, he notes in his own re-analysis that Dr. Dupont's control (which eliminated all references to heartburn) was problematic to the extent that it also said "better" *fewer* times than the test commercial, which uses the spoken term, "eight times." (The control version uses it *six* times − *often enough* to fairly represent the comparative leitmotif of the ad.)

It is therefore fair to say, as Dr. Dupont points out, that the issue is not whether the commercial asserts that Nexium is better; it is, rather, *what specifically Nexium is better at doing.* Since Dr. Dupont utilized an open-ended questioning technique to elicit consumer perceptions relating to that point, the question did not, itself, introduce any sort of bias with respect to how or why Nexium is better, and could not predispose respondents to select certain content themes over others.

In response, Dr. Rappeport would properly counter that while the *question* may be inherently unbiased, the *environment* is not entirely free

of noise, since consumers exposed to years of Nexium promotion are generally aware that it is a product for "heartburn." Indeed, it is the strong existing association between Nexium and ordinary heartburn that AstraZeneca cleverly seeks to leverage in a commercial that keys off "better" data in healing esophageal erosion. Presumably, this is one of the ways in which advertisers can mislead consumers – i.e., by taking careful account of how people are inclined to generalize from the part to the whole in an effort to make sense of information, and by creating ads that subtly encourage that sort of extrapolation.

So let us suppose, then, that consumers who hear the Nexium commercial, with its drumbeat repetition of the word, "better," will tend to recognize that the sponsor of the commercial would like them to believe it is better than some competitive product(s). Let us assume, further, that because they already know Nexium is a heartburn drug, consumers are predisposed to assume, even without being explicitly told, that Nexium is better at relieving heartburn. It is plausible to argue that many will "play back" that response (better at relieving *heartburn*), even though it is not specifically mentioned in the ad.

On the other hand, if the ad actually did do an adequate job of also communicating that Nexium is superior to other products *specifically in healing (moderate-to-severe) esophageal damage,* we might also expect consumers to play back something about that particular claim. Any veteran of marketing knows that advertisers work very hard to ensure that so-called "key messages" get communicated by controlling how, and how often, they are conveyed in an ad. *Had AstraZeneca wanted to underscore erosive esophagitis, it would have designed the ad in such a way as to ensure that the majority of consumers heard the message.* That, however, did not happen here – at least, not as measured by the responses to Q's. 1 and 2.* Of all the mentions, well under 40% referenced healing damage to the esophagus compared with

---

*Please tell me, as completely as you can, what the commercial communicated to you about Nexium? ... What else, if anything, did the commercial communicate to you about Nexium?

over 80% who referenced acid reflux or indigestion.*  Similarly, in response to Q.5 (*What did the commercial tell you Nexium was better at doing?*), references to acid reflux or other symptom relief outnumber references to damage by over two to one (68% vs. 29%).  Had they effectively communicated superiority in addressing esophageal erosion, we would not have expected such a statistical margin of difference.  Indeed, had AstraZeneca truly aimed to communicate a message that highlighted damage to the esophagus and received "playback" on that particular point from less than half the market, I suspect they would have rewritten or pulled the ad.

Dr. Rappeport pays no heed to that point, focusing entirely on the comparison between the control and the test arms.  Noting that removal of references to heartburn reduced the percent of people who discerned a symptom relief message by a delta of 25%, he contends that the difference between the two is nearly halved if the responses are re-based by calculating respondents who referenced superior symptom relief as a percent of those *actually asked Q.5, rather than the total sample*.  In effect, Dr. Rappeport seeks to impose a *penalty* on the Dupont survey because, for reasons that remain unclear (and may still reflect chance), fewer respondents in the control sample registered the superior claim.

Dr. Rappeport's approach here is, in fact, *inconsistent* with the analytic strategy customarily used in Lanham Act surveys.  Logically, the proper denominator for this calculation is the *entire sample – meant to* represent the relevant consumer universe – *rather than* only the percent of respondents who pass through the Q.4 filter.  If Dr. Rappeport's approach were to be adopted, it would have the routine effect of distorting the proportion of people deemed to be confused or misled in any survey arm, and as here, would improperly shift the frame of reference from the broader universe to a smaller subset.

---

*Actual percentages are subject to minor variation based on subgrouping decisions but there are at least twice as many references to acid indigestion and reflux as to esophageal damage.

Dr. Rappeport looks to Q.6 to confirm the results of his re-analysis, and indeed, Q.6 tells a slightly different story, though not the one Dr. Rappeport claims it to.

> (Q.6)  *Thinking about what the commercial communicated to you, which <u>one</u> statement on this card best describes what the commercial communicated to you about how Nexium compares with other products?  You can just read me the number next to the answer that you pick.*
>
>> (1)  *It said Nexium heals damage to the esophagus better than the other leading prescription medicines, but did not say it was better than the other leading prescription medicines at relieving the symptoms of acid reflux disease, such as heartburn.*
>>
>> (2)  *It said Nexium relieves the symptoms of acid reflux disease, such as heartburn, better than the other leading prescription medicines, but did not say it was better than the other leading prescription medicines at healing damage to the esophagus.*
>>
>> (3)  *It said Nexium is better than the other leading prescription medicines both at healing damage to the esophagus and at relieving the symptoms of acid reflex disease, such as heartburn.*
>>
>> (4)  *None of the above describe what the commercial communicated to me.*
>>
>> (5)  *Don't know.*

In response to that question, just over six in ten selected an answer that says the ad communicates *both* the claims – i.e., better at relieving the symptoms of acid reflux such as heartburn *and* better at healing damage to the esophagus.  Dr. Rappeport makes much of that result, as if to suggest that selection of response #3 exonerates the commercial because those respondents are *half*-right.  True, they may be half-right – but they are also *half-wrong*.  Nexium is *not* better than the other

leading prescription medicines at relieving symptoms of acid reflux disease, such as heartburn.

It is, of course, noteworthy that substantially more people referenced an esophageal damage message in response to Q.6 than they had in prior open-ended questions but I interpret that result as artifact – more the result of guessing flavored by response bias, than a reflection of anything respondents truly gleaned from the commercial.

I do not mean to suggest that close-ended questions are generally inappropriate (as some Lanham Act researchers have mistakenly argued) since I concur heartily with Dr. Rappeport that, *under certain circumstances*, close-ended questions can yield more pertinent information than open-ended questions. In this case, however, I think Dr. Dupont's close-ended question was structured in such a way as to (unwittingly) encourage guessing – *and in a* rather expansive direction. The response categories, as worded, were turgid and complex, requiring a fair degree of care and attention to distinguish one from another. There is also an abundance of experience to suggest that when given a set of answers that offer option "A" vs. "B" vs. "A-*plus*-B," respondents are generally predisposed to choose A-*plus*-B, on grounds that "more is better" – or, in this case, that a comprehensive answer is more likely to be correct. Under these circumstances, it comes as no surprise that respondents who felt themselves challenged to recall and interpret certain subtle message nuances simply took the "safe" option and declared the ad to communicate more rather than less.

## IV. RESPONSE TO CRITICISMS OF DR. DUPONT'S INTERNET AD SURVEY *QUA* SURVEY

- **Response to Criticism that the Close-ended Question Should be Given Greater Weight in Interpreting the Results of this Survey**

Dr. Dupont approached the design of the control in his internet ad survey from the *opposite* perspective, by removing the qualifying message about moderate-to-severe esophageal damage rather than by attempting to purge the commercial of all content about acid reflux. In doing so, he achieved a more elegant design that twists the lightbulb rather than the lamp, so-to-speak, and averts some of the problems observed in the TV commercial survey. If removal of the qualifying information does nothing to reduce the level of playback regarding moderate to severe damage, then it can be concluded, by implication, that the qualifying information is having no effect on how consumers interpret the ad, leaving them free to draw the broadest possible inferences about the superiority of Nexium.

From what I can see, Dr. Rappeport takes no issue with the design of the control in this second survey. His objection lies elsewhere – specifically with the way Dr. Dupont interprets responses to the close-ended questions and the weight that he gives to the open-ended responses in drawing his conclusions. Dr. Dupont points out while large proportions responded to the open-ended questions by recalling comparative claims that suggested Nexium was superior to Prevacid, references to moderate-to-severe damage were made by only 8% of consumers exposed to the test ad and by virtually none of those exposed to the control ad. That led Dupont to draw the conclusion that the qualifying information went entirely unnoticed in the ad, and that impressions of generalized superiority were thus being drawn.

Here, again, however, Dr. Dupont included a follow-up closed-ended question for good measure, and it is this question that gives

Dr. Rappeport grounds to draw different conclusions about how consumers interpret the internet ad.

Dr. Dupont posed the following question to people who said they recalled the ad saying that Nexium heals acid-related damage better than the other leading medicine:

> (Q.7)  *Looking at the choices printed on this card, and based on what the ad communicated to you, for what group of people will Nexium heal acid related damage better than the other leading medicine?*
>
> (1)  *All people with damage to the esophagus caused by acid reflux disease*
>
> (2)  *Only people with moderate-to-severe damage to the esophagus caused by acid reflux disease*
>
> (3)  *Don't know/no opinion*

Even though only about 8% of test cell respondents (or 11%, by Dr. Rappeport's tally) made reference to "moderate-to-severe" damage in prior open-ended questions, over half the respondents who were asked this question in both *test and control* conditions chose the response category "all people with damage to the esophagus caused by acid reflux disease." There are two noteworthy aspects to these findings: (1) many more respondents played back the narrow (moderate-to-severe) interpretation of superiority in response to this question than had volunteered similar responses in the open-end; and (2) *respondents who saw the edited ad were just as likely to choose the more restrictive interpretation as those who saw the test ad.*

Dr. Rappeport can easily rationalize the first of these outcomes because he presumes that many people must have noticed the qualifying phrase but simply failed to mention it in their open-ended responses. He is harder pressed, however, to account for the fact that as many people in the control group gave that same response as gave it in the test group.

Clearly, those test group respondents could not have based their answer on the qualifying information in the ad because it had been removed from the ad they had just seen. How, then, to explain it?

Dr. Rappeport struggles for an explanation, speculating that these data may be a result of preconceptions that respondents brought to the survey based on prior exposure to Nexium ads. In effect, Dr. Rappeport would have us credit two premises that are difficult to reconcile: (A) that the information about moderate-to-severe disease is so powerful that it has accrued in people's minds over time and is mentally projected onto ads, even if not mentioned, yet; and/or (B) this information is still not salient enough to have surfaced with greater frequency in the open-ends. This set of hypotheses lacks plausibility, however, given that so few test respondents thought to mention it in their open-ended responses, and virtually none of the control respondents made any mention of it at all. If there were so much carry-over, I would have expected more mentions to surface spontaneously in the open-end questions. Thus, I think the principal explanation lies elsewhere.

If anything, the data generated by this question suggest that respondents were tending to *guess* when they chose an answer but that, once again, they were more apt to choose an inclusive response (*all* people) than a narrow one (only people with moderate-to-severe). Had guessing not been a crucial — *perhaps the only* — factor accounting for this response distribution, we might reasonably have expected *some* discrepancy in the response patterns for the two cells by virtue of the fact that respondents in the test group had more information available to them.

Can we, then, reconcile responses to this close-ended question with the pattern of responses observed in answer to the close-ended question from the TV commercial survey? Recall that in the earlier survey, respondents were presented with three response options: A but not B; B but not A; A plus B. A little over half chose the more inclusive (arguably simplest) answer, and nearly four in ten chose either of the

two narrower answers, a pattern not dissimilar to what we observe here.  It is my hypothesis that in both of these samples, large numbers of respondents were merely guessing.

Regardless of what explanation one chooses for this anomalous set of responses, there is no doubt that this close-ended survey question cannot be trusted to provide meaningful data.  (At best, it offers, methodological insight on how survey questions can go astray.)  Whenever there is serious doubt about the validity of a close-ended question, as here, it is prudent to default to the most pertinent open-ended questions – particularly since one could reasonably argue that a close-ended question was not needed in either of these studies to elucidate or amplify the open-ends.

## V.  MY OWN ANALYSIS AND CONCLUSIONS

Survey research is a *social* science, and there are, in fact, more ways than one to achieve a given objective.  Thus, any two practitioners might disagree about precisely how to go about measuring relevant attitudes in a given situation using acceptable survey techniques.  It is critically important, in evaluating the methodological merits of a survey, to distinguish between minor points of contention (about which reasonable and informed professionals might agree to differ) and major ones that would invalidate a survey, or render it essentially useless for the purpose at hand.

As my response to Dr. Rappeport's criticisms would imply, I feel that none of the criticisms leveled at either one of Dr. Dupont's surveys depreciates their probative value in this case.  Although I, too, take issue with a few of the methodological decisions Dr. Dupont made, I am convinced that:  (1) the surveys themselves have been designed in such a way as to render pertinent and valid information about whether or not Nexium campaign misleads consumers; and (2) that body of data generated by both surveys support the view that the ads are, indeed, false and misleading.

Having already responded to Dr. Rappeport's criticisms, the time has now come for me to offer data interpretations of my own.  It should be recalled that Dr. Rappeport's criticisms of these surveys fall into two distinct categories.  First, he disputes whether Dr. Dupont set out to measure the correct thing, thereby challenging the *relevance* of either survey to the case at hand.  Second, he raises several technical criticisms of each survey, thereby challenging the *validity* of both surveys on their own terms, as well as the legitimacy of Dr. Dupont's interpretation of the data.

As already noted, I think that Dr. Rappeport is very much mistaken in his view that the surveys fail to address relevant questions.  In my opinion, Dr. Dupont correctly sought to determine whether consumers generalized claims of Nexium's superiority under a *narrow* set of circumstances to the product's *overall* performance in providing relief of acid reflux for the vast *majority* of consumers. Any consumer who comes away from those ads believing that Nexium provides superior relief of acid reflux, or superior relief of all erosive esophagitis, has

been misled. Consumers have the right to know whether any superiority benefit attributed to a product is likely to accrue to them personally – particularly when the data show clearly that if they do not fall into a particular category, it probably will not. Since most consumers with indigestion do not have esophageal damage, much less moderate-to-severe damage, most will not experience the superior benefits asserted in both Nexium ads. They should therefore not be encouraged to make judgments about whether or how Nexium is "better" without fully understanding the qualifications that properly attach to Nexium's superiority claims. The surveys conducted by Dr. Dupont properly aim to determine if they do.

I also believe, despite some misgivings about particular questions in each survey, that both of them demonstrate (via certain of the open-ended responses), that consumers have been encouraged by the ads to over-generalize those benefits. For reasons described in my report, I entirely discount the close-ended questions designed to clarify their interpretations (Q.6 in the TV commercial survey and Q.7 in the Internet survey). *Nonetheless, I think that data from each of the surveys lend convincing support to the contention that both ads are misleading to consumers.* Notably, the TV commercial leaves consumers with the misleading impression that Nexium is "better" at treating ordinary acid reflux or indigestion, and the Internet Ad misleads in the sense that it fails to clarify that Nexium's superiority in healing damage is confined only to moderate-to-severe cases.

Before pointing directly to the data that support those conclusions, I want to note that, although these two studies must be viewed as something of a "matched set" (because they have certain things in common), it is simply not possible to take *precisely* the same approach to the analysis of both since neither the ads at issue nor the surveys are perfectly parallel in all respects. Each study sheds light on the subject, but not in exactly the same way.

In arriving at my conclusions, I have given differing weight to the control in each study because the two studies differ with regard to the material tested and the way the controls were constructed. In the TV commercial survey, I have relied more heavily on the test arm data because I believe it is actually a more accurate representation of events even though the control data, if properly

analyzed, are entirely consistent. By contrast, in the Internet ad survey, I have relied *entirely on the test/control comparison* because that ad is focused more narrowly and explicitly on acid-related damage, such that the only real question is whether respondents register the qualified conditions under which the claim is true (i.e., whether moderate-to-severe damage is noticed). The best way to ascertain the answer to that information is by directly comparing the test and control arms of the study.

In both surveys, I rely primarily for my conclusions on the "directed" open-ended questions – specifically, those questions which ask respondents who acknowledge hearing a claim of "better" in the ad what specifically they believe Nexium is better at doing, or what they recall about the claim of superiority. My rationale for giving less weight to the more general open-ended questions ("Please tell me what the ad communicated to you about Nexium") is not that these questions are invalid but rather, that they supply less information than the directed open-ends.

Thus, the data on which I have relied, and the conclusions I have drawn, are as follows:

- *In the TV commercial survey*, approximately 68% of test cell respondents* described Nexium in Q.5 as "better" at relieving acid reflux or heartburn and other stomach symptoms, whereas only 29% mentioned that it was better at healing damage to the esophagus or throat (and none referenced moderate-to-severe damage in particular). The fact that roughly 40% of respondents failed to detect what AstraZeneca is ostensibly intending to communicate, but *did* discern a message of superior symptom relief, suggests that the commercial is doing a far better job of communicating what it does *not* intend to communicate than what it ostensibly does. If we look specifically at the control data to correct for noise, *and* we perform the proper statistical analysis, we still see that at least 25% have been misled by the commercial.

---

*Of the 85% asked the question

- *In the Internet ad survey*, which focused directly on damage to the esophagus, respondents who were shown the control ad responded in precisely the same way to every open-ended question in the survey as those who were shown the test ad. Specifically, in response to Q.4 *(What do you recall the ad saying about that (i.e., that Nexium heals acid-related damage better than other leading medicines?)*, only about 4% referenced "moderate-to-severe" in the test cell and no mention was made in the control. By implication, the ad fails to make clear to almost anyone that the claim of superior healing applies only to that subset of patients with moderate-to-severe damage. Put another way, almost everyone exposed to that ad draws a false and misleading impression about the circumstances under which (and the person for whom) Nexium may be better.

In sum, I believe that each of those surveys demonstrate, albeit in slightly different ways, that the ads at issue convey broad superiority claims that go well beyond the narrow set of circumstances or contingencies justified by the studies cited in the ads. In the case of the TV commercial, it appears that at least one in four consumers (and potentially more) are left with an erroneous impression. In the case of the Internet ad, very nearly *everyone* is misled.

The results from Dr. Dupont's survey are not close calls, nor do they require the splitting of statistical hairs. Despite Dr. Rappeport's attempts to chip away at the credibility of these surveys, they still justify the conclusion that a significant percent of consumers who view the Nexium ads will be misled. I believe, further, that the ad which recently appeared in <u>Good Housekeeping</u> (July 2005) is so substantially similar to the Internet ad tested in Dr. Dupont's second survey that conclusions drawn from his research can be safely extrapolated to the print ad. It is structured in very much the same way, and I anticipate that a survey like the one already conducted would document that it, too, conveys a false and misleading message.

\*     \*     \*     \*     \*

Submitted by:

_____
Susan Schwartz McDonald, Ph.D.

_____
June 29, 2005
Date

**APPENDIX**



NATIONAL ANALYSTS
RESEARCH & CONSULTING

## SUSAN SCHWARTZ McDONALD, Ph.D.

As President and CEO of National Analysts, and leader of the firm's Healthcare and Consumer practices, Dr. McDonald consults to clients on strategic marketing issues including demand forecasting and optimization, pricing, positioning, portfolio strategy, and brand equity assessment.

Dr. McDonald is a specialist in the application of forecasting techniques to healthcare markets, having supported the launch of many pharmaceutical products and medical technologies in a wide range of therapeutic areas. Other categories in which she has extensive experience include OTC pharmaceuticals, food and beverage products, and mass media. In those settings, she has contributed to the development of advanced research techniques that support market segmentation and brand extension strategy.

She also directs National Analysts' litigation support practice, a context in which she is frequently called upon to conduct surveys and testify as a marketing and market research expert in cases pertaining to trademark confusion and dilution, unfair advertising, and other issues under the Lanham Act.

Most of Dr. McDonald's 30-year marketing career was spent at Booz·Allen & Hamilton, a worldwide management and technology consulting firm, of which she was a Vice President for over five years. Prior to that, she was a journalist and a poet, contributing regularly to a number of major magazines and newspapers, including *National Review* and *Harper's*. Dr. McDonald is also coauthor (with Alfred Goldman) of a standard text on qualitative research methods, <u>The Group Depth Interview: Principles and Practice</u>, published by Simon & Schuster/Prentice Hall (January 1987). She lectures and writes frequently on marketing issues and market research techniques, and has contributed to medical journals as well as marketing texts. In addition to serving as a member of the Board of Directors of the Council of American Survey Organizations, Dr. McDonald co-chairs its Guidelines and Standards Committee and its Pharmaceutical Marketing Research Taskforce.

Dr. McDonald holds M.A. and Ph.D. degrees from the University of Pennsylvania's Annenberg School, where she was trained in communications theory and social psychology. Her B.A. was awarded magna cum laude, Phi Beta Kappa, from Smith College in 1969.

# SUSAN SCHWARTZ McDONALD, Ph.D.

## *MARKETING PUBLICATIONS AND PRESENTATIONS*

**(1996 to Present)**

*Charting the New Product Development Course: A Market Research Case Study Workshop,* conducted at the Institute for International Research's 2nd Annual Pharmaceutical Marketing Research Roundtable, Philadelphia, PA, November 1996.

*The Positioning Research Ritual: When Not to Bother At All,* presented at the Pharmaceutical Marketing Research Group Fall '98 Meeting, Baltimore, MD, September 1998.

*Project Conception: Questioning Your Client/Designing the Study,* presented at the CASRO Advanced Project Directors Training Conference, Philadelphia, PA, September 14, 2000.

*Transforming Market Strategy into Marketing Action: An Overview of Primary Research Techniques,* presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, November 2001.

*The Positioning Paradox: When Words Hold Ideas Captive,* presented at the Pharmaceutical Marketing Research Group Fall '02 Meeting, Tysons Corner, VA, October 2002.

*The Long and Winding Road: Market Research in Support of Creative Concept Development,* presented at the Healthcare Marketing & Communications Council Account Service Development Program, New York, NY, October 2004.

*How to Design and Implement Successful Pricing Research: Counsel and Caveats from the Trenches,* presented at the Professional Pricing Society, 6th Annual Pricing Conference, Chicago, IL, October 1995; reprinted in The Journal of Professional Pricing, 13, 3, 2004.

# SUSAN SCHWARTZ McDONALD

## TESTIMONY/DEPOSITION ACTIVITY SUMMARY

### (2001 – Present)

ZonePerfect Nutrition Company, Plaintiff v. Hershey Foods Corporation, Hershey Chocolate & Confectionery Corporation, Barry D. Sears, and Zone Labs, Inc., Defendants
U.S. District Court for the District of Massachusetts
Civil Action No. 04-10760-RGS
*Deposition on behalf of Plaintiff (June 25, 2004), New York)*

Edge Wireless, LLC, Plaintiff v. U.S. Cellular Corporation, Defendant
U.S. District Court for the District of Oregon
No. CV-03-1362 AA
*Deposition on behalf of Defendant (April 14, 2004), Philadelphia)*
*Testimony (May 20, 2004), Eugene, OR)*

Brennan's, Inc., Owen E. Brennan, Junior, James C. Brennan and Theodore M. Brennan, Plaintiff
v. Dickie Brennan & Company, Inc., Cousins Restaurants, Inc., Defendant
U.S. District Court for the Eastern District of Louisiana
No. 00-2413 (E.D. La.)
*Deposition on behalf of Plaintiff (July 24, 2002, Philadelphia)*
*Testimony on behalf of Plaintiff (November 2002, New Orleans)*

Vulcan Print Media, Inc., Plaintiff v. Las Vegas Sports News, Defendant
U.S. District Court for the Eastern District of Pennsylvania
No. 98-5768
*Deposition on behalf of Defendant (May 2, 2001, Philadelphia)*