## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ASTRAZENECA LP, | ) | <u>**PUBLIC VERSION**</u> |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1332 - KAJ |
| | ) | |
| TAP PHARMACEUTICAL PRODUCTS INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PUBLIC VERSION OF TAP PHARMACEUTICAL PRODUCTS INC.'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE <u>THE TESTIMONY OF THOMAS DUPONT AND SUSAN S. MCDONALD</u>

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant-Counterclaimant*
*TAP Pharmaceutical Products Inc.*

*Of Counsel:*

Thomas C. Morrison
Karla G. Sanchez
Amanda K. Kay
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710

George C. Kokkines
TAP Pharmaceutical Products Inc.

Dated: December 21, 2005

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ........................................................................ 1

SUMMARY OF THE FACTS............................................................................... 2

ARGUMENT

I.    Dr. Dupont's Television And Internet Surveys Should Not Be Excluded .......................... 9

      A.    The Television Survey Was Conducted Properly .................................. 10

            1.    The Survey Had A Proper Universe And Asked The
                  Appropriate Questions ....................................................... 11

            2.    There Was No Need For Additional Probing Of
                  Respondents' Answers ....................................................... 13

            3.    Dr. Dupont's Analysis Of The TV Survey Is Proper ................................ 17

      B.    The Internet Survey Is Supported By Valid Data .................................. 18

II.   Dr. Dupont's Surveys Are Not Excludable under Rule 403............................. 21

III.  Dr. McDonald's supplemental Testimony Should Not Be Excluded................................ 23

CONCLUSION.................................................................................... 25

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

AHP Subsidiary Holding Co. v. Stuart Hale Co.,
   1 F.3d 611 (7th Cir. 1993) ....................................................................9

American Home Prods. Corp. v. Procter & Gamble Co.,
   871 F. Supp. 739 (D.N.J. 1994) .........................................................15

Banjo Buddies, Inc. v. Renosky,
   399 F.3d 168 (3d Cir. 2005)................................................................23

Betterbox Commc'ns Ltd. v. BB Techs., Inc.,
   300 F.3d 325 (3d Cir. 2002)................................................................24

Church & Dwight Co. v. S.C. Johnson & Son, Inc.,
   873 F. Supp. 893 (D.N.J. 1994) .........................................................10

Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City,
   383 F.3d 110 (3d Cir. 2004)................................................................21

Coleman v. Home Depot, Inc.,
   306 F.3d 1333 (3d Cir. 2002)..............................................................21

E. & J. Gallo Winery v. Gallo Cattle Co.,
   967 F.2d 1280 (9th Cir. 1992) ..............................................................9

Forrest v. Beloit Corp.,
   424 F.3d 344 (3d Cir. 2005)................................................................21

Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.,
   221 F. Supp. 2d 457 (S.D.N.Y. 2002)..................................................9

Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,
   82 F.3d 1533 (10th Cir. 1996) ..............................................................9

InstyBit, Inc. v. Poly-Tech Indus., Inc.,
   95 F.3d 663 (8th Cir. 1996) ..................................................................9

Johnson & Johnson  Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.,
   960 F.2d  294 (2d Cir. 1992)..........................................................17, 18

Johnson & Johnson-Merck v. Rhone-Poulenc Rorer,
    19 F.3d 125 (3d Cir. 1994)..................................................................................15

MasterCard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.,
    2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) ...............................................22

McNeil-PPC, Inc. v. Merisant Co.,
    2004 WL 3316380 (D.P.R. July 29, 2004) .....................................................9

Mobil Oil Corp. v. Pegasus Petroleum Corp.,
    818 F.2d 254 (2d Cir. 1987)..............................................................................9

Pittsburgh Press Club v. United States,
    579 F.2d 751 (3d Cir. 1978)............................................................................10

Schering Corp. v. Pfizer Inc.,
    189 F.3d 218 (2d Cir. 1999)..............................................................................9

Sears, Roebuck & Co. v. Menard,
    2003 WL 168642 (N.D. Ill. Jan. 24, 2003) ...................................................22

Southland Sod Farms v. Stover Seed Co.,
    108 F.3d 1134 (9th Cir. 1997) ..........................................................................9

U-Haul Int'l, Inc. v. Jartran, Inc.,
    522 F. Supp. 1238 (D. Ariz. 1981) ................................................................10

Waldorf v. Shuta,
    142 F.3d 601 (3d Cir. 1998) ...........................................................................24

Warner-Lambert Co. v. Schering-Plough Corp.,
    1991 WL 221107 (S.D.N.Y. Oct. 15, 1991) ................................................18

## FEDERAL STATUTES

Fed. R. Evid. 403 ................................................................................................21

## SECONDARY SOURCES

Federal Judicial Center's Manual for Complex Litigation, § 11.493 (4th ed. 2004) .......................9

Handbook of Recommended Procedures for the Trial of Protracted Litigation,
    25 F.R.D. 351 (1960) .......................................................................................11

McCarthy on Trademarks and Unfair Competition, § 32:50 [5] (3d ed. 1994)..............................10

McCarthy on Trademarks and Unfair Competition, § 32:159 (4th ed. 2003) ...............................12

Moore's Federal Practice Reference Manual on Scientific Evidence (1994) ................................18

## INTRODUCTION AND SUMMARY

TAP submits this memorandum in opposition to AstraZeneca's motion to exclude the surveys of Dr. Thomas Dupont and the supplemental testimony of Dr. Susan McDonald.

The television and Internet surveys conducted by Dr. Dupont are relevant and reliable: they ask all critical questions, utilize the correct universe, and accurately reflect the respondents' responses to well-constructed open-ended questions. The surveys are highly probative to the central issue in this litigation: whether consumers understand the narrow limitations on the superiority claims made in the NEXIUM TV and Internet ads. AstraZeneca's criticisms should be presented through cross-examination and introduction of its own expert witness at trial. Any "prejudice" that befalls AstraZeneca from these surveys is not the sort of extra-judicial prejudice that Rule 403 was intended to prevent; rather, it is "prejudice" caused by the consideration of evidence that is directly relevant to the core issues in the case.

AstraZeneca also seeks to exclude the testimony of Dr. McDonald as presented in her Supplemental Report. Dr. McDonald prepared this report after reviewing documents that revealed, inter alia, that AstraZeneca's marketing goal with respect to NEXIUM was to utilize NEXIUM's reputation for healing esophageal erosions in order to "create the impression" that NEXIUM provides greater symptom relief than PREVACID (AZ007354). Dr. McDonald's profession is assisting pharmaceutical companies – through market research and otherwise – in preparing marketing and advertising strategies. Her testimony about AstraZeneca's marketing strategy is relevant to (i) refuting AstraZeneca's claims regarding the intent behind its advertising and (ii) proving AstraZeneca's intent to mislead, a factor that is directly relevant to TAP's damages claim.

## SUMMARY OF THE FACTS

Dr. Thomas Dupont conducted two surveys for TAP. The first addresses the "Better Is Better" television commercial that was the subject of TAP's preliminary injunction motion. The object of the survey was to determine whether consumers understand the commercial to be talking about acid reflux *symptoms*, such as heartburn, or the *healing* of esophageal erosions caused by acid reflux disease. The second survey addresses a website ad for NEXIUM that touts the drug's allegedly superior healing benefits. The object of this survey was to determine whether the limitation of NEXIUM's superiority to *patients suffering from moderate to severe erosions* was understood by consumers.

### The Television Survey

TAP commissioned Dr. Dupont to conduct a study of the "Better is Better" television commercial (Exh. A) to determine what messages consumers take away from the ad. The survey was conducted at shopping malls in twenty locations across the country. The respondents were 479 men and women over the age of twenty-five who either (i) have taken a prescription medicine to treat heartburn or acid reflux disease in the past six months or (ii) intend to do so in the next six months. 240 interviews were conducted using the "Better is Better" television commercial and 239 were conducted using an edited, or "control", commercial.

The control ad was not actually necessary because the purpose of the survey was merely to determine whether the *explicit* superiority message pertained to symptoms (as claimed by TAP) or healing (as claimed by AstraZeneca). Nevertheless, because Dr. Dupont believed he would be criticized if he did not include a control, he created one (Dupont Dep. at 78:14–78:21) (Exh. B). The control was a modified version of the commercial that removed the explicit references to "heartburn" and some, but not all, of the references to "acid reflux disease". Both

| <u>Summary of Table 6</u> (responses to Q1 and Q2) | | |
| --- | --- | --- |
| *Q1-Please tell me what the commercial communicated to you about NEXIUM.* *Q2-What else, if anything, did that commercial communicate to you about NEXIUM?* | | |
| | NEXIUM's "Better is Better" <u>Television Commercial</u> | Message Playback <u>Symptoms v. Damage</u> |
| Resolves <u>Symptoms</u> (non-comparative): | **69.6%** | |
| Resolves <u>Damage</u> (non-comparative): | 31.7% | **2.2:1** **(non-comparative)** |
| Resolves <u>Symptoms</u> Better (comparative): | **13.8%** | |
| Resolves <u>Damage</u> Better (comparative): | 10.2% | **1.4:1** **(comparative)** |

These two questions demonstrate that more than twice as many respondents took away the message that NEXIUM resolves **symptoms** of acid reflux disease than took away the message that NEXIUM resolves **damage** caused by acid reflux disease. These non-comparative results are significant because they demonstrate how prevalent the message of symptoms is in the commercial. Among the comparative responses, one-and-one-half as many respondents took away the message that NEXIUM is better than other drugs at resolving symptoms than took away the message that NEXIUM is better at resolving damage. Based on these responses, Dr. Dupont concluded (Dupont TV Rpt. at 6-7):

> "Considering that the NEXIUM commercial ostensibly is about how NEXIUM treats esophageal damage better than other products, it is notable that, regardless of whether the playback was comparative or non-comparative, messages that NEXIUM relieves or treats acid reflux and/or its symptoms outnumbered messages that NEXIUM heals damage by a factor of 2:1."

| Summary of Table 9 (responses to Q5) | | |
|---|---|---|
| **Q5-What did the commercial tell you that NEXIUM was better at doing?** | | |
| | NEXIUM's "Better is Better" Television Commercial | Message Playback Symptoms v. Damage |
| Resolves <u>Symptoms</u> Better (comparative): | **67.9%** | |
| | | **2.4:1** |
| Resolves <u>Damage</u> Better (comparative): | 28.8% | |

Question 5 was posed to those respondents who answered "yes" to the closed-ended questions, "Do you recall the commercial saying NEXIUM was better?" and "Did the commercial tell you what NEXIUM was better at doing?" Of the 206 respondents who answered these two questions affirmatively, more than two-thirds took away the message that NEXIUM is better than other drugs at resolving the **symptoms** of acid reflux disease; less than one-third took away the message that NEXIUM is better at resolving the **damage** caused by acid reflux disease. The symptoms to damage ratio in this question is 2.4 to 1.

---

**Summary of Table 10 (responses to Q1, Q2, and Q5)**

*Q1-Please tell me what the commercial communicated to you about NEXIUM.*
*Q2-What else, if anything, did that commercial communicate to you about NEXIUM?*
*Q5-What did the commercial tell you that NEXIUM was better at doing?*

|  | NEXIUM's "Better is Better" Television Commercial | Message Playback Symptoms v. Damage |
|---|---|---|
| Resolves <u>Symptoms</u> Better (comparative): | **71.7%** |  |
| Resolves <u>Damage</u> Better (comparative): | 32.1% | 2.2:1 |

---

Table 10 combines all three of the open-ended questions in the survey. Taken together, these results demonstrate that 71.7% of respondents who saw the TV ad took away the message that NEXIUM resolves **symptoms** better, which is more than twice as many as took away a message about **damage**. Dr. Dupont concluded that (TV Rpt. at 5):

> "The results of this survey demonstrate quite clearly that the NEXIUM commercial at issue communicates strongly to consumers the message that NEXIUM is better than other brands with respect to relieving or treating acid reflux and/or its symptoms."

**The Internet Survey**

TAP subsequently commissioned Dr. Dupont to conduct a study of a new advertisement that appeared in early January on AstraZeneca's website for NEXIUM (www.purplepill.com) (a copy of the ad is attached as Exh. G). This survey was conducted at shopping malls in twelve locations among 411 men and women over the age of twenty-five who either (i) have taken a prescription medicine to treat heartburn or acid reflux disease in the past six months or (ii) intend to do so in the next six months, and are Internet users (Dupont Internet

Rpt. at 2). 205 interviews were conducted using the NEXIUM ad as displayed on AstraZeneca's website and 206 interviews were conducted using an edited version of the ad. The edited ad was modified to remove all of the ad's *seven* references to "moderate to severe erosions" so that the modified ad contained no language limiting the claim to a particular subgroup of patients. Comparing the responses from the group viewing the actual ad to those who viewed the edited ad allowed Dr. Dupont to determine whether the inclusion of the references to "moderate to severe damage" in the actual ad caused consumers to take away a narrower superiority message than they did when viewing a concededly false ad that made no attempt to narrow the superiority claim.

The methodology of the survey was as follows. Each respondent sat at a computer and viewed the ad within Internet Explorer as it would appear on a home computer. After viewing the ad, respondents went to a different location where they were asked a series of open-ended questions followed by one closed-ended question.

In response to Question 1 ("First, please tell me what that ad communicates to you about NEXIUM.") and Question 2 ("What else, if anything, did the ad communicate to you about NEXIUM?"), only 8.3% of the respondents who saw the actual ad provided an answer that indicated an understanding of the "moderate to severe" limitation. The respondents were then asked "Do you recall the ad saying that NEXIUM heals acid-related damage better than the other leading medicine?" The respondents who answered "yes" were then asked Question 4 ("Specifically, what do you recall the ad saying about that?"). In response to that question, only 4.4% of consumers who saw the actual ad mentioned the "moderate to severe" limitation. Because virtually no one who saw the edited ad played back this limitation, the survey

demonstrates that the inclusion of the "moderate to severe" language in the real ad did not appreciably change the unlimited superiority message of the edited (and false) ad.

Dr. Dupont therefore concluded that the "moderate to severe damage" limitation is not understood by consumers (Internet Rpt. at 5):

> "The survey results indicate that consumers clearly understood the NEXIUM Internet ad (either version tested) to be communicating a message that NEXIUM is superior to other products. . . . However, the specifics of the 'better' claim, in particular that NEXIUM heals moderate to severe acid-related damage to the esophagus better than does PREVACID, were not effectively communicated to consumers."

### Dr. Susan McDonald

Dr. McDonald was retained on behalf of TAP to evaluate the TV and Internet surveys conducted by Dr. Dupont and to respond to criticisms of those surveys by AstraZeneca. Dr. McDonald's first report, dated June 2005, is entitled "Response to Criticisms By Dr. Michael Rappeport of Two Surveys Conducted to Determine Whether A Pair of NEXIUM Ads Are False and Misleading."  In addition to responding to the criticisms made by Dr. Rappeport, Dr. McDonald also analyzed the surveys and reached her own conclusions.  Dr. McDonald concluded (Rpt. at 20) that "data from each of the surveys lend convincing support to the contention that both ads are misleading to consumers".  This initial Report is not at issue on this motion.

Subsequently, Dr. McDonald reviewed documents produced by AstraZeneca and its advertising agency that speak to the company's strategy in developing the "Better Is Better" campaign.  In September 2005, Dr. McDonald commented on these documents in a "Supplemental Report Re NEXIUM Advertising."  It is this report that AstraZeneca seeks to exclude.

# I

## DR. DUPONT'S TELEVISION AND
## <u>INTERNET SURVEYS SHOULD NOT BE EXCLUDED</u>

AstraZeneca's criticisms of Dr. Dupont's surveys should be addressed through cross-examination and the introduction of its own expert witness. Courts rarely exclude consumer surveys pursuant to <u>Daubert</u>, so long as the survey is conducted according to accepted survey principles. <u>McNeil-PPC, Inc.</u> v. <u>Merisant Co.</u>, 2004 WL 3316380, at *12 (D.P.R. July 29, 2004), citing <u>Southland Sod Farms</u> v. <u>Stover Seed Co.</u>, 108 F.3d 1134, 1143 (9th Cir. 1997); <u>Harolds Stores, Inc.</u> v. <u>Dillard Dep't Stores, Inc.</u>, 82 F.3d 1533, 1544 (10th Cir. 1996); <u>Insty*Bit, Inc.</u> v. <u>Poly-Tech Indus., Inc.</u>, 95 F.3d 663, 671 (8th Cir. 1996); <u>AHP Subsidiary Holding Co.</u> v. <u>Stuart Hale Co.</u>, 1 F.3d 611 (7th Cir. 1993).

As pointed out in the Federal Judicial Center's <u>Manual for Complex Litigation</u>, § 11.493 at 103 (4th ed. 2004), even if the Court finds "deficiencies" in the proponent's showing that the population was properly chosen, the sample was representative of that population, and the data was accurately reported and analyzed, the Court may nevertheless "receive the evidence subject to argument going to its weight and probative value." <u>Accord</u>:  <u>Schering Corp.</u> v. <u>Pfizer Inc.</u>, 189 F.3d 218, 228 (2d Cir. 1999) ("[e]rrors in methodology thus properly go only to the weight of the evidence."); <u>Mobil Oil Corp.</u> v. <u>Pegasus Petroleum Corp.</u>, 818 F.2d 254, 259 (2d Cir. 1987) ("[t]he district court properly admitted these surveys into evidence, despite claims of statistical imperfections by both sides, as those criticisms affected the weight accorded to the evidence rather than its admissibility"); <u>Friesland Brands, B.V.</u> v. <u>Vietnam Nat'l Milk Co.</u>, 221 F. Supp. 2d 457, 460 (S.D.N.Y. 2002); <u>E. & J. Gallo Winery</u> v. <u>Gallo Cattle Co.</u>, 967 F.2d 1280,

1292 (9th Cir. 1992) ("[t]echnical unreliability goes to the weight accorded a survey, not its admissibility").

The reasoning behind this heavy weight of authority is obvious: virtually every survey submitted in a modern day Lanham Act case is met by criticism from an opposing expert since "it is relatively easy for one ad expert to criticize a survey done by another expert." U-Haul Int'l, Inc. v. Jartran, Inc., 522 F. Supp. 1238, 1252 (D. Ariz. 1981). Moreover, "there is no such thing as a 'perfect' survey." Church & Dwight Co. v. S.C. Johnson & Son, Inc., 873 F. Supp. 893, 906 (D.N.J. 1994), quoting 4 McCarthy on Trademarks and Unfair Competition, § 32:50[5] at 32-228-29 (3d ed. 1994). Any technical defects in a survey should be used to lessen a survey's "evidentiary weight, not to reject the results out-of-hand." Id.

## A.    The Television Survey Was Conducted Properly

Even AstraZeneca's expert admits that his criticisms of the TV Survey go to its credibility, not its admissibility (Rappeport Dep. 69:4-69:9, attached as Exh. H) ("What [the error in the survey] does is sharply weaken the credibility of the conclusions"). While AstraZeneca presents three circuitous arguments for excluding the TV survey, none of them render the survey improper under the standards governing surveys.

For a survey to be admissible in this Circuit, it must meet the following requirements: (1) a proper universe must be examined; (2) a representative sample must be chosen; (3) the persons conducting the survey must be experts; (4) the data must be properly gathered and accurately reported; (5) the sample design, the questionnaires and the manner of interviewing must meet the standards of objective surveying and statistical techniques; and (6) the survey must be conducted independently of the attorneys involved in the litigation. See Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1978), citing Judicial

Conference Study Group, <u>Handbook of Recommended Procedures for the Trial of Protracted Litigation</u>, 25 F.R.D. 351, 429 (1960). The TV survey satisfies each of these requirements. Moreover, as shown below, none of AstraZeneca's three criticisms offset the survey's compliance with these basic criteria.

### 1. The Survey Had A Proper Universe And Asked The Appropriate Questions

AstraZeneca disingenuously argues (Br. 11 ) that the survey did not address the proper universe because Dr. Dupont failed to ask each respondent if he or she is a "typical consumer" who believes the commercial is targeted at his or her "routine experiences." In making this argument, AstraZeneca has seized upon a comment in Dr. McDonald's report made in response to one of the elaborate analogies proffered by AstraZeneca's expert, Dr. Rappeport. In refuting Dr. Rappeport's argument, Dr. McDonald stated (Rpt. at 5-6):

> "The issue is not whether NEXIUM is ever superior to PREVACID, but whether it is superior at doing what the more typical consumer requires and expects from a product to treat routine acid reflux.
>
> From my perspective, the issues that a survey is required to address in this case are precisely these: Do a statistically meaningful percent of target consumers take away a message from the NEXIUM ads that they will gain greater benefit from NEXIUM than PREVACID for the relief of the acid reflux they routinely experience; and is that erroneous message directly attributable to the words and images in the NEXIUM promotion?"

In referring to "what the more typical consumer requires and expects from a product to treat acid reflux," Dr. McDonald was simply referring to the "typical" consumer who takes acid reflux drugs for the relief of heartburn and other symptoms; the question posed by the survey was whether those consumers take away a message of symptom relief or a message of healing relief. Dr. McDonald was certainly not suggesting, as AstraZeneca contends (Br. 2, 11)

that Dr. Dupont was required to ask a question as to whether each respondent viewed himself or herself as a typical consumer. Significantly, AstraZeneca omitted from its moving papers the sentence that immediately follows the portion of Dr. McDonald's report in which she discussed the need for the survey to accurately capture the reactions of the "typical consumer". After posing the two questions that she said needed to be determined from "typical consumers", she stated that (McDonald Rpt. at 5-6):

> "[T]hose are the questions that Dr. Dupont's surveys were designed
> to answer."

Nowhere in Dr. McDonald's report does she suggest that Dr. Dupont failed to construct the proper universe, failed to properly screen the respondents, or failed to ask questions to ensure that the respondents were members of the target audience. In fact, Dr. McDonald strongly endorses the findings of Dr. Dupont's surveys. As she states (Rpt. at 22):

> "The results from Dr. Dupont's survey are not close calls, nor do
> they require the splitting of statistical hairs. Despite
> Dr. Rappeport's attempts to chip away at the credibility of these
> surveys, they still justify the conclusion that a significant percent
> of consumers who view the Nexium ads will be misled."

Had AstraZeneca directly challenged the universe of the survey, the challenge would fail. The "typical consumer" of NEXIUM and PREVACID who has "routine experiences" with acid reflux disease is precisely the person the screening questionnaire was designed to pinpoint. Thus the universe for the TV survey consists of males and females age 25 and over who (i) have taken a prescription medicine to treat heartburn or acid reflux disease in the past six months or (ii) intend to do so in the next six months (Dupont TV Rpt. at 20). That is exactly the "segment of the population whose perceptions and state of mind are relevant to the issues in the case." McCarthy on Trademarks and Unfair Competition, § 32:159 (4th ed. 2003). Michael Rappeport, AstraZeneca's own survey expert, stated that he agreed with the universe

chosen for the survey except for the screening out of individuals with expertise in the health care field (Rappeport Dep. at 59:13-59:21; 52:13-52:19), a criticism that is irrelevant to AstraZeneca's motion.

Moreover, Dr. McDonald was asked at her deposition about her statement regarding "typical consumers". She explained that this did not mean that Dr. Dupont needed to ask a question in those words; rather, the reaction of "typical consumers" is "encoded" in the survey data itself. As she explained (Dep. at 145:20-146:14):

> Q:  You say that Dr. Dupont correctly sought to determine whether consumers generalized claims of NEXIUM superiority under a narrow set of circumstances to the product's overall performance in providing relief of acid reflux for the vast majority of consumers. **What questions in the Dupont survey ask about or address the issue of the vast majority of consumers?**
>
> A:  It really is encoded, if you will, in the response of any given consumer who is kind of a typical consumer. So wording doesn't have to be present in the question; **it is an inference that one draws from the data that you elicit when you structure the questionnaire in a particular way, using a particular sample frame.**

In sum, whether construed as an argument that Dr. Dupont failed to ask a "critical" question, or as a challenge to the "universe" of consumers included in the survey, this portion of AstraZeneca's motion is without merit.

### 2.    There Was No Need For Additional Probing Of Respondents' Answers

In his critique of the TV survey, AstraZeneca's expert spun out the following elaborate hypothesis (Rappeport Rpt. at 5-6):

- Even if consumers understand that NEXIUM is only superior to PREVACID for the healing of esophageal damage, and that it is not superior in terms of symptom relief; and

- Even if they further understand that this superiority only applies to patients with moderate to severe erosions;

- They might nevertheless conclude that this makes NEXIUM a superior overall acid reflux medication that would be better for them than PREVACID.

Dr. McDonald pointed out in her deposition (pp. 18:13-18:21) that it would be impossible in the space of a TV commercial to provide consumers with all the information necessary to allow them to digest and understand such a claim (i.e., consumers would have to understand that this alleged superiority would only be beneficial for approximately one in every 100 acid reflux disease sufferers and that it had no impact on their everyday symptoms, such as heartburn and acid indigestion). Dr. McDonald also pointed out that Dr. Rappeport's hypothesis is inconsistent with her understanding of pharmaceutical advertising law, i.e., a company may not make an unqualified superiority claim for its product where the superiority in question applies only to a small subset of patients or conditions (McDonald Rpt. at 4-5). As set forth in TAP's motion to strike this position of Dr. Rappeport's report, this is indeed established Lanham Act law (see TAP's Motion to Exclude Certain Testimony by Michael Rappeport, Nov. 23, 2005 (D.I.87) at 4-5).

In its motion, AstraZeneca has now taken Dr. Rappeport's hypothesis and turned it into an argument that Dr. Dupont did not adequately probe the respondents to ascertain their understanding of why NEXIUM is "better." Thus AstraZeneca contends that (Br. 13):

> "[A] subject who provides a response to the open-ended question that NEXIUM is superior for acid reflux disease may simply have believed that, all other things being equal, if one drug heals moderate to severe EE better than another, it is therefore a better drug."

This view is flawed for two reasons. First, the notion that further probing was required is not supported by Third Circuit precedent. Second, the verbatim answers themselves provide the necessary information as to why NEXIUM was said to be "better" or superior; any

responses that are ambiguous, and which AstraZeneca believes should have required additional probing, *were not counted among the respondents that Dr. Dupont concluded were misled*.

***Extensive Probing is Disfavored:*** In Lanham Act cases involving consumer surveys, repeated questioning of subjects beyond their initial answers is disfavored. In <u>American Home Products Corp.</u> v. <u>Procter & Gamble Co.</u>, 871 F. Supp. 739, 761 (D.N.J. 1994), the court discounted a survey because, <u>inter alia</u>, it was structured so that the final question in the survey was "used as a device to prompt the survey participants to continue to search for messages that they initially did not perceive to be conveyed." In reaching this conclusion, the court stated its intention to echo the ruling in <u>Johnson & Johnson-Merck</u> v. <u>Rhone-Poulenc Rorer</u>, 19 F.3d 125, 133 (3d Cir. 1994), in which the Third Circuit affirmed the district court's rejection of a survey based on, <u>inter alia</u>, the fact that many of the responses were elicited only after repeated probes ("[t]he technique of punctuating open-ended questions with repeated probes is questionable").

***Additional Probing Was Not Necessary:*** The second reason AstraZeneca's argument fails is that the reasons consumers gave for NEXIUM's alleged superiority *are already reflected in their verbatim responses*. The tables showing the breakout of responses to the various open-ended questions reflect a breakdown of those respondents who referred to "symptom relief," those respondents who referred to "healing" of damage, and those who merely referred generally to NEXIUM being "better" (Dupont TV Rpt. at 8-9, 12, and 14). *Those who merely took away a general message that NEXIUM is "better" were not counted in the group of respondents who took away a misleading message*. This can be seen from an examination of the survey's coding sheet.

The responses to the open-ended questions were coded into categories depending on their nature (<u>e.g.</u>, comparative, superior at healing damage, better, etc.) Redacted

> Redacted

> Redacted

Thus only those respondents who stated that they took away a message regarding symptoms or acid reflux disease in general were coded as being misled; those who took away a message regarding superior "healing" and those who merely took away a non-specific message that NEXIUM is "better" were not coded as being misled. Redacted

For example, AstraZeneca cites to Subject 416 as an example of a respondent whose answers demonstrate that further probing would have reduced the number of respondents who were identified as having been misled. In response to Question 5, Subject 416 answered "It's better than other competitors"; when he was then mistakenly asked "in what way (is it better)," the subject replied "it heals damage caused by acid reflux" (T01827). Redacted

> Redacted

Redacted (T00327): answers assigned to this code *were not included* in the "persons who were misled" computation. Furthermore, had this subject not been mistakenly asked "in what way [is NEXIUM better]", the response to Question 5 would have been simply "it's better than other competitors". Redacted

> Redacted

In either event, that response would *not* have been tabulated as representing a misled respondent (Dupont Dep. at 99:7-99:11).

Similarly, Subject 423 answered, in response to Question 1, that: "NEXIUM is the healing purple pill. NEXIUM heals acid reflux. NEXIUM is chosen by America's doctors. It is better than all competitors." This subject was also mistakenly asked "why," to which she replied "it heals reflux damage." Redacted

> Redacted

> Redacted
>
> Redacted

Once again, none of these codes were counted in the "persons who were misled" tally. As with Subject 416, if this subject had not been asked the "why" question, her answers would not have been counted as a misled respondent.

In short, AstraZeneca's contention that further probing would have reduced the number of respondents identified as having been misled is without merit. In fact, further probing could just as easily have *increased* the tally of misled respondents as some of those who merely said that NEXIUM was "better" in response to the open ends might have responded, with further probing, that NEXIUM was better at relieving acid reflux symptoms. Of course, in that event, Dr. Dupont would have been accused of excessive probing and AstraZeneca would have fought to strike the answers to the probes.

### 3.     Dr. Dupont's Analysis Of The TV Survey Is Proper

In drawing conclusions about the TV Survey, Dr. Dupont properly relied on the unambiguous responses to the open-ended questions; he discounted the closed-ended data after determining that it was unreliable (Dupont Dep. 68:10-68:14). Dr. McDonald agrees with this analysis (McDonald Rpt. at 14). AstraZeneca argues, however (Br. 15), that this renders the TV Survey inadmissible.

Determining that a particular survey question was flawed does not undermine the validity of the entire survey. In fact, open-ended questions typically are considered more relevant and reliable than closed-ended questions, and courts frequently disregard data elicited in response to closed-ended questions without invalidating the entire survey. For example, in <u>Johnson & Johnson * Merck Consumer Pharms. Co.</u> v. <u>Smithkline Beecham Corp.</u>, 960 F.2d

294, 300 (2d Cir. 1992), the Second Circuit upheld the district court's finding that the open-ended questions provided "the most persuasive evidence of the message communicated by [the advertisement]" because they were "more objective." Conversely, the district court had properly discounted the value of the closed-ended questions because they "ranged from being 'somewhat leading' to 'very leading.'" Id. In another case, the district court disregarded the closed-ended questions in both parties' surveys because they were unhelpful. Warner-Lambert Co. v. Schering-Plough Corp., 1991 WL 221107, at *3 (S.D.N.Y. Oct. 15, 1991). Accordingly, Dr. Dupont's decision to draw conclusions based on the open-ended questions is not a basis for excluding the survey.

AstraZeneca also argues that the survey is unreliable because Dr. Dupont included data from the Kansas City site in the control data despite the fact that it differs from that of the other test sites. In mall intercept surveys, it is common to select multiple locations so that the expert can test for, and report on, any differences observed across sites. See Shari Seidman Diamond, Reference Guide on Survey Research, Moore's Federal Practice Reference Manual on Scientific Evidence, p. 240 (1994). Moreover, Dr. McDonald testified that it would be inappropriate to exclude the Kansas City data unless there was evidence of wrongdoing (see McDonald Dep. at 77:13-78:2). Dr. Dupont reviewed the responses from Kansas City and found no evidence of wrongdoing (see Dupont Rebuttal Rpt. at 9). It was, therefore, appropriate to include this data in the control tabulations; this inclusion cannot conceivably render the entire survey inadmissible under Daubert.

B.    **The Internet Survey Is Supported By Valid Data**

In the Internet survey, the results of the open-ended questions demonstrate that only 8.3% of respondents understood that NEXIUM's allegedly superior healing rate is only true

for those patients with moderate to severe EE – despite the fact that this limitation is explicitly mentioned *seven times* in the Internet ad. AstraZeneca seeks to exclude this survey because Dr. Dupont and Dr. McDonald rely solely on the data from the open-ended questions; they deemed the data from the single closed-ended question to be unreliable because the answers demonstrated a high degree of "guessing" by the respondents (Dupont Dep. at 138:14-138:16; McDonald Dep. at 120:4-120:10). In its motion, AstraZeneca incorrectly claims (Br. 7) that Dr. Dupont acknowledged that he could not draw conclusions based solely on the open-ended questions.

        This argument is not supported by Dr. Dupont's testimony. The quoted "admission" by Dr. Dupont was not that he needed both sets of data to draw *any* conclusion, but rather that he needed both sets of data to draw a conclusion about what both sets of data show (Dupont Dep. 146:21-146:123). Dr. Dupont made clear that the data from the closed-ended question was not necessary in order for him to arrive at a conclusion regarding the Internet ad (id. at 130:23-131:15):

> Q: With respect to the Internet ad, is it correct, is it your testimony that the fact that a relatively small number of respondents volunteered moderate to sever in response to the open-ended questions means that they were being misled by the advertising?

> A: It means that they didn't -- it means that they were misled because they did not get the message that the claim was limited to moderate to severe damage.

> Q: If you had that evidence standing alone, you didn't have the close-ended results, you would be prepared to conclude solely by virtue of the fact that people did not volunteer moderate to severe to you that they're being misled?

> A: Yes.

In sum, AstraZeneca's attempts to invalidate the Internet survey are unsupported by the record and should be rejected.

## II

## DR. DUPONT'S SURVEYS ARE
## NOT EXCLUDABLE UNDER RULE 403

To support its Rule 403 argument, AstraZeneca mechanically restates all of its arguments for exclusion of Dr. Dupont's surveys pursuant to Daubert as indicia that the surveys lack probative value. For the same reasons those arguments are deficient under Daubert, they are also deficient under Rule 403.

Federal Rule of Evidence 403 permits the exclusion of relevant evidence only where the probative value of that evidence is substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403. AstraZeneca has not identified any particular "unfair prejudice" it would suffer upon the admission of Dr. Dupont's surveys. The fact that the surveys prejudice AstraZeneca by supporting TAP's argument as to the message communicated by the NEXIUM ads is scarcely the type of prejudice envisioned by Rule 403. As the Third Circuit recently said:

> "[T]he term 'unfair prejudice' as a factor against which the probative value of evidence is weighed under Rule 403 is often misstated as mere prejudice. Indeed, any evidence that tends to harm a party's case could be said to be prejudicial. Thus, the prejudicial effect of admitting the evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403."

Forrest v. Beloit Corp., 424 F.3d 344, 359 n.10 (3d Cir. 2005), citing Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343 n.6 (3d Cir. 2002).

The cases cited by AstraZeneca on this point are inapposite. In Citizens Financial Group, Inc. v. Citizens National Bank of Evans City, 383 F.3d 110, 119 (3d Cir. 2004), the Third

Circuit held that the district court did not abuse its discretion in a reverse confusion case where the survey improperly utilized a universe significantly broader than the senior user's customer base. Only after concluding that the survey was too fundamentally flawed to be admissible under <u>Daubert</u> did the court alternatively exclude the survey pursuant to Rule 403.

Similarly, in <u>MasterCard International Inc.</u> v. <u>First National Bank of Omaha, Inc.</u>, 2004 WL 326708 at *9-*10 (S.D.N.Y. Feb. 23, 2004), the district court excluded the survey pursuant to <u>Daubert</u> and Rule 403 because of a series of fundamental problems with the survey methodology. These problems included the fact that (i) the number of respondents (only 52) was too small to provide meaningful results; (ii) the report failed to address the issue of non-response bias; (iii) the survey included no data concerning the sophistication of respondents or their positions within the bank; and (iv) the decision the survey was designed to test is typically made with far more information than was provided to the survey respondents. The survey in <u>Sears, Roebuck & Co.</u> v. <u>Menard</u>, 2003 WL 168642 at *1, *3 (N.D. Ill. Jan. 24, 2003), was also excluded because of fundamental flaws in its design and was "little more than a word association test."

In sum, the surveys that AstraZeneca cites as having been excluded pursuant to Rule 403 were all patently flawed and unreliable. Dr. Dupont's surveys are not. In any event, any flaws identified by AstraZeneca go to the weight to be accorded the surveys by the trier of fact, and not to their admissibility.

### III

## DR. MCDONALD'S SUPPLEMENTAL TESTIMONY SHOULD NOT BE EXCLUDED

Dr. McDonald, through her Supplemental Report, provides useful testimony regarding the context of AstraZeneca's "Better is Better" marketing strategy based on her expertise in pharmaceutical marketing strategy, a subject that constitutes the core of her everyday business. Her testimony in this regard is not, as AstraZeneca contends (Br. 19), "mere personal belief." To the contrary, it derives from Dr. McDonald's analysis of documents in her field of expertise, such as market research questionnaires, qualitative study excerpts, metrics used by AstraZeneca to measure consumer impressions, and qualitative feedback from consumers (see McDonald Supp. Rpt. and Dep. at 154:19-154:25, 155:25-156:11).

At the very least, Dr. McDonald's Supplemental Report testimony is relevant to TAP's claim for damages. Although a showing of willfulness or bad faith is not *required* for recovery of damages or profits in a Lanham Act case, it is *grounds* for such recovery. See Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 174-75 (3d Cir. 2005). In addition, AstraZeneca will undoubtedly elicit testimony from its own witnesses regarding AstraZeneca's purported lack of intent to convey a broad message of superiority; Dr. McDonald's testimony is necessary to rebut such testimony from AstraZeneca's witnesses.

AstraZeneca is also wrong when it argues (Br. 19) that Dr. McDonald is opining on "the ultimate issue" in the case. In a Lanham Act false advertising case, the ultimate issue is whether the advertising in question is false. Dr. McDonald's testimony does not address that issue; rather, she testifies to such matters as (i) the purpose of AstraZeneca's "Better is Better" marketing campaign, (ii) AstraZeneca's belief as to how that campaign will be perceived by

consumers and (iii) the criteria used by AstraZeneca to gauge the results of that campaign. These are issues Dr. McDonald deals with on a day-to-day basis in advising pharmaceutical companies on their marketing strategies (McDonald Supp. Rpt. at 2 and Dep. at 159:17-159:19, 160:13-160:17). Under Daubert, the basis for specialized knowledge such as that possessed by Dr. McDonald can be based on "practical experience as well as academic training and credentials"; moreover, the basis for such knowledge is to be construed "liberally." Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 327-28 (3d Cir. 2002), quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). Dr. McDonald's testimony about AstraZeneca's marketing strategy should therefore be permitted.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to exclude the two Dupont surveys and Dr. McDonald's Supplemental Report should be denied.

Dated: December 14, 2005

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant-Counterclaimant*
*TAP Pharmaceutical Products Inc.*

*Of Counsel:*

Thomas C. Morrison
Karla G. Sanchez
Amanda K. Kay
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710

George C. Kokkines
TAP Pharmaceutical Products Inc.

Dated: December 14, 2005
164628.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December, 2005, the attached **TAP**

**PHARMACEUTICAL PRODUCTS INC.'S BRIEF IN OPPOSITION TO PLAINTIFF'S**

**MOTION TO EXCLUDE THE TESTIMONY OF THOMAS DUPONT AND SUSAN S.**

**MCDONALD** was served upon the below-named counsel of record at the address and in the

manner indicated:

Josy W. Ingersoll, Esquire                                    HAND DELIVERY
Young Conaway Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE  19801

Harold P. Weinberger, Esquire                          VIA FEDERAL EXPRESS
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY  10036


                                        /s/ Lauren E. Maguire
                                        _____
                                        Lauren E. Maguire

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2005, the attached **PUBLIC**

**VERSION OF TAP PHARMACEUTICAL PRODUCTS INC.'S BRIEF IN OPPOSITION**

**TO PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF THOMAS DUPONT**

**AND SUSAN S. MCDONALD** was served upon the below-named counsel of record at the

address and in the manner indicated:

Josy W. Ingersoll, Esquire                                      <u>HAND DELIVERY</u>
Young Conaway Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE  19801

Harold P. Weinberger, Esquire                          <u>VIA FEDERAL EXPRESS</u>
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY  10036


*/s/ Lauren E. Maguire*
_____
Lauren E. Maguire