# EXHIBIT A

1

2    IN THE UNITED STATES DISTRICT COURT

3    DISTRICT OF DELAWARE

4    -----------------------------------x

5    ASTRAZENECA, LP,

6                              Plaintiff,

                             Civil Action No.

7               -against-        04-1332

8    TAP PHARMACEUTICAL PRODUCTS,

     Inc.,

9

                             Defendant.

10   -----------------------------------x

                             October 28, 2005

11                           8:55 a.m.

12        Deposition of BERT SPILKER, Ph.D., M.D.,

13   taken by the Plaintiff, pursuant to notice, at

14   the offices of Kramer, Levin, Naftalis &

15   Frankel, LLP, 1177 Avenue of the Americas, New

16   York, New York, before Marlene Lee, Certified

17   Shorthand Reporter, Certified Realtime

18   Reporter and Notary Public within and for the

19   State of New York.

20

21

22

23

24

25

Page 18

BERT SPILKER, Ph.D., M.D.

1
2  A.    Well, I treated patients at the
3  University of North Carolina Medical School in
4  North Carolina Memorial Hospital for several
5  years in the clinics.
6       Q.    What years was that?
7       A.    It says it there.  It would
8  have been about 1980 to '85.
9       Q.    Was that the last time you
10 treated patients?
11      A.    Yes.
12      Q.    When was the last time you
13 treated patients on a full-time basis?
14      A.    On a full-time basis, would
15 have been during my work at Rhode Island -- in
16 Rhode Island.
17      Q.    In the last 20 years have you
18 treated any patients?
19      A.    Well, yes, I've treated
20 occasional patients, because I've maintained
21 my medical licenses and, for a period,
22 maintained all my DEA numbers, et cetera.
23      Q.    When you say you've treated
24 occasional patients in the course of a week,
25 how many patients do you typically treat, if

Page 19

BERT SPILKER, Ph.D., M.D.

1
2  any?
3       A.    Oh, well, it probably -- or it
4  would have been less than one per week.
5       Q.    What about per month?
6       A.    Maybe -- it varied over those
7  years.  If we're talking about subsequent to
8  1985 --
9       Q.    Yes.
10      A.    -- oh, for a number of years I
11 would have been treating patients in different
12 ways.  I would say maybe, on the average, one
13 every other month or so.
14      Q.    The last five years have you
15 treated any patients?
16      A.    No.
17      Q.    In the last 10 years have you
18 treated any patients?
19      A.    No.
20      Q.    In the last 15 years have you
21 treated any patients?  That is, since 1990
22 have you treated any patients?
23      A.    Certainly up until '93 I would
24 have treated a few, when I moved from North
25 Carolina to Minnesota.

Page 20

BERT SPILKER, Ph.D., M.D.

1
2       Q.    Now, what was your specialty?
3       A.    Internal medicine, and clinical
4  pharmacology, really.
5       Q.    Okay.  Can you trace your work
6  history after you left your internship in
7  1978?
8       A.    I mentioned -- after '78?
9       Q.    Yes.
10      A.    I mentioned the two positions I
11 had in Reston, Virginia, which took me till
12 1979 when I moved to North Carolina and worked
13 at Burroughs Wellcome Company from 1979 to
14 January 1993.  Would you want me to describe
15 the positions there, or just move forward?
16      Q.    Well, I see in your CV, from
17 '79 to '83 you were senior clinical research
18 scientist; correct?
19      A.    Yes.
20      Q.    In 1983 to '93 you were
21 director of project coordination; correct?
22      A.    Yes.
23      Q.    Generally what type of work did
24 you do in those two positions?
25      A.    Well, the first one I set up

Page 21

BERT SPILKER, Ph.D., M.D.

1
2  clinical trials, monitored clinical trials,
3  interpreted the data that we got, and worked
4  in the medical department of the company
5  developing drugs in several different areas.
6       Q.    Were any of those drugs GI
7  drugs?
8       A.    No, they were not.
9       Q.    So --
10      A.    Then --
11      Q.    I'm sorry.  Go ahead.
12      A.    After the three years I spent
13 doing that, I was promoted to start a new
14 department, which was called project
15 coordination, it was like a project planning
16 department, and to serve as the special
17 assistant on scientific matters to the head of
18 R&D.  And in that role I was on the most
19 senior R&D management committee.  And my
20 roles, I would say, were primarily research
21 management, and you could say administration
22 as well, and worked on many different projects
23 or oversaw them and had to be -- or oversaw
24 the department I put together of 10 or 12
25 people.

Page 22

BERT SPILKER, Ph.D., M.D.

1    Q.   Now, any of your work
2 during those 10 years concern GI drugs?
3    A.   I believe we had a number of
4 drugs in the GI area, and so it would have
5 been the overseeing of drugs that we had for
6 any GI complaints.
7    Q.   Do you remember what those
8 drugs were?
9    A.   No.  I haven't even thought
10 about that in ages about a lot of the specific
11 drugs.  I mean, I can think of some of the
12 most common drugs we -- or most popular drugs
13 we had, but there were a lot of others for --
14 like cancers that might have involved GI
15 cancers, et cetera.
16    Q.   Well, did any of the drugs you
17 worked on at Burroughs Wellcome treat GERD?
18    A.   No.
19    Q.   After you left Burroughs
20 Wellcome you went to Chronimed; right?
21    A.   I was recruited from Burroughs
22 Wellcome to start a pharmaceutical company,
23 Chronimed, which was a mail order pharmacy.  I
24 was recruited by the Dean of the School of

Page 23

BERT SPILKER, Ph.D., M.D.

1 Pharmacy at the University of Minnesota who
2 was on the board at Chronimed.
3    They said, "We don't know
4 anything about drug development or drugs but
5 we think it's a good area to be in so we'd
6 like you to set up a company."  They gave me
7 the resources and told me I had 18 months to
8 be successful or I'd be let go.  So I accepted
9 the challenge and set up a company called
10 Orphan Medical, and we went public and raised
11 money.  And I licensed in 16 drugs, myself;
12 oversaw their development; had 28 face-to-face
13 meetings with the FDA; and brought seven of
14 them to the market.
15    Q.   Were any of those drugs GI
16 drugs?
17    A.   Yes, definitely.  We had
18 sucrase for sucrase-isomultase deficiency.
19 Some of them involved the GI system, but they
20 were certainly not drugs to treat GERD or
21 esophageal erosions.
22    Q.   Now, in 1998 you left to become
23 senior vice-president of PhRMA; correct?
24    A.   That's correct.

Page 24

BERT SPILKER, Ph.D., M.D.

1    Q.   What is PhRMA?
2    A.   PhRMA is the trade association
3 that represents the research-based
4 pharmaceutical industry that's based in
5 Washington, D.C.
6    Q.   Do you know: Is TAP a member of
7 PhRMA?
8    A.   I don't know.
9    Q.   What did you do as senior
10 vice-president?
11    A.   I had to represent the
12 pharmaceutical industry at meetings with FDA
13 on a very frequent basis or meetings at which
14 FDA was also represented.  I had to interact
15 with all of the former commissioners and
16 current commissioners of FDA on a lot of
17 policy matters.
18    I had to interact with the
19 press almost every day, where someone from
20 communications was also present as protection,
21 really, for me in case I was misquoted or
22 taken out of context.  And I would say I was
23 never misquoted in hundreds of articles, where
24 my name appeared, but I was taken out of

Page 25

BERT SPILKER, Ph.D., M.D.

1 context a fair number of times.
2    Also served on the steering
3 committee for the International Conference on
4 Harmonization representing the U.S. industry
5 for the period I was at PhRMA.  And I had a
6 department of 10 people, and I had to hire
7 them and review them and do administration.
8    And we had between 60 and 100
9 different committees that I would have to
10 oversee.  And there were many other
11 activities, some of which are perhaps outlined
12 in my CV.
13    Q.   Did you testify in Congress
14 while you were senior vice-president of PhRMA?
15    A.   Yes, I did.
16    Q.   What is the purpose of PhRMA?
17    A.   PhRMA is to -- PhRMA is, in
18 essence, a lobbying organization, but I was
19 not considered a lobbyist.  They have strict
20 definitions of who is and who is not.  But
21 it's a lobbying organization to represent
22 their interests in interacting with Congress,
23 the public, and other organizations.
24    Q.   Does PhRMA also issue

7 (Pages 22 to 25)

Page 34

```
1            BERT SPILKER, Ph.D., M.D.
2       Q.   Do you know whether this was
3   work that you did specifically for a
4   manufacturer of PPIs?
5       A.   Are we talking about the
6   current case?
7       Q.   No.  I'm talking about --
8       A.   The case that I dealt with in
9   the past?
10      Q.   Yes.
11      A.   No, that case I cannot recall
12  the specific PPIs.
13      Q.   Oh.  Okay.
14      A.   I don't believe it was -- I
15  mean --
16      Q.   Let me ask -- I'm sorry.
17      A.   It may have been only
18  omeprazole.  It was not so much comparative.
19  I thought you had switched to the current
20  case.
21      Q.   I apologize.  I see the
22  ambiguity in the question.  Let me ask it
23  again.  Were you asked, in connection with the
24  prior matter, to evaluate the comparative
25  efficacy of any PPIs?
```

Page 35

```
1            BERT SPILKER, Ph.D., M.D.
2       A.   Oh, no.
3       Q.   And prior to this case have you
4   ever been asked to evaluate the comparative
5   efficacy of any PPIs?
6       A.   No.
7       MR. WAGNER:  Let's take a
8   break.  I'll make my phone call, and then
9   we'll resume.
10           (A brief recess was taken.)
11      Q.   Getting back to the cases that
12  you've worked on -- and I apologize if I've
13  asked this question -- but did any of the
14  litigations you worked on involve any drugs
15  designed to treat GERD?
16      A.   Well, they might have in the
17  '70s because I worked on literally hundreds of
18  cases in medical malpractice.
19      Q.   Do you recall specifically
20  whether any of the drugs in those cases
21  treated GERD?
22      A.   No.
23      Q.   Would you agree with me your
24  field of expertise is clinical trials;
25  correct?
```

Page 36

```
1            BERT SPILKER, Ph.D., M.D.
2       A.   That's my main field, but
3   that's only one of my fields of expertise.
4       Q.   Okay.  Would you agree with me,
5   sir, you're not an authority in the field of
6   gastroenterology?
7       A.   I'm not an expert in the field
8   of gastroenterology, per se, yes, that's
9   correct.
10      Q.   Are you a gastroenterologist?
11      A.   No.
12      Q.   Have you ever conducted any
13  clinical trial involving GI drugs?
14           MS. SANCHEZ:  Objection.  Asked
15  and answered.
16      A.   You're saying have I ever
17  conducted trials myself, conducting -- GI
18  trials?  The answer is no.
19      Q.   Do you have any experience in
20  the field of gastroenterology?
21      A.   I would say yes.  First off,
22  I'm a methodologist dealing with procedures
23  that are applicable to every therapeutic area.
24  Also I believe that when I was at Burroughs
25  Wellcome and at other companies, that some of
```

Page 37

```
1            BERT SPILKER, Ph.D., M.D.
2   these other companies had drugs in the GI
3   area, and we looked into those in different
4   ways, both during discovery and development.
5       Q.   As you sit here today, do you
6   recall whether any of those drugs were drugs
7   designed to treat GERD?
8       A.   No, I don't believe they were.
9       Q.   Have you ever treated any
10  patients for GI disease?
11      A.   Well, yes.
12      Q.   When was the last time?
13      A.   Well, some of the people I
14  provide medical advice to today even have GI
15  diseases.
16      Q.   Well, are you seeing them
17  specifically to provide advice concerning
18  their GI diseases?
19      A.   These are not my patients in
20  that I'm not charging them.  These are family
21  members and friends and relatives who have a
22  wide variety of GI diseases, including GERD.
23      Q.   And are you providing advice
24  specifically about their GI diseases?
25      A.   Yes.
```

10 (Pages 34 to 37)

BERT SPILKER, Ph.D., M.D.

1
2 clinically significant if you have a 4.9
3 percent difference between two treatments
4 really strains my credulity why anyone would
5 say that that is clinically significant.
6          I mean, Dr. Fennerty is
7 basically stating what I believe the FDA has
8 often said, and that is, you want to see a 30
9 percent difference. I lowered it to 20.
10         Q.   Are you aware that Dr. Fennerty
11 has said the results showing statistically
12 significant superiority for Nexium over
13 Prevacid are clinically relevant? Are you
14 aware he made that statement in this case?
15         A.   Do I know where?
16         Q.   Do you know whether he made
17 that statement?
18         A.   He did indirectly certainly in
19 his publication. I'm going based on his
20 publication where he certainly is indicating
21 that.
22         Q.   Can you Look at Exhibit 8,
23 which is Dr. Fennerty's declaration.
24              (Spilker Exhibit 8 for
25 identification, Declaration of M. Brian

BERT SPILKER, Ph.D., M.D.

1
2 Fennerty, M.D.)
3         Q.   If you look at paragraph 14, he
4 states, "In sum" --
5         MS. SANCHEZ:  Give us a moment.
6         Q.   "-- the results of Study 322
7 showing statistical significantly better
8 performance of esomeprazole over lansoprazole
9 are clinically relevant with respect to
10 healing moderate to severe esophagitis." Do
11 you see that?
12         A.   Yes, I do see it.
13         Q.   Do you agree with it?
14         A.   Absolutely not, because -- may
15 I ask if Study 322 is the study that he then
16 published under his name?
17         Q.   Yes.
18         A.   Well, then, I would challenge
19 his statement based on his own deposition as
20 well as all of my experience, my knowledge of
21 what clinically relevant -- and I'm assuming
22 that "clinically relevant," as he is using it,
23 is equivalent to my term "clinically
24 significant," which I don't think is a big
25 issue. So I think that for him to say that is

BERT SPILKER, Ph.D., M.D.

1
2 a little disingenuous, myself.
3         Q.   Let's go back to your other
4 treatise, "Quality of Life and
5 Pharmaco-Economics in Clinical Trials."  This
6 is a book that you edited; correct?
7         A.   Yes, it is.
8         Q.   Would you agree with me that
9 it's an authority in the field of clinical
10 trials?
11         A.   Yes.
12         Q.   To put this book together you
13 solicited articles from well over 100 leading
14 authorities in the field of clinical studies;
15 correct?
16         A.   No.  I solicited articles from
17 well over 100 experts in the field of quality
18 of life and pharmaco-economics.
19         Q.   And were some of these also
20 authorities in the field of clinical trials?
21         A.   Some of them were.
22         Q.   Am I right that nowhere in this
23 book did any author, including yourself, posit
24 the 20 percent rule?
25         A.   I don't believe that this was

BERT SPILKER, Ph.D., M.D.

1
2 relevant to have included in the book.  It's
3 not something -- I don't know, if you look up
4 clinical significance in the index, if there's
5 anything listed there or not.  I just don't
6 know.
7         Q.   Let me go back a step.  Whether
8 it should have been in the book or not, am I
9 right: There's nothing in the book positing
10 the 20 percent rule?
11         A.   I'm not aware of this 20
12 percent rule, and I do take exception to your
13 calling it a rule, because I've described it
14 as a spectrum going from a very low number up
15 to probably 30 percent in some cases.  And so
16 to call it a 20 percent rule, I'm happy to
17 deal with that and accept that for the purpose
18 of this deposition, but I would never, ever
19 write that there is anything like a 20 percent
20 rule.
21          What I would have written or
22 would write today if asked to do so is that
23 there is a spectrum, and that probably goes
24 from a very low number, 2, 3 percent in some
25 cases, up to 30 percent.

Page 114

BERT SPILKER, Ph.D., M.D.
1
2      Q.   Let's go back so that we don't
3  have any confusion.  What we've posited -- I
4  think we agreed to posit as the 20 percent
5  rule for the purposes of this deposition, your
6  statement, "Because biological variability
7  between patients is often described as
8  accounting for a 20 percent difference around
9  the mean values in biological and clinical
10  sciences, differences below that number should
11  not be considered clinically significant."
12      Am I right that that statement
13  is not found in this book, "Quality of Life
14  and Pharmaco-Economics in Clinical Trials"?
15      A.   It's not found there because it
16  wouldn't be relevant to put it there.
17      Q.   But it's not there.
18      A.   I'm not aware of it being
19  there.
20      Q.   Am I right, there are articles
21  in here which address the issue of clinical
22  significance?  If you look at page 461 and
23  1183.
24      A.   Yes, you are correct.  However,
25  of course, I never indicated to these people

Page 115

BERT SPILKER, Ph.D., M.D.
1
2  what they should be writing.
3      Q.   Did you edit those two
4  articles?
5      A.   Yes.
6      Q.   And you did a competent job as
7  editor of this job; correct?
8      A.   That's not for me to judge
9  that.
10      Q.   I suspect you did a competent
11  job.  Are both of these two books -- strike
12  that.  Are these two books used by the drug
13  industry?
14      A.   Yes.
15      Q.   Do you know whether they're
16  used in universities?
17      A.   Yes, I do.
18      Q.   Are they?
19      A.   Yes.
20      Q.   Are they used in medical
21  schools?
22      A.   That, I don't know.  I imagine
23  that some medical schools might use it.  But
24  often medical school training does not go into
25  either of those aspects, so I think it would

Page 116

BERT SPILKER, Ph.D., M.D.
1
2  be very minimal.
3      Q.   And over the years have you
4  gotten feedback on these two books?
5      A.   Yes, I have.
6      Q.   Would you agree with me that
7  the feedback has been uniformly positive?
8      A.   Yes.
9      Q.   Now, do you have any other --
10  strike that.  Do you have any writings --
11  strike that.  You've published a number of
12  articles about clinical trials; correct?
13      A.   Yes.
14      Q.   And in any of those articles
15  have you stated that, in words or substance,
16  "Because biological variability between
17  patients is often described as accounting for
18  a 20 percent difference around the mean values
19  in biological and clinical sciences,
20  differences below that number should not be
21  considered clinically significant"?
22      A.   Well, as I've said before, that
23  statement is referring to something that is
24  not a very severe situation.  But given that I
25  see this as a spectrum, I've never written

Page 117

BERT SPILKER, Ph.D., M.D.
1
2  anything that I am aware of that mentioned
3  this, quote, 20 percent rule.
4      Q.   Okay.
5      A.   Because also, when you're
6  dealing with FDA, one must have a lot of
7  flexibility to negotiate what level of
8  differences, and it's often not between drugs
9  but it's between drug and placebo and drug and
10  no treatment will be considered as clinically
11  significant.  And I would never want to put
12  myself in the position of putting a stake in
13  the ground without a great deal of caveats,
14  which I've described basically in terms of
15  this being a spectrum.
16      So I don't think if I was
17  redoing that book today I would include
18  something and call it a 20 percent rule or
19  even refer to it in that sense, except to give
20  a range, which I think is reasonable.
21      Q.   If a PPI trial did show a
22  difference in excess of 20 percent with
23  respect to healing EE, would you agree that
24  those results are clinically significant?
25      A.   Yes.

30 (Pages 114 to 117)

# EXHIBIT B

# BERTRAM A. SPILKER, PhD, MD, FCP, FFPM

## CONSULTANT

| | |
|---|---|
| ADDRESS: | 8004 Overhill Road, Bethesda, Maryland 20814-1145 |
| TELEPHONE: | 301-718-5150 (office) |
| FAX: | 301-657-1403 (home) |
| E-MAIL: | bspilker@comcast.net |

DATE OF BIRTH: July 3, 1941, Washington, D.C.

MARITAL STATUS: Married, Arlene Titow in 1967
CHILDREN: Adam (born 1969) and Karen (born 1971)

EDUCATION:

| | | |
|---|---|---|
| University of Pennsylvania | A.B. in Chemistry | (1962) |
| State University of New York Downstate Medical Center | Ph.D. in Pharmacology | (1967) |
| University of California Medical Center at San Francisco | Post-Doctoral Research | (1968) |
| University of Miami Medical School Ph.D. to M.D. Program | M.D. | (1977) |
| Brown University Medical School Roger Williams General Hospital | Resident in Medicine | (1978) |

MEDICAL LICENSES: North Carolina and Virginia.

MEDICAL PRACTICE: Part-time in Internal Medicine, Reston, Virginia (1978-1979).
Hypertension Clinic at UNC's Memorial Hospital, Chapel Hill (1980-1983).

HONORS:

Elected as Fellow of the Faculty of Pharmaceutical Medicine of the Royal Colleges of Physicians of the United Kingdom (F.F.P.M.).

Elected as Fellow of the American College of Clinical Pharmacology (F.C.P.).

Proposed by the American Medical Association (AMA) to the Department of Health and Human Services (HHS) to be Commissioner of the FDA (1990).

FDA Commissioner's Special Citation for work on Orphan Drugs (1993).

Award of Excellence in Clinical Research (1993). Presented by Advanstar Publications, (1994). (First Annual Award).

1

BASCV

Honorary Lifetime Membership in the American Academy of Pharmaceutical Physicians for contributions to pharmaceutical medicine (1994).

August, 2003

**PAST POSITION:**
**1998-2002**

Senior Vice President of Scientific and Regulatory Affairs, Pharmaceutical Research and Manufacturers of America (PhRMA).

- Manage all issues concerning science and regulatory affairs
- Lead group of ten staff and oversee six steering committees (Regulatory, Clinical, Biotechnology & Biologics, Technical, Informatics and Preclinical) and 52 other committees with company members.
- Present technical expertise and reports as appropriate to Board of Directors and other PhRMA groups plus our member companies and other external organizations.
- Help develop PhRMA policy and present our position through multiple channels including public hearings and Congressional testimony.
- Provide media interviews 4-8 times each week to major media.
- Member of ICH Steering Committee and Co-Chair of the ICH Global Cooperation Group.
- Member, Institute of Medicine Roundtable on Drugs, NIH Panel on Surrogate Endpoints, and National Patient Safety Foundation Committee on Safe Drug Use Steering Committee (Represent the pharmaceutical industry).
- Maintain liaison and relationships with over 50 government agencies, professional groups and trade associations.

**SUMMARY OF**
**POSITIONS:**

| Years | Company | Position |
|---|---|---|
| 1998 - 2002 | PhRMA | Senior Vice President |
| 1994 - 1997 | Orphan Medical | President |
| 1993 - 1994 | Chronimed | Executive Dir. of Orphan Medical |
| 1993 - 1994 | Chronimed | Vice President |
| 1983 - 1993 | Burroughs Wellcome | Director of Project Coordination |
| 1979 - 1983 | Burroughs Wellcome | Senior Clinical Research Scientist |
| 1978 - 1979 | JRB Associates | Senior Medical Consultant |
| 1972 - 1975 | Sterling-Winthrop | Senior Research Scientist |
| 1970 - 1972 | Philips-Duphar | Senior Research Scientist |
| 1969 - 1970 | Pfizer | Senior Research Scientist |

**PAST POSITION**
**1994 - 1997:**

President
Orphan Medical, Inc.
Minnetonka, Minnesota 55305

The blueprint I created in co-founding Orphan Medical focused on licensing in drugs in Phase II with high medical value that could be developed rapidly at low cost (under $5 million) and would have an IRR above 40%.

I conducted all in-licensing to build the portfolio, created the development and regulatory strategies, recruited the staff, built the infrastructure of the company and managed the development program. A few highlights as of December 1997:

BASCV

- Orphan Medical grew from a one person division to an independent public company on the major NASDAQ exchange.
- The staff grew from one to thirty-three.
- Five NDAs plus a 510k were filed and approved (Four methyl pyrazole for both human and veterinary use, Elliotts B solution, Betaine, Sucrase, Catrix). Another NDA was close to filing and has since been approved (i.v. Busulfex for bone marrow transplants).
- Twelve drugs were in development and 12 INDs active when I went to PhRMA in Washington, DC
- Held 28 face-to-face meetings with the FDA where we had remarkable success convincing them to accept novel development programs
- The market cap was $45 million (peaked at $70 million) (December, 1997)
- Raised a total of $29 million in two secondary IPO financings. Helped create the prospectus and was the main speaker on the "road shows"
- Received four FDA grants totaling almost $2 million
- Formed numerous alliances with marketing partners, both in the US and overseas
- Received the corporate award from the National Organization for Rare Disorders (NORD)
- Clinical trials were underway at over 80 sites (December, 1997)
- Obtained 12 US patents, 8 orphan drug designations, and 2 orphan drug status for our products

**PAST POSITION**
**1993 - 1994:**

Executive Director
Orphan Medical, a Division of CHRONIMED, Inc. &
Corporate Vice President, CHRONIMED, Inc.
Minnetonka, Minnesota 55305

Established, developed, staffed, and managed an organization that licensed in and developed products for orphan populations. During the 18 months that Orphan Medical was a Division of Chronimed, we had one OTC medicine brought to the market, seven prescription medicines licensed in and in development, staff was built from one to 12, and the division became an independent corporate entity.

**PAST POSITION:**
**1983 - 1993**

Director, Project Coordination
Burroughs Wellcome Co.
Research Triangle Park, North Carolina 27709

**RESPONSIBILITIES:**

Supervised the twelve staff members of the Department of Project Coordination; Lead the matrix project system; Provided assistance to all project leaders and managers; Directed 26 Therapeutic Area Panel Committees; Interacted with managers in Canada, Europe, and Japan to expedite drug development; Coordinated all licensing opportunities within research and development; Organized and planned major research and development meetings, including US-UK retreats and strategy meetings, Trustee visits, Research Committee, and informal U.S. strategy meetings; Spoke at in-house meetings to present the annual summary of research and development project activities (e.g. Burroughs Wellcome Canada, Corporate Affairs Unit, Human Resources Unit); Hosted

3                                    --                                    BASCV

visiting dignitaries (e.g. Head of USSR Institute of Economics, Member of Central Presidium of Czechoslovakia, KABI Board of Directors).

ACCOMPLISHMENTS AT BURROUGHS WELLCOME CO.:

I.    Medical Department

    1.    Designed, implemented, monitored, and interpreted data for a variety of significant Phase I to III clinical studies in neurology (e.g., epilepsy, Parkinson's Disease, centrally acting muscle relaxant for back pain).

    2.    Acted as principal investigator of two double-blind dermatology studies utilizing novel methodologies I developed.

    3.    Served as project leader for a centrally acting muscle relaxant.

    4.    Developed formats used for NDA reports on a neuromuscular blocking drug.

II.    Department of Project Coordination

    1.    Organized the Department of Project Coordination and served as its first head from 1983 to 1993.

    2.    Supervised the creation and issuance of more than 20 new project-related documents and analyses that have been issued periodically since 1983.

III.    Research, Development, and Medical Unit

    1.    Represented the Vice-President of Research, Development, and Medical at meetings and speaking engagements.

    2.    Modified the project system to strengthen it and improve its efficiency.

    3.    Created many analyses of the research and development function, including financial analyses.

    4.    Served as facilitator to help resolve differences between U.S. and U.K. departments.

    5.    Helped create and direct strategies on many projects.

    6.    Created the overall strategy document for research and development.

    7.    Created the research forum as a means to explore areas for future research.

    8.    Established and directed a multi-faceted educational program for project leaders.

    9.    Organized Burroughs Wellcome's overall strategy and specific programs for orphan drugs and quality of life activities.

    10.    Developed the program to create both proactive and reactive research and development strategies for licensing in new drugs.

--

11.    Initiated a series of lunchtime seminars and panel discussions.

IV.    <u>Corporate Level</u>

1.    Served on corporate task forces representing research and development: security, strategy development, business principles, employee drug testing, licensing activities.

2.    Instituted a project manager system for supervising OTC drug projects.

3.    Represented research and development in creating the overall Burroughs Wellcome Co. strategy document.

4.    Reviewed licensing proposals and participated on decision making panels.

V.    <u>Worldwide Wellcome Foundation</u>

1.    Organized and participated in annual retreats and meetings each year, including the main international retreat for research and development at which the UK and US CEOs and marketing heads attended.

2.    Prepared speeches for the Vice-President of Research Development and Medical, and the Chairman of the Wellcome Foundation. Wrote sections of the annual report.

3.    Co-authored the first worldwide research and development strategy document and participated in the creation and review of others.

4.    Developed many procedures used internationally between research and development and marketing units, and within research and development.

PREVIOUS
POSITION:
1979 -1983

<u>Senior Clinical Research Scientist</u>
Department of Clinical Research
Burroughs Wellcome Co.

Responsible for the design and analysis of clinical trials that were implemented through investigators in North America. These were in the area of epilepsy, Parkinson's Disease and other therapeutic areas. Served also as project leader.

ACADEMIC
APPOINTMENTS:
(At Present)

<u>Adjunct Professor of Medicine</u> (1980 - present)
Department of Medicine
University of North Carolina Medical School

Treated patients in the Anti-Hypertension Clinic (1980 to 1983). Participated in research projects and presented lectures (1979 to 1993). Promoted from Clinical Assistant Professor to Clinical Associate Professor (1988), and to Full Professor (1990).

<u>Clinical Professor of Pharmacy</u> (1980 - present)
University of North Carolina School of Pharmacy

Presented an entire 28-hour course on advanced methods in clinical studies (1988). Presented lectures in various other courses each year from 1980 to 1992).

<u>Clinical Professor of Pharmacy Practice</u> (1993 - present)
University of Minnesota School of Pharmacy

Presented lectures and seminars in various courses (1993 to 1998).

<u>Clinical Professor in the Graduate Faculty of Social and Administrative Pharmacy</u>
University of Minnesota School of Pharmacy

Presented lectures and seminars in various courses (1993 to 1998).

<u>Visiting Professor of Clinical Pharmacology</u>
University of Illinois Medical School, Peoria, Illinois (1995 - 2003)

Presented course on clinical trials (1996).

| | |
|---|---|
| ACADEMIC APPOINTMENTS: (Previous) | <u>Adjunct Professor of Business</u> (1992)<br>Fuqua School of Business<br>Duke University<br>Durham, North Carolina |

Co-taught a course on the pharmaceutical industry with Professor Henry Grabowski, Chair and Professor of Economics.

<u>Adjunct Professor of Pharmacology</u> (1979 - 1996)
Department of Pharmacology
University of North Carolina Medical School

Presented lectures to graduate students in several courses (1980-1993). Promoted from Adjunct Associate Professor to Full Professor (1988).

| | |
|---|---|
| BOARD OF DIRECTORS: (Previous) | Swedish Orphan A.B. (Stockholm), 1990 - 1993<br>Orphan Europe S.A.R.L. (Paris), 1990 - 1993<br>Multimedia Publishers (New York), 1994 - 1995<br>Society for Chronic Disease (Minneapolis), 1993 - 1997<br>Orphan Medical, Inc. (Minnetonka), 1994 - 1997<br>MetaWorks, Inc. (Boston), 1996 - 1999<br>Phoenix International Life Sciences(Montreal), 1997 - 2001 |

| | |
|---|---|
| SCIENTIFIC ADVISORY BOARDS: | MetaWorks Inc. (Boston), 1993 - 1996<br>United States Pharmacopeia (Rockville, MD), 1995 - 1997<br>(Represented the American Medical Association)<br>DataEdge, Inc. (Philadelphia), 1995 - 2001<br>Centre for Medicines Research (Epsom, UK), 1999 - 2002<br>UNC-CH (Chapel Hill, NC) Center for Education and Research in Therapeutics (CERTS), 1999-present<br>Acurian Inc. (Philadelphia), 2000 - present |

--                                                    BASCV

Learnwright (Rockville, MD), 2001 - present
Fast Track  (San Mateo, CA), 2001 - present
Ernst & Young (McLean, VA), 2001 - present
Madison Avenue Tools (Milwaukee), 2001 - present

**PAST POSITIONS:**
**1978 -1979**

Senior Medical Consultant
JRB ASSOCIATES, INC., 8400 Westpark Drive, McLean,
Virginia 22102.  Telephone (703) 821-4866

JRB Associates, Inc. employed more than 200 professionals in all aspects of health related services.

Selected projects in which I participated:

1.     The National Cancer Institute (NCI)

Directed the activities of 15 professionals who analyzed, classified, and evaluated the entire archive of Public Health Service documents related to low-level radiation resulting from atomic weapons testing in the 1950's and 1960's.  Served as advisor and staff director to a national panel of experts established by the Secretary of Health, Education, and Welfare to recommend future research objectives with respect to low-level radiation.

2.     The Environmental Protection Agency (EPA)

Under the Toxic Substance Control Act, the EPA identified 11 groups of chemicals to be evaluated in order to determine their potential for causing health problems.  I reviewed and evaluated the human health data for several of these groups of chemicals and provided recommendations for future clinical investigations.

3.     The Food and Drug Administration (FDA)

JRB provided economic and legislative analyses related to the Drug Regulation Reform Act and the Medical Device Amendments of 1976.  I served as task leader for the former project and evaluated clinical investigations of medical devices for the latter.

**PREVIOUS**
**PHARMACEUTICAL**
**EXPERIENCE:**
**1969 -1970**

Pfizer Ltd.
Sandwich, Kent, England

Personally established and directed the Cardiac Stimulant program with a staff of six to study drugs acting on heart muscle, and organized the laboratories to carry this out.

Collaborated on the animal research of Prazosin (Minipress), a new antihypertensive.

7                                                --                                        BASCV

Collaborated on the animal research of Tolamolol, a new beta adrenergic antagonist.

Developed the structure activity relationship that directly led to the development of a new drug for the treatment of heart failure. This drug was tested in clinical trials.

1970 -1972       Philips-Duphar B.V.
                 Weesp, The Netherlands

Personally established and directed the antithrombotic and antihypertensive program with a staff of six, and organized the laboratories to carry this out. Collaborated on the animal research of Tiprenolol, a new beta adrenergic antagonist.

Collaborated on the animal research of Ritodrine, a beta adrenergic agonist used to retard premature labor.

1972 -1975       Sterling-Winthrop Research Institute
                 Rensselaer, New York

Directed the Bronchodilator and Autonomic Pharmacology Projects. Responsible for hiring, training, supervising and evaluating seven employees.
Performed many of the animal studies on the bronchodilator Bitolterol, (Tornalate).
Collaborated on Phase IV Isoproterenol (Isuprel) and Isoetharine (Bronkosol) studies.

TEACHING         Downstate Medical Center - Department of Pharmacology
EXPERIENCE:            Lectured and led laboratory sections. (1965-1967).

                 University of California Medical Center
                      Taught an eight lecture course in pharmacology. (1967-1968).

                 Pfizer, Ltd.
                      Advisor to two graduate students. (1969-1970).

                 University of North Carolina Medical School
                      Taught cardiovascular pharmacology to graduate students, supervised clinical pharmacology laboratories for medical students, and lectured to medical students. Served as Masters thesis advisor for a student in the School of Pharmacy. Lectured in several different courses each year from 1979 - 1993.

                 Duke University Fuqua School of Business
                      Taught a course on the pharmaceutical industry with Professor Henry Grabowski. (1992).

                 University of Illinois College of Medicine at Peoria

8                              --                              BASCV

Taught a 16 hour course on topics related to clinical trials. (1996).

University of the Sciences in Philadelphia
Taught a two-day course in drug development  (2002, 2003)

**COURSES:**     Created the three day course "Clinical Interpretation of Drug Data" (1985) and served as Course Director at the Center for Professional Advancement.

Presented the above course twice each year in the United States and once each year in The Netherlands  (1986 -1990).  Also presented this course in Denmark (1988).

"Practical Aspects of Clinical Trials and Strategies"
I presented this two or three-day course:
        Copenhagen (1989)
        Uppsala, Sweden (1990)
        Washington, DC (1990)
        London, (1991)
        Barcelona, (1992)
This was presented as a one-day course in Denmark (1993).

"Improving Your Effectiveness as a Pharmaceutical Manager"
I presented this two-day course:
        London (1990)
        Madrid (1991)
        Paris (1991)

"Symposium on Clinical Trials"
I presented most of this two-day course in Pretoria, South Africa (1992).

**PROFESSIONAL**
**SOCIETIES:**     American College of Clinical Pharmacology (ACCP) - Fellow (FCP)
American Management Association (AMA)
American Medical Association (AMA)
American Society for Pharmacology and Experimental
  Therapeutics (ASPET)
American Society for Clinical Pharmacology and Therapeutics
  (ASCPT)
Drug Information Association (DIA)
Society for Clinical Trials (SCT)
Society for Pharmaceutical Medicine (SPM)

**EDITORIAL WORK:**     Editorial Board of:
    "American Journal of Clinical Research" (1992 through 1996).
    "Clinical Research and Drug Regulatory Affairs" (1987 through 1991).
    "Drug Information Journal" (1989 through 1991).
    "Drug News and Perspectives" (1988 to present).
    "Quality of Life Research" (1991 to present).
    "Applied Clinical Trials" (1992 to 2002).

Review manuscripts for:
"JAMA", "European Journal of Pharmacology," "Archives Internationales de Pharmacodynamie et de Therapie," "Journal of Investigative Dermatology," "Epilepsia," "Controlled Clinical Trials," "Medical Care," "Journal of Clinical Epidemiology," "PharmacoEconomics", "Cancer" and others.

**BIOGRAPHICAL LISTINGS:**

American Men and Women of Science
Dictionary of International Biography
International Who's Who
Men of Achievement
Personalities of America
Personalities of the South
Who's Who in Frontier Science and Technology
Who's Who in Society

**PROFESSIONAL ASSOCIATIONS:**

Pharmaceutical Manufacturers Association (PMA)
Member of PMA Commission on Drugs for Rare Diseases (1988 - 1990). Chairman of PMA Commission on Drugs for Rare Diseases (1990 - 1993).

Member of Medical Relations Committee (1986 - 1989).
Co-Chair of Medical Relations Committee (1989 - 1992).
Chair of Medical Relations Committee (1992 - 1993). Chair of the Task Force on forming the American Academy of Pharmaceutical Physicians (1991 - 1993).

PMA Visiting Scientist at Schools of Pharmacy:

University of Nebraska (1986)
Creighton University (1986)
University of Minnesota (1987)
University of Alberta (1988)
University of Saskatchewan (1988)
Ohio Northern University (1989)
Auburn University (1990)

Founded the Visiting Industry Program for Physicians at Medical Schools.

PMA Medical Section Meeting Talks and Panel Presentations
"Problems with Multinational Versus Uninational Clinical Trials." (1990).
"Design, Conduct, and Analysis of Data from Clinical Trials in a Harmonized World." (1990).
"Pharmaceutical Industry Perspective on Orphan Medicines." (1991, 1992).
"Report of the Task Force on an Association of Pharmaceutical Physicians." (1991, 1992).

Many additional presentations made at meetings from 1987 - 1993, and at PhRMA meetings from 1998 to present.

Pharmaceutical Manufacturers Association of Canada
Presented a one-day series of talks and workshops on drug development topics in Montreal (1989) and in Toronto (1989, 1992, 1993, 1994).

Proprietary Association (PA)
Member of Antirheumatic Task Group (1986 - 1990).

American Cancer Society
Liaison Member, Committee on Clinical Trials (1988 - 1992).

Swedish Institute of Health Economics and Danish National University
Presented lectures and workshop on quality of life in Copenhagen (1993, 1994, 1995).

Pharmaceutical Education and Research Institute (PERI)
Presented over a dozen lectures and talks through 2000.

**KEYNOTE ADDRESSES:**

"An Overview of Clinical Investigations." Regulatory Affairs Professionals Society, San Diego (1989).

"Trends and Forces in the Pharmaceutical Industry and Their Impact on Information Management." Drug Information Association, Philadelphia (1990).

"Future Directions of Clinical Trials and Strategies." First Annual Clinical Research and Practice Conferences, Auburn University School of Pharmacy, Auburn, Alabama (1990).

"An Overview of the Factors Influencing Innovation." at the Conference: Creating the Research Environment for Drug Discovery, Centre for Medicines Research, London (1990).

"Multinational as Opposed to Uninational Clinical Trials." South African Pharmacology Congress, Bloemfontein (1992).

"Principles of Clinical Audit and How to Prepare for an Audit by the FDA." South African Pharmacology Congress, Bloemfontein (1992).

"Standards for Quality of Life Trials." South African Pharmacology Congress, Bloemfontein (1992).

"Ethical Issues in Clinical Trials." South African Pharmacology Congress, Bloemfontein (1992). "Standards for Clinical Trials & Medical Devices." Medical Alley, Minneapolis (1993).

"Standards of Clinical Trials for Medical Devices." Bethesda (1994).

"Virtual Drug Development on a Global Basis." Spanish Pharmaceutical Physicians, Barcelona (1996).

11                                                    --                                                    BASCV

"Clinical Investigations: An Overview of Where We are Going in the '90s." Regulatory Affairs Professionals Society, Washington DC (1996).

"Uses and Misuses of Quality of Life Data." International Epilepsy Congress, Dublin (1997).

"Recruitment and Retention Strategies in the New Millenium." Halifax (1998).

"Post Marketing Surveillance in the New Millenium: Practices and Challenges" Opening Ceremony of New Clinical Research Unit of Seoul National University", Seoul (1998).

"Current Trends in the Pharmaceutical Industry that Impact International Commerce" Cosmos Alliance, Washington (2003).

"Pharmaceutical Opportunities and Directions" Prous Science Users Meeting, Princeton and San Diego (2003).

"Current Trends in Drug Development" PhRMA's Annual Meeting of the Biomedical Compliance Committee, Bethesda (2003).

"Advancing Clinical Research in Otolaryngology Through Industry Partnerships" Neel Distinguished Research Lecture, ENT Society, Annual Meeting, Orlando (2003)

| | |
|---|---|
| **INVITED LECTURES AT UNIVERSITIES:** | "Clinical Pharmacology in the Drug Industry." Department of Pharmacology, University of North Carolina Medical School, Chapel Hill (1981). |

"Practical Considerations in Planning and Conducting Clinical Trials." Department of Pharmacology, University of North Carolina Medical School, Chapel Hill (1983).

"Myths and Misconceptions About the Drug Industry Today." Symposium: "Business Ethics in the Drug Industry" at East Carolina University, Greenville, North Carolina (1984).

"The Golden Rules of Clinical Trials." Johns Hopkins Medical School, Baltimore (1988).

"Interpretation of Clinical Data." University of Montreal, Montreal (1989).

"Ethical and Policy Issues of Government Regulations for Anti-AIDS Drugs." Institute of Policy Sciences and Government Affairs, Duke University, Durham (1990).

"Academic-Industry Relationships." AAMC Meeting, Duke University, Durham (1990).

"Quality of Life Assessments in Clinical Trials." Yale University, New Haven (1990).

--                                    BASCV

"Cross-Cultural Functioning: Issues and Resolutions." Distinguished Lecture Series at the University of North Carolina, Chapel Hill (1990).

"Designing and Implementing Research Protocols in Clinical Departments." Albany Medical College Grand Rounds, Albany (1990).

"Perspectives on Quality of Life Issues." Health Policy Forum of the University of North Carolina School of Public Health (1991).

"The Medical and Marketing Interface in the Pharmaceutical Industry." University of Mississippi, Oxford (1991).

"Current Issues in the Pharmaceutical Industry." Duke University (1992).

"Roles of Statisticians in Clinical Research." Medical Research Council of South Africa, Pretoria, South Africa, Pretoria, South Africa (1992).

"Patient Compliance in Clinical Trials." University of Durban - Westville, South Africa (1992).

"Current Issues in Clinical Trials." Medical Research Council of South Africa, Capetown, South Africa (1992).

"Marketing Less Commercially Attractive Drugs." University of Minnesota (1993).

"Forum on Drug Development and Clinical Trials." Philadelphia College of Pharmacy and Science (1993).

"Orphan Drug Development." University of Minnesota Pharmacy Honor Society Awards Banquet (1995).

"Centralized Clinical Trials in a University Hospital Setting." University of Cincinnati, Grand Rounds (1996).

"The Value of Clinical Trials in Pediatrics." University of Michigan Medical School, Grand Rounds (1997).

"Golden Rules of Clinical Drug Development." Seoul National University Special Seminar (1998).

"Roles of Regulatory Affairs Professionals." Seoul National University Special Seminar (1998).

"Good Clinical Research Practices." Johns Hopkins University Medical School (1999).

"Are FDA Standards of Drug Safety Appropriate?" Johns Hopkins University Medical School (1999).

"Current Topics in Pharmaceutical Development" University of Florida School of Pharmacy (2002).

**INVITED LECTURES AT PROFESSIONAL MEETINGS:**

"Changing Regulations with Special Reference to the Drug Regulation Reform Act." ASCPT Symposium: "Forces Altering Clinical Trial Design." in San Francisco (1980).

"Approaches to Cooperation on the Discovery of New Therapies for Rare Disorders." Mount Sinai Medical School, New York (1984).

"Development of Orphan Drugs:  An Industry Perspective:"  Conference of "Orphan Drugs and Orphan Diseases" Leeds Castle, England  (1985).

"An Industry Perspective on Orphan Drugs." at the "National Conference on Orphan Drugs" Washington, D.C.  (1988).

"Drug Development:  An Industry Perspective."  Family Health International, Research Triangle Park, North Carolina (1988).

"Postmarketing Standards."  Regulatory Affairs Professionals Society, Nice, France (1989).

"Future Directions of Clinical Trials and Strategies."  Drug Information Association, Boston (1989).

"Visiting Scientists Program in Schools of Pharmacy." American Association of Colleges of Pharmacy, National Meeting, Portland (1989).

"The Future of Medicines." World Conference on the Future, Washington, D.C. (1989).

"Design of Studies to Measure and Enhance Compliance."  Drug Information Association Workshop, Philadelphia (1989).

"Planning and Managing Integrated Clinical Development Programs:  Flexible Two Research Center Approach."  Drug Information Association, Amsterdam, The Netherlands (1989).

"National Versus Multinational Clinical Trials: Impact of Medical, Cultural, and Regulatory Differences."  Drug Information Association, Amsterdam, The Netherlands (1989).

"The Future of Drug Discovery and Development."  American College of Physicians, Chicago (1990).

"How to Conduct More Clinical Trials With Fewer Resources."  Seventh International Conference on Pharmaceutical Medicine, Madrid (1990).

"How Can the Standards of Published Clinical Trials Be Improved."  Seventh International Conference on Pharmaceutical Medicine, Madrid (1990).

"Extrapolation of Preclinical Safety Data to Humans." Canadian Public Health Association and World Health Organization Symposium on Risk Estimation for Pharmaceuticals, Ottawa (1990).

"Partnering Initiatives to Increase Product Value." Conference on Strategies in the Pharmaceutical Industry, New York (1991).

"The Pharmaceutical Industry's Response to the New Orphan Drug Regulations." Food and Drug Law Institute Seminar, Washington, D.C. (1991).

"The Perspective of the Pharmaceutical Industry on Orphan Drugs." National Organization of Rare Disorders First Annual Meeting, Baltimore (1991).

"External Influences on Protocol Design." Antiepileptic Drug Trials Workshop, Miami (1992).

"Health Related Quality of Life." Quantitative Assessment of Epilepsy Care, (NATO sponsored meeting) Porto, Portugal (1992).

"Worldwide Compatability of Diagnostic Criteria." Drug Information Association, San Diego (1992).

"Roles of Regulatory Affairs in Drug Development." Drug Information Association, San Diego (1992).

"Pharmacoeconomics." Capitalizing on Healthcare Reform, Chicago (1993). "Benefit to Risk Considerations in Drug Development." Drug Information Association, London (1993).

"Drug Development Under Health Care Reform." Drug Forum, Tokyo (1993).

"Valuing a Deal from Both the Licensor's and Licensee's Perspectives." Global Business Research Meeting, San Francisco (1994).

"Patient Recruitment in Clinical Trials." New Clinical Drug Evaluation Unit (NCDEU) Meeting, Marco Island, Florida (1994).

"Standards of Clinical Trials for Medical Devices," Bethesda, Maryland (1994).

"Orphan Drug Development – Lessons for Europe." Geneva Pharmaceutical Consortium, Geneva (1996).

"Orphan Drug Development on a Global Basis." Management Forum, London (1996; 1997).

"Perspectives for Viewing Quality of Life and Pharmacoeconomics." American Association of Pharmaceutical Scientists, Seattle (1996).

"What's New in Clinical Trials." Eighth Phoenix Symposium, Montreal (1997).

"Creating a Frame of Reference for Pharmacoeconomics." International Epilepsy Congress, Dublin (1997).

BASCV

"Methods to Improve Patient Compliance."  Drug Information Association, Baltimore (1997).

"Quality of Life Instruments:  Statistical Issues."  Swedish Statistical Society, Uppsala, Sweden (1997).

"Industry Views on Academic Freedom to Publish Research Data."  Council of Scientific Society Presidents, Washington DC (1998).

"The Future of Pharmaceutical Spending."  AAAS Workshop "How to Fund Science: The Future of Medical Research, Wye River MD (1999).

"Drug Safety."  American College of Preventive Medicine, Crystal City VA (1999).

"Pharmaceutical Activities in Neurotherapeutics."  American College of Neurotherapeutics First Annual Meeting, Washington DC (1999).

"Direct to Consumer Ads: An Industry Perspective."  National Association of Boards of Pharmacy, Washington DC (1999).

"ICH Globalization Initiatives." ICH Conference, Washington DC (1999).

"Welcoming Address" ICH Fifth International Conference, San Diego, CA (2000).

"Global Cooperation Group" ICH Fifth International Conference Plenary Session, San Diego, CA (2000).

" Shortening Drug Development" Health Pathways and Maryland High Tech Society Inaugural Speaker, Gaithersburg, MD (2003).

"Clinical Development Strategies" and "Regulatory Strategic Approaches." Each talk presented at a one-day Food and Drug Law Institute Conference in Washington, DC (2002) and in Teaneck, NJ (2003).

"Issues and Problems of Clinical Data Interpretation"  12th International Congress on Cardiovascular Pharmacotherapy, Barcelona, Spain, (2003).

"Approaches to Shortening Drug Development" Japanese Economic and Trade Organization, New York (2003).

**INVITED DISCUSSANT:**

"Health Policy Issues Regarding Quality of Life."  University of North Carolina/Glaxo Symposium (1991).

"Statistical Analysis of Safety Data from Clinical Trials." Drug Information Association, Chicago (1993).

"Comments on Methodological Aspects of Proposed Trial of DCA in Cerebral Malaria." NIH, Bethesda (1993).

16                              --                                        BASCV

"Improving the Efficiency of Drug Development." at Pharmaceutical Executive Conference, New Brunswick (1994).

"Risk Communications" at Meeting co-sponsored by FDA, PhRMA and AHRQ , Chapel Hill, NC (2001).

"ICH Activities with Non-ICH Countries" (CIOMS - International Council of Medical Society Organizations), Geneva (2002).

"Industry's Perspective on Ethical Guidelines" at CIOMS, Geneva (2002).

**MODERATOR OR SESSION CHAIR:**

"The Future Starts Now-Geriatrics and Emerging Specialties." Research Triangle Park, North Carolina (1980).

"Update on Headaches." Research Triangle Park, North Carolina (1981).

"Practical Solutions for Common Medical Problems." Research Triangle Park, North Carolina (1984).

"New Concepts and Strategies for Clinical Trials."   Drug Information Association, Boston (1989).

"National Versus Multinational Clinical Trials: Impact of Medical, Cultural, and Regulatory Differences."   Drug Information Association, Amsterdam, The Netherlands (1989).

"Interpretation of Laboratory Data."   Associates of Clinical Pharmacology, Montreal (1990).

"New Treatment of Rare Diseases." Frontiers in Rare Disease Research, Second Biennial Conference, Washington, D.C. (1990).

"FDA Regulations in the 1990s." Drug Information Association, San Francisco (1990).

"Improving Data Management and Use of Resources in Clinical Research." Seventh International Conference on Pharmaceutical Medicine, Madrid (1990).

"Managing Investigational Medicines More Effectively."   Drug Information Association, Washington, D.C. (1991).

"Current Issues and Dilemmas in Quality of Life Trials." Clinical Research International Symposium, Washington, D.C. (1991).

"Clinical Trials.". Two-day Conference in Philadelphia (1992).

"Orphan Drug Development in Europe." One-day Conference in London (1996).

"Global Product Registration." Two-day Conference in Philadelphia (1996).

BASCV

"Surrogate Endpoints." Half-day Meeting at NIH Meeting in Bethesda (1998).

"Methodology of Surrogate Endpoints." Breakout Chair at NIH Meeting in Bethesda (1999).

"Opening Plenary Session of ICH-5" Co-chair with Dr. Sharon Smith Holston, FDA. Three day meeting, San Diego, CA (2000).

"Plenary Session on Hepatotoxicity." Meeting sponsored by FDA, PhRMA and AASLD, Westfields, VA (2001).

"Risk Assessment." Meeting co-sponsored by FDA, PhRMA and AHRQ, Chapel Hill, NC (2002).

**PRESENTATIONS TO GOVERNMENT:**

Presentation to Korean FDA Commissioner on Ethnic Diversity Aspects of New Development (May 18, 1998).

Statement on IRBs to Government Reform and Oversight Subcommittee on Human Resources (House of Representatives) (June 11, 1998).

Seminars at FDA: Regulatory and Scientific Roles and Activities of PhRMA (June 24, 1998); Quality of Life Issues (December 4, 1998)

Statement at FDA CBER Stakeholder's Meeting (August 14, 1998).

Statement at FDA CDER Stakeholder's Meeting (August 17, 1998).

Statement at FDA Stakeholder's Meetings (September 14, 1998; April 28, 1999; August 6, 1999 (Dietary Supplements)).

"Conceptual Models of Surrogate Endpoints." Presentation at NICHD Workshops (1998, 1999); PPRU Workshop of NICHD (1999).

Seminar at the Armed Forces University of Technology on "Industry Views of Regulations (1999 and 2000).

Presentation to NIH Conference on Women's Health Issues (1999).

Presentation to NIH Conference on Surrogate Endpoints (1999).

GAO Conference on Drug Safety: Industry Perspective (1999).

Presentation to FDA's Office of Pharmaceutical Sciences (2000).

Presentation to FDA's Office of Orphan Products Development (2000).

Two statements to the FDA and NTSB on Drugs and Driving (2001).

Statement to the FDA's RX to OTC Hearing (2001).

Presentation to National Academy of Sciences on Industry's View of Medical Journal Policies (2001).

Presentations to the Institute of Medicine on Human Subject Protection (2001), and on Clinical Trials (2001).

**GOVERNMENT CONSULTANT:**

Chairman of the National Cancer Institute's (NCI) Special Review Committee of Grants for Quality of Life Assessments in Special Populations. Three day meeting in Columbia MD (1993).

National Institute of Drug Abuse (NIDA) meeting on Master Agreements (1993); grant reviews (1993, 1999).

Agency for Health Care and Policy Research (AHCPR) grant reviews (1999).

Member of the NIH "Ad Hoc Advisory Group on the Coordination of Rare Disease Research" (1997).

**PRESENTATIONS TO CONSUMER GROUPS:**

Consumer Federation of America: "Overview of Safety" (1998); Panel on Safety in the Modernized FDA (1999).

Consortium on Microbicides: Industry Perspective (1999).

**MEETING ORGANIZER/ PLANNING COMMITTEE**

American Enterprise Institute: Safety Meeting (1999).

IOM Pediatric Conference (1999).

NIH Surrogate Endpoint Meeting (1998 and 1999) - See book chapters F2, F3.

FDA, PhRMA, AASLD Hepatotoxicity Conference (2001).

FDA, PhRMA, AHRQ Risk Assessment Meeting (2002).

**MEDIA PRESENTATIONS:**

"Key Drivers for the 21st Century" National Press Foundation (Washington, DC, 1999).

**CIVIC CLUB TALKS:**

"Discovery and Development of New Drugs." Durham Rotary Club (1986); Chapel Hill Kiwanis Club (1986); Chapel Hill Rotary Club (1987); Raleigh Civitan Club (1987); Association of Extension Home Economists (1988); Raleigh Kiwanis Club (1989); Raleigh Rotary Club (1989); Raleigh Academy of Medicine (1990); Durham Jaycees (1990); Rho Chi (Pharmacy Honor Society, 1995).

**MARKETING TALKS:**

Training of Sales Representatives at the Burroughs Wellcome Company (1980 - 1992).

Formal discussions with 40 to 80 physicians in Johannesburg, Durban, and Capetown, South Africa (1992).

**CAREER TALKS:** Discussions with physicians who recently joined the industry.
PERI (Arlington, VA). 1998 (2x); 1999 (2x).

**MANAGEMENT:** Directed a staff of up to 30 (1993 - 2002).

Business courses at the State University of New York in Albany (1974) and University of North Carolina at Chapel Hill (1988).

Consultant to the UNC School of Business (1983 -1984).

**INVITED REVIEWER:** Institute of Medicine Reports (1990 – 2001).
Grant Applications submitted to the Dutch National Cancer Society (1991).
Faculty Tenure Application - University of Toronto (1991).
National Institute of Drug Abuse Reports (1992 - 2001).
GAO Reports (1999 - 2001).
Inspector General Reports (1999 - 2001).
National Bioethics Advisory Board Reports (1999 - 2001).

**ADDITIONAL INFORMATION:** Collaborated with Dr. John Coltart at St. Bartholomews Hospital in London on research into electrophysiological effects of drugs (1969 - 1971).

Completed the Boston Marathon (1966).

Invited seminar speaker and course director at numerous pharmaceutical companies (1983 to present).

Proposed the formation of a consortium on Rare Diseases in December 1990 to the Orphan Products Board of the Department of Health and Human Services (DHHS). This concept was approved by the Assistant Secretary of the DHHS in June 1991 and the meetings initiated later in 1991 with 24 representatives of government, academic, trade association, consumer, and industry groups.

Interim President of Phoenix, United States, a Canadian contract research organization (CRO) (January through March 1998). Led a staff of 330.

BASCV

# EXHIBIT C

# GUIDE TO
# CLINICAL
# TRIALS

## BERT SPILKER



LIPPINCOTT WILLIAMS & WILKINS

CHAPTER 71

# Summary of Principles and Procedures to Follow

Introduction, 505
   The Major Axiom of Clinical Interpretation, 506
   Who Interprets Clinical Data? 506
   Orientation of Interpretations, 506
Goals of Interpretation, 506
Perspectives, 507
   Differentiating Between Data Analysis,
      Interpretation, and Extrapolation, 507
   Three Major Perspectives, 507
   Extrapolation of Clinical Data, 508
Overall Outcomes of Results Obtained in Clinical
   Trials, 508
   Types of Positive (or Negative) Results, 508
   Types of Inconclusive Outcomes, 508
Components of the Overall Clinical Response, 509
   Sources of Clinical Variability, 509
   Outpatient versus Inpatient Trials, 510
   Determining the Magnitude of the Placebo
      Response, 510
   Including a No-Treatment Group, 510
Types of Clinical Data, 510
Clinical Significance of Data versus Their Statistical
   Significance, 510
   Both Statistical and Clinical Significance Are
      Positive, 510
   Statistical Significance Is Positive but Clinical
      Significance Is Not, 511
   Statistical Significance Is Absent but Clinical
      Significance Is Positive, 511

   Both Statistical and Clinical Significance Are
      Negative, 511
Clinical Significance to Whom? 511
Levels of Evaluating Clinical Significance, 511
Clinical Significance of Trial Data versus Their
   Relevance for Medical Practice, 512
   Factors Affecting Relevance of Clinical Trial Data
      for Medical Practice, 512
   Why Are Physicians Sometimes Unaffected by
      Clinical Trial Data That Are Relevant for
      Medical Practice? 512
Approaches to Interpreting Data, 513
   Ten-Step Approach to Interpreting Clinical Data,
      513
Data Sets of Different Sizes, 514
   Interpreting a Large Quantity of Data, 514
   Interpreting a Small Quantity of Data, 514
Extrapolating the Interpretation of Data, 515
   Levels of Interpretation, 516
Presentation of Data to Support an Interpretation,
   516
Strength or Quality of an Interpretation, 516
Styles of Interpretation, 517
   Overinterpretation and Underinterpretation, 517
   Conservative Interpretation, 517
   Personal Interpretation, 517
The Institution of the Interpreter, 517

## INTRODUCTION

*Interpretation* denotes the process of discerning the clinical meaning or significance of or providing an explanation for data that are being evaluated. The term *data* usually refers to data collected from patients entered in a clinical trial. Numerous aspects of clinical data usually require an interpretation within the broad categories of safety or efficacy.

The major assumptions made in the descriptions given of data interpretation are that this process usually occurs after the clinical trial is completed and the data have been analyzed (usually statistically). The major procedures that are conducted prior to, and subsequent to, the clinical interpretation of data are illustrated in Fig. 71.1. Although each of the processes is shown as a separate event, there is often some overlap between two or more. Analyses of data are primarily

505



**FIG. 71.1** Procedures to conduct after completion of a clinical trial.

statistical exercises, and the interpretation of data is primarily a clinical exercise. The same individual(s) may be associated with several (or all) of the steps shown. Also, the time between any two steps may be extremely short or prolonged.

A circular (or spiral-like) process is alluded to but not emphasized. This refers to the fact that interpretation of data from one clinical trial often leads to and contributes to the development of a follow-up trial, which generates data whose interpretation often leads to an additional trial, and so on (Fig. 71.1).

### The Major Axiom of Clinical Interpretation

*This entire book is based on the axiom that data analysis, data interpretation, and the extrapolation of data are three separate processes.* The influences of one on the other and their interactions are described in many chapters.

### Who Interprets Clinical Data?

Clinical interpretation of clinical data is performed by various individuals connected with a trial, including the investigator, the sponsor (for sponsored trials), and/or other individuals who evaluate the data. The sponsor of a medicine trial is primarily concerned with discerning the clinical significance of the data for its relevance in medicine development or evaluation; the academic clinical investigator is usually primarily con-

cerned with treatment of his patients, plus issues relating to publications, grants, and career opportunities. The primary care physician is mainly concerned with the significance of the data for its relevance in treating his or her patients.

### Orientation of Interpretations

This book is primarily oriented toward the interpretation of clinical data insofar as it affects development of medicines. The topic of patient treatment, however, is considered throughout the text and is specifically addressed in several chapters, including that on clinical judgment.

Clinical investigators usually hope to attain an accurate understanding of the data, which may be extrapolated to other patients or situations. The process of extrapolation is dependent on many factors, the most important being an accurate interpretation of the data.

### GOALS OF INTERPRETATION

Three major goals in clinically interpreting data are (1) to establish the most meaningful and relevant significance (i.e., importance) of the clinical trial overall, (2) to relate the results (i.e., data) to the original objectives of the trial, and (3) to compare data from the trial with data obtained in other trials. It is possible to consider additional goals after the data have been interpreted.

These include developing a hypothesis that may be evaluated in future trials and extrapolating the data to particular patients, environments, and types of treatment. Other goals are to assess the clinical significance the data have for the diagnosis, treatment, or prevention of disease in the patients studied or in other patient groups. Finally, the data may provide insight into interpretation of the nature of characteristics of the disease itself. The eventual goal of many trials is to attain an improvement in the practice of medicine.

## PERSPECTIVES

### Differentiating Between Data Analysis, Interpretation, and Extrapolation

It is important to differentiate between the processes of data analysis, data interpretation, and data extrapolation. The first involves primarily statistical procedures and evaluations, whereas the latter two are primarily clinical and do not necessarily require statistics. Interpretation and extrapolations of data require clinical judgment and often scientific logic. *It is the author's contention that data analysis, data interpretation, and data extrapolation are distinct processes.* Although two different individuals usually conduct these processes, they may be conducted by the same individual. Days or months may elapse between the two processes, or only a few milliseconds between analysis and interpretation or between interpretation and extrapolation.

Clinical interpretation primarily involves determining whether the results affirm the objectives or purposes of the clinical trial. This initially involves confirming that the treatment groups are comparable in terms of relevant demographic and other characteristics. Interpretation also involves a determination of clinical significance and relevance of data for patients treated in the trial.

### Three Major Perspectives

The three major perspectives used to interpret data are discussed: (1) statistical significance, (2) clinical significance, and (3) relevance for medical practice. Interpretation begins when a clinical trial is completed: the data have been collected, edited, and entered in a computer; appropriate statistical tests have been used to analyze the data; and the statistical report has been written. At this stage the data must be interpreted.

### Statistical Significance

Statistical significance on its own does not provide information on whether a data set is important for pa-

tients, and if so, how important. Clinical significance must be evaluated separately, although there is often a relationship between statistical significance and clinical significance.

### Clinical Significance

The criteria used to evaluate clinical significance in terms of a medicine's efficacy are best established before a clinical trial begins. This is most often done by addressing the following question: How large a response in the most important parameter(s) measured would be necessary to convince physicians to use the clinical trial medicine or nonmedicine test therapy in treating their patients? This question may also be phrased in terms of a benefit-to-risk ratio. For example, what type and magnitude of patient response would be necessary for this medicine to have a greater benefit-to-risk ratio than that of other medicines (or nonmedicine treatments) used for the same indication? Other forms of the question may be raised that relate to safety, compliance, quality of life, or other characteristics. Each question involves comparisons with standard treatments, placebo, or the physicians' perceptions.

If the amount of change of an essential parameter necessary to achieve clinical significance is unknown, a group of physicians may be asked for their opinions. Although one might guess that their responses would be randomly distributed, experience has shown that such responses usually cluster in a given region. This is not surprising if one assumes that there is a value for a parameter's change that is clinically significant. If this exercise is conducted prior to a clinical trial it generally yields a response related to the specific disease being treated, and not to the specific medicine being tested. Hence, the amount of change of a critical parameter caused by any new medicine must equal or surpass the change caused by existing therapy. Exceptions might be for medicines with an important advantage not possessed by existing therapy, such as an improved quality of life or improved safety profile.

### Relevance for Medical Practice

Relevance of data for medical practice means: What are the implications of the data for treating other patients? This is another way of stating that data from a clinical trial, from a group of trials, or even from a single patient must be extrapolated to new situations, new patients, and new conditions. Asking the question of how important or relevant the data are for other clinical situations may lead to a different interpretation from that based on the group of patients treated.

### Outpatient versus Inpatient Trials

Data obtained in inpatient trials cannot always be interpreted (or extrapolated) to outpatients. An impeccably conducted trial of a new medicine compared with placebo in inpatients could unequivocably demonstrate that a medicine was clinically effective, but these data would not demonstrate that the same medicine would be effective if given to outpatients.

Some of the many sources of variability that are not usually present in inpatient trials and that will affect an outpatient trial include (1) diet, (2) exercise, (3) sleep, (4) environmental factors, (5) personal relationships, (6) stress, (7) concomitant medicines, and (8) compliance with the protocol. Unless these factors are controlled and/or evaluated in outpatient trials, a flawed trial may result, and it may not be possible to convince physicians to modify their therapeutic practices based on data obtained in inpatients.

Figure 71.3 illustrates the major possible components of a clinical effect observed in a trial. These include the natural history of the disease, placebo response of medicine, concomitant medications or therapy, personal factors, plus the response due to the medicine itself. It can be difficult to determine how much of a patient's response is due to the medicine, and how much to other factors. During a clinical trial that continues over a number of days or longer, any of these factors may vary in a simple or complex way. Simple or complex interactions between these factors may also occur, and may vary during the duration of the clinical trial. The "?" symbol in the figure indicates that clinical deterioration may, but does not usually, result from that cause.

### Determining the Magnitude of the Placebo Response

Assume that one is interpreting the clinical response to a medicine in a double-blind clinical trial. When determining the magnitude of the effect due to a medicine, it is usual to subtract the magnitude of the effect observed in the placebo-treated group from that observed in the medicine-treated group. This is usually done on a group basis to obtain the "true" medicine response. The scientific evidence to support this practice is almost nonexistent, but few authors have questioned it. Little information is available about how the additional factors (shown in Fig. 71.3) actually interact. It is, therefore, naive to simply subtract the placebo response from the total response to obtain the medicine response. Unfortunately, no satisfactory solution to this issue has been proposed.

### Including a No-Treatment Group

The patient's underlying disease is often assumed to remain constant throughout a clinical trial. This con-

cept is sometimes tested, but in most trials it is not. Patients who have marked deterioration (or sometimes improvement) during a trial demonstrate that the status of their underlying problem has changed. In some situations a "no-treatment" group of patients who are merely observed would be an appropriate control group to study. This three-arm clinical trial (i.e., medicine, placebo, and no-treatment) would allow the extent of the disease's change to be evaluated and also the effect of placebo.

### TYPES OF CLINICAL DATA

No single classification of clinical data is universally accepted. The simplest is to discuss data as related to safety or efficacy. While this differentiation is generally useful, it is also incomplete. Other categories of clinical data include pharmacokinetics, quality of life, compliance, and pharmacoeconomics. These categories may overlap and other categories of clinical data may also be defined.

### CLINICAL SIGNIFICANCE OF DATA VERSUS THEIR STATISTICAL SIGNIFICANCE

In most clinical situations the statistical significance and clinical significance of the data are either both positive or they are not. If there is a clinically significant effect it is usually statistically significant and vice versa. Nonetheless, often one, but not both of these characteristics are positive. The four possible combinations are described below.

1. Statistical significance:  Present (i.e., positive)
   Clinical significance:  Present
2. Statistical significance:  Present
   Clinical significance:  Not present
3. Statistical significance:  Not present
   Clinical significance:  Present
4. Statistical significance:  Not present
   Clinical significance:  Not present

Variations could be described: clinical significance could be positive, equivocal, or negative (i.e., representing patient deterioration). These combinations could apply to data interpretation for a single patient, a single clinical trial, or a single medicine.

### Both Statistical and Clinical Significance Are Positive

The first combination occurs when results of a clinical trial are both statistically and clinically significant. The most likely interpretation of this outcome is that the trial confirms the objectives. The data could also represent a false-positive effect.

**Statistical Significance Is Positive but Clinical Significance Is Not**

In the second combination statistical significance is positive, but clinical significance is not present. This is an extremely common occurrence that happens, for example, when (1) a vital sign changes by a small amount that is statistically significant because of the large number of measurements made, (2) the change in an efficacy parameter's amplitude is small, but statistically significant, often because of minimal variability, (3) the efficacy parameter changes at one or a few of many time points, but results are not consistent, (4) tolerance develops rapidly to a medicine, (5) the patient population studied was atypical, or (6) the parameters evaluated were not the most important ones indicative of activity.

A possible interpretation is that one of the results was false. The positive result might have occurred because too many measurements were made or the results occurred by chance (1 in 20 independent statistical tests will be positive because of chance alone). The failure to observe clinical significance might represent a false-negative result or be caused by confounding variables that may or may not be known.

**Statistical Significance Is Absent but Clinical Significance Is Positive**

A few examples of the third combination (no statistical significance, but clinical significance is positive) include (1) a positive treatment is found for a previously untreatable disease, (2) the number of observations are too small to achieve statistical significance, (3) the most appropriate parameter(s) was not measured, but an important clinical effect was observed, and (4) the most appropriate statistical tests or parameters were not used, but important clinical effects were observed.

Possible interpretations of this situation are that (1) there was an insufficient number of patients in the clinical trial, (2) an insufficient number of measurements were made, (3) inappropriate statistical tests were used, or (4) one or both results are false.

**Both Statistical and Clinical Significance Are Negative**

In the fourth combination, both statistical and clinical significance of data are negative. The most common interpretation is that no clinically important effect is present. Alternatively, one or both results could be a false negative. It is important to examine any unexpected negative results carefully and thoroughly to assure oneself that the data evaluated are not actually positive.

**CLINICAL SIGNIFICANCE TO WHOM?**

No single perspective may be used to evaluate clinical data and their clinical significance. The previous discussion described data primarily from the viewpoint of the investigator who collected the information, but there are other groups whose perspective may differ, including patients, treating physicians, pharmaceutical companies who sponsor clinical trials, and regulatory authorities.

*Investigators and Treating Physicians.* Investigators and treating physicians usually judge clinical significance by how well they are able to treat their patients. Other considerations for investigators relate to whether the data and publications will help their career and whether the money received will be sufficient to purchase new equipment, pay staff, or fund other clinical trials.

*Patients.* Patients usually judge clinical significance in terms of how a medicine affects their particular symptoms and quality of life. They want to know whether the medicine will help them feel better, help their disease, and prevent future problems. Some patients will appreciate benefits gained from reduction of risk factors. Judgment by a patient is usually based on their own personal experience.

*Pharmaceutical Companies.* Pharmaceutical companies judge clinical significance by whether the effect is of a sufficient magnitude and occurs in a sufficiently large population of patients to convince (1) national regulatory authorities to approve their medicine, (2) formulary committees to stock their medicine, and (3) physicians to prescribe their medicine. There is a heavy commercial slant to each of these judgments.

*Regulatory Authorities.* Regulatory authorities must interpret the clinical significance of a medicine in terms of how the medicine will affect their nation's health. The benefit-to-risk ratio, as well as the relative merits of alternative therapy, must be carefully considered. Medicines waiting to be approved are like high jumpers: the bar for each disease is set at a different height depending on the quality of available therapy. The bar becomes progressively higher for each new medicine, because other medicines and nonmedicine treatments that jumped before have improved on past performance of medical therapy and raised the standards. A specific standard height exists for safety and a different one for efficacy. A new medicine that raises one of the two bars by a large amount may not influence the other, or even cause it to be slightly lower under some conditions.

**LEVELS OF EVALUATING CLINICAL SIGNIFICANCE**

Although clinical importance has been described in terms of a medicine's effects in a single clinical trial

512 / PRINCIPLES AND TECHNIQUES IN DATA INTERPRETATION

or for a single patient, clinical significance may be evaluated on several levels. These levels include the following:

1. Single patient given a medicine.
2. Some or all patients in a single clinical trial given medicine.
3. Some or all patients currently receiving the medicine in all clinical trials as well as in clinical practice outside of formal trials.
4. Some or all patients who have received the medicine in the past.
5. Some or all patients with the target disease who are possible candidates to receive the medicine in the future.

## CLINICAL SIGNIFICANCE OF TRIAL DATA VERSUS THEIR RELEVANCE FOR MEDICAL PRACTICE

Clinical trials have the greatest possibility of influencing medical practice if (1) the treatment is both medically and scientifically rational, (2) a dose–response relationship is observed for the most relevant parameters, (3) the response is clinically important in magnitude, (4) the effect is widespread in the patient population and not merely found in one or a few subgroups, and (5) the trial supports previous results.

Clinical trials generally have the least chance of influencing medical practice if (1) the major finding was an unexpected association found on subgroup analysis, (2) evidence of data dredging is present, (3) the results were not part of the trial's objectives, or (4) the results run counter to conventional medical practice.

Both clinical significance and medical practice relevance of data may be positive or only clinical significance may be positive. For example, assume that a clinical trial demonstrates a lowering of blood pressure in hypertensive patients by medicine X, and that the data are statistically significant. Further, assume that the data are clinically significant because all patients had falls in blood pressure greater than levels defined prior to the trial as clinically meaningful. The question to address is whether the data are relevant for medical practice. To answer this it is necessary to know some factors related to the relevance of medical practice.

### Factors Affecting Relevance of Clinical Trial Data for Medical Practice

Relevance for medical practice depends on:

1. Availability of alternative therapy. If no treatment is available the medical practice relevance of a "poor" treatment may be high [e.g., the first investigational medicine reported in the media to treat patients with acquired immunodeficiency syndrome (AIDS), prior to Food and Drug Administration (FDA) approval of the medicine].
2. Suitability of alternative therapy. If the alternative therapy has serious deficiencies, then those characteristics will be important considerations in judging the medical practice relevance of a new medicine.
3. Capability of data to be extrapolated to a new situation. Some data lend themselves to the extrapolation process more easily than others.
4. Various other factors such as price, convenience, or adverse reactions of the medicine. Any of these factors could be an overriding factor in judging whether the data of a new medicine has relevance for medical practice.

Additionally, extrapolating data to other situations is not an all-or-none process. Most data may only be extrapolated to some situations, conditions, and patients. This may restrict the relevance of a clinical trial to a narrow spectrum of all possible aspects and types of medical practice.

### Why Are Physicians Sometimes Unaffected by Clinical Trial Data That Are Relevant for Medical Practice?

Clinical trial data that are statistically significant, clinically significant, and relevant for medical practice are sometimes ignored by physicians and do not influence medical practice. It is important for pharmaceutical companies, professional medical societies, and others to consider why this is so. Companies desire to have their new medicines that possess medical advantages over existing treatment to be sold as widely as possible, and professional groups want their members to be using the most appropriate treatments.

Physicians may not be influenced by important clinical data and interpretations of a new medicine's effects for any of the following reasons.

1. They are unaware, or at least not fully aware of the significance and importance of the data. For example, are results of the clinical trial published, and if so, where? Also, are results of the trial widely discussed?
2. Results may be highly complex and unclear to the physician evaluating the report and data. This indicates the importance of presenting the results in a format that everyone can understand.
3. Results may not be consistent in all efficacy parameters or in all subgroups of patients studied.
4. The patients in the physician's practice may differ in one or more important ways from those entered in the clinical trials (e.g., outpatients versus inpatients, young versus old, mildly ill versus severely ill).

5. The clinical trials may have been conducted in other countries, in different types of patients, or by investigators from a different medical specialty. Physicians must believe that there is relevance for their present or future patients if they are to consider using the new therapy.
6. The physician's assessment of results may be counter to their own experiences and preferences. It is therefore important to know whether physicians accept the results as valid.
7. The treatment may be relatively new and not widely used. Many physicians are reluctant to use the "latest" treatment until their friends discuss their own experiences, colleagues or guests at local medical meetings discuss the medicine, or the company's sales representative describes the medicine.
8. The physician may be loath to change his established habits and methods of treating patients. The medicine may not address the particular aspects of the physician's current treatment that he considers a drawback.
9. There may be other drawbacks of the treatment (e.g., cost, adverse reactions, length of therapy).

Even if all of these points are considered and physicians believe in the new treatment, they represent only one-half of the total equation for using a new therapy. Patients must believe that they should visit a physician. Second, patients must follow through on their intentions and visit a physician. Third, they must fill the prescription given to them, and finally, they must comply with the advice of the physician and take the medicine as directed. This topic is discussed further in Chapter 132.

## APPROACHES TO INTERPRETING DATA

After a clinical trial to evaluate a new medicine's efficacy is completed and the statistical analyses prepared, everyone wants to know "Did the medicine work?" They usually mean: "Is the response in the medicine-treated group of patients better than that observed in the placebo-treated group, or was the average response better on treatment than at baseline?"

### Ten-Step Approach to Interpreting Clinical Data

A general ten-step approach to the interpretation of clinical data is given below. This approach is proposed for use after all data have been edited, processed, and analyzed statistically.

1. Compare the treatment groups in terms of demographic characteristics and prognostic factors. Statistically significant differences in demograph-

ics between the groups do not mean that the differences are clinically significant, but any differences mean that the parameter(s) should be carefully assessed. Differences in a critical prognostic factor can readily mean that the entire set of clinical trial data are worthless, or nearly so. Any demographic characteristic or prognostic disease factor that would be critical to the clinical trial should be used as a basis for randomization (e.g., mild and severe cases, or men and women, or low risk factor and high risk factor patients may be randomized separately). Alternatively, a different randomization system (e.g., minimization) should have been used. Other alternatives may be used to avoid having an important factor represented unequally in the treatment groups, which could invalidate the entire clinical trial.
2. Evaluate whether the data affirm or deny the primary objective(s) of the clinical trial. This is the real heart of the interpretation. It is important that the objectives be clearly indicated in the protocol before the clinical trial is initiated.
3. Evaluate whether the data affirm or deny the secondary objectives of the clinical trial.
4. Consider all the specific factors that may have influenced or biased the data and the interpretation reached.
5. Discuss the interpretation(s) with a statistician and other colleagues to determine whether any additional analyses or subgroup analyses should be conducted.
6. Adopt the "devil's advocate" perspective and strongly criticize one's own interpretation. Then evaluate each criticism and determine how it may be refuted or addressed. These evaluations or counterarguments will be helpful in the discussion section of a publication or report.
7. Compare the interpretations and data with those obtained using standard medicines or treatments. These may be obtained from data in the same clinical trial or from results in the published literature.
8. Discuss the interpretation with others and seek their input and reaction.
9. Extrapolate the interpretations to as many different patient populations, physicians, settings, levels of organization as may be justified and appropriate.
10. Develop hypotheses or plans to evaluate further new questions, issues, or models in future clinical trials.

Many of the subtleties and variations involved in each of these steps are discussed in other chapters. Step four of the general approach described above involves specific factors that may have affected the data or interpretation reached. These may be related to the



FIG. 71.4 General questions to pose about clinical trial data.

trial design, patients, medicine used, or several other categories (see Table 71.1). A detailed discussion of this topic, along with over 100 tables describing specific factors, is presented in Chapter 83. Figure 71.4 illustrates a variation on the approach described in this section.

## DATA SETS OF DIFFERENT SIZES

Different types of data sets can be described along with possible approaches to deriving interpretations. The data sets described in this section are (1) a large quantity of heterogeneous or homogeneous data and (2) a small quantity of heterogeneous or homogeneous data.

### Interpreting a Large Quantity of Data

Assume you have obtained 150 cartons of data on a new medicine you are licensing or will study. Difficulties may arise when an individual who is confronted with a vast amount of heterogeneous data does not know how to approach it to develop an interpretation. There are several ways that one may approach this situation. Even if the first approach appears to yield a meaningful interpretation, it is suggested that several of the other alternatives be followed (or at least considered) to determine whether an even "better" interpretation is possible. The same basic approaches may also be used for homogeneous data.

Before reviewing the data, it is important to determine which aspects of the data, or which data, are relevant. This decision is based primarily on the ob-

jectives of the clinical trials, which should be indicated in the protocols. If the objectives are not sufficiently delineated, it will generally be necessary to define more precisely exactly what objectives are to be addressed with the data.

*Splitters.* The first approach could be referred to as the "divide and conquer" or "splitter" method. In this system the data are divided (i.e., classified) into various well-defined categories, and each of the resulting smaller data sets is evaluated and interpreted separately. The first hurdle comes in choosing the categories that are to be considered. The categories may be obvious, but there is a reasonable probability that there will be more than one set of equally appropriate categories to consider. Under such circumstances a hierarchy should be created and followed so that each relevant category is tried, at least to the extent necessary to identify the best set of categories. Possible categories to use in approaching data might be based on (1) physiological function of patient, (2) length of exposure to the medicine, (3) age of patient, (4) concomitant treatments, or (5) any of many other possible sets of categories. In most situations, the possible categories to be used for classification will be suggested by the nature of the data.

*Typologies versus Classifications.* In some data sets it may be possible to discern certain common characteristics. Clusters of patients, events, or observations may stand out when the data are examined according to one or more of the "common" characteristics. This approach is referred to as a typological approach. The distinction between a typology and classification is that in the former, the categories are suggested by a combination of characteristic

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2004 DEC 15  PM 4: 21

ASTRAZENECA LP,                          )
                                         )        **CONFIDENTIAL:**
              Plaintiff,                 )        **FILED UNDER SEAL**
                                         )                                    A 0407-1590
       v.                                )        C.A. No. 04-1332-KAJ
                                         )
TAP PHARMACEUTICAL PRODUCTS INC.,        )
                                         )
              Defendant.                 )

| | | |
|---|---|---|
| SERIAL NO. 31 | | |
| SERVED | | |
| RECEIVED | | |
| FILED | | |

**DECLARATION OF BERT SPILKER, PH.D., M.D.**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17[h] Floor
P.O. Box 1150
Wilmington, Delaware 19899

*Attorneys for Defendant Tap
Pharmaceutical Products Inc.*

*Of Counsel:*

Thomas C. Morrison
Karla G. Sanchez
Blair Axel
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Kenneth D. Greisman
Vice President and Chief Legal Counsel
TAP Pharmaceutical Products Inc.

Karen L. Hale
Senior Counsel
Abbott Laboratories

Dated:  December 15, 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
——————————————————————————  x
                                         :
ASTRAZENECA LP,                          :
                                         :
                Plaintiff,               :
                                         :       Civil Action No. 04-1332-KAJ
          - against -                    :
                                         :
TAP PHARMACEUTICAL PRODUCTS INC.         :
                                         :
                Defendant.               :
                                         :
——————————————————————————  x
```

### DECLARATION OF BERT SPILKER, PH.D., M.D.

Bert Spilker, under penalty of perjury, declares as follows:

1.      I have reviewed the declarations of Drs. Castell, Fennerty and Johnson (the "plaintiff's experts"). My conclusions and statements in my original declaration do not have to be modified in light of the plaintiff's experts' comments, who presented incomplete versions of my statements or misstated them in some way. I submit this declaration in response to those declarations and in further support of TAP's motion for a preliminary injunction.

#### Determining Clinical Significance

2.      The three plaintiff's expert declarations address a central issue – whether the results of the Castell and Fennerty studies are clinically significant. In my initial declaration, I set out a definition of clinical significance and my opinion that under the facts of this case a 20% difference between the effects of the two drugs on healing esophageal erosions or eliminating clinical symptoms would be needed to demonstrate

1129640v1

clinical significance. As I explained in my declaration, my opinion is based on the now uncontroverted view that, in general, an approximately 20% variation exists in individual patient responses and measurements between patients, often referred to as "noise." In other words, in general, the results from the same patient taking the same drug can vary by as much as 20%; similarly the results between patients taking the same drug can vary by as much as 20%. These variations may be due to, and the magnitude of the variations influenced by, such factors as environment, personal mood, emotional state, time of day, and degree of the symptom at the time the drug is taken, among other factors. Therefore, these variations may be less or more than 20%, and in a clinical trial, when clinically significant differences between drug effects are expected to be less than 20% it would be necessary to describe in detail, and in advance of initiating the clinical trial (not in hindsight), why a smaller difference should be considered clinically significant.

3.      None of the plaintiff's experts provided any opinion or justification for why a difference of less than 20% should be considered clinically significant. Nor did they provide an alternate percentage or any references to support their conclusory opinions.

4.      In fact, there is no rule or fixed percent for establishing clinical significance, but there are procedures for determining this value for any trial, which I mentioned in my original declaration. And, because of the large number of variables that influence clinical significance, neither the FDA nor any well-respected groups have established guidelines of the magnitude of difference between two drugs that is clinically significant. But, when developing new drugs the FDA usually requires a difference between the test drug and placebo or between the test drug and "no treatment" to be at

2

least 30%, and considers smaller differences to be clinically insignificant. One of the major reasons for the 30% or greater value chosen by companies and the FDA is because of the "noise" mentioned in paragraph 2 above.

### Clinical Significance in AstraZeneca's Studies

5.      I evaluated the final medical reports of four clinical trials that AstraZeneca conducted of esomeprazole (Nexium) versus lansoprazole (Prevacid) (coded by AstraZeneca as study numbers 267, 322, 325 and Metropole). Study 267 was eventually published as the Castell paper (referred to herein as the "Castell trial"), Study 322 corresponds to the Fennerty abstract (referred to herein as the "Fennerty trial") and Study 325 and Metropole are two studies comparing Nexium and Prevacid over longer periods of time. Although the clinical professionals at AstraZeneca who wrote the protocols and final medical reports offer no clear percentage that they define as being clinically significant in these clinical trials, an analysis of the methodology used by AstraZeneca to calculate the number of patients that were needed to be enrolled in these studies is highly relevant and allows us to determine the level of difference that they considered in fact to be clinically significant.

6.      In any well controlled trial comparing the efficacy of two drugs, the statistician determining the number of patients to be enrolled in the study needs to know how great a difference between the two drugs is expected, and what difference would be clinically significant. The statistician would need to know the SMALLEST DIFFERENCE between the two groups of patients being tested that will be clinically meaningful (i.e., significant) to the people conducting the clinical trial and to those in the medical community or to any regulatory agency that will evaluate the results of the trial.

3

7.    In advance of the study, the statistician would also need to know how sure the clinician(s) wants to be that the response will be observed if it is truly present. This is referred to as the "power" of the trial. Usually, in studies sponsored by the pharmaceutical industry, the power of a trial chosen is between 70% and 85%.

8.    The power of the four AstraZeneca studies was 85% for trial 325, 90% for the Fennerty trial, and 95% for both the Castell trial and the METROPOLE trial. A 95% power is highly unusual in the pharmaceutical industry (or in academia) because it requires a company (or medical school in a university) to enroll substantially more patients than would be needed for the usual 80% or 85% power.

9.    The value of the difference sought in the Fennerty, METROPOLE and 325 trials was 10%, i.e., the studies were designed to find a 10% difference between the healing rates of the two drugs. Although the difference sought between the two drugs in the Castell trial was only 3%, in my opinion the 3% was not chosen because the planners of the trial believed that the extremely low number of 3% would be clinically significant, but because they were looking to see if there was ANY difference between the two drugs that could be shown to exist.

10.    This supposition is confirmed by AstraZeneca's commission of the Fennerty trial. Had AstraZeneca considered the 3.8% result that was obtained in the Castell trial to be clinically significant then there would not have been a reason to increase the level of difference between the two groups that was sought in the follow-up Fennerty trial to 10%.

11.    The importance of this point can be well illustrated with an example. If a clinical trial was designed to show a difference of two drugs in preventing

4

death, then one might consider and discuss whether a 3% difference between two drugs would be clinically significant. However, if one is looking at a less catastrophic event, such as reducing seizures, reducing blood pressure, or reducing gastrointestinal problems, then a 3% difference between two drugs is almost trivial, regardless of whether the data are statistically significant. If the level of clinical significance defined in advance of a trial is to be less than 20% (level of background noise within or between patients) then one needs to present a strong rationale why a lower level has been chosen. This was not done by the plaintiff's experts, who merely assert (without evidence) that the data are clinically significant. This was also not done by AstraZeneca in its protocols or in its final medical reports, where some gave assertions without evidence that the data were clinically significant; but it is noteworthy that no such statement of clinical significance appears in the Discussion or Conclusions of the Castell trial's final medical report.

12.     Thus, it is very probable and reasonable to assume that AstraZeneca believed a 10% difference in healing between the two groups in these trials to be the magnitude of difference that is clinically significant. However, neither the METROPOLE, the 325, nor the Fennerty trials demonstrated the 10% difference sought. The Fennerty trial showed a 4.9% difference, which is less than half the amount that AstraZeneca evidently considers is needed to show clinical significance. The METROPOLE study showed a 7% difference, the 325 study showed an 8% difference and the Castell trial showed that across all grades of esophageal erosions there was a 3.8% difference, all of which are below the level of demonstrating a clinically significant difference.

1129640v1

13.    Although the Castell trial showed a difference above 10% for the subsets of C and D patients (but not the A and B patients, where there was almost no difference), this was determined in a **post hoc analysis**, that was thought about and conducted after the trial was completed. These types of statistical, or post hoc, analysis that professionals conduct after a trial are universally agreed not to be valid and cannot be relied on for drawing important or meaningful conclusions. The reasons for this statement include the fact that this type of evaluation, often referred to as "data dredging," can turn up all sorts of spurious findings, some of which may appear to be highly important. AstraZeneca is very upfront in admitting that the analysis of C and D patients was post-hoc (see for example Johnson Decl. ¶ 25; Castell Decl. ¶ 15).

14.    But, the results found in a post hoc analysis can be, and often are used as the basis for a new hypothesis, which must then be tested in a new clinical study. Therefore, the result in the Castell trial that Nexium was more effective than Prevacid in healing esophageal erosions in patients classified as Grades C & D would not be considered as a valid conclusion, but could be evaluated in a new trial specifically designed to test this hypothesis. This appears to be at least one of the major reasons why AstraZeneca set up and conducted the Fennerty trial (see Fennerty Decl. ¶ 4).

15.    Having then conducted a clinical trial to seek a clinically significant difference of 10% in the Fennerty trial, AstraZeneca was unsuccessful because Fennerty only resulted in a 4.9% difference. Thus, as I previously stated, I conclude that the differences between Nexium and Prevacid in healing any grade or grades of esophageal erosions and in treating symptoms of GERD are clinically non-significant.

6

Executed in Bethesda, Maryland, on December 14, 2004.

_____
Bert Spilker

7

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2004, the attached **DECLARATION**

**OF BERT SPILKER, PH.D., M.D.** was served upon the below-named counsel of record at the

address and in the manner indicated:

Josy W. Ingersoll, Esquire                                 HAND DELIVERY
Young Conaway Stargatt & Taylor
1000 West Street
17th Floor
Wilmington, DE  19801

Harold P. Weinberger, Esquire                           VIA FEDERAL EXPRESS
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY  10022


_____
John G. Day

149881.1

# EXHIBIT E

# REDACTED IN FULL

# EXHIBIT F

# REDACTED IN FULL

# EXHIBIT G



Supplement to

April 2004   Volume 126 • Number 4 • Suppl 2

www.gastrojournal.org

VANDERBILT UNIVERSITY
ESKIND BIOMEDICAL
LIBRARY

APR 2 8 2004

NASHVILLE, TENNESSEE
37232-8340

**Digestive Disease Week
and the
105th Annual Meeting of the American
Gastroenterological Association**
*May 15-20, 2004, New Orleans, LA*

- **Program of the Annual Meeting of the American Gastroenterological Association, the American Association for the Study of Liver Diseases, the Gastroenterology Research Group, the Society for Surgery of the Alimentary Tract, and the American Society for Gastrointestinal Endoscopy**

- **Abstracts of Papers Accepted by the American Gastroenterological Association**

- **Abstracts of Papers Accepted by the American Association for the Study of Liver Diseases**

- **Abstracts of Papers Accepted by the Society for Surgery of the Alimentary Tract**

W1266

**Interpreting the Clinical Relevance of Treatment Differences in Patient-Reported Outcomes (PROs) in Patients Treated for Reflux Disease**
Ola Junghard, Ingela Wiklund

Purpose: To explore what can be considered to be a clinically relevant treatment difference in PROs with a 7-graded response format, by relating it to differences in rates of symptom resolution.

Patients and Methods: PRO data from a clinical trial (n = 997), comparing omeprazole 20 mg with omeprazole 10 mg and ranitidine 150 mg bid in patients with reflux disease, were used in this analysis. The PRO data were collected using the Gastrointestinal Symptom Rating Scale (GSRS) Reflux dimension, which consists of two 7-graded items, one for heartburn and one for acid regurgitation. The mean change from baseline to 4 weeks is compared with the proportion of patients being symptom-free (i.e., score = None on both items in the GSRS reflux dimension) after 4 weeks of treatment. A treatment difference of 10 %-points is often considered as clinically relevant and is used as an anchor.

Results: The mean Reflux dimension score change was 1.48 for omeprazole 20 mg, 1.32 for omeprazole 10 mg and 1.15 for ranitidine. The corresponding proportion of patients with complete symptom relief during the past 7 days was 42%, 34% and 26%, respectively. Thus the difference between omeprazole 20 mg and ranitidine 150 mg of 0.33 score points corresponds to a difference in the proportions of symptom-free patients of 16%. The difference between omeprazole 20 mg and omeprazole 10 mg of 0.16 score points corresponds to a difference in proportions of 8%. Hence, a treatment difference of 10 %-points corresponds to a difference in mean Reflux dimension score of 0.2. The same relationship, that a difference of 10 % points corresponds to a difference in mean score of 0.2, was found when evaluating the GSRS heartburn item separately.

Conclusion: The results suggest that a treatment difference of 0.2 score points defines a clinically relevant treatment difference, at least in studies where a large proportion of the patients become symptom-free. A difference of 0.5 score points, previously suggested as a standard, is unrealistic and much too large to define a clinically relevant treatment difference in studies with highly effective treatments.

W1267

**Cost of Illness in a Cohort of Patients with Gastroesophageal Reflux Disease Over 2 Years**
Michael Kulig, Marc Nocon, Andreas Leodolter, Michael Vieth, Daniel Jaspersen, Joachim Labenz, Tore Lind, Wolfgang Meyer-Sabellek, Manfred Stolte, Peter Malfertheiner, Stefan N. Willich

# EXHIBIT H

# REDACTED IN FULL