**REDACTED -- Public Version, filed 1/20/06**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ASTRAZENECA LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C.A. No. 04-1332-KAJ |
| | ) | |
| TAP PHARMACEUTICAL PRODUCTS, INC., | ) | ~~CONFIDENTIAL -- FILED~~ |
| | ) | ~~UNDER SEAL~~ |
| Defendant. | ) | |

**REPLY BRIEF OF PLAINTIFF ASTRAZENECA LP IN
FURTHER SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF THOMAS DUPONT AND SUSAN MCDONALD**

Josy W. Ingersoll (No. 1088)
*jingersoll@ycst.com*
John W. Shaw (No. 3362)
*jshaw@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, , 17th Floor
1000 West Street
Wilmington, Delaware  19899-0391
(302) 571-6600

Attorneys for AstraZeneca LP

Of Counsel:

Harold P. Weinberger
Jonathan M. Wagner
Kerri Ann Law
Jeremy A. Cohen
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Dated:  January 12, 2006

**REDACTED -- Public Version, filed 1/20/06**

<u>Table of Contents</u>

<u>Page</u>

Table of Authorities ................................................................................................................... ii

Preliminary Statement.................................................................................................................1

Argument ....................................................................................................................................2

Point 1  THE TV SURVEY IS FATALLY FLAWED BECAUSE IT IS IRRELEVANT
TO KEY ISSUES AND REACHES CONCLUSIONS NOT SUPPORTED BY THE
DATA .............................................................................................................................2

    A.  The TV Survey does not "fit" the issues of this case .................................................2

    B.  TAP's additional arguments are misplaced..............................................................6

    C.  The TV Survey fails to ask relevant questions in other respect as well....................9

Point 2  THE INTERNET SURVEY YIELDED NO RELIABLE DATA
FROM WHICH ANY VALID CONCLUSIONS CAN BE DRAWN...........................11

Point 3  THE MCDONALD SUPPLEMENTAL REPORT IS NOT PROPER EXPERT
EVIDENCE..................................................................................................................13

Conclusion ................................................................................................................................14

**REDACTED -- Public Version, filed 1/20/06**

Table of Authorities

Cases:

*American Home Products Corp. v. Procter & Gamble Co.,*
   871 F. Supp. 739 (D.N.J. 1994) ...........................................................................7

*CFTC v. American Metal Exch. Corp.,*
   693 F. Supp. 168 (D.N.J. 1988) ...........................................................................6

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.,*
   350 F. Supp. 2d 582 (D. Del. 2004) ...................................................................13

*Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.,*
   873 F. Supp. 893 (D.N.J. 1994) ...........................................................................6

*Citizen Financial Group, Inc. v. Citizens National Bank,*
   No. Civ. A. 01-1524, 2003 WL. 24010950 (W.D. Pa. Apr. 23, 2003),
   *vacated in part on other grounds,* 383 F.3d 110 (3d Cir. 2004) ...............................................4

*ConAgra, Inc. v. Geo. A. Hormel & Co.,*
   784 F. Supp. 700 (D. Neb. 1992) ......................................................................3, 7

*Daubert v. Merrell Dow Pharmaceuticals,*
   509 U.S. 579 (1993) .............................................................1, 3, 4, 5, 6, 11, 14

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
   967 F.2d 1280 (9th Cir. 1992) ............................................................................5

*Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.,*
   221 F. Supp. 2d 457 (S.D.N.Y. 2002) ..................................................................5

*General Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ...............................................................................8, 11, 12

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP,*
   325 F. Supp. 2d 841 (M.D. Tenn. 2004) ......................................................3, 4, 11

*Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v.*
   *Rhone-Poulenc Rorer Pharmaceuticals, Inc.,*
   19 F.3d 125 (3d Cir. 1994) ..............................................................................7, 8

*McGowan v. Cooper Indus., Inc.,*
   863 F.2d 1266 (6th Cir. 1988) ..........................................................................13

**REDACTED -- Public Version, filed 1/20/06**

Table of Authorities
(continued)

Page

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987) ...................................................................................5

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
    345 F. Supp. 2d 431 (D. Del. 2004)......................................................................13

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................................13

*Schering Corp. v. Pfizer, Inc.*,
    189 F.3d 218 (2d Cir. 1999) ...................................................................................5

*Sears, Roebuck & Co. v. Menard, Inc.*,
    No. 01 C 9843, 2003 WL. 168642 (N.D. Ill. Jan. 24, 2003) .........................3, 7, 11

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    522 F. Supp. 1238 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982) ...........5, 6

*Wells Fargo & Co. v. WhenU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003) .................................................................4

*Zeneca Inc. v. Eli Lilly & Co.*,
    No. 99 Civ. 1452, 1999 WL. 509471 (S.D.N.Y. July 19, 1999) ...............................6

Statutes:

Fed. R. Evid. 403 ...................................................................................1, 3, 14

Fed. R. Evid. 702 ...................................................................................1, 4, 14

**REDACTED -- Public Version, filed 1/20/06**

<u>Preliminary Statement</u>

Plaintiff AstraZeneca LP respectfully submits this reply brief in further support of its motion, pursuant to Rules 403 and 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), to exclude the testimony of Dr. Thomas Dupont, expert consumer survey witness for defendant TAP Pharmaceutical Products, and the testimony of TAP's second survey expert, Dr. Susan Schwartz McDonald.

In its Opening Brief, AstraZeneca demonstrated that the two consumer surveys conducted by TAP in this case should be excluded because (i) the survey concerning an AstraZeneca television commercial (the "TV Survey") failed to ask critical questions, including those identified by TAP's own expert as relevant, and (ii) the survey concerning an AstraZeneca internet ad (the "Internet Survey"), is incapable of providing reliable data to support any valid conclusions based on the admissions of TAP's own experts. TAP's principal response is that the surveys should nevertheless be admitted because "errors in methodology . . . go only to the weight of the evidence," not their admissibility. (TAP Br. at 9) (D.I. 108).

TAP's opposition papers miss the point entirely. If indeed the two surveys were merely infected with methodological flaws, TAP's position and the cases TAP cites might be well-taken. But that is not the basis for AstraZeneca's motion. The TV Survey is inadmissible not because of technical flaws, but because it does nothing to address the relevant questions in this case and thus does not "fit" the issues in the case as required by *Daubert* and the Federal Rules of Evidence. The Internet Survey likewise fails to fit the case, because that Survey has generated no data from which any valid conclusions can be drawn. Finally, Dr. McDonald's supplemental report, which purports to make factual findings as a trier-of-fact based on a

**REDACTED -- Public Version, filed 1/20/06**

selective reading of the record, should be excluded because it is not within the ambit of proper expert evidence.

<u>Argument</u>

<u>Point 1</u>

THE TV SURVEY IS FATALLY FLAWED BECAUSE IT IS IRRELEVANT TO KEY
<u>ISSUES AND REACHES CONCLUSIONS NOT SUPPORTED BY THE DATA</u>

As shown by AstraZeneca in its Opening Brief, the TV Survey should be excluded because the questions actually asked in the TV Survey do not help determine whether consumers take away a misleading message from the commercial. Nothing raised by TAP detracts from this dispositive point.

A.    <u>The TV Survey does not "fit" the issues of this case</u>

Contrary to TAP's assertions, AstraZeneca's motion is not based on the mere methodological flaws in the TV Survey, but rather on the fact that it fundamentally fails to assess whether consumers took away a misleading message from the television advertisement because Dr. Dupont's questions did not address that issue. Consequently, many of the respondents whom Dr. Dupont determined were misled may not have actually been misled.

Dr. Dupont concluded that any TV Survey respondent who answered that the television ad communicated that Nexium is better than Prevacid for treating acid reflux disease or its symptoms was misled. But Dr. Dupont did nothing to determine *why* those respondents indicated that Nexium is better than Prevacid for acid reflux disease. As explained by AstraZeneca's survey expert, Michael Rappeport, a respondent who believed Nexium is better than Prevacid for acid reflux disease *because* it is better for EE would not have been misled.

(Rappeport Rebuttal at 6). TAP's expert Dr. McDonald agreed. (McDonald Tr. 62, AstraZeneca's Appendix in Support of its Motion to Exclude the Expert Testimony of Thomas Dupont and Susan McDonald ("Op. App.") Exh. E). Nor would a respondent have been misled if he or she had stated that Nexium is better than Prevacid for treating symptoms of acid reflux disease and regarded EE as a "symptom of acid reflux disease." Because Dr. Dupont did nothing to determine what respondents meant by their answers, his survey is incapable of establishing whether or not the commercial misleads and is thus irrelevant to the issues in this case.

As set forth in AstraZeneca's Opening Brief, courts have excluded survey evidence that fails to address relevant issues as a matter of course. For example, in *Sears, Roebuck & Co. v. Menard, Inc.*, No. 01 C 9843, 2003 WL 168642, at *3 (N.D. Ill. Jan. 24, 2003), a Lanham Act defendant brought a motion to exclude survey evidence under *Daubert* and Rule 403 because, as in this case, the survey "failed to ask respondents a very important question," specifically, a follow-up question designed to gauge *why* respondents gave the answers they gave. The court concluded that the survey "failed to ask respondents a crucial state-of-mind question regarding perceived association. It did not accurately gauge likelihood of confusion and thus fails to meet the standards set for in *Daubert*." *Id. See also ConAgra, Inc. v. Geo. A. Hormel & Co.*, 784 F. Supp. 700, 725 (D. Neb. 1992) (trademark survey that fails to ask "what makes you say that?" incapable of proving confusion because absent answers to that question, perceived confusion could be non-existent or attributable to factors other than infringement).

In *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 325 F. Supp. 2d 841 (M.D. Tenn. 2004), the court similarly rejected on *Daubert* grounds a survey that was methodologically sound but did not bear on the relevant issues. The court observed that "[a]

- 3 -

**REDACTED -- Public Version, filed 1/20/06**

requirement of *Daubert* is that the expert opinion must 'fit' to the issue before the fact finder, clearly." *Id.* at 850 (citations omitted). Since there was no "fit" between the survey results and the issue in the case, the court excluded survey evidence under *Daubert*. *See also Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 765 (E.D. Mich. 2003) (rejecting Lanham Act survey on *Daubert* grounds because survey "failed to take into account obvious alternative explanations" for responses).

Finally, in *Citizen Financial Group, Inc. v. Citizens National Bank*, No. Civ. A. 01-1524, 2003 WL 24010950, *2 (W.D. Pa. Apr. 23, 2003) *vacated in part on other grounds*, 383 F.3d 110 (3d Cir. 2004), the court in considering whether to exclude Lanham Act survey evidence observed that "*Daubert* and Rule 702 require that the expert's testimony 'fits' the facts of the case. 'Fit' requires that the proffered testimony must in fact assist the jury, by providing it with relevant information, necessary to a reasoned decision of the case." (citations omitted). The court found that the survey failed to fit the issues and therefore excluded it. On appeal, and like TAP here, the plaintiff in *Citizens* argued that "any problems of [the] survey should have affected only its evidentiary weight but not its admissibility," an argument the Court of Appeals rejected as "unpersuasive." 383 F.3d at 121:

> The District Court excluded the survey because [the survey expert's] methodology was fundamentally flawed and because the danger of undue prejudice far outweighed the limited probative value of the survey, especially for a jury. The courts have held that mere technical unreliability goes to the weight accorded a survey, not its admissibility. The Court in this case concluded that [the] survey did not suffer from mere technical flaws, but from fatal flaws. Thus, the Court appropriately fulfilled its duty as a gatekeeper in excluding this evidence.

Id.

**REDACTED -- Public Version, filed 1/20/06**

TAP in its opposition papers has failed to address these cases. Instead, TAP falls back on irrelevant cases reaching the conclusion that technical flaws affect weight, not admissibility. Equally significant, none of the cases TAP cites concerns a motion to exclude under *Daubert*.

For example, TAP cites *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) (TAP Br. at 9), but in that case, the court addressed hearsay objections to the surveys, not objections to their "fit" under *Daubert*. Thus, the court held that surveys qualify "for a traditional hearsay exception [which] obviates the need to examine methodology before overruling a *hearsay* objection." 189 F.3d at 227-28 (emphasis added). AstraZeneca has not asserted a hearsay objection to TAP's survey.

Similarly, in *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d 457, 460 (S.D.N.Y. 2002) (TAP Br. at 9), the court merely considered a hearsay challenge to a survey, not a *Daubert* challenge. In *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987) (TAP Br. at 9), there was no claim that the survey failed to fit under *Daubert*, but rather a claim that both parties' surveys suffered from "statistical imperfections." 818 F.2d at 259. In *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992) (TAP Br. at 9-10) that court merely rejected a challenge to technical aspects of a survey, holding that "it is routine to admit a *relevant* survey; any technical unreliability goes to weight, not admissibility." 967 F.2d at 1292 (emphasis added). And in *U-Haul Int'l, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1249-50 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982) the Court only considered

- 5 -

**REDACTED -- Public Version, filed 1/20/06**

survey evidence in the context of a preliminary injunction motion after concluding that the expert's survey and his testimony "related to an issue of importance in this proceeding."[1]

Finally, *Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893 (D.N.J. 1994) (TAP Br. at 10), like the other cases cited by TAP, did not involve a *Daubert* challenge to survey evidence. Rather, the court weighed competing surveys, crediting one after finding that its questions were "relevant queries." 837 F. Supp. at 909. Nothing in *Church & Dwight* or any of the other cases cited by TAP requires a court to admit surveys that fail to address relevant issues or otherwise "fit" the case under *Daubert*.

B.    <u>TAP's additional arguments are misplaced</u>

In an attempt to deflect the Court's attention from the rule prohibiting surveys that do not fit the case, TAP offers two additional arguments. First, TAP contends that AstraZeneca is advocating "extensive probing" from Dr. Dupont and that under Third Circuit law, such additional probing of respondents' answers is inappropriate. (TAP Br. at 14-15). Second, TAP asserts that even though the survey failed to ask the question, the verbatim answers provide the necessary information as to why respondents said Nexium was better than Prevacid. (TAP Br. at 15). Neither argument salvages TAP's TV Survey.

---

[1]    Even at that, the court noted that the surveys were relevant in the context of a preliminary injunction motion since they bore on the issue of likelihood of success, but "the context of a preliminary injunction hearing may well be different than in a final hearing on the merits." 522 F. Supp. at 1252. *See also CFTC v. American Metal Exch. Corp.*, 693 F. Supp. 168, 173 (D.N.J. 1988) (considering on motion for preliminary injunction evidence that would not be admissible at trial because "in the context of a request for emergent relief, the rules of evidence are relaxed so as to provide swift relief, avoid lengthy proceedings and prevent irreparable harm."); *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 Civ. 1452, 1999 WL 509471, at *2 (S.D.N.Y. July 19, 1999) ("The strict rules of evidence do not apply to a hearing on a motion for preliminary injunction.").

**REDACTED -- Public Version, filed 1/20/06**

TAP cites *American Home Products Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739, 761 (D.N.J. 1994) and *Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 133 (3d Cir. 1994) as supporting a rule disfavoring "extensive probing" in surveys (TAP Br. at 15). In *American Home Products*, the court questioned the validity of responses where the survey featured five consecutive open-ended questions, all asking with varying degrees of specificity what message an advertisement communicated, and three of which asked "what else" the ad communicated. 871 F. Supp. at 748. The court held that these "four open-ended questions followed by a fifth query" were inappropriate because they prompted survey participants "to continue to search for messages that they did not initially perceive to be conveyed . . ." *Id.* at 761. But AstraZeneca has never asserted that Dr. Dupont should have asked repeated "what else" probes in his survey. Rather, under the circumstances of this case, Dr. Dupont was obligated to determine what respondents meant by their answers by asking — once only — an entirely different question: why respondents answered as they did. *See Sears, Roebuck*, 2003 WL 168642; *ConAgra*, 784 F. Supp. 700. For the same reason, TAP's reliance on *Johnson & Johnson-Merck* for the proposition that "[t]he technique of punctuating open-ended questions with repeated probes is questionable" (TAP Br. at 15) is entirely misplaced. [2]

TAP's second argument, that asking the "why" question was not necessary, is belied by the only two instances in which survey interviewers mistakenly did ask "why" respondents answered as they did. In one instance, a respondent initially stated that Nexium is

---

[2]     It bears mentioning, however, that TAP selectively quotes from the Court's decision in *Rorer*. The complete sentence reads: "The technique of punctuating open-ended questions with repeated probes is questionable *but did not discredit the responses to questions (2a), (2b), and (2c).*" 19 F.3d at 135 (emphasis added).

**REDACTED -- Public Version, filed 1/20/06**

"better than competitors" and when mistakenly asked, "in what way," answered: "It heals damage caused by acid reflux." A second respondent stated that Nexium "is better than all other competitors" and when mistakenly asked "why," he stated: "It heals reflux damage." REDACTED . Since Dr. Dupont did not pose the "why" question to any of the other respondents, the number of survey respondents who were coded as misled but would have given the same reason for their beliefs is not known.

TAP responds that neither of the two survey subjects identified above would have been coded as misled, even without their additional explanatory answer. (TAP Br. at 16-17). But that is precisely the point: because they were not asked the "why" question, there is no way of knowing how many respondents who answered that Nexium is better than Prevacid for acid reflux disease — and *were* coded as misled — said so for the same reason. Ultimately, TAP concedes the point, stating, "further probing could just as easily have *increased* the tally of misled respondents as some of those who merely said that Nexium was 'better' in response to the open ends might have responded, with further probing, that Nexium was better at relieving acid reflux symptoms." (TAP Br. at 17). The point is that TAP has the burden of establishing what percentage of respondents has allegedly been misled. *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d at 129. The TV Survey is incapable of meeting that burden and therefore fails to fit the issues in the case.[3]

---

[3]    TAP also resists AstraZeneca's point that Dr. Dupont's conclusions are not valid because they are directly contradicted by the closed-ended data in his survey. According to TAP, "[d]etermining that a particular survey question was flawed does not undermine the validity of the entire survey." (TAP Br. at 17). AstraZeneca's argument is not that a particular survey question is flawed, but rather that Dr. Dupont's own data contradicts his conclusions. That is a proper basis to exclude the TV Survey. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Finally, TAP contends that AstraZeneca's expert Dr. Rappeport admitted that his criticisms of the TV Survey "go to its credibility, not its admissibility." (TAP Br. at 10).

REDACTED

In any event, Dr. Rappeport does not make decisions concerning the admissibility of evidence.

C.     The TV Survey fails to ask relevant
       questions in other respect as well

As set forth in TAP's Opening Brief, a further ground for excluding the TV Survey is based on the testimony of TAP's expert, Dr. McDonald, who opined that the relevant questions that must be addressed by the survey research in this case are (i) whether consumers take away a message from the Better ads that Nexium is superior to Prevacid for the requirements and expectations of a "typical consumer," and (ii) whether consumers take away a message that they will gain a greater benefit from Nexium than from Prevacid for the acid reflux they routinely experience. (Op. App. Exh. F at 5-6). As both Dr. Dupont and Dr. McDonald admitted, however, not one question in the TV Survey addressed "typical consumers" or "routine experiences," she said needed to be addressed. (*See* Opening Br. at 11-12).

Faced with this failure, TAP contends that "AstraZeneca disingenuously argues that the survey did not address the proper universe because Dr. Dupont failed to ask each respondent if her or she is a 'typical consumer' who believes the commercial is targeted at his or

- 9 -

REDACTED -- Public Version, filed 1/20/06

her 'routine experiences.'" (TAP Br. at 11). TAP cites to page 11 of AstraZeneca's Opening Brief as containing this argument, but there is no "improper universe" argument on page 11 or anywhere else in AstraZeneca's papers. TAP also says Dr. Dupont was not required to ask "whether each respondent viewed himself or herself as a typical consumer." (TAP Br. at 11-12). TAP cites to pages 2 and 11 of AstraZeneca's brief as containing that argument. Once again, TAP has rejected an argument AstraZeneca never made.

The argument AstraZeneca *did* make is that Dr. McDonald identified two relevant questions and both Drs. Dupont and McDonald conceded that the survey asked neither question. TAP's only response is that Dr. McDonald testified, despite her opinion identifying the two relevant questions, that Dr. Dupont did not really need to ask those relevant questions because there is "an inference that one draws from the data" that reflects the routine experiences of typical consumers. (TAP Br. at 13). Dr. McDonald theorized that because the survey screening questions sought to exclude anyone who was not a "typical user," one may infer from the survey responses given by these "typical users" that they were providing answers concerning the experiences of typical users. But not one of Dr. Dupont's questions asks respondents to comment specifically on how Nexium will work for them; there are no questions that ask, "What does the commercial say Nexium will do *for you*?" Rather, the questions in the TV Survey are general, such as "Please tell me what that commercial communicated to you about Nexium." Even the closed-ended answer choices are framed in terms of "relieving *the* symptoms of acid reflux disease" and "healing damage to *the* esophagus" rather than "relieving *my* symptoms" or "healing damage to *my* esophagus." These questions simply do not address the specific personal experiences of survey respondents (who may or may not be "typical users"), and there is no basis to infer that they do.

- 10 -

**REDACTED -- Public Version, filed 1/20/06**

In short, because the TV Survey fails to ask the relevant questions identified by TAP's own expert, the TV Survey should be excluded under the "fit" prong of *Daubert*. *See Sears, Roebuck*, 2003 WL 168642; *Gibson Guitar Corp.*, 325 F. Supp. 2d 841.

Point 2

THE INTERNET SURVEY YIELDED NO RELIABLE DATA
FROM WHICH ANY VALID CONCLUSIONS CAN BE DRAWN

As set forth in AstraZeneca's Opening Brief, TAP's Internet Survey offers no reliable data from which valid conclusions can be drawn. Dr. Dupont admitted that the only conclusions he could reach based solely on the responses to the open-ended questions in the Internet Survey were that "there is a lower bound estimate of 11 percent of people who saw the test ad who understood the limitation" and that "if you want further information, you have to go to the close-ended questions." (Dupont Tr. 142, Op. App. Exh. D). But TAP's second survey expert Dr. McDonald testified that the responses to the closed-ended questions in the Internet Survey were obviously guesses and thus not sufficiently reliable to allow any conclusions to be drawn from them. (McDonald Tr. 18, Rep. App. Exh B). Since TAP's experts therefore collectively admit that (i) the open-ended responses are insufficient on their own to prove that consumers were misled and (ii) the closed-ended questions provided no reliable data, the Internet Survey is incapable of offering probative evidence that consumers were misled. *See, e.g., General Electric*, 522 U.S. at 146.

TAP's response to this point is premised entirely on a citation to partial testimony. Thus, TAP claims that Dr. Dupont testified that the closed-ended data "was not necessary in order for him to arrive at a conclusion regarding the Internet ad." (TAP Br. at 19). For support, TAP cites a fragment of Dr. Dupont's deposition testimony in which he purportedly testified that

- 11 -

**REDACTED -- Public Version, filed 1/20/06**

he could conclude that respondents were misled solely on the basis of their open-ended responses. (*Id.*). We invite the Court to review the entire testimony on this subject. (Dupont Tr. 140-42, 146-47). It will be clear that under further questioning, Dr. Dupont clarified that he could draw only a very limited conclusion from the open-ended data and that to conclude that respondents were misled, he needed the closed-ended data as well:

> A.    I believe looking at both the open and the close-ended results, they both show that few people got the message.
>
> Q.    You need them both together, though, to reach that conclusion according to you; isn't that right?
>
> A.    That's what I said.

(Dupont Tr. 146-147).[4]

TAP is bound by the testimony of its own experts: (i) Dr. Dupont's conclusion that both the open-ended and closed-ended responses are necessary to show that the internet ad is misleading and (ii) Dr. McDonald's recognition that the closed-ended data is valueless. (*See* cases cited in AstraZeneca's Opening Brief at 11). That testimony demonstrates that the Internet Survey is thus incapable of providing evidence that the internet ad is misleading. *See, e.g., General Electric*, 522 U.S. at 146.

---

[4]    Dr. Dupont's Rebuttal Report makes equally clear that he was able to conclude that consumers were misled only by relying on the flawed closed-ended data. There, he stated that "the open-ended questions don't help us a lot in understanding whether or not consumers understood the limitation on the claim being made in the ad." (Dupont Rebuttal Report at 14, AstraZeneca's Reply Appendix in Further Support of its Motion to Exclude the Expert Testimony of Thomas Dupont and Susan S. McDonald Exh. A).

**REDACTED -- Public Version, filed 1/20/06**

Point 3

THE MCDONALD SUPPLEMENTAL
REPORT IS NOT PROPER EXPERT EVIDENCE

TAP also seeks to introduce Dr. McDonald's opinions, based on her selective review of certain documents produced in discovery, that AstraZeneca intended to communicate a broad superiority claim for Nexium and succeeded in doing so. These opinions are excludable as the "testimony of an expert that constitutes mere personal belief as to the weight of the evidence [which] invades the province of the fact-finder." *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 588 (D. Del. 2004). The cases applying this rule are legion and include this Court's holdings in *Chemipal* and *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 435 (D. Del. 2004). TAP fails to refute any of these cases in its opposition papers, and with good reason: there is no basis to admit Dr. McDonald's personal opinions concerning AstraZeneca's intent predicated on nothing more than her review of a limited number of documents produced during discovery. *See Oxford Gene*, 345 F. Supp. 2d at 443 (prohibiting expert from testifying as to "intent, motive or state of mind"); *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1988) (excluding expert opinion "because it addressed matters that were equally within the competence of the jurors to understand and decide."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (barring expert testimony in products liability suit concerning the "intent, motive or states of mind of corporations, regulatory agencies and others"; such testimony has "no basis in any relevant body of knowledge or

**REDACTED -- Public Version, filed 1/20/06**

expertise" and constitutes "'musings as to defendants' motivation [that] would not be admissible if given by any witness — lay or expert'") (citation omitted).[5]

<u>Conclusion</u>

For these reasons, AstraZeneca respectfully requests that the Court exclude the testimony of Thomas Dupont and Susan Schwartz McDonald.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Josy W. Ingersoll (No. 1088)
*jingersoll@ycst.com*
John W. Shaw (No. 3362)
*jshaw@ycst.com*
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600

Attorneys for Plaintiff AstraZeneca LP

Of Counsel:

Harold P. Weinberger
Jonathan M. Wagner
Kerri Ann Law
Jeremy A. Cohen
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Dated:  January 12, 2006

---

[5]    For the same reasons that the testimony of Drs. Dupont and McDonald is inadmissible under Fed. R. Evid. 702 and *Daubert*, the testimony should also be excluded under Fed. R. Evid. 403 as more prejudicial than probative. *See AstraZeneca's Opening Brief at 17-18.

**REDACTED -- Public Version, filed 1/20/06**

REPLY APPENDIX TO MOTION
TO EXCLUDE DUPONT &
MCDONALD TESTIMONY

**REDACTED -- Public Version, filed 1/20/06**

AstraZeneca's Reply Appendix in
Further Support Of Its Motion To Exclude The
Expert Testimony of Thomas Dupont and Susan S. McDonald

### Table of Contents

Description                                                                                    Tab

Deposition Testimony of Susan S. McDonald, Ph.D.,
    November 1, 2005 ...........................................................................................................A

Rebuttal Expert Report of
    Thomas D. Dupont, Ph.D.
    June 2005...........................................................................................................................B

**REDACTED -- Public Version, filed 1/20/06**

# EXHIBIT A

```
 1

 2

 3          IN THE UNITED STATES DISTRICT COURT

 4            FOR THE DISTRICT OF DELAWARE

 5                    -   -   -

 6   ASTRAZENECA L.P,       :  CIVIL ACTION

             Plaintiff,     :

 7                          :

        -against-           :

 8                          :

     TAP PHARMACEUTICAL     :  CASE NO. 04-1332(KAJ)

 9   PRODUCTS, INC.,        :

             Defendant.     :

10

                    -   -   -

11

             Philadelphia, Pennsylvania

12           Tuesday, November 1, 2005

13                    -   -   -

14          Pretrial Examination of SUSAN

15   SCHWARTZ McDONALD, taken pursuant to notice,

16   at the law offices of Morgan, Lewis & Bockius,

17   LLP, 1701 Market Street, on the above date,

18   beginning at approximately 9:30 a.m., before

19   Debra Ann Whitehead, an Approved Reporter of

20   the United States District Court and Notary

21   Public.

22                    -   -   -

23

24

25
```

**LEGALINK**®
A **WORDWAVE** COMPANY

LegaLink Manhattan
420 Lexington Avenue, Suite 2108
New York, NY 10170

tel (212) 557-7400
tel (800) 325-3376
fax (212) 692-9171

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

Page 2

```
 1

 2    APPEARANCES:

 3         HAROLD P. WEINBERGER, ESQUIRE

           Kramer Levin Naftalis & Frankel, LLP

 4              1177 Avenue of the Americas

                New York, NY  10036

 5

                Counsel for Plaintiff

 6

           THOMAS C. MORRISON, ESQUIRE

 7         Patterson Belknap Webb & Tyler, LLP

                1133 Avenue of the Americas

 8              New York, NY  10036-6710

 9              Counsel for Defendant

10                   -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              (INDEX at end of transcript)
```

Page 3

```
 1

 2              MR. WEINBERGER:  We are not

 3        waiving signing, but it doesn't have to

 4        be signed before you.  All objections,

 5        except as to form, are reserved until

 6        trial.

 7              Anything else, Tom?

 8              MR. MORRISON:  No.

 9              SUSAN SCHWARTZ McDONALD, Ph.D.,

10        having been duly sworn, was examined and

11        testified as follows:

12   BY MR. WEINBERGER:

13        Q.    Good morning, Dr. McDonald.

14        A.    Good morning.

15        Q.    How did you come to be retained in

16   this matter?

17        A.    Tom Morrison called me some months

18   ago, I can't recall when, and laid his issues

19   and case before me and asked if I was

20   available.

21        Q.    What is it that he told you?

22        A.    He shared with me that there was a

23   false advertising claim; that the TAP was the

24   plaintiff; AstraZeneca, and specifically the

25   Nexium product, were the defendant.
```

```
 1              Susan Schwartz McDonald, Ph.D.

 2    that's a possibility; in other words, that it

 3    is possible that, in any given case, the

 4    question of whether a consumer is misled may

 5    turn on why the consumer took away that

 6    message?

 7       A.   On why they took that message away?

 8            Do you mean what existing context

 9    was in their head, what particular

10    apprehensions or misapprehensions they might

11    have from other places?

12            I'm not sure what you mean.

13       Q.   Okay.  If a consumer knows

14    everything there is to know about a particular

15    subject matter, and, based upon that, would

16    come to a certain belief, and he comes to that

17    same belief after seeing the commercial, is

18    that person being misled?

19       A.   It's a hypothetical that I don't

20    really know how to grapple with, because it

21    strikes me as impossible or unlikely.

22       Q.   What is being misled, in your mind?

23    What is the definition of someone being

24    misled?  Not the legal.

25              MR. MORRISON:  I object to this
```

1           Susan Schwartz McDonald, Ph.D.

2    person would make, whether you would make it

3    or you think it is the right decision or not,

4    how can that person be misled by an ad which

5    leads them to the same place?

6       A.    Only if we know that were the

7    individual to have perfect information, far

8    broader and more detailed and more nuanced

9    than anything that any commercial can ever

10   communicate, only then can we argue that the

11   consumer is not misled.

12           They may make a poor judgment, but

13   they are not misled.

14      Q.    Okay.  So you would agree, in that

15   scenario that you just gave me, the consumer

16   would not be misled?

17      A.    If the consumer has perfect

18   information and they use it, they may not be

19   misled.  They may make a faulty misjudgment,

20   but they may not be necessarily misled.

21      Q.    At the bottom of Page 5 in bold type

22   you say, "The issue is not whether Nexium is

23   ever superior to Prevacid, but whether it is

24   superior at doing what the more typical

25   consumer requires and expects from a product

**REDACTED -- Public Version, filed 1/20/06**

# EXHIBIT B

**REDACTED -- Public Version, filed 1/20/06**

# Rebuttal Expert Report of Thomas D. Dupont, Ph.D.

# RE: TAP Pharmaceuticals v. AstraZeneca

Submitted To:

Patterson, Belknap, Webb & Tyler, LLP

June, 2005

D²R esearch

71 South Glen Road
Kinnelon, NJ 07405
(973) 492-0100

#100-5-04

REDACTED -- Public Version, filed 1/20/06

# TABLE OF CONTENTS

|                                                              | Page |
| ------------------------------------------------------------ | ---- |
| Preface                                                      | 1    |
| Rebuttal Overview                                            | 2    |
| Detailed Rebuttal                                            | 4    |
| Rappeport Chapter II:  The Underlying Issues                 | 4    |
| Rappeport Chapter III:  Interpreting Dupont's TV Survey      | 6    |
| Rappeport Chapter IV:  Dupont's TV Survey Qua Survey         | 7    |
| Rappeport Chapter V:  Dupont's Internet Survey               | 11   |
| Rappeport Chapter VI:  Dupont's Internet Survey Qua Survey   | 12   |

$D^2$ |Research

**REDACTED -- Public Version, filed 1/20/06**

# PREFACE

I, Thomas D. Dupont, Ph.D., designed and conducted two surveys on behalf of TAP Pharmaceuticals in connection with TAP's lawsuit vs. AstraZeneca, related to Astra-Zenaca's advertising for Nexium.

At the request of AstraZeneca's counsel, Dr. Michael Rappeport of RL Associates prepared a critique of those surveys, dated May 12, 2005. This report is my rebuttal to Dr. Rappeport's critique.

The two surveys I conducted are:

1. <u>Consumer Perception Test Of Nexium "Man Talks About Better" :45</u>, dated January 20, 2005. This survey of Nexium's TV commercial is referred to by Rappeport as "Dupont's TV Survey."

2. <u>Consumer Perception Test of Nexium Internet Ad</u>, dated March 14, 2005. This survey of an advertisement appearing on Nexium's website is referred to by Rappeport as "Dupont's Internet Survey."

My background and other information in compliance with Rule 26 (a)(2)(B) is contained in each of my two survey reports. My compensation for preparing this rebuttal will be approximately $10,000. In preparing this rebuttal I have relied on no materials other than my experience, my two surveys, and Rappeport's critique.

Dated this 28th day of June, 2005

_Thmo O Dupont_
_____

Thomas D. Dupont, Ph.D.

$D^2$ | Research

**REDACTED -- Public Version, filed 1/20/06**

# REBUTTAL OVERVIEW

## A.    The Dupont Surveys

The two surveys that are the object of the Rappeport critique are these:

### 1.    TV Survey

In this survey, conducted among current and prospective users of Rx heartburn/acid reflux drugs, 240 persons viewed the 45 second version of the Nexium "Man Talks About Better" TV commercial.  The survey results showed that over 70% of respondents perceived the commercial to communicate that Nexium is better than other brands at relieving acid reflux disease and/or its symptoms, whereas only 32% got a message of superiority vis-à-vis damage to the esophagus.  Moreover, fewer than 1% of respondents volunteered that the superior healing of damage message applied only to moderate or severe cases (as was disclosed in the commercial via a "super").

This survey included a control group who viewed a version of the commercial edited to eliminate all references to heartburn and most references to acid reflux disease. (However, because of the extremely high frequency with which the Nexium advertising has run, it is likely that most control group members had been exposed to the original, unedited, Nexium commercial).  Still, among this control group 46% (vs. 72% in the Test Group) perceived that the commercial was communicating that Nexium is better than other brands at relieving acid reflux disease and/or its symptoms.

### 2.    Internet Survey

In this survey, also conducted among current and prospective users of Rx heartburn/acid reflux drugs, 205 persons viewed[1] an ad that appears on the Nexium website.  That ad was a more detailed version of a print ad that has run in consumer magazines.  The Internet ad talks about how Nexium heals acid-related damage better than Prevacid in patients with moderate to severe damage, and shows supporting bar charts (the charts are absent in the print ad).  In order to test the efficacy of the

---

[1]  Respondents were interviewed at shopping malls and viewed the ad on computers at the malls. The survey was not conducted over the Internet.

$D^2$ Research

disclosure about superiority being limited to moderate/severe damage, the survey included a comparison group exposed to an ad in which those disclosures were deleted. The survey results showed that the responses to the two ads were virtually identical; the disclosure about moderate/severe damage was ineffective. Among those exposed to the Test (unedited) ad, only 11% said anything about moderate/severe damage, and when asked directly whether the better healing claim applied to all people or just those with moderate/severe damage, more respondents replied "all people" than replied "only those with moderate to severe damage."

## B.    Overview Of Rappeport Critique

The issues that my two surveys set out to test were relatively simple:

- ♦ Does the TV commercial communicate to consumers that Nexium is superior at relieving acid reflux disease or its symptoms (as opposed to just communicating that it is better at healing moderate to severe damage to the esophagus)?
- ♦ Does the Internet ad communicate to consumers that the "better healing" claim applies only to moderate to severe damage (as opposed to all damage)?

Dr. Rappeport, in his critique, tries to make these straightforward issues complex by insisting, without any data or other basis, that consumers interpreted the ads in a way that is at variance with what the survey data showed to be the case. It is important to note that Rappeport could find very little fault with the design, execution or analysis of either survey. Instead, he constructed far-fetched theories about how consumers interpreted the ads, and faulted my surveys for not testing his theories. If he really believed his theories had any validity, he had the opportunity to test them himself, but apparently chose not to.

In the remainder of this report I will expand on the above and, for the reader's convenience, follow the chapter-by-chapter structure of Rappeport's critique.

$D^2$ Research

**REDACTED -- Public Version, filed 1/20/06**

## DETAILED REBUTTAL

### A. Rappeport Chapter II: The Underlying Issues

In this chapter Rappeport defines acid reflux, heartburn, erosive esophagitis and acid reflux disease, and concludes that many consumers (indeed the overwhelming majority) are unaware of the distinctions among them and ignorant of the implications of those distinctions. I agree, and the data from my surveys supports this. The question is, if consumers don't understand those distinctions, is it legal for an advertiser to exploit that ignorance in order to plant the impression that his product is better for all those conditions? If the Lanham Act says NO, then my surveys show that Astra-Zeneca is in violation.

Rappeport then goes on to describe what he calls the "real issue" in the case,

> *"If a typical consumer knew and understood the four definitions given above [acid reflux, heartburn, erosive esophagitis, acid reflux disease],*
>
> *And if they also knew that one medicine did a better job than another medicine at healing the complication of acid reflux called erosive esophagitis,*
>
> *And if they also knew that because of the complexity of the scientific measurements involved, there was at this point simply no evidence as to which product, if either, actually did a better job of reducing the amount of acid refluxed into the esophagus,*
>
> *Would they believe that Nexium is better than Prevacid for "acid reflux disease"?*
>
> *That is, regardless of the lack of specific test evidence, is doing a better job at healing one of the principal complications arising from acid reflux disease TANTAMOUNT IN THE MIND OF THE CONSUMER to doing a better job in some sense at treating acid reflux disease? In other words, are consumers who see this commercial, and interpret it to have something to say about relative efficacy with regard to acid reflux disease, doing so*
>
> *a) because they are being misled by the commercial, or*
>
> *b) because the commercial is presenting an abridged account of facts, which if they were known in their entirety would still lead them (the consumer not the experts) to the same conclusion?"*

D²|Research

**REDACTED -- Public Version, filed 1/20/06**

In effect, Rappeport is taking the position that consumers will perceive that comparative superiority, on any product dimension, will lead to consumer perception that the product is better "overall" and, moreover, that if that happens consumers are not being misled.  That is contrary to my understanding of the Lanham Act, which is that the law does not allow an advertiser to communicate a message of overall superiority when that superiority exists only in certain limited circumstances.  No better example can be found than in the landmark case, American Home Products v. Johnson & Johnson (1978),[2] in which the court enjoined Anacin advertising that said, "Anacin can reduce the inflammation that comes with pain,  Tylenol cannot."  While Anacin had evidence of superior reduction of inflammation in certain circumstances, it could not prove superior pain relief, and consumer surveys showed that consumers interpreted the advertising to be saying that Anacin was a superior analgesic generally.  The decision in that case is consistent with my understanding of advertising law as applied by the courts, the NAD (before whom I have appeared and lectured) and the TV networks.

Returning to Rappeport's analysis, one only has to think of some other examples to realize how erroneously ludicrous his position is.  If an SUV maker advertises that his SUV goes through deeper snow than a competitor, will a consumer living in Florida conclude that the advertised SUV is "better overall?"  If a credit card issuer advertises a lower interest rate than the competition, will a consumer who always pays his monthly bills in full conclude that the advertised card is "better overall?"

In addition, Rappeport's hypothetical syllogism is incomplete.  Indeed, two key facts are omitted.  A more accurate version of Rappeport's syllogism would be:

> *"If a typical consumer knew and understood the four definitions given above [acid reflux, heartburn, erosive esophagitis, acid reflux disease],*
>
> *And if they also knew that one medicine did a better job than another medicine at healing the complication of acid reflux called erosive esophagitis,*

---

[2]  American Home Products Corp. v. Johnson & Johnson, 577 F.2d 160

D$^2$ Research

**REDACTED -- Public Version, filed 1/20/06**

> *And if they also knew that most acid reflux/heartburn sufferers don't have erosive esophagitis,*
>
> *And if they also knew that Nexium's superiority applied only to moderate or severe cases of erosive esophagitis (which are the minority of total cases)*
>
> *And if they also knew that because of the complexity of the scientific measurements involved, there was at this point simply no evidence as to which product, if either, actually did a better job of reducing the amount of acid refluxed into the esophagus,*
>
> *Would they believe that Nexium is better than Prevacid for "acid reflux disease"?*

It is my opinion that any reasonable person, knowing all these facts, would conclude that, for the vast majority of potential users, Nexium is no better than Prevacid for "acid reflux disease."

Rappeport's entire criticism of what my surveys set out to do hinges on hypothetical scenarios of what consumers <u>might have meant</u> by their answers to the survey questions, and he even goes so far as to speculate that his hypothetical interpretations of meaning are more accurate reflections of what consumers meant than what they actually said. If he really believes that, he had three months to test his theory, at least in the case of my survey of the TV commercial. That survey took five weeks to complete, and the report was turned over to AstraZeneca on January 31, 2005 – 3 ½ months prior to the issue date of Dr. Rappeport's rebuttal.

## B.    Rappeport Chapter III: Interpreting Dupont's TV Survey

This chapter is essentially a repetition of Chapter II, and Rappeport again asserts (without data) that consumers perceive being better at healing erosive esophagitis to be equivalent to being better at treating acid reflux disease. Rappeport then faults my survey for not testing this proposition, and my control for not being appropriate to test that proposition. At the risk of being repetitive myself, I would say that if Rappeport really believes his interpretation has merit, he had ample opportunity to conduct a survey to prove it.

$D^2$ | Research

**REDACTED -- Public Version, filed 1/20/06**

My survey was meant to test a different proposition – whether consumers perceive the commercial to be communicating superiority at treating the symptoms of acid reflux, and whether they understood that the message of healing acid-related damage better applied only to cases of moderate/severe damage. I believe the survey did test that proposition, and that the proposition so tested was the appropriate one to test.

## C.    Rappeport Chapter IV: Dupont's TV Survey Qua Survey

In this chapter Rappeport points out alleged flaws in the design, implementation and analysis of my TV survey. I will address each in turn.

### 1. Survey Design

The survey was a mall intercept survey, and Rappeport agrees that such was appropriate. However, he found fault with the geographic distribution of the malls, a point which I believe he greatly exaggerated. The truth is, the U.S. Census divides the country into nine regions. The survey was conducted in 20 locations, 10 in the Test Group and 10 in the Control Group. The Test survey was conducted in all nine regions (one region had two locations). The Control survey was conducted in eight out of the nine regions. The TV survey was not a political poll (for which one might expect substantial differences by region); it was a perception survey of a commercial which aired nationally. There is no reason to expect that geography, per se, would have any influence on the results. The important thing was to conduct the survey in a number of locations, and for those locations to be dispersed around the country. That goal was accomplished.

Rappeport also criticized several aspects of the screening procedure. First, he found fault with the fact that persons employed in health care were excluded. It is a standard practice in consumer surveys to exclude persons with "specialized knowledge," and one will find that most such surveys exclude persons employed in the industry covered by the survey. I concede, however, that the survey results apply only to people not employed in the health care field.

D²|Research

REDACTED -- Public Version, filed 1/20/06

He also faulted the fact that in the screening consumers were asked whether they had taken, or intended to take, Rx medicines to treat heartburn or acid reflux disease. This was necessary, of course, since that was the relevant universe for the survey (and Rappeport agrees it was the relevant universe).  Rappeport posits that the mention of heartburn and acid reflux in the screening caused consumers to mention heartburn and/or acid reflux in reply to the questions subsequently asked after they had twice viewed the commercial.  This criticism overlooks a number of key facts:

   A. The screening questions diverted attention from heartburn and acid reflux by also asking about "headaches or body aches" and "allergies or hay fever."

   B. The screening was conducted in accordance with the way screening is usually conducted in consumer perception surveys.  If one is looking for sufferers of a specific ailment, there simply is no substitute for asking people whether they suffer from that ailment.

   C. There is no denying that Nexium is for sufferers of heartburn or acid reflux, and that consumers use the terms "heartburn" and "acid reflux" to describe what they suffer.

   D. A time lag (probably about five minutes or so) occurred between the screening questions and the survey questions, during which the respondent traveled from the main concourse of the mall to the interviewing service office, provided his or her name and phone number, and viewed the commercial twice.

   E. Even if the screening questions somehow induced respondents to mention heartburn or acid reflux in response to the survey questions, they could respond with either comparative or non-comparative statements about those things.  The vast majority of such responses, at least until the survey focused specifically on the "better" message, were non-comparative.

Furthermore, Rappeport seemed to feel that the screening questions should have included some references to erosive esophagitis.  It is difficult to understand what that would accomplish, since most heartburn/acid reflux sufferers don't have esophageal damage, and many or most of those who don't realize it, as it can only be diagnosed by a physician.

### 2. Survey Implementation

This entire section was devoted to criticism of the interviewing in one Control Group city, Kansas City (24 of the 239 Control Group respondents).  Rappeport's problem

D$^2$ | Research

**REDACTED -- Public Version, filed 1/20/06**

with Kansas City appears to be that in that city fewer respondents (compared to the total) gave replies dealing with symptom relief and more of them gave replies dealing with erosive esophagitis. For AstraZeneca, those are "bad" results (whereas had Kansas City been in the Test Group, AstraZeneca no doubt would have been happy with the results). My view is this:

♦ When you have ten cities in a survey and samples of around 24-25 in a city, there are going to be differences, if only due to the small sample sizes. That's why you have multiple locations and add them all together to reach your conclusion.

♦ I have examined detailed verbatim responses from Kansas City. It seems apparent to me that, for whatever reason, on average the Kansas City respondents understood the commercial better (more accurately) than the average respondent overall. The difference is not great, but it is there.

♦ That does not mean there is anything "wrong" with the Kansas City results, any more than that there is something "wrong" with results in some other city where comprehension was below average. Both are part of the whole and must be so treated.

### 3. Interpretation of the Data

This section of Rappeport's report is an exercise in creative data manipulation designed to drive down the percentage of respondents who perceived a false message. As shown in Table 7 of my survey report, 71.7% of Test Group respondents said the commercial communicated that Nexium relieves heartburn/acid reflux symptoms better, versus 46.0% in the Control Group (a difference of 26 percentage points). [3] It is true, as Rappeport points out, that most of the responses concerning superiority on symptom relief came in response to survey question #5, which asked those respondents who had previously acknowledged that the commercial said Nexium was better, "What did the commercial tell you Nexium was better at doing?" That is a perfectly fair and acceptable question, properly filtered to exclude those who got no message regarding superiority, and Rappeport does not suggest otherwise.

---

[3] For reasons unknown, in his critique Rappeport changed the 46% in the Control Group to 47%.

D²|Research

**REDACTED -- Public Version, filed 1/20/06**

What he does do is suggest that there is a vast difference between Test and Control groups in the percentage of respondents saying the commercial said Nexium is better (and therefore in the percentage who were asked survey question #5). That is not true; the actual percentages saying that the commercial said Nexium was superior are 86% in the Test Group and 71% in the Control group. Rappeport posits that this small difference is caused by the fact that the word "better" was mentioned eight times in the Test commercial and three times in the Control commercial. First of all, the Control commercial mentioned "better" four times, not three. Second, four times is a lot of times in a 45 second commercial; it does not necessarily follow that eight times has to be significantly more effective at communicating better than four times. Finally, he ignores another plausible explanation for why that 15 percentage point difference occurred – maybe some of the people who viewed the Control commercial and understood the limited circumstances in which Nexium was better chose to express that view by responding that the commercial did not say Nexium was better. I cannot say with confidence that is what happened, and neither can Rappeport say with any confidence that the difference in the number of "better" mentions led to the difference in perceived superiority.

Rappeport continues his analysis (shown in his Table III) by recalculating percentages to eliminate from the base any people who did not perceive the commercial to say Nexium was superior, and further, by eliminating Kansas City respondents. There is no reasonable basis for either of those two steps, except that it enables him to take the 26 percentage point difference between test and control groups in perceptions that the commercial communicated superior symptom relief and cut it in half.

D$^2$ Research

Rappeport also takes issue with the fact that I relied heavily on the open ended results in my analysis. I did rely more heavily on the open-ended results, for several very good reasons.

- ♦ The open ended questions are completely unbiased and free of any suggestion as to what the commercial might have communicated.
- ♦ The results from the open-ended questions are clear and unambiguous.
- ♦ The closed ended multiple-choice question, on the other hand, is both complex and suggestive. That is undesirable, but unavoidable, given the nature of the message in the commercial. I made it as simple as I could, but it still is complex and it takes careful reading to distinguish between the various choices.

Notably, there are a number of elements of my analysis of survey results with which Rappeport does not take issue:

- ♦ He did not challenge the conclusion that takeaway of superior symptom relief was more than twice as high as takeaway of superior healing of damage.
- ♦ He did not challenge the conclusion that virtually no one noticed that the superiority in healing damage was limited to moderate/severe damage.
- ♦ He did not challenge the view that the control group probably "overcontrols" because the likelihood is high that control group respondents had previously been exposed to the Test commercial. Indeed, he acknowledged (Rappeport report, p. 22) that this "is completely feasible."

## D.    Rappeport Chapter V: Dupont's Internet Survey

The Internet Survey which is the topic of this chapter was a mall intercept survey using Nexium's Internet ad. The Internet ad is a longer, more detailed version of a print ad that has run in consumer magazines; if consumers are misled by the Internet ad, they would surely also be misled by the print ad, which includes fewer references to erosive esophagitis. The purpose of the survey was to find out whether consumers understood that the superiority message in the Internet ad was limited to cases of moderate or severe esophageal damage (as opposed to believing that Nexium was better at healing all damage – even mild damage). Rappeport begins by misconstruing the survey as being a survey to find out whether consumers considered the ad to be false. That was in no way the purpose; no questions were asked respecting per-

$D^2$ Research

**REDACTED -- Public Version, filed 1/20/06**

ceived veracity or falsity. The survey did include an edited version of the ad which was clearly false legally, as it did not qualify the "superior healing" claim by saying it applied only to moderate or severe damage. That edited ad was included only to test whether the real ad was any better than the clearly false ad at communicating the limitation on the claim.

Rappeport then took the position, similar to the one he took with respect to the TV survey, that consumers who believe Nexium is better at healing moderate/severe damage will conclude that it is better overall at treating damage, even if the consumer himself does not have moderate or severe damage. As was the case with the analogous position he took with respect to the TV survey, Rappeport has no support for this hypothesis. The only reason for his broaching that hypothesis seems to be to deflect attention from what my Internet survey sought to measure, and to suggest that it should have measured something different.

**E. Rappeport Chapter VI: Dupont's Internet Survey Qua Survey**

In this chapter Rappeport points out alleged flaws in the questions and analysis of my Internet survey. I will address each in turn.

1. Correction To Table 4

Rappeport is correct in pointing out that Table 4 in my Internet report was incorrect. I apologize for the mistake. However, Rappeport's "correction" is also incorrect. The following table presents the correct results, along with his and my previously reported incorrect results. The principal difference between the corrected data and my previously reported (incorrect) data is in the group which saw the edited ad. In that group the correct number who believed Nexium's "better healing" applied only to moderate/severe damage was 29%, instead of the previously reported 38%.

D$^2$ Research

**REDACTED -- Public Version, filed 1/20/06**

Internet Survey Table 4

For What Group Of People Will Nexium Heal Acid Related
Damage Better Than The Other Leading Medicine?
(Closed Ended)

|  | Correct Data | | Originally Reported Data (Incorrect) | | Rappeport Data (Incorrect) | |
|---|---|---|---|---|---|---|
|  | Test Ad % | Edited Ad % | Test Ad % | Edited Ad % | Test Ad % | Edited Ad % |
| All people with damage to the esophagus caused by acid reflux disease | 46 | 51 | 47 | 52 | 43 | 42 |
| Only people with moderate or severe damage to the esophagus caused by acid reflux disease. | 36 | 29 | 38 | 38 | 39 | 38 |
| Don't Know/No Opinion | 9 | 10 | 9 | 10 | 9 | 10 |
| Not Asked (Do not recall seeing claim) | 9 | 10 | 9 | 10 | 9 | 10 |

## 2. Open Ended and Closed Ended Questions

Dr. Rappeport claims I "played down" the results of the open-ended questions. That is untrue. My survey had seven questions; four open ended and three closed-ended. My report had six tables; three reporting results from open-ended questions and three reporting results from closed ended questions. (One table combined the results from two open-ended questions). The "Conclusions" section of the report begins with conclusions drawn from the open-ended questions. However, it is undeniable that one of the closed ended questions (specifically, question #7, reported above) provided the most unambiguous data respecting whether or not consumers understood the "better healing" claim to be limited to moderate/severe damage. As the data show, more respondents replied that the claim applied to "all people" than replied that it applied only to people with moderate/severe damage.

D²|Research

### 3. Data Analysis – Open Ended Questions

There is a grain of truth in Dr. Rappeport's observation (Rappeport report, p. 20) that responses to open ended questions "will generally be limited in their scope and frequently will also be quite imprecise," but he overstates the case – as he does in the subsequent paragraph when he speculates that "experience shows" (what experience?) that this is particularly likely to be the case in this survey. The truth is that in answering open-ended questions, survey respondents will often leave out information that they do not feel is important (but that may be very important to those interpreting the survey results). However, it is difficult to predict when this will and will not occur. The fact of the matter is that in this survey most respondents played back messages that Nexium is better, and about 40% played back that it is better than Prevacid. Relatively few (until they were asked directly), volunteered how or in what circumstances it is better. So, the open ended questions don't help us a lot in understanding whether or not consumers understood the limitation on the claim being made in the ad. Rappeport speculates, based on the open ended results, that a lower bound estimate of the number who understood that Nexium was superior only for moderate/severe damage is 11%. That is consistent with the data and I am content to assume it is a reasonable estimate. The critical question is, what is the upper bound estimate? That is an issue I'll take up in the following section.

### 4. Data Analysis – Closed End Question

As shown on page 12, in response to a closed ended question asking for whom Nexium will heal acid related damage better, respondents exposed to the Test Ad were more likely to say "all people with damage" (46%) than to say "only people with moderate/severe damage" (36%). By that measurement, 36% could be the upper bound estimate (i.e., at most, only 1/3 of consumers understood the limitation on the claim in the ad. However, among those who saw the Edited Ad, 29% said "only people with moderate/severe damage." Remember, the Edited Ad did not limit the claim to moderate/severe damage, so some or all of that 29% must be guessing. If we look

$D^2$ Research

**REDACTED -- Public Version, filed 1/20/06**

at the difference between the Test Ad data and the Edited Ad data on that measure we get a difference of 7%, which can properly be interpreted as:

> *Truly, the Edited Ad could not have communicated the limitation on the claim to anyone, since the ad did not include a limitation on the claim.*
>
> *The data show the Test Ad was successful in communicating the limitation on the claim to 7% more consumers than the Edited Ad did.*
>
> *Therefore, the true number of persons exposed to the Test Ad who understood the limitation on the claim must be 7%.*

Previously, we have seen another measure suggesting that 11% understood the limitation, and there is no reason to suspect that that is incorrect. Given the survey sample size (205), there is no statistically significant difference between the 7% and the 11%. Therefore, one must conclude that, at most, no more than about 11% of consumers understood the limitation on the claim in the Test Ad.

The above is a far more plausible interpretation of the data than Rappeport gave, which was that either:

- ♦ Notwithstanding the wording of the question, which was very specific, respondents were somehow "biased by a mind set created by the wording of the previous open-ended question(s)."
- ♦ Some of the people who thought the Edited Ad talked about moderate/severe damage were playing back preconceptions caused by prior exposure to Nexium ads.[4]

Not only are the above two "interpretations" gross speculation, but Rappeport does not explain how they might have led to the survey findings which exist. He seems satisfied to just throw them out there in hopes the reader will be so confused he will conclude there might be something wrong with the survey.

Finally, Rappeport concludes that "the open-ended questions demonstrate that a significant proportion of consumers will perceive the website as conveying as a primary message that Nexium is better than Prevacid at healing moderate to severe dam-

---

[4] It is not clear what ads he is referring to. The TV commercials mentioned moderate/severe damage only in a briefly appearing, barely readable "super."

D²|Research

**REDACTED -- Public Version, filed 1/20/06**

age." Apparently, 11% is his criterion for what "significant" is, since that's the number who perceived that Nexium is better at healing moderate to severe damage. I sincerely doubt that any advertiser would be happy if told that only 11% of the people who saw his ad knew what it was talking about. The relevant measure is the reciprocal of that 11% -- the 89% who did not understand the claim to be limited to moderate/severe damage.

The important finding to keep in mind – one that Rappeport did not challenge – is that more consumers thought Nexium's "better healing" message applied to all people (46%) than thought it applied only to people with moderate/severe damage (36%).

$D^2$ Research

**REDACTED -- Public Version, filed 1/20/06**

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on January 12, 2006, I caused copies of the

foregoing document to be served upon the following counsel of record as indicated below:

<u>BY HAND DELIVERY & E-MAIL</u>

Steven Balick, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

<u>BY FEDEX & E-MAIL</u>

Thomas C. Morrison, Esquire
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

John W. Shaw (No. 3362)
*jshaw@ycst.com*
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
(302) 571-6600