# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

May 25, 2006

The Honorable Kent A. Jordan  
United States District Court  
844 King Street  
Wilmington, DE 19801

VIA ELECTRONIC FILING

Re: *AstraZeneca LP v. TAP Pharmaceutical Products Inc.,*  
C.A. No. 04-1332-KAJ

Dear Judge Jordan:

    Pursuant to the Court's May 18, 2006 Order (D.I. 155), the parties to the above matter submit their proposed redactions to pages 3, 4 and 7 of the Court's May 18, 2006 Memorandum Opinion (D.I. 154). For the Court's convenience, we enclose a public version of D.I. 154 that reflects these redactions.

Respectfully,

*/s/ John G. Day*

John G. Day

JGD/nml  
Enclosure  
165585.1

c: Clerk of the Court (via electronic filing)  
    Josy W. Ingersoll, Esquire (by hand and electronic mail)  
    Harold P. Weinberger, Esquire (by electronic mail)  
    Thomas G. Morrison, Esquire (by electronic mail)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
2006 MAY 18  AM 7:57

| | | |
|---|---|---|
| ASTRAZENECA LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1332-KAJ |
| | ) | |
| TAP PHARMACEUTICAL PRODUCTS, INC., | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

Josy W. Ingersoll, Esq., John W. Shaw, Esq., Karen E. Keller, Esq., Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000 West St., Wilmington, Delaware 19801; Counsel for Plaintiff.
   Of Counsel: Harold P. Weinberger, Esq., Jonathan M. Wagner, Esq., Kerri Ann Law, Esq., Jeremy A. Cohen, Esq., Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036.

Steven J. Balick, Esq., John G. Day, Esq., Lauren E. Maguire, Esq., Ashby & Geddes, 222 Delaware Ave., 17th Floor, Wilmington, Delaware 19899; Counsel for Defendant.
   Of Counsel: Thomas G. Morrison, Esq., Karla G. Sanchez, Esq., Lauren Storto, Esq., Amanda K. Kay, Esq., Patterson, Belknap, Webb & Tyler LLP, 1133 Avenue of the Americas, New York, New York 10036.

Wilmington, Delaware
May 18, 2006


JORDAN, District Judge

## I. INTRODUCTION

Before me is a Motion to Exclude the Expert Testimony of Creighton Hoffman (Docket Item ["D.I."] 100; the "Motion") filed by AstraZeneca LP ("AstraZeneca"). AstraZeneca filed a Complaint (D.I. 1) requesting a declaratory judgment that its "Better Is Better" advertising campaign did not constitute false or misleading advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (D.I. 1 at ¶¶ 1, 15.) TAP Pharmaceutical Products, Inc. ("TAP") has counterclaimed for a judgment that the Better is Better campaign is both literally false and misleading to consumers. (D.I. 7 at ¶¶ 18-29). Jurisdiction is appropriate under 28 U.S.C. §§ 1138, 2201, and 2202. For the reasons that follow, the Motion will be granted.

## II. BACKGROUND

### A. The Market

AstraZeneca and TAP both produce pharmaceuticals that work as proton pump inhibitors ("PPIs") that treat Gastroesophageal Reflux Disease ("GERD"), commonly known as "acid reflux disease." (D.I. 101 at 3.) AstraZeneca's NEXIUM® (esomeprazole magnesium) and TAP's PREVACID® (lansoprazole) compete with each other and other PPIs, as well as other pharmaceuticals and antacids. (*Id.*)

### B. The "Better Is Better" Advertising Campaign

AstraZeneca began a new direct-to-consumer ("DTC") marketing campaign for Nexium in September 2004. (*See* D.I. 1 at ¶ 7; D.I. 7 at ¶ 12.) That campaign, known

as the "Better Is Better" campaign, ran until March 2005.[1] (D.I. 102, Ex. A at 2.) The campaign claimed, among other things, that "recent medical studies ... prove Nexium heals moderate to severe acid related damage in the esophagus better than the other leading prescription medicine [Prevacid]." (D.I. 1, Ex. B.) Those recent medical studies, known as the Castell and Fennerty studies, show that Nexium healed patients with moderate to severe acid related damage in the esophagus better than Prevacid. (D.I. 1, Ex. C.)

TAP, however, claims that the Better is Better advertising campaign is false. (D.I. 7 at ¶¶ 18-29.) TAP acknowledges that the Castell and Fennerty studies show that Nexium was better by a statistically significant margin at healing esophageal erosion ("EE") in patients with moderate to severe damage. (*Id.* at ¶¶ 22-23.) However, TAP argues that the campaign is false because the campaign claims that Nexium has been proven superior for the relief of symptoms such as heartburn and acid indigestion, which is not supported by the scientific evidence. (*Id.*) Next, TAP claims that the advertising campaign is literally false because Nexium is only marginally better at healing EE and that the marginal difference is clinically meaningless. (*Id.* at ¶ 24.) TAP finally claims that, because only a small minority of patients who suffer from EE have moderate to severe EE, AstraZeneca's claim that Nexium is better at healing EE is misleading to the majority of people who suffer from EE. (*Id.* at ¶ 25.)

---

[1] AstraZeneca claims that the Better is Better campaign actually ran until May 2005, and that Hoffman, TAP's damages expert, believed that the marketing campaign ended in March 2005. (D.I. 101 at 4.) When the campaign ended, however, is not relevant to my disposition of this motion.

2

## C. Hoffman's Opinion

To support its claims for damages based on the Better is Better advertising campaign, TAP submitted the report of Creighton Hoffman, an experienced expert on intellectual property valuation and damages. (D.I. 138, Ex. 1 at Ex. B at 2.) Hoffman has opined that, based on his calculations, TAP should recover the REDACTED in increased profits from Nexium sales that AstraZeneca received during the time that the Better is Better campaign ran. (D.I. 102, Ex. A at 5-7.) Hoffman also notes that, although he believes it would "understate both the benefit of the advertising to AstraZeneca and the damage to TAP[,]" another measure of damages would be the amount AstraZeneca spent on the Better is Better advertising campaign, REDACTED

Hoffman based his opinion on a simple mathematical calculation. He noted that during the seven months, as he understood it,[2] that the Better is Better campaign ran (the "Campaign Period"), Nexium sales were approximately REDACTED more than in the prior seven months (the "Base Period"),[3] or about REDACTED more per month. Prevacid sales, however, were approximately REDACTED during the Campaign Period than during the Base Period. (Id. at 5.) Hoffman also noted that "the deposition testimony of AstraZeneca employees ... reveal[s] no significant events or contract additions that would explain the increase in Nexium's sales during the campaign

---

[2] See supra note 1.

[3] The Campaign Period ran, according to Hoffman's report, from September 2004 until March 2005. (D.I. 138, Ex. 1 at Ex. D.) The Base Period ran from February 2004 until August 2004. (Id.)

3

period." (*Id.* at 5-6.) He asserted that some surveyed patients reported seeing the Better is Better advertisements and then asking for Nexium, and that many doctors would prescribe "Nexium for a patient who is a good candidate for a PPI who mentions Nexium to them." (*Id.* at 6.) Finally, Hoffman said that an AstraZeneca employee "characterized the 'Better' advertising campaign as possibly the 'most significant accomplishment' of 2004, 'with the greatest impact to our Business.'" (*Id.*) Based on the foregoing, Hoffman opined that the entire net gain in sales during the Campaign Period was attributable to the Better is Better campaign. (*Id.*)

Hoffman then went on to calculate TAP's damages. Stating that the average length of therapy for a patient on Nexium is approximately four months, Hoffman extended the damages period for three and a half months beyond the seven month Campaign Period, for a total of ten and a half months. (*Id.* at 6.) Then, he multiplied the increase in Nexium sales of **REDACTED** per month by ten and a half, and found that **REDACTED** in increased revenues were attributable to the campaign. (*Id.*) Hoffman then deducted from this figure the direct costs of the advertising campaign and certain other expenses, to arrive at his damages calculation of **REDACTED** (*Id.* at 7.)

### D.  Other Variables Ignored

In formulating his damages opinion, Hoffman appears not to have taken account of a number of factors that could have caused an increase in sales of Nexium during the ten and a half months Hoffman used for his damages calculation.

First and foremost, although Hoffman testified that Nexium sales had been increasing "pretty much from the time of its introduction" (Deposition of Creighton

4

Hoffman, D.I. 102, Ex. D at 143:5-7), Hoffman did nothing to account for this upward trend in Nexium sales and instead decided that all of the increased sales during the Campaign Period were due to the Better is Better advertising campaign. When asked at his deposition about the upward trend line in Nexium sales, Hoffman testified as follows:

> Q: We were talking about this trend line before. Did you do any analysis to determine whether the results in the seven-month period from September '04 through March '05 were consistent with the prior trend line?
>
> ...
>
> A: I think the trend line speaks for itself. Nexium sales continued to go up. The question is: Why did they continue to go up? Nexium had obviously done everything Nexium could and did do up until August of 2004 to get it as high as it was. After that, something caused it to go over higher.
>
> Q: A trend line – you can make a projection from a trend line for a future period by drawing a line that continues the prior trend; isn't that right?
>
> A: It's like multiple regression. In this case all it takes is a ruler and pencil. It doesn't necessarily have any meaning.
>
> Q: But you can do that.
>
> A: You can do that.
>
> Q: Did you do any analysis to determine whether or not the actual results for the seven-month period that you're analyzing were consistent with what you would get if you simply extended the trend line?
>
> A: I looked at prior sales, and looked at the plots, and, yes, Nexium sales have been going up, and they continued to go up.
>
> Q: If you drew the actual results over the trend line, would it be over, under, or on it?
>
> A: That would depend on where one measured the exact trend line. I mean, you're going to have to give me a beginning and ending point and then we can do that with a ruler and pencil.
>
> Q: I'm asking if you did it.
>
> A: No, I didn't do a ruler and pencil.

(D.I. 102, Ex. D at 145:7-147:2.) Hoffman failed to adjust his damages calculation to account for an acknowledged, pre-existing sales trend, even though he later testified, with respect to the period beginning in February 2004, that sales of Nexium "[w]ould

5

have been affected by everything Nexium did. Advertising, marketing, detailing, quantity of product, price. Everything that went on inside Nexium for the period leading up to February of '04 would have presumably had some influence on what the sales were in February of '04." (D.I. 102, Ex. D at 155:20-156:2.)

AstraZeneca also points to other factors that could have caused an increase in Nexium sales during the period between September 2004 and March 2005. Although this may not be an exhaustive list, these factors include the following:

1. There is evidence that, during the period for which Hoffman calculated damages, the overall market for PPIs grew. (Declaration of Christian Keller,[4] D.I. 102, Ex. C at ¶ 4.)

2. Additionally, AstraZeneca and Nexium "had a tremendous amount of managed care activity, many State Medicaid wins, some major HMO wins, such as United Healthcare, our formulary status changed." (Deposition of Christian Keller, D.I. 102, Ex. F at 38:6-9.) Between July 2004 and February 2005, AstraZeneca was awarded Medicaid contracts for Nexium in almost twenty states. (Declaration of Paul Villa,[5] D.I. 102, Ex. B at ¶ 4.) This took Nexium's market share for prescriptions in all state Medicaid plans from 15.79% to 19.52%. (*Id.* at ¶ 5.) During this time period, Nexium was also added to the preferred drug list of Caremark, a managed care

---

[4] Christian Keller is the Brand Director, Consumer Promotions for Nexium for AstraZeneca. (Declaration of Christian Keller, D.I. 102, Ex. C at ¶ 1.)

[5] From 2002 until October of 2004, Paul Villa was the Contracting Director for Managed Markets for the GI Therapeutic Area, which included Nexium. (Declaration of Paul Villa, D.I. 102, Ex. B at ¶ 1.)

6

company. (Deposition of Paul Villa, D.I. 102, Ex. E at 21: 2-8.) Nexium also had other managed care 'wins' during this time period. (*Id.* at 21:12-22:2.)

3. AstraZeneca undertook other marketing efforts which may have affected Nexium sales. For example, before and during the period when the Better is Better advertising campaign ran, over 2,000 professional sales representatives marketed Nexium to physicians. (Keller Decl., D.I. 102, Ex. C at ¶ 5.) Additionally, a field incentive plan was implemented at the end of 2004 to provide monetary incentives to sales representatives for increasing prescriptions of Nexium. (*Id.*) Furthermore, the Operations and Portfolio Management Team at AstraZeneca gave the Nexium team an additional **REDACTED** to market Nexium for use with certain pain relievers called NSAIDs. (*Id.* at ¶ 6.)

4. TAP stopped advertising Prevacid on television sometime in late 2004 or early 2005. (Deposition of Antoine Pompe,[6] D.I. 102, Ex. G at 35:22-36:3.) Additionally, during the period from August until October of 2004, a shortage of Prilosec OTC, another PPI, resulted in an increase in sales of Prevacid and likely affected the entire market for prescription PPIs, including Nexium. (*Id.* at 45:19-25.)

5. AstraZeneca also asserts that physicians could have read the Castell and Fennerty studies themselves and, based on their own reading of those studies, concluded that Nexium would be an appropriate therapy for their patients. (D.I. 101 at 11.)

---

[6] Pompe is the Director of Marketing for Prevacid at TAP.

6. Finally, the price of Nexium rose about 10 cents per pill during the Better is Better campaign. (D.I. 102, Ex. D at 138: 14-23.)

TAP claims that, based on his deposition testimony, Hoffman did take account of at least some of these variables but determined that they did not have an effect on his damages calculation. (D.I. 138 at 3-4.) Indeed, when asked about different variables that could have caused an increase in Nexium sales separate from the Better is Better advertising campaign, Hoffman consistently answered that he relied on the responses of AstraZeneca executives as to what the significant differences were between the Base Period and the Damages Period, that he "ran down" those variables, and that he determined they had no effect. (*See, e.g.*, D.I. 102, Ex. D at 98:4-19; *id.* at 118:15-21; *id.* at 163:3-15.) However, there is no indication in his report that Hoffman accounted for any of the variables noted here.

## III.   STANDARD OF REVIEW

Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or to exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

8

## IV. DISCUSSION

### A. Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 26

AstraZeneca has moved to exclude Hoffman's testimony under Federal Rule of Evidence 702. Rule 702 obligates judges to ensure that any scientific or technical testimony admitted is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise[.]" The party offering the expert testimony has the burden of proving admissibility. *See Daubert*, 509 U.S. at 592 n. 10 (citation omitted). The expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. *See Joiner v. Gen. Elec. Co.*, 522 U.S. 136, 144 (1997) (noting failure of plaintiffs to explain "how and why [they] ... could have extrapolated their opinions"); *Kumho Tire*, 526 U.S. at 152 (an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert*, 509 U.S. at 590 (expert's testimony "must be supported by appropriate validation").

Rule 702 further requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. *Daubert*, 509 U.S. at 591-92. The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts

known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).

Additionally, Federal Rule of Civil Procedure 26(a)(2)(B) states, in relevant part, that an expert "report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; [and] the data or other information considered by the witness in forming the opinions[.]"

### B. Damages Under the Lanham Act

In order to recover damages for false advertising under the Lanham Act, a plaintiff must show that the methodology used to calculate damages from false advertising is reliable, and that there is a causal link between the actionable conduct and the damages. *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984). "[A] plaintiff who establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled only to such damages as were caused by the violation. Although a court may engage in some degree of speculation in computing the *amount* of such damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing, causation must first be established." *Id.* (emphasis in original) (internal citations omitted).

In establishing causation, a witness does not have to take into account every possible factor, but must account for the most salient factors in his or her analysis. More specifically, "[a] statistical study is not inadmissible merely because it is unable to exclude all possible causal factors other than the one of interest. But a statistical study that fails to correct for salient explanatory variables, or even to make the most

10

elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court." *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537-38 (7th Cir. 1997) (discussing study of effect of racial discrimination on scholastic achievement that attributed all differences to racial discrimination or poverty, and did not account for any other factors); *see also Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F.Supp. 1227, 1233 (S.D.N.Y. 1990) (In false-advertising case involving ice-cream makers, "[t]he court did not admit [the expert's] testimony, however, because his assumption did not provide for the impact of other significant factors, such as the possible effects on sales of a declining trend in the popularity of freezer-type ice-cream makers, the appearance of several competitors, vigorous price competition and, most importantly, [the plaintiff]'s poor marketing strategy."). Therefore, although Hoffman was not necessarily required to account for every possible variable that AstraZeneca might put forward, he needed to have taken account of and corrected for enough variables to allow a rational cause-and-effect conclusion to be drawn. On that fundamental requirement, his report and proposed testimony fall short.

Other than the Better is Better campaign, Hoffman failed to account for any variable that may have explained the increase in sales of Nexium during the Campaign Period as compared to the Base Period. Most significantly, Hoffman did not account for the fact that Nexium sales had been increasing from the time the product launched all the way through the Campaign Period and the additional three and a half months for

which Hoffman calculated damages.[7] Hoffman testified that he did not do a "paper and pencil" analysis of the upward trend of Nexium sales because

> [i]t would be meaningless. I looked at it and saw Nexium sales were, in fact, continuing to go up, and that Nexium had done – investigated. Nexium had done a lot of things, as we would expect, to get that first 250 in sales every month. The question is what would make it go even higher.

(D.I. 102, Ex. D at 147: 2-8.) Based on that conclusion, Hoffman assumed that anything AstraZeneca had done before September 2004 to increase Nexium sales had been accounted for in the Base Period, and had no effect on the sales during the Campaign Period. That assumption and his "even higher" assertion point out the serious problem. There simply is no basis for the assumption that all of the factors which may have combined to increase Nexium sales prior to the Better is Better campaign suddenly ceased to operate when the campaign began. Common sense alone makes that seem unlikely. The "even higher" comment further highlights the flawed approach TAP is advocating. To say that sales went "even higher" presupposes that there is some baseline measurement of increasing sales to which the "even higher" sales can be compared. But Hoffman did no such baseline analysis. Nowhere in his

---

[7] TAP argues that Hoffman did discuss the trend line of Nexium sales in his deposition. However, under Rule 26, an expert is required to disclose in his report a "complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions[.]" Hoffman did not discuss the trend line of Nexium sales in his report, and thus did not disclose his reason for not taking it into account in coming to his damages opinion. Therefore, TAP did not comply with Rule 26 in presenting Hoffman's report, and, for that additional reason alone, it is subject to exclusion.

report or his testimony did Hoffman analyze what would have happened to Nexium sales in the absence of the Better is Better campaign.[8]

Moreover, his testimony that analysis of the upward trend of Nexium sales would be meaningless is inconsistent with his own testimony regarding the period beginning in February 2004. He said that sales of Nexium "[w]ould have been affected by everything Nexium did. Advertising, marketing, detailing, quantity of product, price. Everything that went on inside Nexium for the period leading up to February of '04 would have presumably had some influence on what the sales were in February of '04." (D.I. 102, Ex. D at 155:20-156:2.) Despite that testimony, Hoffman concluded, without explanation, that nothing other than the Better is Better campaign caused Nexium sales to increase during the Campaign Period.

Because Hoffman failed to account for any factor other than the Better is Better campaign in explaining increased Nexium sales, his opinion has "no value as causal explanation and is therefore inadmissible in federal court." *People Who Care*, 111 F.3d at 537-38. Thus, Hoffman will be precluded from testifying regarding his analysis of damages based on AstraZeneca's profits.[9]

---

[8] As already noted, Hoffman also failed to account for several additional factors cited by AstraZeneca that could have caused an increase in sales of Nexium during the ten and a half months Hoffman used for his damages calculation. (*See supra* at 6-7.)

[9] After oral argument on the instant motion, TAP submitted additional argument, asking to supplement Hoffman's report. (D.I. 151.) TAP asserts that Hoffman accounted for the four factors that AstraZeneca's 30(b)(6) witnesses enumerated in their deposition testimony, including the positive trend in Nexium sales (D.I. 151 Attachment at 2-4), and that Hoffman should be allowed to supplement his report to address other factors described by AstraZeneca in connection with this Motion (*id.* at 4-6). TAP acknowledges that it was aware of the trend line issue, and in fact asserts that Hoffman analyzed the trend line in his report. (*Id.* at 3-4.) I have found that his analysis

13

### C. Alternative Damages Theory

TAP asserts that, in his opinion, Hoffman presented an alternative theory on damages, based on the costs expended by AstraZeneca in promoting its Better is Better campaign. TAP claims that this measure of damages has been accepted as appropriate in Lanham Act cases. (D.I. 151 at 1, citing *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1037 (9th Cir. 1986) (Stating that the court "calculated damages with respect to each claim under two distinct methods. ... The second theory relied on the cost of the advertising campaign to Jartran, $6 million, and the cost of corrective advertising by the U-Haul System, $13.6 million.").) However, AstraZeneca asserts that this alternative damages theory has not been widely adopted. (D.I. 152 at 1-2, citing *Gillette Co. v. Wilkinson Sword, Inc.*, No. 89 CV 3586 (KMW), 1992 WL 30938, at *4 (S.D.N.Y. Feb. 3, 1992) ("*U-Haul 's* cost of advertising measure has not been widely adopted").

I need not decide whether a cost-of-advertising model of damages could ever be appropriate. It is sufficient to say that it is not appropriate in this case. In precedent cited by both sides, some proof was required to show that the cost of advertising was a sensible surrogate for either the plaintiff's damages or the defendant's profits. *See U-Haul*, 793 F.2d 1034 at 1037 (awarding $20 million in actual damages after calculating that the plaintiff's revenue shortfall was approximately $20 million, and the cost of the defendant's advertising campaign and the cost of the plaintiff's corrective advertising

---

in this regard is inadequate, and that his failure to meaningfully address the trend in Nexium sales provides a basis for excluding his testimony. TAP's request for leave to amend Hoffman's report comes unfairly late and without reasonable excuse and will therefore be denied.

together also amounted to about $20 million); *Gillette*, 1992 WL 30938, at *5 ("The cost-of-advertising measure for damages is permissible only if it is a surrogate for plaintiff's damages or defendant's profit"). TAP has failed to show that the costs expended by AstraZeneca on the Better is Better campaign are an appropriate measure of damages in this case. In fact, Hoffman asserts in his report that awarding damages in the amount of AstraZeneca's cost for the Better is Better campaign "would understate both the benefit of the advertising to AstraZeneca and the damage to TAP." (D.I. 102, Ex. A at 7.) Because TAP has presented no evidence that a cost of advertising measure of damages would be an appropriate surrogate for TAP's actual damages, TAP will not be permitted to present this damages theory at trial.

## V. CONCLUSION

Accordingly, the Motion to Exclude the Expert Testimony of Creighton Hoffman (D.I. 100) will be granted, and, as noted (note 9, supra), TAP's request to supplement Hoffman's report (D.I. 151) will be denied. An appropriate order will follow.